## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MEGAN MCGUIRE, | ) | |
| | ) | Case No. 8:16-cv-00004 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Senior Judge Joseph Bataillon |
| | ) | |
| CORY COOPER, TIMOTHY DUNNING, | ) | Magistrate Judge Susan M. Bazis |
| Individually and in his official capacity as | ) | |
| Sheriff of Douglas County, Nebraska, and | ) | |
| DOUGLAS COUNTY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE TO MOVANTS'
### STATEMENTS OF UNDISPUTED FACTS

Plaintiff, Megan McGuire, through her attorneys, Loevy & Loevy, under

Federal Rule of Civil Procedure 56 and Local Rule 56.1 (b)(1) tenders this

response to the statements of undisputed facts offered by Defendant Dunning

and Defendant Douglas County in their memoranda in support of motions for

summary judgment (Dckts. 123, 124):

### Defendant Douglas County's Statement of Undisputed Facts (Dckt. 123)

1. Plaintiff objects to the entirety of Defendant Douglas County's Statement of

   Undisputed Facts No. 1 because it is a legal conclusion, which is not allowed

   under Local Rule 56.1(a)(2). Without waiving that objection, Plaintiff disputes

   this statement of fact because her Complaint expressly includes a claim under

   Nebraska law. See Dckt. 1 at County IV. This statement of "fact," ignores the

   entirety of the complaint and confuses the jurisdictional statement as a

   limitation. In fact, the jurisdictional statement explains only why this Court has

jurisdiction over this case, and in no way places a limit on Plaintiff's claims.

2. Plaintiff objects to the entirety of Defendant Douglas County's Statement of Undisputed Facts No. 2 because it is really a legal conclusion that is not allowed under Local Rule 56.1(a)(2). Without waiving that objection, Plaintiff does not dispute the absence of diversity jurisdiction here.

3. Plaintiff objects to the entirety of Defendant Douglas County's Statement of Undisputed Facts No. 3 (except for the statement that Plaintiff has not filed a notice of claim) because the allegations are really legal conclusions that are not allowed under Local Rule 56.1(a)(2). Without waiving that objection, Plaintiff admits that she has not submitted a written notice of claim regarding her claim for indemnification to Douglas County, but affirmatively states that her claim for indemnification has not yet accrued as she has not yet obtained a judgment for which to seek indemnification.

**Defendant Dunning's Statement of Undisputed Facts (Dckt. 124)**

1. Plaintiff disputes the entirety of the facts identified in Defendant Dunning's Statement of Undisputed Facts No. 1 because they are based on inadmissible hearsay as identified in the cited references. Plaintiff further objects to the relevance of the proposed facts.

2. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 2:

**[T]he DCSO's Code of Conduct and other policies in effect on February 10, 2013 expressly prohibited prolonging a detention beyond the amount of time otherwise justified by the purpose of the initial detention without development of additional reasonable suspicion and**

**misusing a Deputy's authority for personal gain.**

The cited references do not support that contention.  In fact, the evidence

supports that there was no express prohibition. *Ex. 10, Dunning Dep. at*

*108:108:5-110:12, 117:3-5.*

**DCSO requires its employees to conduct themselves toward the public
in a civil, courteous, and professional manner, which Dunning believed
rule out unlawfully searching or seizing, discriminating against,
sexually assaulting, harassing, or otherwise abusing a member of the
public.**

That broad conclusion as fact is not supported by the cited reference. Plaintiff

does not dispute that the DCSO's Code of Conduct does contain words to that

effect. Although the policy itself may say so, as cited, this broader conclusion is

not supported by the references, and Plaintiff presents evidence, both direct and

through reasonable inference, in opposition to summary judgment to dispute this

contention. For instance, Defendants' own retained expert admits that the

implementation of what looks good on paper is the key: "wonderful policy, but

they have a custom and practice that's inconsistent with the policy, so the policy

may not mean anything." *Ex. 45, Ryan Dep. at 155:11-13*. In short, it is a larger

look at the customs and practices within the department that are the relevant

inquiry. A reasonable jury can conclude that DCSO's paper polices were not

sufficiently implemented by Defendants. *See Plaintiff's Argument at II.A.4,*

*II.B.1.* Plaintiff further disputes the self-serving statement of subjective belief

about what Dunning believed the DCSO's written policies and affirmatively

provided. His statements of subjective belief are not undisputed fact and

Plaintiff intends to present evidence that a reasonable jury could use to conclude that his stated subjective belief is not true or not reasonable. For instance, as noted above the test here is not the paper policy, but how Defendant Dunning created custom and practice. *Ex. 45, Ryan Dep. at 155:11-13*. Plaintiff presents evidence, both direct and through inference, in opposition to summary judgment that the policies, customs, and practices do not "rule out" the conduct in this paragraph. *See Plaintiff's Argument at II.A.4.*

3. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 3:

> **Before and on February 10, 2013, for any Recruit Deputy to be eligible to work for DCSO, she or he was required to complete the training course for law enforcement at the Nebraska Law Enforcement Training Center ("NLETC").**

That statement is overly broad in time based on the cited references. Plaintiff does not dispute, however, that for the relevant time period in relation to this case that the training was conducted as stated.

4. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 4:

> **The objectives of requiring this training for Recruit Deputies are to reinforce the ethical foundations of DCSO Deputies and prepare them for their duties as law enforcement officers.**

The cited reference includes no foundation for that contention as fact.

> **The primary purpose of that incident's inclusion in the training was to provide Recruit Deputies with a real-world example of sexual misconduct within DCSO and how DCSO did not tolerate that behavior.**

The cited references do not support that contention as fact. The cited slide

4

speaks for itself and states only that the deputy resigned, but states nothing about any discipline or treating the issue seriously. Plaintiff presents evidence, both direct and through inference, in opposition to summary judgment to dispute this contention. For instance, Plaintiff's retained expert holds the opinion that the power point slide was inadequate to convey what Defendants' claim. *Ex. 13, Tremblay Dep. at 159:9-160:22.*

**This hypothetical ethics scenario and surrounding discussion communicated to Recruit Deputies that using their position as DCSO Deputies to get dates or profile females for any other kind of reason is wrong.**

The cited references lack foundation to be taken as fact as to what was communicated to deputies. Plaintiff presents evidence, both direct and through inference, in opposition to summary judgment to dispute this contention. For instance, Deputy Cooper testified that he was trained to ask women what they would do for him to avoid arrest *(Ex. 1, Cooper Dep. at 282:17-283:18),* which directly undermines Defendants' contention here. Moreover, deputies were trained to ask personal questions of people in the public, also undermining this. *Exh. 10, Dunning Dep. at 102:16-103:1; Dckt. 125-3 at ¶86a. See also, Plaintiff's Argument II.B.2.a.* Defendants may offer evidence about its training and present this argument to the jury, but this is not an undisputed "fact."

**This message extends to behaviors well beyond asking for dates because if that is wrong, any escalation of that behavior is also wrong.**

The argument presented here lacks foundation to be taken as fact. Plaintiff presents evidence, both direct and through inference, in opposition to summary

judgment to dispute this contention. See Plaintiff's response above regarding the other offered facts in this paragraph, which is incorporated here. Defendants are free to argue this contention and ask a jury to make inferences in support of their proposed conclusion, but this is not an undisputed fact.

5. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 5:

**The Field Training Program is an intensive on-the-job training.**

The cited references lack foundation upon which to describe the training as "intensive." Moreover, Plaintiff presents evidence, both direct and through inference, in opposition to summary judgment to dispute this contention. For instance, Deputy Cooper testified that he was trained to operate in ways contrary to official DCSO policy. *Ex. 1, Cooper Dep. at 88:25-91:3, 335:10-336:2; Ex. 58, Deputy Cooper Response to Plaintiff Int. at ¶10.* He also testified that he observed his field training officer nap during training, this is hardly intensive. *Ex. 1, Cooper Dep. at 77:8-16; Ex. 14, Tremblay Report at 10.* Finally, Cooper testified that when he was supposed to be trained in radar operation, his field training officer balled up the paper and threw it on the ground. *Ex. 1, Cooper Dep. at 78:9-22.* All of these undermine the argument that the training was "intensive" and create a dispute of that proffered fact.

**If a Recruit Deputy used inappropriate language when interacting with a citizen or behaved in an inappropriate way during an interaction with a member of the public, it would be documented on the Daily Observation Report and the Recruit Deputy would be corrected right away by the Field Training Officer and again once the Daily Observation Report was reviewed.**

The cited references lack foundation upon which to base this broad argument.

Individual officers can testify about their experience, but to infer whether that

was department-wide practice is for a jury to conclude.

**Behaviors such as sexual harassment or innuendo, rude or foul language, or any sort of inappropriate physical contact would be documented on the Daily Observation Report and would elicit immediate action involving not only the Field Training Officer but also DCSO's chain of command because these behaviors are clear violations of DCSO's Code of Conduct and are egregious in nature.**

The cited references lack foundation upon which to base this broad argument.

Individual officers can testify about their experience, but to infer whether that

was department-wide practice is for a jury to conclude.

**Anything like sexual harassment or innuendo, rude or foul language, or any sort of inappropriate physical contact would be considered a "behavior" problem opposed to a "knowledge" problem, and would trigger discussion about whether the Recruit Deputy should continue to be considered for retention with DCSO.**

The cited references lack foundation upon which to base this broad argument.

Individual officers can testify about their experience, but to infer whether that

was department-wide practice is for a jury to conclude.

8. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement

of Undisputed Facts No. 8:

**Other DCSO Deputies who received the same training as Cooper and who were subject to the same supervision he was did not conclude it was acceptable to knowingly conduct an unlawful search or seizure, discriminate against anyone, or sexually assault a member of the public.**

The cited references lack foundation upon which to base that broad argument.

7

Individual officers can testify about their experience, but there is no foundation

that the experience extended to every officer.

Plaintiff further disputes the relevance of these arguments.

9. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement

of Undisputed Facts No. 9:

**On February 10, 2013, there was no question at all in Cooper's mind that DCSO did not permit him or any other Deputy to coerce sex or any sort of sexual contact from a citizen who had been stopped or detained. Cooper knew very clearly that doing so was unacceptable. He also knew it was unacceptable to exchange criminal charges for having a member of the public perform any sort of sexual act upon him, including oral sex. If [Cooper] had a question on this, Cooper believed DCSO could answer it.**

Although Deputy Cooper did testify to these subjective beliefs, as Defendants

admit, he also did engage in those very acts so a jury could find that he believed

that the DCSO would not stop him from engaging in that misconduct. In

addition, Defendants expressly trained Cooper to ask the coaxing questions of

Ms. McGuire about what she could do to get Mr. Worland out of trouble so a jury

could reasonably conclude that he believed that the DCSO permitted him to ask

those questions, which led directly to his sexual misconduct of Ms. McGuire. *Ex.*

*1, Cooper Dep. at 282:17-283:18*. Moreover, Deputy Cooper also testified in denial

of that misconduct. *Ex. 1, Cooper Dep. at 267:21-268:1*. Defendants admit that

Deputy Cooper is dishonest in denying the misconduct. *See Dckt. 124, Dunning*

*Memo at 19, 38, 57*. Defendants further admit that they caught Cooper lying

about his interactions with Ms. McGuire. *Id*. On the full record, Cooper's state of

mind cannot be an undisputed fact for purposes of summary judgment because a

8

jury can reasonably conclude that his statements of subjective belief are not

believable (just as Defendants do not believe his subjective statements in other

related contexts).

10. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 10:

**On February 10, 2013, Cooper understood that, if DCSO discovered that he used the threat of arrest to sexually assault a citizen, he would be fired. He did not even need to ask anyone about that. In addition to being grounds for his termination, he knew it was against the law to use the threat of arrest to sexually assault a citizen and that using the threat of arrest or any other means of coercing someone into nonconsensual sexual conduct could result in his going to jail.**

For the same reason that Plaintiff disputes Defendant Dunning's contentions in

paragraph 9 above, she disputes these conclusions.

11. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 11:

**On February 10, 2013, Cooper also knew that sexual misconduct less egregious than sexual assault was not permitted, and that he could not sexually harass members of the public. Cooper understood what types of actions could constitute sexual harassment, including sexual advances, unwelcome sexual comments requests for sexual favors, any other verbal conduct of a sexual nature, and actual sexual conduct. At any point on and before February 10, 2013, Cooper felt that if he was unclear on whether conduct might constitute sexual harassment, DCSO could clarify.**

For the same reason that Plaintiff disputes Defendant Dunning's contentions in

paragraph 9 above, she disputes these conclusions.

12. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 12:

**On or before February 10, 2013, Cooper knew that having someone take off her shirt in exchange for not arresting her or not citing her boyfriend would, at a minimum, be sexual harassment. That was obvious to him.  Cooper also knew that he could not have a citizen take off her shirt in exchange for avoiding criminal charges against herself or someone else. He agreed that was obvious. He did not know anyone who had ever done that.**

For the same reason that Plaintiff disputes Defendant Dunning's contentions in

paragraph 9 above, she disputes these conclusions.

13. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 13:

**On February 10, 2013, Cooper did not believe DCSO had an established practice of releasing persons who were in possession of marijuana or paraphernalia in exchange for sexual contact or sexual conduct."; He did not believe there was an established practice of doing so in exchange for any sort of benefit personal to the Deputy, either. To Cooper's knowledge, no Deputy had ever conditioned her or his release of persons who were in possession of marijuana or paraphernalia upon an exchange of sex or sexual conduct or any other benefit personal to the Deputy.**

For the same reason that Plaintiff disputes Defendant Dunning's contentions in

paragraph 9 above, she disputes these conclusions.

14. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 14:

**Before and on February 10, 2013, citizens could complain to DCSO about any type of misconduct by its members.**

The cited support for this contention do not support this conclusion and/or

because they lack foundation for this broad statement.

**Before and on February 10, 2013, all citizen complaints were investigated. DCSO thoroughly investigated other instances in which citizens complained about any sort of sexual misconduct.**

There is evidence that this is not true. For instance, evidence supports that the complaint that Deputy F.W. licked his teenage stepdaughter's bare breast (no I.A. No.) was not subject to DCSO investigation (*Ex. 29, F.W. Personnel file at DCSO 6703-6755*); the complaint that a DCSO officer placed his hands on a woman's hips and involuntarily kissed her (I.A. No. 1965) was not investigated (*Ex. 13, Tremblay Dep. at 96:8-17; Martin Dep. at 317:5-319:23; Ex. 35, Ex. 42 to Martin Dep. at 3543*); the complaint that a deputy discussed how revealing a female prisoner's clothes were and asked the woman prisoner if she was going to be "getting a bitch" in prison (*Ex. 37, DCSO interview at 2:43-3:30, 6:20-7:20, 13:00-13:40, 14:55-16:00, 28:55-29:40, 29:40-29:55;; Ex. 36, Ex. 41 to Martin Dep. at 3555-58, 3562* (I.A. No. 1984)) was not investigated; and the complaint that a deputy said that he would like to [have sex with] a student's mother (*Ex. 27, Ryan Report at ¶96; Ex. 45, Ryan Dep. at 244:22-248:14; Ex. 63, IA 2840 at DCSO 3730-3732 (*I.A. No. 2840)) was not investigated. In fact, even in this case, the DCSO did not undertake an investigation in February or March 2013 even after learning that Cooper was in the vicinity of a known police sexual assault of a citizen. *See Plaintiff's facts in her memorandum in opposition to summary judgment ("Facts") at I.D.*

**When the complaints were substantiated, DCSO disciplined the employee involved.**

The sources offered in support of this contention lack foundation for this broad argument, including what the term substantiated means, who made that

determination, and whether the substantiation was based on a proper

investigation. Moreover, as stated above in this paragraph, Defendants did not

always investigate complaints in a way that was geared toward fact-finding and

truth. Plaintiff incorporates that evidence here.

**DCSO thoroughly investigated other instances in which citizens
complained about any sort of sexual misconduct.**

There is evidence that this is not true. As stated above in this paragraph,

Defendants did not always investigate complaints in a way that was geared

toward fact-finding and truth regarding issues of sexual misconduct. Plaintiff

incorporates that evidence here.

**Before and on February 10, 2013, Cooper had not been the subject of
any complaint accusing him of any kind of sexual misconduct**.

The sources offered for this broad global contention lack foundation. Although

individuals within the DCSO may testify that they did not receive complaints

about Deputy Cooper, there is simply no foundation for any global testimony

that nobody accused Deputy Cooper of sexual misconduct.

18. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 14:

**When Cooper shined his flashlight in, he did, in fact, see a mason jar
with marijuana in it sitting on the center console. Cooper recognized
the marijuana upon shining his flashlight into the car.**

There is evidence to dispute this proffered fact. First, Cooper testified that the

jar he saw contained a "small user amount" of marijuana and candies. *Ex. 1,*

*Cooper Dep. at 250:1-14*. A reasonable jury could infer that he was not able to

identify it as marijuana from where he stood outside the truck. This is especially true since Cooper only asked Mr. Worland if he had anything illegal in the truck (implying he did not know there was marijuana there) after he had removed Ms. McGuire from the truck and locked her into his police car. *Ex. 9, Worland Dep. at 34:9-21*. And then it was only after Mr. Worland admitted to possessing marijuana that Deputy Cooper took possession of the jar and searched the truck. *Ex. 7, McGuire Dep. at 87:12-21; Ex. 8, McGuire 11/20/13 Dep. at 80:10-81:25; Ex. 9, Worland Dep. at 37:4-9*. A reasonable jury could conclude that if Cooper had known the jar contained marijuana before then, he would have retrieved it rather than leave it alone with Mr. Worland, who could have tried to destroy the evidence. Moreover, as noted above, Defendants admit that Deputy Cooper lied about not engaging in sexual misconduct and falsified reports in this case. See *Dckt. 124, Dunning Memo at 19, 38, 57*. A reasonable jury could believe Mr. Worland's version over Deputy Cooper's that Cooper identified the marijuana only after Mr. Worland identified it as such.

**Cooper made his decision to search the truck as soon as he saw the marijuana. He believed he had a reasonable suspicion of criminal activity justifying a search of Mr. Worland's vehicle.**

For the same reasons identified above in this paragraph, Plaintiff disputes these proffered facts.

20. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 20:

**Cooper put the marijuana on top of his cruiser and got into the car.**

13

This statement implies that Deputy Cooper put the marijuana on the police car when he initially seized Ms. McGuire in the back of his police car. But Mr. Worland's testimony fixes the point in time when Deputy Cooper become aware of the marijuana and took it as occurring after Ms. McGuire was already locked in the car. *Ex. 9, Worland Dep. at 34:9-21*. As noted above, Defendants admit that Deputy Cooper lied about not engaging in sexual misconduct and falsified reports in this case. *See Dckt. 124, Dunning Memo at 19, 38, 57*. A reasonable jury could believe Mr. Worland's version over Deputy Cooper that Cooper identified the marijuana only after Mr. Worland identified it as such.

21. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 21:

**As she sat in the cruiser, Ms. McGuire realized the marijuana had been blown off the roof of the car. Cooper went back to the truck and removed Mr. Worland.**

This statement implies that the marijuana blew off the roof of the police car when Ms. McGuire was initially placed into the police car. As stated above, Mr. Worland places the timing of the identification and seizure of marijuana after Mr. McGuire was locked in the back of the police car. *Ex. 9, Worland Dep. at 34:9-21*. As noted above, Defendants admit that Deputy Cooper lied about not engaging in sexual misconduct and falsifying reports in this case. *See Dckt. 124, Dunning Memo at 19, 38, 57*. A reasonable jury could believe Mr. Worland's version over Deputy Cooper that Cooper identified the marijuana only after Mr. Worland identified it as such.

22. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 22:

**However, the only other time he indicated a supervisor was aware before February 10, 2013 that he had not called dispatch when searching a vehicle was one day earlier on February 9, 2013.**

There is no foundation from the cited reference to offer this contention as fact

regarding what any supervisor knew. Plaintiff does not dispute that Cooper can

testify that no supervisor ever stated awareness to him of that fact before

February 10, 2013. But that does not allow Defendants to use that to argue no

such prior awareness.

23. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 23:

**From the commencement of this lawsuit, Ms. McGuire has framed this questioning as an integral component of Cooper's sexual assault upon her.**

Plaintiff is unsure what this means to be able to respond. She does state,

however, that her positions regarding these issues are stated in her opposition to

Defendants' motions for summary judgment.

33. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 33:

**When Dunning and Bilek decided to wait for further information from OPD, neither had directed an administrative investigation to review any DCSO Deputy's (including Cooper's) cruiser recordings, Daily Activity Reports, vehicle locator information, or information about persons whose names had been checked. Had DCSO commenced an administrative investigation, it would have had to notify any Deputies subject to that investigation.**

To the contrary, DCSO was not prohibited from conducting its own internal investigation: OPD never asked DCSO not to interview its deputies, specifically Cooper, about Plaintiff's allegations nor did OPD ask DCSO not to do a name search; OPD wanted any information able to identify the offender. *Ex. 56, Worley Dep. at 49:19-50:2, 20:11-19, 77:25-78:4.* In April, when Defendants decided to look into this matter, they did not wait for OPD to give them the green light before starting their investigation. *Dckt. 125-15, Martin Declaration at ¶16.*

29. Martin started the internal investigation while the OPD investigation was still open. *Ex. 45, Ryan Dep. at 223:12-25.* Martin gathered all the data proving Cooper's sexual misconduct – GPS, in-car video, dispatch records, daily reports – without Cooper's knowledge and without alerting Cooper of OPD investigation. *Ex. 3, Martin Dep. at 274:7-275:2; Ex. 57, Martin 30(b)(6) Dep. at 32:9-33:7; Ex. 60, Ex. 20 to Martin Dep.*

More importantly, when it came down to it, DCSO simply was not concerned about interfering with the OPD investigation: Martin interviewed Cooper first, alerting him that law enforcement was aware of his misconduct against the Plaintiff, before OPD had a chance to advise Cooper that he was under investigation and to talk to him. Dckt. 125-15, Martin Declaration at ¶¶16(i), 21. In fact, there is documentary proof to demonstrate that Dunning could have obtained the evidence tying Deputy Cooper to the scene of the crime at any time he wanted without notifying Deputy Cooper (or otherwise jeopardizing the OPD investigation). On April 9, 2013, Martin pulled the dispatch information tying

Deputy Cooper to the dispatch search of Ms. McGuire and Mr. Worland. *Ex. 44, Ex. 5 to Martin Dep. at 4549-50, 4547-48.* He did not notify Deputy Cooper of any investigation until four days later, on April 13, when he gave notice that he was investigating Cooper. *Ex. 60.* Even on April 19, 2013, Martin did not know if OPD had told Cooper yet of the investigation (meaning that Martin was the first one to tell Cooper). Ex. 44, Ex. 5 to Martin Dep. at 4453. Even that notice would not tip off Deputy Cooper to the OPD investigation because it only alleged a violation of rules regarding radio transmissions. *Id.*

**As a result, when they opted to await further word from OPD, Bilek and Dunning did not know of any information leading them to believe that Cooper or any other DCSO Deputy was, in fact, involved.**

Plaintiff intends to present evidence to the contrary. On February 22, 2013, Martin emailed OPD that the DCSO had a deputy, Cooper, who was near Zorinsky Park at the time Ms. McGuire says she was victimized. *Ex. 3, Martin Dep. at 186:4-187:3; Ex. 44, Ex. 5 to Martin Dep. at 4404.* Martin, Dunning, and Bilek discussed the OPD investigation, and Martin advised that Cooper was in the area of the incident that OPD was investigating. *Exh. 3, Martin Dep. at 205:9-206:19, 212:17- 213:1, 220:25-222:7, 232:2-8; Exh. 44, Exh. 5 to Martin Dep. at 4402.* A reasonable jury could conclude that Bilek and Dunnign were on notice that Cooper was, in fact, involved at that time.

34. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 34:

**When Bilek and Dunning decided to await further word from OPD, both believed the report was going to be adequately and thoroughly**

**investigated by OPD. Bilek and Dunning believed that OPD would conduct a thorough investigation into the reported sexual assault, and that it would not take OPD a long time to determine whether or not a sexual assault actually occurred and whether or not a DCSO Deputy was involved. Although Bilek and Dunning were both skeptical that a DCSO Deputy would have done something so blatantly, seriously criminal in nature as committing sexual assault, neither discounted the possibility because of their prior experience with former Crime Lab Manager David Kofoed, a once trusted employee who had fabricated evidence during a criminal investigation – something Bilek and Dunning previously would not have believed he would do. However, in Kofoed's case, he (Kofoed) was identified from the outset and the only question was whether he had done what he was accused of.**

These self-serving and subjective proffered statements of "fact" are merely arguments that Defendants can present to a jury, but a reasonable jury does not have to believe them. As stated above in response to paragraph 33, Defendant Dunning intentionally decided not to seek the readily available information that at any time they were looked at would have tied Cooper specifically to the scene of the crime, A reasonable jury could conclude that Dunning simply wanted to protect his own and the DCSO's reputation and hoped the whole issue would go away either by finding that it was not one of his deputies or by the victim not being believed or not pursuing the claim.  Martin, Dunning, and Bilek discussed the OPD investigation, and Martin advised that Cooper was in the area of the incident that OPD was investigating. *Exh. 3, Martin Dep. at 205:9-206:19, 212:17- 213:1, 220:25-222:7, 232:2-8; Exh. 44, Exh. 5 to Martin Dep. at 4402.* Dunning decided that DCSO would do nothing to investigate and DCSO would just sit tight and monitor OPD's progress.  *Dckt. 124-4 , Bilek Decl. at ¶14*; *Ex. 10, Dunning Dep. at 201:15-21.*  Dunning's contemporaneous order not to take

any action to gather information, which would have directly tied Cooper to the scene of the crime demonstrates that he had no interest in seeing his deputy identified in order to avoid discrediting his department. *See Plaintiff's Argument at II.B.1.b.iii; Facts II.D.*

**OPD had not identified any suspect.**

The cited support for this contention lacks foundation. Moreover, Martin told OPD that it had a deputy who was near the park, but did not provide any additional information. *Ex. 3, Martin Dep. at 186:4-187:3; Ex. 44, Ex. 5 to Martin Dep. at 4404.*

36. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 36:

**Sgt. Worley did not feel as though OPD had to wait for DCSO to offer information relating to OPD's criminal investigation.**

In fact, Worley testified that the dispatch data from the DCSO was the big lead to identify Cooper as the culprit. *Ex. 56, Worley Dep. at 56:3-7, 66:5-10, 87:22-25, 101:9-20, 102:2-7; Ex. 41, Love 9/13/13 Dep. at 24:25-24:4, 26:17-21.* Moreover, there is no relevance to this proffered statement of fact. Worley would have no reason to know that Defendant Dunning and the DCSO were sitting on a gold mine of evidence to break open Worley's investigation so he would not know what he was waiting for.

37. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 37:

**OPD's criminal investigation was impacted by Ms. McGuire.**

The cited support for that argument does not state that. In fact, Plaintiff intends
to present evidence to the jury that in March 2013 Defendant Dunning and the
DCSO sat on objective information that was ultimately the big lead in the case
will be for a jury to decide. *Plaintiff's Facts at 1.D. See also Ex. 56, Worley Dep.
at 56:3-7, 66:5-10, 87:22-25, 101:9-20, 102:2-7; Ex. 41, Love 9/13/13 Dep. at
24:25-24:4, 26:17-21.* If Defendants wish to take the position in front of the jury
blaming the victim for any investigation delay they are certainly entitled to do
so, but it is not an undisputed fact.

38. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 38:

**Although DCSO did not provide instruction regarding behaviors that
may indicate a law enforcement officer's risk of sexual misconduct,
when two other DCSO personnel assigned to Road Patrol heard the
woman's complaint about her interaction with Cooper, both recognized
a problem and reported it. Deputy Birkhofer, who executed the warrant
later that day and transported the woman to jail, reported what she had
heard of Cooper's actions because it sounded to her as though his
actions were very wrong for any DCSO Deputy as they violated both
agency policy and state law. She knew to report what she had heard to
her supervisor, Lt. Robert Jones.  Far from being punished for failing to
cover up what Cooper did, Birkhofer received a commendation for
reporting what she had heard about Cooper's actions with the woman
on April 1, 2013, ultimately triggering DCSO's administrative
investigation into Cooper.**

The record does not support this argument as being fact. In fact, the evidence
supports that it was neither Jones nor Birkhofer who initiated any complaint or
investigation of Cooper, it was E.P. herself. E.P. first contacted 911 at 7:12 p.m.
to report the suspicious circumstances of Cooper's attempt to lure her to the
park. *Exh 53, 911 Report; Ex. 51, E.P. Dep. at 22:1-9.* The 911 report states:

"Depty arrived at apt approx. 1520. Told caller she has a warrant. Stated to not

tell anybody he was there today & to meet him in park apprx 2100." *Id*.   In

contrast, Birkhofer did not meet up with E.P. until between 8:00-8:15. *Exhibit*

*48, Birkhofer Dep. at 5:25-6:3*. Moreover, Robert Jones, Cooper's Supervisor,

admits in his contemporaneous report on the subject that the basis for the

suspicion was not Birkhofer, but E.P.'s report to the dispatcher. *Dckt. 125-55 at*

*73, Jones Decl.; Ex. 1, Cooper Dep. at 177:3-11*.  The contention, therefore, that it

was the Birkhofer report, and not E.P.'s earlier telephone call to 911 that was

responsible for "ultimately triggering DCSO's administrative investigation into

Cooper" is simply not true (or at minimum, contested). *Exh 53, 911 Report; Ex.*

*51, E.P. Dep. at 22:1-9; Exhibit 48, Birkhofer Dep. at 5:25-6:3; Dckt. 125-55 at 73,*

*Jones Decl*.

39. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 39:

**Bilek recommended this because he thought Cooper's actions on April 1, 2013, were far enough out of the ordinary and suspicious enough to cause him (Bilek) to suspect it was possible Cooper may, after all, have been involved in the matter OPD had called about on February 21 or 22, 2013, even though OPD had still not identified Cooper or any other DCSO employee as a suspect. Bilek felt that if Cooper was the suspect OPD was looking at, then he should not be interacting with the public while DCSO investigated his actions of April 1, 2013. Dunning agreed.**

These self-serving statements of subjective "fact" do not have to be accepted by a

jury. In fact, a reasonable jury could conclude that it was not Dunning or Bilek's

altruism that led to these actions, but the realization that allegations about

Cooper had seeped from the DCSO command structure, by way of E.P.'s report to

the 911 center, so they could no longer contain the risk that Cooper would discredit the department. *Exh 53, 911 Report; Ex. 51, E.P. Dep. at 22:1-9; Exhibit 48, Birkhofer Dep. at 5:25-6:3; Dckt. 125-55 at 73, Jones Decl.* A reasonable jury could conclude that Bilek and Dunning were not as altruistic as they claim in this contention based on the fact that if Bilek and Dunning were so concerned, as soon as they heard that Cooper was in the vicinity of Zorinsky Park when Ms. McGuire was assaulted, they would have retrieved the internal data that was available at their fingertips that could have proved conclusively that Cooper was at Zorinsky Park and that Deputy Cooper ran Mr. McGuire and Mr. Worland's names through dispatch. *See Plaintiff's Facts at I.B.* He did not. They, instead, chose to do nothing. *Dckt. 124-4 , Bilek Decl. at ¶14; Ex. 10, Dunning Dep. at 201:15-21.* Defendants are not entitled to the inference sought here as an undisputed fact.

40. Plaintiff objects to the self-serving subjective characterization that Matt Martin conducted a "thorough" investigation. Plaintiff contends that the investigation was insufficient. *See Plaintiff's Facts at I.D. and Plaintiff's Argument at II.B.1.b.iii.*

41. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 41:

**Sgt. Worley found Lt. Martin to be helpful to OPD's criminal investigation; he never had the feeling that DCSO was trying to hide information from him.**

Plaintiff disputes the relevance or admissibility of this purported "fact," which is

simply speculation about someone else's state of mind,

43. Plaintiff disputes the following proposed facts in Defendant Dunning's

Statement of Undisputed Facts No. 43:

**Dunning also approved … DCSO to contact local media to disseminate information about Cooper's dismissal from DCSO in an effort to encourage any other potential sexual assault victims to come forward.**

Plaintiff disputes this self-serving subjective "fact" about Dunning's motivation.

In fact, a reasonably jury can conclude that Dunning knew that the story would

make the newspaper regardless as criminal charges were likely to be brought

(and were brought on June 10, 2013) now that OPD had the proof belatedly

provided to it by DCSO that would directly tie Cooper to the scene of the crime,

and that Dunning's media efforts were nothing more than a gambit to get out in

front of that coverage to limit the damage to the credibility of his department.

*Ex. 11, Keane Dep. at 37:9-14; Ex. 74 to Keane Dep.* This is especially true given

that Dunning could have retrieved the internal data that could have proved

conclusively that Cooper was at Zorinsky Park and ran Mr. McGuire and Mr.

Worland's names through dispatch as soon as he heard that Cooper was in the

area of the assault. *See Plaintiff's Facts at I.D.* He did not. *Id.* Defendants are

not entitled to the inference sought here.

**Contrary to Ms. McGuire's accusation that Dunning only fired Cooper upon learning that he would be arrested and charged for his sexual assault (Compl. ¶ 31), DCSO fired Cooper at a time when OPD's investigation was still ongoing and DCAO's intentions remained unknown.**

Plaintiff disputes this argument offered under the guise of "fact." For the same

reasons as described above regarding Dunning's media efforts, a reasonable jury could conclude that Dunning's firing of Deputy Cooper was nothing more than damage control based on his utter indifference in identifying Cooper as the culprit from February 2013 until his hand was forced after the 911 call about Cooper from E.P. A reasonable jury could conclude that by mid-May 2013, the writing was on the wall that Cooper would be arrested and prosecuted. His lies had been revealed, OPD was concluding its investigation, and there was very little chance that Cooper would not, therefore, be prosecuted.

46. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 46:

**Other DCSO Deputies had not heard of any other DCSO Deputy doing what Cooper did to Ms. McGuire.**

The evidence cited in support of this conclusion lack foundation for this broad conclusion. While Dunning can present evidence from those deputies who offered him declarations to that that they had not heard of any such conduct, but those declarations cannot impute the same knowledge to all DCSO deputies. There is simply no foundation for that.

49. Plaintiff disputes the following proposed facts in Defendant Dunning's Statement of Undisputed Facts No. 49:

**While the experts retained by the County Defendants and Ms. McGuire disagree on whether law enforcement agencies must have stand-alone sexual misconduct policies (and the reasons for having them), both retained experts agree that the majority of law enforcement agencies in the United States do not have such policies.**

Plaintiff disputes that the experts retained in this case disagree about the need

for departments to have a stand-alone policy. Defendant's retained expert agrees

with Plaintiff's that such a policy is required.  John Ryan opined that a police

agency may be liable under *Monell* for failing to have a policy covering high-

risk/critical tasks:

> In the current state of civil rights litigation, an agency's failure to
> have policies covering high-risk/critical tasks may be viewed as
> evidence that the agency is deliberately indifferent to the rights of
> citizens.

*Exh. 17, Tromblay Rebuttal Report at ¶¶28-30* (citing "Sexual Misconduct,

Sexual Harassment, and Sexual Discrimination, is subtitled: "Policy v. Custom /

Operational Policy & Failure to Have a Policy", Ryan, John ©2008 Article

published in the free PATC E-Newsletter Link to Article online). Ryan includes

sexual misconduct among high-risk/critical tasks. *Ex. 45, Ryan Dep. at 136:15-*

*24.* Ryan further supports that conclusion: "when dealing with sexual

misconduct as well as harassment and discrimination, agencies must have a zero

tolerance policy and validate that policy through training, supervision and

enforcement." *Id.*

Plaintiff disputes the conclusion about what other agencies did or did not do

about a sexual misconduct policy because it is not relevant and lacks foundation.

Both experts in this case testified that there is no study to be able to know how

many agencies had such policies in 2013. Mr. Tremblay testified that he is not

aware of the number in 2013. *Ex. 13, Tremblay Dep. at 60:16-61:2, 92:4-11.*

Similarly, John Ryan admits that he does not know of a data set to say how

many law enforcement agencies have sexual misconduct policies. *Ex. 45, Ryan*

*Dep. at 41:2-14, 147:18-25.* Indeed, Ryan has been giving a proposed sexual

misconduct policy to law enforcement agencies for ten years. *Ex. 45, Ryan Dep.*

*at 152:6-13.*

**In 2013, DCSO comported with the standard in law enforcement.**

This legal conclusions is barred in statements of fact in support of summary

judgment under Local Rule 56.1(a)(2). If this statement is meant to be limited to

the standard regarding the existence of a sexual misconduct policy, there is

insufficient foundation for that assertion given the testimony cited above in this

paragraph from the retained experts in this case.


RESPECTFULLY SUBMITTED,

/s/ Mark Loevy-Reyes

*Attorneys for Plaintiff Megan McGuire*

Arthur Loevy
Jon Loevy
Cindy Tsai
Mark Loevy-Reyes
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900

**CERTIFICATE OF SERVICE**

I, <u>Mark Loevy-Reyes</u>, an attorney, hereby certify that on April 23, 2018, I electronically filed the foregoing Plaintiff's Response to Movants' Statement of Undisputed Facts using the CM/ECF system, which will send notification of such filing to all parties except for Cory Cooper, and I hereby certify that I have e-mailed the document to the following non-CM/ECF participant:

Cory Cooper
*c.cooper.417@gmail.com*

<u>/s/ Mark Loevy-Reyes</u>
*One of Plaintiff's Attorneys*