## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MEGAN MCGUIRE, | ) | |
| | ) | Case No. 8:16-cv-00004 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Senior Judge Joseph Bataillon |
| | ) | |
| CORY COOPER, TIMOTHY DUNNING, | ) | Magistrate Judge Susan M. Bazis |
| Individually and in his official capacity as | ) | |
| Sheriff of Douglas County, Nebraska, and | ) | |
| DOUGLAS COUNTY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE TO DEFENDANTS TIMOTHY F. DUNNING'S AND DOUGLAS COUNTY'S MOTIONS FOR SUMMARY JUDGMENT

# EXHIBIT 10

## Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

MEGAN MCGUIRE,            ) CASE NO. 8:16 CV 00004
                         )
    PLAINTIFF,    ) DEPOSITION OF
                  ) TIMOTHY DUNNING
    VS.           )
                  )
CORY COOPER, TIMOTHY      )
DUNNING, INDIVIDUALLY AND )
IN HIS OFFICIAL CAPACITY  )
AS SHERIFF OF DOUGLAS     )
COUNTY, NEBRASKA, AND     )
DOUGLAS COUNTY,           )
                          )
    DEFENDANTS.    )
- - - - - - - - - - - - - -
        DEPOSITION OF TIMOTHY DUNNING, taken
before Morgan M. Catania, RPR, CSR(IA), General
Notary Public within and for the State of Nebraska,
beginning at 9:15 a.m., on February 14, 2017, at
Douglas County Attorney, Civil Division, 909 Civic
Center, 1819 Farnam Street, Omaha, Nebraska.

## Page 2

```
 1         A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
    MS. CINDY TSAI
 3  LOEVY & LOEVY
    311 North Aberdeen, Third Floor
 4  Chicago, Illinois 60607
    (312) 243-5900 (Phone)
 5  (312) 243-5902 (Fax)
    cindy@loevy.com
 6
 7  FOR THE DEFENDANTS SHERIFF TIMOTHY DUNNING AND
    DOUGLAS COUNTY:
    MR. TIM DOLAN
 8  MS. MEGHAN M. BOTHE
    MR. WILLIAM ROONEY, III
 9  DOUGLAS COUNTY ATTORNEY'S OFFICE
    909 Civic Center
10  Omaha, Nebraska 68183
    (402) 444-7622 (Phone)
11  (402) 444-6817 (Fax)
    tim.dolan@douglascounty-ne.gov
12  meghan.bothe@douglascounty-ne.gov
13
14      A L S O  P R E S E N T
15  Mr. Matthew Martin
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1            I N D E X
 2  CASE CAPTION ....................... Page    1
    APPEARANCES ........................ Page    2
 3  INDEX .................................. Page    3
    SEALED TESTIMONY .................... Page   87
 4  TESTIMONY ............................ Page    4
    REPORTER CERTIFICATE ................. Page  210
 5
 6
    DIRECT EXAMINATION:
 7    By Ms. Tsai ..................... Page    4
 8          E X H I B I T S
 9  EXHIBIT NO.                   MARKED
10  110. GENERAL ORDER GO-24-2008          142
11  111. GENERAL ORDER GO-18-2008          145
12  112. GENERAL ORDER GO-27-2012          157
13  113. GENERAL ORDER GO-20-2012          176
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1       (Whereupon, the following proceedings were
 2  had, to-wit:)
 3            TIMOTHY DUNNING,
 4       having been first duly sworn,
 5    was examined and testified as follows:
 6          DIRECT EXAMINATION
 7  BY MS. TSAI:
 8    Q.  Sheriff, can you please state and spell
 9  your full name for the record, please.
10    A.  Sure.  Timothy F. Dunning, D-U-N-N-I-N-G.
11    Q.  And when was the last time you sat for a
12  deposition?
13    A.  I don't know.  Two, three years ago.  It
14  could be even longer.
15    Q.  Okay.
16    A.  It would have been with Tim.
17    Q.  Okay.  Well, I will just go through some
18  basic rules --
19    A.  Sure.
20    Q.  -- because it's been some time.  We have
21  the court reporter here.  She is going to take down
22  everything that's said today -- all of my questions,
23  all of your answers.  I ask that you answer with
24  verbal cues as opposed to body language --
25    A.  Sure.
```

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

DUNNING - Direct (By Ms. Tsai)

Page 5

1      Q.  -- nodding.  That can't get captured by
2  the court reporter.
3      Also a lot of times, especially when we go
4  into the conversation a little bit more, you're
5  going to know -- be able to anticipate my question.
6  Just so that we have a clean record, I ask that you
7  let me finish a question before you answer.
8      If at any point I interrupt you before you
9  are done with your answer, let me know.  I don't
10  mean to.  I will have you finish the answer before I
11  move on to the next question.
12      At any time if there is any question that
13  I ask that's unclear to you, whether it's because my
14  voice drifted off or you don't understand my
15  question, please let me know, and I will either
16  repeat my question or rephrase it.
17      A.  Okay.
18      Q.  If you answer my question, is it fair for
19  me to assume that you have understood it as I've
20  asked it?
21      A.  Okay.
22      Q.  Okay.  At any point if you need a break,
23  whether to stretch your legs, use the restroom, take
24  a call, let me know.  I'm happy for us to take a
25  break.  The only caveat to that is, if there is a

Page 6

1  question pending, you answer the question first
2  before we take the break.
3      A.  Sure.
4      Q.  Okay.  When did you first learn about a
5  lawsuit -- about this lawsuit?
6      A.  I don't remember.
7      Q.  Was it within the last year?  Two years
8  ago?
9      A.  I don't recall.  I mean, it was whenever I
10  got the notice.  That's when I knew about it.
11      Q.  Who -- where did you receive the notice
12  from?
13      A.  We probably would have gotten the
14  notice -- I probably would have gotten that notice
15  by email.  Or I guess it could have come in the
16  mail.  I -- I just don't recall.
17      Q.  Okay.  Do you recall who sent the notice
18  to you?
19      A.  I believe -- it would have come from the
20  County Attorney's Office.
21      Q.  Okay.  What was included in the notice of
22  the lawsuit?
23      MR. DOLAN:  Objection:  Calling for
24  potential attorney-client communications.
25      MS. TSAI:  Yes.

Page 7

1      MR. DOLAN:  I'm going to instruct you
2  not to answer --
3      MS. TSAI:  Right.
4      MR. DOLAN:  -- if the question
5  inquires into communications with your lawyers.
6  BY MS. TSAI:
7      Q.  Let me take a step back.
8      Was the civil complaint included in the
9  notice of the lawsuit?
10      A.  I don't remember.
11      Q.  Since you've received notice of the
12  lawsuit, have you reviewed the complaint that was
13  filed?
14      A.  Yes.
15      Q.  Okay.  When was the last time you reviewed
16  the complaint?
17      A.  Probably in the course of the last
18  two weeks.
19      Q.  Was it in preparation of your deposition
20  today?
21      A.  Correct.
22      Q.  Okay.  And what is your understanding of
23  the allegations the plaintiff is alleging in this
24  lawsuit?
25      A.  My understanding is that the plaintiff

Page 8

1  believes that I furthered or -- a culture of
2  indifference.
3      Q.  Okay.  Any other -- any other allegations,
4  to your understanding?
5      A.  That I probably improperly -- that I
6  allegedly improperly trained Cooper.
7      Q.  Okay.  Any other allegations?
8      A.  That's all I recall.
9      Q.  Okay.  And upon reading the complaint and
10  understanding what the plaintiff's allegations are,
11  what did you do?
12      A.  Waited for today.
13      Q.  Okay.  So is it fair to say from the time
14  you received notice of the lawsuit until today, you
15  have not taken any steps to -- well, taken any steps
16  in your capacity as a sheriff of Douglas County?
17      A.  Oh, I see.  Okay.  I misunderstood your
18  original question.
19      We've -- we've taken some steps to further
20  enhance our review of videos, making sure that --
21  we're now doing a quarterly review of videos to see
22  how they match up with reports and their daily
23  reports.
24      Q.  When were those steps taken?
25      A.  I don't recall.  I mean, it's --

2 (Pages 5 to 8)

DUNNING - Direct (By Ms. Tsai)

Page 9

1    Q.  Was it is within the last year?
2    A.  Yeah.
3    Q.  Could it have been further than that?
4    A.  Pardon?  I don't believe so.
5    Q.  Is there a written policy or a general
6  order that outlines these new procedures?
7    A.  Yes.
8        MR. DOLAN:  I'm going to object to
9  relevance.  Temporal overbreadth.
10 BY MS. TSAI:
11   Q.  And is it a general order, or is it a
12 written policy of a different sort?
13   A.  I believe it's a general order.
14   Q.  Do you know the number?
15   A.  No.  No.
16       MR. DOLAN:  I'm also going to object
17 on subsequent remedial measures grounds.
18 BY MS. TSAI:
19   Q.  Other than reviewing the video on a
20 quarterly basis and comparing it to the daily
21 reports, have you taken any additional steps upon
22 learning about the allegations of this lawsuit?
23   A.  Not that I can recall.
24   Q.  Okay.  And I don't want to go into details
25 about your conversations or communications with

Page 10

1  attorneys here, but how many times have you met with
2  the Douglas County attorneys relating to this civil
3  case?
4    A.  I'm going to say four, maybe five times.
5    Q.  When was the first time you met with
6  attorneys?
7    A.  I don't -- I don't recall.  I'm just
8  assuming that we had a meeting some time ago kind of
9  laying out the need for --
10   Q.  And I don't want to go into conversations.
11   A.  Okay.
12   Q.  Because that's privileged.
13   A.  Okay.  Yeah.  I'm going to say maybe
14 five -- five times.
15   Q.  Okay.  And when was your most recent
16 interaction?
17   A.  Yesterday.
18   Q.  Okay.  And who did you meet with
19 yesterday?
20   A.  Tim Dolan and Meghan Bothe.
21   Q.  And how long did you meet for?
22   A.  Maybe an hour.
23   Q.  Do you remember prior to yesterday when
24 was the last time you met with the attorneys?
25   A.  What was that?

Page 11

1    Q.  Do you remember when was the last time you
2  met prior to yesterday?
3    A.  Oh, it was -- I was gone all last week; so
4  it would have been, I believe, the Thursday before
5  that, whatever that day would be.
6    Q.  And, again, who did you meet with at that
7  meeting?
8    A.  At that time, Bill Rooney, Meghan Bothe,
9  and Tim Dolan.
10   Q.  And how long did that meeting last?
11   A.  Probably a couple of hours.
12   Q.  These last two meetings, did you meet with
13 attorneys in preparation for today's deposition?
14   A.  Yes.
15   Q.  Did you meet with attorneys at any other
16 time in preparation for your deposition?
17   A.  Yeah.  Prior to Thursday I think we met on
18 Tuesday or Wednesday.
19   Q.  And who was at this meeting?
20   A.  All three that I've mentioned before.
21   Q.  Okay.  And how long was that meeting?
22   A.  Maybe a couple of hours.
23   Q.  We've discussed three of the five meetings
24 you've had with the attorneys.  Do you recall when
25 the other two meetings occurred?

Page 12

1        MR. DOLAN:  Object.  He didn't firmly
2  commit to five meetings.  But -- misstates the
3  witness's prior testimony.
4        You may answer as best you can.
5        THE WITNESS:  What's that?  I can
6  answer?
7  BY MS. TSAI:
8    Q.  You may answer.  And I'll repeat my
9  question.
10   A.  Okay.
11   Q.  Do you recall when the other two meetings
12 were?
13   A.  I don't.
14   Q.  Okay.
15   A.  And to be truthful, I'm not even sure if
16 they occurred.  I just kind of remember offhandedly
17 meeting maybe in -- and it could have been in
18 concert with them meeting with someone else in my
19 office, but I couldn't recall.  And I couldn't tell
20 you how long those were either.  They weren't very
21 long.  I know that.
22   Q.  Okay.  Is it fair to say prior to the
23 Tuesday or Wednesday when you first met with the
24 attorneys in preparation for your deposition, that
25 that was the first time you've had substantive

3 (Pages 9 to 12)

DUNNING - Direct (By Ms. Tsai)

Page 13

1   conversations or communication with the attorneys
2   about this lawsuit?
3          MR. DOLAN:  I'm going to object.
4   Your question puts the -- he just -- you're asking
5   him to confirm substantive legal communications by
6   asking about communications with this lawsuit.
7   You're directly inquiring into legal or privileged
8   communications.
9          I'm going to instruct you not to answer
10  that question.
11         MS. TSAI:  And just for the record, I
12  just want to clarify that I'm not asking about the
13  substance of the communication but whether that was
14  the first time that the deponent spoke to attorneys
15  about this lawsuit in detail.
16         MR. DOLAN:  Counsel, by saying "about
17  this lawsuit," that is absolutely substantive.
18  You're asking what we talked about.
19         MS. TSAI:  I'm just -- so to clarify,
20  I am asking whether two weeks ago was the first time
21  the sheriff had a substantive conversation about the
22  lawsuit.  I'm not asking about what the substance of
23  the communication was.
24         MR. DOLAN:  I think that's our
25  disconnect.  You are asking about the substance of

Page 14

1   the communication because you're saying "about this
2   lawsuit."
3          By answering, by confirming or denying,
4   he's still going to be providing information about
5   the substance of those privileged communications.
6   Is it your testimony -- is it your position that
7   when I depose Ms. McGuire next week, I can ask her
8   about when she has talked with you about this
9   lawsuit in particular?
10         MS. TSAI:  About the lawsuit, but not
11  about the details of the conversation.
12         MR. DOLAN:  You have a broader
13  interpretation than I do.  I think you're inquiring
14  into privileged -- the substance of privileged
15  communication by even asking what he has talked
16  about, and you have just put the privileged
17  communication -- instead of asking, "What did you
18  talk about," you've put some of those communications
19  into the form of your question.
20         It's objectionable, and I'm going to
21  instruct you not to answer because that divulges
22  privileged communications.
23         MS. TSAI:  Okay.  I understand your
24  position.  I will move on, and that has -- that's a
25  position that the County is taking, and we will note

Page 15

1   that for the plaintiff's deposition next week as
2   well.
3   BY MS. TSAI:
4      Q.  Did you meet with any prosecutors relating
5   to the criminal prosecution of Cory Cooper for the
6   incident involving Megan McGuire?
7      A.  Did I meet with any prosecutors?
8      Q.  Yes.
9      A.  No.
10     Q.  Okay.  Have you discussed this case with
11  the County's insurance carrier?
12     A.  No.
13     Q.  To your knowledge, has the County's
14  insurance carrier been notified of this lawsuit?
15     A.  I have no knowledge.
16     Q.  In addition to meeting with the attorneys,
17  what else did you do in preparation for today's
18  deposition?
19     A.  Other than what?  Oh, other than meeting?
20     Q.  With the attorneys, yes.
21     A.  Read -- read Cory Cooper's deposition.
22  Read -- read some reports.  Reread some -- some
23  general orders.  I can't -- I really can't think of
24  anything else.
25     Q.  When did you receive a copy of

Page 16

1   Cory Cooper's deposition?
2      A.  I think I've had it for a while, but I
3   didn't read it until two, three weeks ago.
4      Q.  Okay.
5      A.  I read it previously, but, I mean, I kind
6   of scanned down to...
7      Q.  What reports did you read?
8      A.  The reports that are -- that were
9   associated with his arrest.  Lieutenant Martin's
10  investigation.
11     Q.  Did you review the entire internal affairs
12  investigation file or just Lieutenant Martin's
13  reports?
14     A.  I think I -- I believe I read the whole
15  thing.
16     Q.  Okay.
17     A.  Yeah, I did.
18     Q.  Any other reports other than the
19  investigation relating to Mr. Cooper, other than --
20     A.  Not that I can immediately recall.
21     Q.  And what about the general orders?  Which
22  general orders did you review?
23     A.  Having to do with their in-car camera
24  policy or our code of conduct.  I don't recall the
25  others.

4 (Pages 13 to 16)

DUNNING - Direct (By Ms. Tsai)

Page 17

1      Q.  Did you review any other deposition
2   transcript from this case other than Mr. Cooper's?
3      A.  No.
4      Q.  Did you review any deposition summaries
5   about -- relating -- strike that.
6          Did you review any deposition summaries
7   from the depositions taken in relation to this case?
8      A.  I think the only one I've read is
9   Cooper's.
10     Q.  Okay.  Have you had any communication at
11  any time with Lieutenant Martin about his deposition
12  in this case?
13     A.  I know he -- he took one.  It was a long
14  day.  And other than that, not -- not really.  Not
15  in-depth.
16     Q.  Okay.  And when did you talk to him about
17  his deposition?
18     A.  We've probably talked a little bit about
19  it every day since I -- since I was scheduled to be
20  here.
21     Q.  Okay.  What did you guys talk about?
22     A.  Well, I mean, just dreading the fact of
23  spending -- spending the whole day.
24     Q.  Anything else other than the length of the
25  deposition?

Page 18

1      A.  Not -- no.
2      Q.  Did he provide you with any guidance as to
3   what types of questions you would be asked today?
4      A.  Not really.
5      Q.  Did he provide you with any insight as
6   to -- well, strike that.
7          Lieutenant Martin sat in on a few other
8   depositions related to this case.  Did he -- did you
9   have any communication with him at any time about
10  his observations about those depositions?
11     A.  No.
12     Q.  Did you have any communication at any time
13  with any of the individuals who have been deposed in
14  this case?
15     A.  I'm not sure who all was deposed, to be
16  truthful.
17     Q.  Okay.  I would like to move on and ask you
18  a few background questions.  Okay?
19          When did you become sheriff of Douglas
20  County?
21     A.  January 1st, 1995.
22     Q.  And has there ever been a gap from 1995 to
23  present where you were not the sheriff of the
24  County?
25     A.  Has there ever been what?

Page 19

1      Q.  A gap in time.
2      A.  No.
3      Q.  Okay.  Can you please provide a brief
4   summary of your employment history prior to becoming
5   sheriff?
6      A.  For -- for 21 and a half years prior I was
7   with the Omaha Police Department.  And prior to
8   that -- March of 1971 through June of 1973 I worked
9   for the City of Papillion on their police
10  department.
11         Prior to that I was in college, and I
12  worked for a company called Security International.
13  Prior to that I worked for a company called Curzon
14  Advertising.
15     Q.  What was your title at Security
16  International?
17     A.  What was what?
18     Q.  What was your title at Security --
19     A.  Security officer.
20     Q.  And you mentioned earlier you were working
21  at Security International when you were in college.
22  Was that a part-time job, or were you working full
23  time?
24     A.  No.  It was -- no.  It was pretty full
25  time.  I was working about 100 hours a week.

Page 20

1      Q.  That's more than a full-time job.
2          Were you going to college part time, then?
3      A.  Yeah.
4      Q.  Okay.  Where did you go to college?
5      A.  University of Nebraska at Omaha.
6      Q.  And did you obtain a degree?
7      A.  Yeah.  I have a bachelor's and master's
8   degree from there.
9      Q.  And what's your master's degree in?
10     A.  Public administration.
11     Q.  When did you receive that degree?
12     A.  Either 1989 or 1990.  I don't recall the
13  exact date.
14     Q.  Okay.  And what was your bachelor's in?
15     A.  Because I was -- because I was, like, a
16  lifer student, it was in general studies.  Because I
17  had majors in both business and -- and criminal
18  justice.
19     Q.  And when did you receive your bachelor's
20  degree?
21     A.  I want to say 1978.
22     Q.  How much time -- was there any gap between
23  when you received your bachelor's degree and when
24  you start working towards your master?
25     A.  Yeah.  There was probably about four

5 (Pages 17 to 20)

DUNNING - Direct (By Ms. Tsai)

Page 21

1    years. I started my master's once and then dropped
2    out, but kind of -- at that time you had -- you had
3    a time limit.
4         Q.   Uh-huh.
5         A.   And I wasn't going to make it; so I
6    dropped out. And then I started back up again.
7         Q.   When you first started your master's
8    degree, was that also through the University of
9    Nebraska-Omaha.
10        A.   Correct.
11        Q.   Okay.
12        A.   I have nine graduate hours through the
13   University of Virginia.
14        Q.   Were they -- were you at -- were you
15   residing in Virginia at some period of time?
16        A.   I was in the FBI Academy, and as a part of
17   coursework there, I was able to take some graduate
18   hours.
19        Q.   When were you at the FBI Academy?
20        A.   January through March of 1988.
21        Q.   And what was your purpose for enrolling in
22   the FBI Academy?
23        A.   Executive development.
24        Q.   At that time were you a -- at the Omaha
25   Police Department?

Page 22

1         A.   Yes.
2         Q.   And did the Omaha Police Department
3    sponsor you to attend that academy?
4         A.   Correct.
5         Q.   When did you attend the police academy?
6         A.   I started with Omaha Police on June 30th,
7    1973. And at that time my -- I believe it was a
8    12- to 14-week academy.
9         Q.   Other than your studies at University of
10   Nebraska-Omaha, the FBI Academy, the police academy,
11   and your graduate credits through University of
12   Virginia, have you received any other higher
13   education training?
14        A.   I went through what's call LEADS. It's
15   also sponsored by the FBI. It's an 80-hour
16   executive development course.
17        Q.   And when did you take that?
18        A.   I want to say 1996.
19        Q.   And what was your purpose of attending the
20   80-hour course?
21        A.   Just to further the -- the development.
22        Q.   Any others?
23        A.   I mean, there is a lot of courses I've
24   taken in the course of being with the County.
25        Q.   Okay. Any other --

Page 23

1         A.   Advanced?
2         Q.   -- advanced, executive level type of
3    training?
4         A.   Not that -- not that I can recall. You
5    know, let me clarify that. Excuse me. I have to
6    have -- by law I have to have 20 hours of retraining
7    every year, and so I go to a -- I go up to a lot of
8    other conferences that have training. National
9    Sheriffs' Association, Major County Sheriffs'
10   Association, Nebraska Sheriffs' Association. CALEA
11   conferences also have training. I have attended a
12   lot of those.
13        Q.   And are these one-day trainings, or are
14   they a week long?
15        A.   No. They are usually, you know, probably
16   on average 20 to -- 20 to 30 hours per conference.
17        Q.   And do you attend one a year? I mean --
18   well, strike that.
19             Do you attend more than 20 hours a year --
20        A.   Easily.
21        Q.   -- of training?
22        A.   Easily.
23        Q.   Okay. What --
24        A.   Excuse me.
25        Q.   What's discussed at these training

Page 24

1    seminars?
2         A.   A lot of them are case studies on major --
3    major events that happen around the country. Such
4    as -- for example, the Boston bombing was covered at
5    length, the San Bernardino shooting, just to mention
6    a couple. There is a lot of ethics training, a lot
7    of leadership training, other -- you know, other
8    best practices.
9         Q.   And at these training seminars have there
10   ever been discussions about conduct of a sexual
11   nature by law enforcement officers?
12        A.   I can't say there has been any training in
13   that regard.
14        Q.   Have there been seminars or discussions
15   about this topic that you've attended?
16        A.   Not that I recall.
17        Q.   Going back to your employment with OPD,
18   what was your highest rank there?
19        A.   Lieutenant.
20        Q.   And why did you decide to leave the
21   department?
22        A.   I -- I felt that I had been there long
23   enough, and I had some people approach me about
24   running for sheriff, and so I did.
25        Q.   Sheriff of Douglas County, that's an

6 (Pages 21 to 24)

DUNNING - Direct (By Ms. Tsai)

Page 25

1   elected position; correct?
2       A.  Pardon?
3       Q.  It's -- being the sheriff of Douglas
4   County --
5       A.  Yeah.
6       Q.  -- that's an elected position?
7       A.  Yes, ma'am.
8       Q.  Okay.  And how long is each term?
9       A.  Four years.
10      Q.  And you became the sheriff in January of
11  1995?
12      A.  Yes.
13      Q.  Does that mean you first decided to run
14  for sheriff in 1994, or was it prior to that?
15      A.  Oh, the election?
16      Q.  Uh-huh.
17      A.  Yeah.  That was in 1994.
18      Q.  Okay.  Other than people approaching you
19  to run for the position, why did you decide to run
20  to become sheriff?
21      A.  I just had been looking at that job for
22  some time.  Actually, four years prior to me running
23  I had -- I had taken a serious look at it, had had
24  people approach me, but I wasn't at a point in my
25  pension when I could leave, and so I waited.  And

Page 26

1   then they approached me again, and I just happened
2   to be in the mood to say yes.
3       Q.  Okay.  And what changes were you looking
4   to make at the department if you were elected
5   sheriff at that time?
6       A.  I don't remember my original brochure, but
7   there were some things there that needed to be
8   changed.  People assigned in to, say, the Criminal
9   Investigation Bureau, they -- they had to be buddies
10  of somebody.  And then since that time I've -- I've
11  changed that to have term limits.
12          The sheriff's office really didn't have
13  representation in the legislature.  I've changed
14  that.  I'm a member of the Nebraska Sheriffs'
15  Association legislative team.
16          The -- the crime lab that I inherited was
17  in absolute -- was in terrible shape.  People
18  were -- had worked the toll ladder had been kicked
19  out of the radio room.  They were working in the
20  crime lab.  So we professionalized that.  The --
21  both the crime lab and crime scene responders are
22  all accredited now.
23          Had kind of a makeshift training unit at
24  the time.  I came in.  We changed that and made it a
25  professional group that were -- that are people that

Page 27

1   are actually professional trainers and role models
2   throughout the department.
3           At the time I became sheriff we were --
4   the City of Omaha and the -- the sheriff's office
5   were both in badly need of a radio system, and I,
6   along with others, merged the two.
7           The -- the in-car cameras were emerging at
8   that time, and so we were one of the first agencies
9   to have in-car cameras in the state.
10          Training was very -- training -- in
11  general, outside training was just nonexistent when
12  I got here.  I think I spent 100 grand in 1995 to
13  send people out to some outside training.
14      Q.  And what's the value of having deputies
15  attend outside training seminars?
16      A.  Well, because there really wasn't a lot of
17  good quality training locally on -- on a variety of
18  topics.  And what -- the value that I see in that is
19  they get the opportunity to network with other
20  agencies, learn what some best practices are and
21  learn what some bad practices are, and bring that
22  back to our agency.
23      Q.  And today are deputies offered an
24  opportunity to attend outside training?
25      A.  Yeah.  It's kind of -- it's shrunk this

Page 28

1   year because of budget constraints.  But I would say
2   we probably still send our people more than any
3   other agency in the state.
4       Q.  And so in 1995 in-car cameras was
5   something that was already occurring in some
6   jurisdictions; is that right?
7       A.  Uh-huh.
8       Q.  And when did the department -- well, when
9   did the department first explore bringing in-car
10  cameras into your vehicles?
11      A.  There was -- there was an Omaha police
12  officer that was killed in August of 1995.  And as a
13  result of that, his father started a foundation
14  called the Jimmy Wilson Foundation.  And as a result
15  of that, he -- agencies would file grants with their
16  foundation to get those cameras, and we were one of
17  the first to receive those.  I don't remember how
18  many we initially started with.
19          But, yeah.  I just don't remember how many
20  we got on that first wave, but we continually bought
21  them until we had them in all of the cars -- all of
22  the marked units.
23      Q.  Sure.
24          Do you recall approximately how long it
25  took to get all -- get cameras in all of the marked

7 (Pages 25 to 28)

DUNNING - Direct (By Ms. Tsai)

Page 29

1   units?
2        A.  I don't.
3        Q.  Okay.  And you mentioned earlier you're
4   part of the Nebraska sheriff legislative team; is
5   that right?
6        A.  Yes.
7        Q.  Okay.
8        A.  It's a committee.
9        Q.  Okay.  And what does the committee do?
10       A.  We review legislation and we take back to
11  the membership bills that we recommend they support,
12  monitor, or oppose.
13       Q.  And what types of legislation are you
14  reviewing?
15       A.  Like, right now we are -- we've just
16  agreed to support LB289, which is a human
17  trafficking bill to enhance penalties to help the
18  prosecutors to charge people that are pandering
19  with -- with a higher level.  And the bill also
20  increases penalties.  And it takes away the grey
21  area of having to -- to prove that somebody was
22  actually pandered.  That, as long as you knew or
23  should have known that that was occurring, the
24  prosecution is now able to charge.
25            I've got probably about a seven-page list

Page 30

1   of bills on my desk right now that --
2        Q.  Okay.
3        A.  -- are bills that we're either supporting
4   or opposing or monitoring.
5        Q.  And as you review the proposed
6   legislation, are you -- well, how do you as a
7   committee decide whether or not to support or --
8   support a certain legislation?
9        A.  Yeah.  First, we'll go through, and we do
10  this -- I get an -- I get an email of legislation
11  updates.  I get that every day, sometimes a couple
12  times a day.  One email will be an updated list of
13  new bills.  Another list will be all of our bills
14  and then an update as to maybe the -- when the next
15  hearing is, what senators have signed on to the
16  bill, maybe some amendments that have been filed.
17       Q.  And as you're reviewing the substance of
18  these legislation, do you receive secondary
19  sources/data to help you determine whether this is a
20  good legislation or not?
21       A.  Yeah.  In some cases we will -- we'll have
22  aids from the senators call us to get us on board to
23  explain what their -- their bill is about.  Maybe we
24  don't fully understand it and don't like how it
25  sounds.  So we -- we have that -- that opportunity

Page 31

1   through our lobbyists.
2        Q.  Okay.  And so using the example the human
3   trafficking --
4        A.  Sure.
5        Q.  -- did you receive information about human
6   trafficking being, you know, a national wide
7   epidemic?  Or what kind of information -- I guess
8   I'm trying to understand what kind of information
9   you get to --
10       A.  Yeah.  So when I'm on the --
11       Q.  I'm going to have to finish my question
12  before you answer.
13       A.  Sure.  I'm sorry.
14       Q.  This is like what we mentioned earlier.
15            What kind of information do you receive to
16  help you evaluate certain legislation?
17       A.  So with the human trafficking bill, as I
18  mentioned there, I'm on the Governor's Task Force
19  for -- for human trafficking.  That was a group that
20  was created probably about four or five years ago --
21  a bill sponsored by Amanda McGill, who is a state
22  senator.
23            From that I also became part of a local
24  group, the Coalition on Human Trafficking.  That's
25  an interdenominational group.  And so -- and then

Page 32

1   I'm also on a -- the Attorney General's Task Force
2   on -- on human trafficking.  Through their --
3   through those avenues there is a wide variety of
4   information that comes through.
5            We -- we also enlisted the University of
6   Nebraska at Lincoln to do a study on labor and sex
7   trafficking to see -- to see if, in fact, it was a
8   problem.  Because if we were going to be applying
9   for grants or enforcement education, social
10  services, that sort of thing, we needed to have some
11  hard data.
12            We then also partnered up with Creighton
13  University, and Creighton University just did a
14  study on scraping Backpage and were able to show
15  that there is a hard number of cases that are
16  occurring here in Nebraska every year,
17  specifically -- or I guess, more specifically, in
18  the Omaha area.
19       Q.  Is it fair to say that you have source --
20  resources like the ones you've mentioned here to
21  help you evaluate all of the various type of
22  legislation you'll be viewing?
23       A.  Yes.
24       Q.  Okay.  During your time -- well, how long
25  have you been on this committee?

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

DUNNING - Direct (By Ms. Tsai)

Page 33

1      A.  The Governor's Task Force, I had been
2   there since it started; so I want to say it's --
3   this governor has only been a year.  So I want to
4   say I've been on it maybe close to four years.  The
5   Attorney General's Task Force, I've only been on it
6   maybe about a year and a half.
7          The human trafficking coalition here in
8   the Omaha area, I've been on that for at least a
9   couple -- maybe going on three years.
10     Q.  Okay.  And what about -- how long have you
11  been on the Nebraska sheriff legislation committee?
12     A.  Excuse me.  I couldn't give you an exact
13  date per -- but for quite a number of years.
14     Q.  Okay.  And during the years that you've
15  been on the Nebraska sheriff legislative committee,
16  have you reviewed legislation relating to efforts to
17  diminish crimes of a sexual nature?
18     A.  Could you -- could you be more specific?
19     Q.  Sure.
20        So one of the examples that you gave is
21  that you are reviewing legislation to make it -- to
22  help decrease the human trafficking problem.  And so
23  my question is during the years that you have been
24  on the Nebraska sheriff legislative committee --
25     A.  Uh-huh.

Page 34

1      Q.  -- have you reviewed any legislation where
2   they are making proposals to address crimes that are
3   of a sexual nature?
4      A.  Yeah.  We've -- we've supported and
5   opposed -- I mean, we have supported the Sex
6   Offender Registry Act but we opposed them watering
7   it down -- the legislature.  So I have been involved
8   in that.
9      Q.  Okay.  And you -- you also receive data to
10  support --
11     A.  Uh-huh.
12     Q.  -- why we should not water down the sexual
13  offender registry; correct?
14     A.  Yes.
15     Q.  Okay.  What about -- can you think of
16  other examples that you've received legislate --
17  legis- -- strike that -- legislature relating to
18  crimes of -- of a sexual nature?
19     A.  Yeah.  There has been a variety of bills
20  in the domestic violence arena that have also
21  covered that topic.
22     Q.  Okay.  And what about sexual assault?
23     A.  I can't -- you know, I can't think of --
24  I'm trying to think of a specific bill, and I can't
25  think of one.  But I'm sure that I have.

Page 35

1      Q.  Okay.  So out of curiosity, since you've
2   been elected sheriff of Douglas County, most of your
3   re-elections have been unopposed; correct?
4      A.  I had -- well, I had -- I obviously had an
5   opponent the first time because I ran against a guy.
6   I had an opponent in 2002, and I had an opponent in
7   2006.
8      Q.  For the years where you don't have an
9   opponent, do you still campaign and set an agenda of
10  what you hope to accomplish?
11     A.  Not as -- not as hard.  I mean, there is
12  some deadlines when somebody can file.  Once I --
13  once I'm comfortable and I'm not hearing a rumor of
14  anybody or they haven't filed, I slow down to a
15  halt.
16     Q.  Okay.  I think you mentioned earlier that
17  sometimes you attend training that is sponsored by
18  the commission of accreditation for law enforcement
19  agencies?
20     A.  I didn't hear the whole question.
21     Q.  If I heard you correctly, you mentioned
22  earlier that sometimes you attend training that is
23  put together by the commission of -- a Commission on
24  Accreditation for Law Enforcement Agencies; correct?
25     A.  Yes.

Page 36

1      Q.  And what's the acronym for that?
2      A.  CALEA.
3      Q.  CALEA.  Okay.  We'll start using that one.
4      A.  All right.
5      Q.  Okay.  Douglas County Sheriff's Office
6   became accredited by CALEA in 2005; is that right?
7      A.  Well, that's possible.  I don't think we
8   actually got the certificate until 2006.
9      Q.  Okay.
10     A.  We probably had our on-site in 2005, but
11  the -- after you have your on-site, the next
12  conference is where you get your certificate, and I
13  think that was in 2006.
14     Q.  And did you specifically seek out
15  accreditation from CALEA for your department?
16     A.  Yes.  They hadn't had it before, and it
17  was a battle to begin with because change.
18     Q.  No one likes change.
19        And why did you feel that it was important
20  for the department to get accreditation through
21  CALEA?
22     A.  Well, No. 1, you're attaching best
23  practices to your agency.  You're taking away the
24  grey area that might exist out there on what -- what
25  somebody can do and can't do.  That grey area goes away.

9 (Pages 33 to 36)

DUNNING - Direct (By Ms. Tsai)

Page 37

1    And you have the ability through CALEA to
2  continually update and upgrade your agency.
3    Q.  What do you mean by that?
4    A.  Because we have -- you know, there is a
5  standards review every single conference.  There is
6  three a year.  And through there you -- you're able
7  to see the discussion on developing practices or
8  mandatory standards.  And through that, you know,
9  whether it takes place or not, if you -- you know,
10  if you can see that there's something on the
11  horizon, you begin developing it for your agency to
12  make it mandatory before it ever occurs.
13    Q.  Does CALEA provide its members model
14  policies?
15    A.  Yes.  That's what it's all about.
16    Q.  Okay.  And are the Douglas County Sheriff
17  Office's general orders based off of these model
18  policies?
19    A.  Well, anything that's mandated, yes.  We
20  may have other things that we address that they
21  don't.
22    Q.  I see.
23    So as part of -- to obtain your
24  accreditation and to keep it, CALEA requires certain
25  policies to be adopted by your department?

Page 38

1    A.  Correct.
2    Q.  Do they also propose -- provide model
3  policies that are not mandated but for the
4  department to consider adopting?
5    A.  There are some optional standards.  I
6  couldn't -- if you asked me "give me an example," I
7  couldn't do it right here at this point in time.
8    But there are some optional standards.
9  And when you have your on-site, your actual
10  inspection from outside auditors, you're -- I think
11  you're able to opt out of at least two standards.
12  We've never done that.  We've always had -- they
13  started to -- when we first were accredited, you
14  know, we passed with flying colors.  Didn't have
15  any -- we didn't have any applied discretions or
16  anything, no -- nothing that was of -- of a problem.
17    The last two accreditations that we've
18  had, we actually went up to an additional tier that
19  CALEA has, which is called the -- well, the first
20  time it was called the gold standard.  Then they
21  changed the -- the gold standard to be called with
22  excellence, and so we have that now as well.
23    Q.  Okay.  When the department received the
24  accreditation from CALEA, did the general orders
25  change significantly from what the department had

Page 39

1  prior to the accreditation?
2    A.  Well, there was some areas we didn't even
3  probably have -- have the mandatory standards.
4    Q.  Can you give me --
5    A.  I can't give you an example.
6    Q.  Okay.
7    A.  I mean, I -- if you -- the person to ask
8  that works for me, Rob Sofie.  He would be the
9  expert to ask that of.
10    Q.  And what's his role at the department?
11    A.  He's our -- oh, what do we call him?  He's
12  the policy coordinator.  He's our accreditation
13  manager.
14    I mean, that was -- can I --
15    Q.  Sure.
16    A.  When I first got there, we didn't even
17  have an SOP.  So that was -- that was kind of a work
18  in progress.  And then when I left Omaha Police,
19  they were just starting to get accredited.  I mean,
20  they were starting the process, and I liked what was
21  taking place.  So that's when we brought it in.
22    Q.  I see.
23    Is Omaha Police Department also accredited
24  by CALEA?
25    A.  Yes.

Page 40

1    Q.  Okay.
2    A.  But I don't believe they have the
3  excellence.
4    Q.  You mentioned that CALEA comes on site to
5  evaluate the department.  That was during the
6  initial process.  Do they continue to come on site
7  for the reaccreditation?
8    A.  Yeah.  Yeah.  They come every three years.
9  And then prior to them doing the on-site, we -- we
10  hire some -- what we call mock assessors to come in
11  and give us an overlook and see if there is anything
12  we need to tighten up prior to our actual on-site.
13    So -- so, in effect, we are actually
14  getting looked by -- on the mock we might have four
15  to five people there.  For the on-site, it just
16  depends how many CALEA sends.  It might be two,
17  might be three.  So we are kind of getting a double
18  look by almost, you know, seven, eight people.
19    Q.  And what are they looking for when they
20  come on site?
21    A.  What they are looking for is they are
22  going to look at -- they'll -- before they come,
23  they'll pick out how many -- how many standards they
24  are going to take a look at, and they will look to
25  see that "You said you were going to do X.  Did --

10 (Pages 37 to 40)

DUNNING - Direct (By Ms. Tsai)

Page 41

1   did you actually do X?"
2         If there is, you know, inspection
3   functions and we say that we're doing them X -- X
4   number of times, they are going to check that to
5   make sure you are.  They go through our property
6   room.  They go -- every single item that's in there
7   gets inspected.
8         Q.  Do they interview deputies and other
9   employees of the department?
10        A.  Yes.
11        Q.  And what types of questions are asked at
12  these interviews?
13        A.  Depending on what standard they are
14  looking at at the time, they will ask -- they will
15  ask them questions related to their job and
16  knowledge and to their actual practice to make sure
17  that practice that they are stating matches up with
18  what our policy is.
19        Q.  Does CALEA, to your knowledge, have a
20  model policy on how law enforcement officers should
21  interact with private citizens?
22        A.  In that -- I'm trying to think of -- they
23  do try and address that through mandating some sort
24  of community survey.  And they don't specify how
25  that survey goes, but you have to have some

Page 42

1   mechanism in -- in place.
2         Like, we're -- we're changing ours now to
3   try and get a -- to get a better feel by sampling
4   people that have had accidents, that have made
5   police reports, have -- have called us to their
6   homes and send them out, like, a brief eight- to
7   ten-question questionnaire just to see how we're
8   doing.
9         Q.  And is that a questionnaire that the
10  private citizen receives at the end of its -- his or
11  her interaction with your department?
12        A.  I don't know that -- I don't know that
13  we're leaving it at the scene.  I think we're
14  mailing it to them.
15        Q.  I see.
16        A.  And I believe we also have -- I believe we
17  have it on our website as well now.  The problem
18  with that is it's -- it's anonymous; so say a -- I
19  arrest you.  You could -- you could respond
20  200 times.  So it's kind of a potshot thing, and so
21  we're trying to make it more representative of
22  what's taking place.
23        Q.  And what is the response rate like in
24  terms of people returning the survey?
25        A.  Fairly good.

Page 43

1         Q.  Do you know -- do you have a percentage?
2         A.  I don't have it with me.
3         Q.  Do you have a range?
4         A.  Rob Sofie would be the one to ask that.
5         Q.  Okay.  How are you able to determine that
6   some people skew the results of the survey by --
7         A.  That's the problem.  You can't.
8         Q.  Okay.  So you don't know for sure that
9   that is a problem at this department?
10        A.  What's the problem?
11        Q.  In terms of citizens filling out multiple
12  surveys.
13        A.  Don't -- don't know.
14        Q.  Okay.
15        A.  It could be -- I could have 100, and it
16  could be all from the same person.
17        Q.  Okay.  Does CALEA provide model policies
18  or best practices on interactions between law
19  enforcement officers of opposite sex?  In other
20  words, does CALEA touch on workplace environment
21  type of policies?
22        A.  I'm sure.  I can't specify the policy,
23  though.
24        Q.  To your knowledge, it's not what --
25        A.  I -- I know that we have a policy on

Page 44

1   sexual harassment, and I'm -- I can't imagine that
2   it wouldn't be a part of CALEA's mandated standards.
3         Q.  Okay.  So it's your understanding that the
4   department's sexual harassment policy comes from
5   CALEA and not from Douglas County as a whole?
6         A.  Well, I'm sure we had it before anyway.
7   Because we -- like, the County itself has a policy,
8   and we mirror that.
9         Q.  Okay.  So -- and just so that I'm clear,
10  is it your understanding that the Douglas County
11  Sheriff's Office sexual harassment policy comes from
12  Douglas County, or does it come from CALEA?
13        A.  I can't answer that.  That -- again, it
14  would be Rob Sofie.
15        Q.  Okay.
16        A.  I don't -- I don't write those things.  He
17  does.
18        Q.  Does he run revisions of policies, general
19  orders through you?
20        A.  Yeah.  We have a -- we use a -- some
21  software called PowerDMS, and through Power --
22  everything goes through there, whether it's an
23  announcement of somebody going to training, somebody
24  getting promoted, any general orders.  People have
25  the ability -- before we issue them, people have the

11 (Pages 41 to 44)

DUNNING - Direct (By Ms. Tsai)

Page 45

1    ability to weigh in what -- whether they support it
2    or -- or oppose it and, if they oppose it, why.
3         And so we have all that tracked.  And so
4    until -- the whole department has a vetting process.
5    So until they all vet, we don't publish.
6         Q.  Do all employees of Douglas County
7    Sheriff's Office have a say in changes to general
8    orders?
9         A.  Well, I have the final say.
10        Q.  Okay.
11        A.  But I guess what I'm looking for when we
12   do that is if there is something that we've
13   forgotten or if something is going to be so
14   horrendously cumbersome on something we want to
15   track.  Maybe we want to track something monthly,
16   quarterly, and then somebody says, "Well, you know,
17   we don't want to do that because I also got to be on
18   the street."  That sort of thing.  That -- we just
19   give them a chance to weigh in.
20        Q.  Okay.
21        A.  And if you've had the ability to weigh in,
22   then you -- then you shouldn't be whining later.
23        Q.  Does that work?
24        A.  Yeah.  I -- I think it does.
25        Q.  Okay.  In addition to attending the

Page 46

1    seminars and training programs presented by CALEA,
2    do you also receive publication from CALEA?
3         A.  Yeah.  They -- but it's -- it's
4    electronic.
5         Q.  Okay.  What does the publication cover?
6         A.  It's usually a recap of the last
7    conference, or they might let you know some
8    standards that they're -- they're reviewing.
9         Q.  And so even if you weren't able to attend
10   a certain conference, you still are able to receive
11   the knowledge and information that was presented at
12   the conference through the publication?
13        A.  Yes.
14        Q.  Do you review the literature that you get
15   from CALEA on a regular basis?
16        A.  Yes.
17        Q.  Okay.  And is that one of the ways that
18   keeps you informed and up to speed on nationwide
19   trends relating to law enforcement?
20        A.  Yes.
21        Q.  Other than CALEA, how else do you stay up
22   to date on law enforcement trends and issues?
23        A.  Like I say, the National Sheriffs'
24   Association, Major County Sheriffs' Association.
25        Q.  What was the second one?

Page 47

1         A.  Major County Sheriffs' Association.
2         Q.  And is that a nationwide association?
3         A.  Yes.
4         Q.  Okay.  And what's the requirement to be --
5    to meet the requirement of Major County?
6         A.  Well, for me it's -- we're the -- the
7    largest sheriff's office in the state.  Otherwise I
8    previously didn't meet the requirements.
9         Q.  Okay.
10        A.  Because you had to have a -- you had to
11   have a sworn workforce of 500 or more.  But what
12   they found was that they weren't having
13   representation from all of the states, and that --
14   that wasn't working for them; so they've changed it
15   now.
16        Q.  And is it correct to say that you also get
17   publication from the National Sheriffs' Association
18   and Major County Sheriffs' Association?
19        A.  Major County Sheriffs' doesn't have a
20   publication.  We meet twice a year, and then every
21   other year we meet three times a year.
22        Q.  And what is the purpose of these meetings?
23        A.  The Major County Sheriffs' meetings are
24   heavy with bringing in, say, the head of the DEA,
25   the head of the FBI.  We just had the attorney

Page 48

1    general last week.  The executive committee of the
2    sheriffs -- Major County Sheriffs' met with Trump.
3    You know, a variety of agency heads, National
4    Security Agency.  They come and speak and talk what
5    they're going to do and things we should be aware
6    of.  A lot of intel.  A lot of, again, discussions
7    on major events that have -- that have occurred.
8         Q.  And you received publication from the
9    National Sheriffs' Association; right?
10        A.  National, yes.
11        Q.  How frequently do you receive a
12   publication from them?
13        A.  I think it's monthly.
14        Q.  And in their monthly publication, they
15   touch upon relevant issues and trends relating to
16   law enforcement; correct?
17        You have to say "yes."
18        A.  Yes.  I'm sorry.
19        Q.  Do they also meet ever?
20        A.  National Sheriffs', yeah.  They usually
21   meet -- it just depends on how we structure the
22   conference.  It will be -- like, this last one
23   National Sheriffs' met first for a few days, and
24   then the last two or three days it's Major County
25   Sheriffs'.

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

DUNNING - Direct (By Ms. Tsai)

Page 49

1     Q.  Okay.  So they piggyback the conference
2  together?
3     A.  Right.
4     Q.  Okay.  And based on your knowledge
5  stemming from various publications relating to law
6  enforcement and your training and the conferences
7  that you've attended relating to law enforcement,
8  would you agree with me generally that sexual
9  assault by a law enforcement officer is something
10  that happens?
11     A.  It's come up in conversation.  You know,
12  agencies talking about things that have happened
13  within their agency.
14     Q.  Okay.  And in those conversations, are
15  there further discussion about what, as executives
16  of -- head of departments, what you guys can do to
17  address this problem?
18     A.  I don't recall those coming up.
19  Usually -- you know, those are usually isolated
20  incidents that was a matter of somebody not
21  following the policies and procedures of their
22  department and/or violating the laws of that
23  particular state.
24     Q.  And so in that conversation, there isn't
25  that follow-up conversation of what we can do to

Page 50

1  make sure that the policies are followed?
2     A.  Fire them and prosecute them.  I mean,
3  that's the...
4     Q.  Okay.  Have you ever heard of the
5  international association of sheriffs of police?
6     A.  Chiefs of police?
7     Q.  Chiefs of police.
8     A.  Yes.
9     Q.  Okay.  And do you ever read publications
10  that are published by this association?
11     A.  I don't belong to them.
12     Q.  Okay.  They are -- they are associated
13  with CALEA; correct?
14     A.  Correct.
15     Q.  Okay.  And I believe I've covered this,
16  but I just want to make sure.
17        Have you ever attended any presentations
18  or seminars where there was discussion about sexual
19  misconduct by law enforcement officers?
20     A.  Not that I recall.
21     Q.  Okay.  Have you ever read any literature
22  publication about sexual misconduct by law
23  enforcement officers?
24     A.  Just the stuff that your office has
25  provided.

Page 51

1     Q.  Okay.  When did you review the literature
2  that my office provided?
3     A.  Maybe about three weeks ago.  Three, four
4  weeks ago.
5     Q.  Was the information that you read -- did
6  you -- did you find that information surprising?
7     A.  I actually took a couple pages out and
8  copied them, and we're going to use them for future
9  interviews of new recruits.  It kind of -- it -- I
10  was already asking some of the questions that they
11  talked about, but they have a further breakdown of
12  it that I thought might be used for a polygraph type
13  of a question.
14     Q.  Was this the first time that you're
15  learning about -- strike that.
16        Are you aware that sexual misconduct is
17  the second most frequent police misconduct behind
18  excessive force nationwide?
19     A.  Behind what?
20     Q.  Excessive force.
21        MR. DOLAN:  Object to foundation.
22     You may answer, if you know.
23        THE WITNESS:  Am I supposed to
24  answer?
25        MR. DOLAN:  You may.

Page 52

1        THE WITNESS:  No, I'm not.
2  BY MS. TSAI:
3     Q.  Okay.  What do you believe is the most
4  frequent police misconduct nationwide outside --
5  after excessive force?
6     A.  Nationwide I don't have a clue because
7  every -- every agency is different.
8     Q.  Okay.  What about at your department?
9     A.  For us, I guess it would probably be
10  discourtesy.  Like -- and I can't say that that's a
11  major problem.
12     Q.  And when you use the term "discourtesy,"
13  does that include -- well, explain to me what you
14  mean by "discourtesy."
15     A.  Just rude, harsh.
16     Q.  Does that include language that makes a
17  citizen uncomfortable?
18     A.  Yes.
19     Q.  Does it include language that the citizen
20  perceives to be sexually related?
21     A.  No.
22     Q.  What -- how would you -- what category
23  would you put that in?
24     A.  I'm putting it in that somebody may be on
25  a traffic stop or a radio call, and they're -- they

13 (Pages 49 to 52)

DUNNING - Direct (By Ms. Tsai)

Page 53

1    may be harsh or crude in their comments.  Not crude.
2    I don't even want to say crude.  I want to say rude.
3        Q.   So during a traffic stop, if a deputy uses
4    cruel language, that would not fall under
5    discourtesy?
6        A.   What was that again?  He uses crude
7    language?
8        Q.   Correct.
9        A.   And then what was that last part?
10       Q.   Would that fall under an officer being
11   discourteous?
12       A.   If he's on a traffic stop?
13       Q.   Yes.
14       A.   If he's using crude language, yeah, that
15   would be inappropriate.
16       Q.   Changing topics.  Please describe for me
17   the role of the Merit Commission.
18       A.   The Merit Commission is, like -- it's
19   established by state law, and it's -- it's, like,
20   our personnel board.  Or it's -- it's the HR for the
21   sheriff's office for the sworn personnel.  So they
22   review our hiring practices.  They -- they hear
23   appeals on discipline.  They -- they approve of our
24   promotional practice.
25       Q.   And how do you interact with the

Page 54

1    commission?
2        A.   Well, I'm -- by law, I'm the secretary of
3    the -- the commission, so we put together an agenda
4    where we are to meet at least -- at least four times
5    a year.
6            And in those meetings we -- some of those
7    meetings are very short because we don't have
8    anything to discuss.  Most of the time it's
9    approving the hiring process and approving the final
10   list, approving a promotional process and approving
11   the final list.  And then period -- periodically we
12   have an appeal of discipline or an appeal of a
13   practice.
14       Q.   What do you mean by "appeal of a
15   practice"?
16       A.   Okay.  The most recent one that I can
17   think of is we had a deputy that -- she had been in
18   a car accident and -- and got hurt.  And so sometime
19   later she's back at work full duty.  We -- we have a
20   regulation that you have to -- you have to score at
21   least an 80 percent on the firearms qualification
22   shoot.
23           She didn't qualify.  Said it was because
24   she had -- she was still suffering from her injury,
25   even though she didn't let anybody know that.

Page 55

1            And so when you don't qualify, we take
2    away your shooting pay.  Your shooting is part of
3    your contract.  We took away her shooting pay for
4    that quarter, and so she appealed that to the Merit
5    Commission.
6        Q.   Okay.  And does the commission have to
7    approve all disciplinary actions, or it's only if
8    the deputy appeals the disciplinary?
9        A.   Yeah.  They wouldn't hear it unless they
10   appeal.
11       Q.   Okay.  Do you need the commission's
12   approval to terminate employees?
13       A.   Do I need to -- I have to notify them, but
14   I don't need the Merit Commission to approve it.
15       Q.   Just notification?
16       A.   Right.
17       Q.   Do you notify the commission whenever a
18   deputy receives disciplinary -- a disciplinary
19   action?
20       A.   Yes.
21       Q.   And how are they notified?
22       A.   They are usually notified at the next
23   meeting.  If it's -- I believe if it's something
24   really serious, we'll send it out ahead of time so
25   they are not surprised by maybe something that's in

Page 56

1    the media, if -- if, in fact, it would reach that
2    level.
3        Q.   And do you notify the commission on
4    changes to policies or general orders, or that's
5    outside their scope?
6        A.   Yeah.  That's outside their purview.
7        Q.   Who has the final say on disciplinary
8    actions?
9        A.   I do.
10       Q.   Do you see and approve all disciplinary
11   actions?
12       A.   Well, yeah.  I'll finally approve -- I was
13   just trying to think of -- if I'm out of town and my
14   chief deputy is the acting sheriff, he may.  But I
15   was trying to think if there was a time when he did.
16   And I think there was one time -- either my current
17   chief deputy or my prior one had a hearing related
18   to me over the phone as to what took place, and I --
19   I approved what he was recommending.
20       Q.   Okay.
21       A.   And that was -- I want to say I think it
22   was Marty Bilek when he was my chief; so it's been
23   some time ago.
24       Q.   Okay.  What about administrative
25   investigations?  Is the commission notified of all

14 (Pages 53 to 56)

DUNNING - Direct (By Ms. Tsai)

Page 57

1    administrative investigations?
2         A.  I don't believe so.
3         Q.  Are you notified of all?
4         A.  I am.
5         Q.  Okay.  And when are you notified of the
6    administrative investigations?
7         A.  Well, it just depends on how it -- how it
8    comes in, if it -- maybe a citizen's complaint that
9    is, say, mailed to Lieutenant Martin or maybe mailed
10   to our department.  Depending on who gets it, I'm
11   notified at some point in time.  And then we decide
12   if it's going to be a line investigation or if it's
13   going to go straight to the Office of Professional
14   Standards.
15        Q.  Okay.  One of the requirements of CALEA
16   accreditation is to establish a early intervention
17   program?
18        A.  A what?
19        Q.  Early intervention program.
20        A.  Yes.
21        Q.  Can you please explain what early
22   intervention program is?
23        A.  Well, I got the expert in here.  But what
24   we want to do is we want to -- we want to catch
25   problems early.  And so I believe I get a report

Page 58

1    either monthly or quarterly from Lieutenant Martin
2    letting me know if -- you know, for example, if we
3    have a sick leave abuser, we're able to capture that
4    early.  But we're also able to capture if someone is
5    getting a number of accommodations.  If someone is
6    frequently complained on for whatever reason, we
7    would be able to track that and -- and so we can --
8    so we can take action.
9         And then as a -- as part of that, then
10   we'll -- we would have -- if something is suspected
11   to be a problem, we would have a monitoring plan.
12        Q.  Did the department have a early
13   intervention program prior to 2005 when it sought
14   accreditation from CALEA?
15        A.  I don't recall if we have.  Because
16   we've -- we have upgraded that as we've gone along;
17   so I'm trying to think of -- we had a -- we had a --
18   we had a previous software package that we were
19   using, and now we're using a -- kind of a best
20   practice version, Guardian Tracking.  So I don't
21   remember if it went into effect in 2005 or not --
22   the first version.
23        I want to say we had something that was
24   early intervention early on because I'm thinking it
25   dated back a ways, but I can't -- I don't remember

Page 59

1    the exact date of that.
2         Q.  So how -- how does the office go about
3    identifying individuals who could potentially
4    benefit from the early intervention program?
5         A.  Well, it goes into kind of a form of
6    counseling.  If I'm, you know -- for example, if
7    Lieutenant Martin is tracking sick leave abuse,
8    we'll be looking at whether somebody took sick leave
9    before or after their days off or before or after
10   vacation or before or after holidays.  We'll take a
11   look at that.
12        Then we sit down and do a monitoring plan
13   with them.  It's usually about for six months.  And
14   then that early intervention goes away if we don't
15   have any more problems.
16        I don't know.  Did that answer it or not?
17        Q.  Well, I guess I'm asking how does the
18   department identify a problem -- a person who may
19   be, if we're using your example, taking advantage of
20   the sick leave policy?
21        A.  Well, sick leave is entered in -- into a
22   system and so we're able to track it that way.
23        Q.  Are there certain categories that are
24   tracked for the purposes of the early intervention
25   program?

Page 60

1         A.  For example?
2         Q.  The sick leave.
3         A.  Pardon?
4         Q.  For example, using -- abusing the sick
5    leave policy.  It's something that is tracked and
6    could be identified?
7         A.  Yeah.  If we would have -- yeah.  If --
8    say we had an employee that was on -- that we knew
9    was pregnant and was taking some sick leave.  We're
10   probably not going to look at that as -- as abuse as
11   we would somebody else's, like I say, taking before
12   and after their days off.
13        And if -- and if we've had them in the
14   system once before, they -- and then they come back,
15   and then we now see that we have a -- we have a
16   frequent flyer and trying to address it that way.
17        Q.  Other than sick leave, what other
18   categories are tracked to identify patterns of
19   behavior?
20        A.  Anything that would have a -- that could
21   potentially be looked at as disciplinary.
22        Q.  How does the office go about tracking all
23   of those things?
24        A.  Well, usually the -- they say the sergeant
25   would or lieutenant would bring it to our attention.

15 (Pages 57 to 60)

DUNNING - Direct (By Ms. Tsai)

Page 61

1    We have -- there's what we call a personnel
2    advisory, and those would be filled out.  Those --
3    those all go to Lieutenant Martin, and so he keeps
4    track of it that way.
5         Q.  Is it fair to say that the early
6    intervention program is dependent on sergeants or
7    lieutenants to complete certain forms -- for
8    example, the personnel advisory -- in order to track
9    patterns of behavior by deputies?
10        A.  It just depends on what the behavioral
11   thing is that we're dealing with.  It makes it
12   better.  I mean, the -- obviously the more data you
13   have, the better it is.
14        Q.  With a deputy who is consistently leaving
15   his or her district while on shift, would that be a
16   pattern or behavior that is tracked for purposes of
17   the early intervention program?
18        A.  Not -- not necessarily.  I mean, it's
19   up -- sometimes, the way our districts are
20   constructed, you may -- might drive out of your
21   district just because of how it's geographically
22   constructed.  So that wouldn't necessarily be a
23   violation.
24        Q.  Right.  I understand that.
25        A.  Yeah.

Page 62

1         Q.  But is it true that a deputy who is
2    constantly leaving his or her district not for
3    purposes of any on-duty assignment, that is a
4    violation of policy?
5         A.  Yeah.  You're supposed to stay in your
6    district.  But, you know, you go to back up other
7    people.  Whether -- whether you have been called to
8    back up or not, you may be back people up.  You may
9    back Omaha police officers up.  If you're working
10   on, you know, one of our borders, you might back up
11   the Washington County sheriff or the Sarpy County
12   sheriff's deputies.
13        Q.  But there is a order that -- well, there
14   is a policy that requires the deputy to radio in if
15   they are going to back up a -- you know --
16        A.  Correct.
17        Q.  Okay.  So is it your testimony today that
18   deputies are permitted to leave their district while
19   on duty?
20        A.  Not without notice.
21        Q.  Not without notice.
22        So is there a way to track a pattern of
23   behavior of deputies leaving their district without
24   notice while on duty?
25        A.  Not that I'm aware of.

Page 63

1         Q.  Okay.  Would you agree with me that using
2    the police vehicle GPS system would be one way to
3    track a pattern of behavior of deputies leaving
4    their district without notice while on duty?
5         A.  You would have to have somebody assigned
6    to the radio room to look at their screens the whole
7    time.  We wouldn't be able to do that from our cars.
8         Now, we -- we are -- that's an area that
9    we are going to enhance here shortly.  I just saw a
10   product here in the last month called MACH that the
11   state patrol put in and Lancaster County sheriffs
12   did.  But I found out that we're getting ready to go
13   live with our new records management system, and
14   we're going to have that feature here in a very
15   short period of time.
16        Q.  Currently with the software that the
17   department has, the department has the capabilities
18   of downloading GPS data from vehicles once they
19   return to the -- from shift; correct?
20        A.  I believe so.
21        Q.  And in that sense, then, the GPS data can
22   capture a pattern of behavior of deputies leaving
23   the district without notice?
24        A.  Yeah.  If you had somebody that could look
25   at that the whole time and not do anything else.

Page 64

1         Q.  Is that an area that the department has
2    not explored?
3         A.  No.
4         Q.  Yes, that's an area that the department
5    has not explored?
6         A.  Correct.
7         Q.  Okay.  What about inappropriate traffic
8    stops?  Is there a method which the department
9    currently tracks a pattern of behavior of deputies
10   who are consistently engaged in inappropriate
11   traffic stops?
12        A.  No.
13        Q.  Okay.  How about inappropriate
14   interactions with private citizens?  Is there a
15   system where the department currently tracks a
16   pattern of behavior where deputies are having
17   inappropriate interactions with citizens?
18        A.  Well, if we would get a citizen's
19   complaint, we would be able to go back and track
20   what was being said that -- that was captured by
21   their mic pack and -- and correspond it with their
22   camera if, in fact, they were in that particular
23   line of vision.
24        Q.  And remind me -- tell me if I'm correct.
25        When -- when a traffic stop is conducted

16 (Pages 61 to 64)

DUNNING - Direct (By Ms. Tsai)

Page 65

1 and the deputy has his or her lights on, that
2 automatically triggers the in-camera -- in-car
3 camera to begin recording; correct?
4      A.  Correct.
5      Q.  And that also triggers the mic pack as
6 well?
7      A.  Yes.
8      Q.  Okay.  And that -- the data from the
9 in-car video and the mic pack is something that the
10 department can download after they return from their
11 shift?
12      A.  You could, yes.
13      Q.  Okay.  Currently the policy is that the
14 department would not download that information
15 unless the deputy requests for that data to be
16 downloaded for a criminal prosecution; correct?
17      A.  And/or if we have a complaint.
18      Q.  Okay.  You mentioned earlier -- using your
19 example of a sick leave abuser, when -- how far back
20 do you look at a person's record to establish
21 where -- if there is a pattern of behavior?
22      A.  I don't -- I don't know how -- how far
23 back they look.
24      Q.  Is there a written policy about that?
25      A.  I don't know that -- I don't know how far

Page 66

1 the policy -- I mean, I don't know that the policy
2 has anything that says how far we look back.
3      Q.  Based on your experience and knowledge on
4 law enforcement and identifying patterns of
5 behavior, what do you believe would be a good
6 practice -- a best practice in terms of how far back
7 you look at a -- a deputy's records to determine
8 that there is a pattern of a certain behavior?
9      A.  For sick leave abuse?
10      Q.  Is there -- would you differentiate based
11 on --
12      A.  Well, yeah.  I mean, it would depend on
13 what's taking place.
14      Q.  Why is that?
15      A.  Well, I mean, there is -- you're dealing
16 with people.  Every -- every situation is different.
17      Q.  So let's first start with your example of
18 sick leave abuse.  How far back do you believe would
19 be a best practice to determine if a deputy exhibits
20 a pattern of abusing the sick leave policy?
21      A.  Well, my -- my guess is you would go back
22 month by month backtracking.  And then if you -- if
23 you were seeing a pattern, then you might go farther
24 back.
25      Q.  Okay.  And you would go -- you would keep

Page 67

1 going back until you no longer see the pattern; is
2 that right?
3      A.  Well, for disciplinary purposes I can't
4 bring anything older than two years in --
5      Q.  Okay.
6      A.  -- on -- on that type of a case.
7      Q.  Sure.
8      A.  So we definitely wouldn't go back any
9 farther than that.
10      Q.  Okay.  Let's use the example of excessive
11 force.  Okay?
12      A.  Okay.
13      Q.  If you are trying to identify if a deputy
14 has a pattern or behavior using excessive force, how
15 far -- what do you believe is best practice?
16      A.  Well, all -- all excessive force is going
17 to be tracked.
18      Q.  Right.
19      A.  So, I mean, that's -- that's readily
20 available data.  So I would guess that we would go
21 back probably to the statute of limitations.
22      Q.  Okay.  And off the top of your head, do
23 you know what the statute of limitation is for
24 excessive force?
25      A.  Not off the top of my head.

Page 68

1      Q.  Okay.
2      A.  I should know, but I don't.
3      Q.  That's okay.
4          Well, let's go -- what about your example
5 of deputies being discourteous to citizens?  What do
6 you believe would be best practice as to how far
7 back you look to establish whether a deputy has a
8 pattern of being discourteous to citizens?
9      A.  You know, I don't know how far back
10 Lieutenant Martin goes.  I mean, he's going to get
11 all of those that have come in as a complaint or
12 something that somebody has -- from our department
13 has maybe witnessed and turned in.  So it wouldn't
14 take many for me to say "We've got to have a
15 hearing."
16      Q.  But in terms of best practice as to look
17 back at the individual's personnel records, how far
18 back would you go?
19      A.  Well, discourteous would probably fall
20 into that two-year --
21      Q.  Two years?
22      A.  -- limit as well because I couldn't bring
23 anything up beyond that at a personnel board
24 hearing.
25      Q.  And I noticed in a lot of the internal

17 (Pages 65 to 68)

DUNNING - Direct (By Ms. Tsai)

Page 69

1    affairs files that we received the term "conduct
2    unbecoming of an officer." Are you familiar with
3    that term?
4        A. Uh-huh.
5        Q. Okay. If you are trying to identify
6    whether a deputy has a pattern of conduct that's
7    unbecoming of an officer, what do you believe is the
8    best practice as to how far back you would look at
9    the person's records?
10       A. Again, I'd track back month by month.
11   Probably just do a -- do a sample of six months.
12       Q. Okay.
13       A. And -- and as you're tracking, if you're
14   finding a --
15       Q. Pattern?
16       A. -- further pattern closer to that six
17   months, then start backtracking further.
18       Q. Okay. And so you would just keep going
19   until you -- there is no pattern there -- until the
20   pattern -- to identify where the pattern began; is
21   that right?
22       A. Well, the pattern would have begun when we
23   first started checking. I mean, that's where we're
24   going to say is this instance repeating itself in
25   any way, shape, or form and start going backwards.

Page 70

1        Q. Okay.
2        A. And if you have a period of time that it's
3    not, then...
4        Q. Then you stop?
5        A. Yep.
6        Q. Okay. But you would go back at least six
7    months?
8        A. Yes.
9        Q. Okay. One of the campaign promises I saw
10   online that you made -- and I don't know when this
11   promise was made -- was erasing the iron curtain
12   between OPD and Douglas County Sheriff's Office.
13       A. Yes.
14       Q. Do you recall that?
15       A. Yes.
16       Q. Do you know when that -- what became --
17   that was part of your campaign?
18       A. That was my first campaign.
19       Q. Okay. Do you need to get that?
20       A. No.
21       Q. Okay. And what did you mean by erasing
22   the iron curtain between OPD and Douglas County
23   Sheriff's Office?
24       A. We didn't have a good working
25   relationship. When I say "we," Omaha Police,

Page 71

1    because that's where I was at the time, didn't have
2    a good working relationship with the sheriff.
3        Q. And when you say that there wasn't a good
4    working relationship, what -- what do you mean by
5    that?
6        A. We didn't interact on cases. There wasn't
7    a -- the sheriff's office wasn't participating in,
8    say, task force cases, that sort of thing. And
9    there was no reason why that had to occur that way.
10       Q. What steps did you take to resolve this
11   problem?
12       A. Well, I was from Omaha Police so it
13   immediately broke down. I mean, it wasn't a problem
14   at all. I had -- I had people get on task forces
15   and...
16       Q. When you became the sheriff of Douglas
17   County, did you issue a directive to inform
18   lieutenants, the sergeants, the deputies, "Listen.
19   We're going to start working with OPD on
20   investigations and stuff"?
21       A. No. But they saw it.
22       Q. How did they see it?
23       A. Well, because they were now involved in
24   things that they had not previously been involved
25   in. We had a greater involvement with the fugitive

Page 72

1    warrants task force. We -- Omaha -- or the
2    sheriff's office had pulled out of the metro area
3    drug task force, and we were back in it again. We
4    helped them on search warrants. They helped us.
5        Q. Did you guys collaborate resources to
6    conduct criminal investigations?
7        A. Well, that was part of the metro area drug
8    task force, yeah. Same with the fugitive warrants
9    task force.
10       Q. What about on criminal investigations not
11   involving drugs or fugitive warrants?
12       A. I guess the example I would use is that we
13   have -- when we have an officer-involved shooting,
14   we have them investigate ours. And we're going to
15   firm that up even further here shortly that, when
16   Omaha Police has an officer-involved shooting,
17   their -- we'll be investigating theirs. We have
18   embedded investigators inside to make sure that
19   everything gets covered.
20       Q. And is the purpose of having the other
21   jurisdiction investigate the officer-involved
22   shooting so that there isn't any conflict of
23   interest? Or what -- I guess --
24       A. Create transparency.
25       Q. Yep.

18 (Pages 69 to 72)

DUNNING - Direct (By Ms. Tsai)

Page 73

1    Other than assigning personnel from the
2  sheriff's office to these multi-jurisdiction task
3  force, what else -- what other steps did you take to
4  erase the iron curtain between OPD and Douglas
5  County Sheriff's Office?
6    A.  Revamped the crime lab so that Omaha
7  Police could use it.
8    Q.  You mentioned earlier about merging the
9  radio system between OPD and Douglas County.  Was
10 that also an effort to erase the iron curtain?
11   A.  Yes.
12   Q.  Prior to you becoming sheriff of Douglas
13 County, did Douglas County deputies assist OPD
14 officers on calls?
15        MR. DOLAN:  Object on relevance.
16 You're talking about 1994 when Cory Cooper was about
17 11 years old.
18        You can answer, if you know.
19        THE WITNESS:  You know, they -- they
20 backed each other up.  You know, the iron curtain
21 thing was between the police chief and the sheriff.
22 BY MS. TSAI:
23   Q.  I see.  Okay.
24   A.  They didn't have -- they didn't have a
25 good working relationship.

Page 74

1    Q.  Okay.  When you are notified of an
2  administrative investigation, what information are
3  you provided at first?
4    A.  When we -- well, I'm trying to take -- I'm
5  not quite sure.  When -- when we started our
6  administrative investigation -- any one or this one?
7    Q.  Any one.
8    A.  I'm just provided what facts are known at
9  that time.  And that's when we decide whether it's
10 going to be a line investigation or if it's going to
11 go to Lieutenant Martin.
12   Q.  And do you receive, like, a -- written
13 documentation, or is someone just telling you the
14 facts?
15   A.  If -- if that's available at the time.
16   Q.  If a sergeant or lieutenant receives a
17 phone call from a concerned citizen about some
18 issue, is there any directive for him or her to
19 write down the concern that the citizen has?
20   A.  It -- at that point it will probably just
21 be a note.
22   Q.  Okay.  And do you see the note?
23   A.  I don't receive the note, but I will
24 receive a -- I will receive a conversation.
25 Lieutenant Martin's office is less than 20 feet from

Page 75

1  mine; so he will usually go in and grab the chief,
2  and they come to my office.  Or he'll inform the
3  chief at that time, and then the chief will brief
4  me.
5    Q.  Okay.  And who makes the determination
6  whether it -- the investigation will be a line
7  investigation or if it will be a OPS investigation?
8    A.  Well, the final decision is mine, but
9  we -- between the -- the three of us we make that
10 determination.
11   Q.  Is it fair to say all administrative
12 investigations you have a initial conversation with
13 the chief and Lieutenant Martin about the complaint
14 and what -- and who should be assigned to the
15 investigation?
16   A.  Right.  As to what is -- depending on what
17 is known at that point in time.
18   Q.  And is there a time limitation as to how
19 long the investigation should take before completed?
20   A.  Well, it's different by the union
21 contract.  We have -- if it's the -- if it's the
22 Local 571 or the IBEW contract, which are the non
23 sworn, I think we have a 30-day window for those,
24 unless waived.
25        For the sworn I believe we have a 90 --

Page 76

1  either -- either a 60- or 90-day window -- never had
2  to reach out that far -- unless waived.  That has
3  any -- on any of them, if there is a criminal
4  overtone, we have more time.
5    Q.  Okay.  If there is a criminal overtone,
6  does the administrative investigation proceed
7  concurrently with the criminal investigation?
8    A.  It could, yes.
9    Q.  Okay.  And if there is a criminal
10 overtone, does the Douglas County Sheriff's Office
11 still conduct the criminal investigation?
12   A.  Could.
13   Q.  Okay.
14   A.  Unless it's already being done by another
15 agency.
16   Q.  Right.
17        In cases where both the administrative
18 investigation and the criminal investigation is
19 being conducted by your department, do the
20 investigators collaborate and work together, or are
21 these independent investigations?
22   A.  Well, there is -- there is -- we have to
23 follow -- by state law we have to follow the police
24 officer bill of rights.  So there is those -- those
25 things that we have to take into consideration.

19 (Pages 73 to 76)

DUNNING - Direct (By Ms. Tsai)

Page 77

1    I believe -- and I could be wrong.  But I
2  believe that Lieutenant Martin can share information
3  up to the point that he gives Garrity, and that has
4  to stop at that point in time.  We -- we can use
5  their investigation from the criminal side.  They
6  just can't use ours --
7    Q.  Right.
8    A.  -- once Garrity has been given.
9    Q.  And the administrative investigation
10  general order breaks down complaints into two
11  categories -- Class I and Class II.  Are you
12  familiar with that?
13    A.  What was that again?
14    Q.  The administrative investigation general
15  order --
16    A.  Okay.
17    Q.  -- breaks down complaints into two
18  categories -- Class I and Class II?
19    A.  Correct.
20    Q.  You're familiar with that?
21    A.  I am.  I don't have it memorized, but I
22  am.
23    Q.  Okay.  And my understanding is that
24  Class I complaints are the complaints that are
25  assigned to the line -- their supervisors, and

Page 78

1  Class II complaints are those that are assigned to
2  OPS?
3    A.  Correct.
4    Q.  Okay.  For -- focusing on Class I
5  complaints, do you receive updates throughout the
6  investigation as to their findings?
7    A.  Yes.
8    Q.  And how do you go about receiving that
9  information?
10    A.  Could be in writing.  It could be a
11  briefing.
12    Q.  Is there --
13    A.  And there is going to be something in
14  writing at the end of the day.
15    Q.  Right.
16    And so my question is between the time you
17  are first notified and then assign a complaint as a
18  Class I complaint to when you receive the final
19  report of their determination and recommendation
20  for -- do you receive any information in between
21  that time?
22    A.  Sometimes.
23    Q.  And do you reach out to the line
24  supervisor to get update, or do they approach you?
25    A.  Yeah.  Generally, they'll -- they'll brief

Page 79

1  the chief, and the chief briefs me.  Or that captain
2  will come in with the chief, and we'll do it
3  together.
4    Q.  So for Class I complaints, is it always a
5  captain that's investigating?
6    A.  Well, he's the -- the lead on it.
7    Q.  Okay.  For Class II complaints -- those
8  are the ones that are assigned to OPS?
9    A.  Correct.
10    Q.  Okay.  And do you receive updates -- well,
11  strike that.
12    First, is it true that the general order
13  provides a longer period of time for investigation
14  for Class II complaints than Class I?
15    A.  What was that again?
16    Q.  The general order for administrative
17  investigations provides more time for Class II
18  investigations than Class I investigations; correct?
19    A.  I don't believe so.  I believe it's the
20  same time limit.
21    Q.  Okay.  Do you find that generally Class I
22  and Class II investigations take about the same
23  amount of time?
24    A.  Each case is different.  It just depends
25  how many witnesses you have and where they are and

Page 80

1  how soon you can get ahold of them.
2    Q.  Do you have any method of tracking the
3  progress of each investigation?
4    A.  No.
5    Q.  So if there is a complaint that is --
6  that's -- whose investigation is pending for 20 days
7  or 30 days, there is no -- you don't have a method
8  of tracking that; correct?
9    You have to say "yes" or "no."
10    A.  No.  But there is no -- you know, three of
11  the captains are on the -- on the same area that I
12  am.  The other one is downtown.  Lieutenant Martin's
13  office is right -- like, I could say, within 20 feet
14  of my office.  So I don't -- I can't think of a time
15  that I waited very long --
16    Q.  Okay.
17    A.  -- if there was information to be told.
18    Q.  If a captain just happens to be extremely
19  busy at a certain point in time and does not get to
20  investigating a complaint, you wouldn't know about
21  that unless someone alerted you of that; correct?
22    MR. DOLAN:  Object:  Calls for
23  speculation.
24    You may answer, if you know.
25    THE WITNESS:  Yeah.  That's not --

20  (Pages 77 to 80)

DUNNING - Direct (By Ms. Tsai)

Page 81

1    that just hasn't happened.
2    BY MS. TSAI:
3        Q.  Well, in all fairness, you wouldn't know
4    if that has happened; right?
5        A.  Well, it just hasn't happened because I'm
6    going to be curious as to what the progress of that
7    is.
8        Q.  Do you remember every complaint?
9        A.  We don't have that many complaints; so
10   it's not hard to keep track of them.
11       Q.  Okay.  So that's a yes?  You do remember
12   every complaint that comes in?
13       A.  I -- I believe reasonably so, yeah.
14       Q.  Okay.  For the complaints that are
15   investigated by OPS, do you receive updates in
16   between the time you first receive notice of the
17   complaint and when the investigation is completed?
18       A.  Yes.  We get briefings.
19       Q.  In written form or just through
20   conversation?
21       A.  Could if -- say there is a investigation
22   that Lieutenant Martin is conducting and say there
23   is several people that are being interviewed.  As
24   those interviews are completed --
25       Q.  Uh-huh.

Page 82

1        A.  -- I might be reading them before he
2    completely finishes that investigation.
3        Q.  Okay.  In the Cory Cooper investigation,
4    there were multiple individuals interviewed by
5    Lieutenant Martin.
6        A.  Correct.
7        Q.  Did you receive transcripts of those
8    interviews prior to the completion of that
9    investigation?
10       A.  I don't remember if I read -- read the --
11   read them before or afterwards, but we did have
12   regular briefings on that.
13       Q.  Okay.  In the investigation regarding
14   Cory Cooper, when you say you have regular
15   briefings, how frequently were they?
16       A.  How what?
17       Q.  How frequently were they?
18       A.  That I read them?
19       Q.  Or that you had conversations and received
20   updates?
21       A.  I think we had -- we had fairly regular
22   briefings on that.  You know, like, if -- if
23   Lieutenant Martin was going to be interviewing
24   somebody two days from now, then in between then I
25   wouldn't need any update because I'm not -- there

Page 83

1    isn't going to be anything to update me with.
2            But it was -- it was pretty regular.  That
3    was a serious case for us.
4        Q.  And I don't mean to be difficult, but in
5    terms of "regular," I'm just trying to have an
6    understanding if your -- if you define "regular" as
7    a few days or a couple of weeks?
8        A.  Oh, it could be a couple of times a day.
9        Q.  Okay.
10       A.  It just depends on how the information
11   comes in.
12       Q.  Is it fair to say for the investigation
13   relating to Cory Cooper, then, you were getting
14   updates as events were occurring?
15       A.  Yeah.  I wanted him out of our uniform as
16   soon as possible.
17       Q.  Okay.  And in that investigation
18   Lieutenant Martin did more than just interview
19   individuals.  He also looked at Mr. Cooper's daily
20   assignment sheets?
21       A.  Correct.
22       Q.  And requested information for in-car
23   camera video?
24       A.  Correct.
25       Q.  And also obtained GPS information or

Page 84

1    attempted to obtain GPS information?
2        A.  I know that he was working with David
3    Galvan, who is our IT person, to get that
4    information.
5        Q.  Okay.  And you were getting updates from
6    him about what he was able to get and what he found
7    and stuff like that on -- on a regular basis?
8        A.  Yes.
9        Q.  Okay.  And as he learned about these other
10   incidents that Mr. Cooper had from other private
11   citizens who were uncomfortable with their
12   encounter, did you learn about those as well?
13       A.  State that again.
14       Q.  Sure.  That was a long-winded question.
15           As Lieutenant Martin discovered encounters
16   between Cory Cooper and other private citizens where
17   the private citizen was uncomfortable with her
18   interaction with Mr. Cooper, you were learning about
19   that as soon as Lieutenant Martin learned about
20   them; correct?
21       A.  Yes.
22       Q.  Okay.  And Lieutenant Martin identified a
23   series of encounters that Mr. Cooper had with
24   private citizens where he stopped them while the
25   individuals were in the -- in a parked car.  Did you

21 (Pages 81 to 84)

DUNNING - Direct (By Ms. Tsai)

Page 85

1    know about those incidents as well?
2        A.  Yes.  Three, that I'm aware of.
3        Q.  Okay.  Are you aware of the encounters
4    that Mr. Cooper had with individuals in parked cars
5    that occurred in January of 2013?
6        A.  I would have to see the reports.  I
7    wouldn't -- I -- yeah.  I'd have to see the reports.
8    I don't remember the dates that well.
9        Q.  Is it fair to say that the directive that
10   you gave Lieutenant Martin is, "Keep me up to speed
11   on what's going on with this case.  I want to know
12   everything"?
13       A.  Yeah.  I didn't even have to tell him
14   that.  That's his -- that's the way he -- that's
15   just the way he operates.
16       Q.  And are you confident that
17   Lieutenant Martin told you everything that he
18   learned in his investigation?
19       A.  Absolutely.
20       Q.  Okay.  In 2015 do you recall how many
21   investigations were conducted by OPS?
22       A.  I got it on a report somewhere.
23           MR. DOLAN:  I object to relevance --
24   temporal relevance.
25

Page 86

1    BY MS. TSAI:
2        Q.  Based on your memory of the OPS
3    investigations from 2010 to 2015, would you agree
4    with me that the types of complaints received and
5    investigated are...
6            I'm sorry.  Can you read that back?
7            (Whereupon, the question was
8                read back by the court
8                reporter.)
9    BY MS. TSAI:
10       Q.  Based on your memory of the types of
11   complaints received and investigated by OPS from
12   2010 to 2015, would you say that the types of cases
13   that were received in 2015 are representative of the
14   type of cases that you received in 2010 through
15   2014?
16       A.  That's hard for me to answer not knowing
17   exactly what they were.
18       Q.  In the last two years, do you recall any
19   complaints investigated by OPS that appear to be
20   different than the types of complaints you received
21   in previous years?
22           MR. DOLAN:  Object to relevance.
23   It's --
24           THE WITNESS:  Without seeing the
25   reports, I couldn't say.

Page 87

1            MR. DOLAN:  And also objection on
2    temporal overbreadth.  You've already answered, but
3    I want that objection on the record.
4    BY MS. TSAI:
5        Q.  In 2010 what was the most common type of
6    complaint investigated by OPS?
7        A.  I would have to see the report.  I
8    couldn't recall like that.
9        Q.  Okay.  What about 2011?  Do you recall?
10       A.  Same thing.
11       Q.  Okay.  And how about 2012?
12       A.  Same thing.  Unless I see the -- what
13   cases he received that year, I have no way of
14   remembering those.
15       Q.  Okay.  And what about 2013?
16       A.  Same answer.
17
18            (As requested by counsel, the
                 following question and answer
19               has been separately bound and
                 sealed.)
20
21
22            MR. DOLAN:  Are we -- those were
23   stamped confidential.  Is this deposition also going
24   to be treated in a confidential manner?  Is it
25   offered under seal?  Or could you use IA numbers?

Page 88

1            MS. TSAI:  Well, let's --
2            MR. DOLAN:  Otherwise -- I mean, I
3    assume that when I'm deposing your client next week,
4    you don't want me dumping a bunch of her medical
5    records in without some sort of agreement that those
6    are going to be confidential.
7            MS. TSAI:  Absolutely.  I can use IA
8    numbers.
9            (As requested by counsel,
                 testimony has been separately
10               bound and sealed.)
11           MS. TSAI:  Well, actually, let's just
12   strike that question completely and take it off the
13   record, if that's agreeable with you?
14           MR. DOLAN:  I don't know if she can.
15   We may just need to --
16           MS. TSAI:  Well, seal that part, at
17   least, then.  Okay?
18   BY MS. TSAI:
19       Q.  This is going to be interesting.  Are you
20   familiar with the IA File No. 2980?
21           MR. DOLAN:  Why don't -- maybe I
22   could propose we could go off the record, and you
23   could state the person's name.  And then while we're
24   on the record, refer to the IA number?
25           MS. TSAI:  Okay.  Great.  Thank you.

22 (Pages 85 to 88)

DUNNING - Direct (By Ms. Tsai)

Page 89

1          (Discussion had off the record.)
2   BY MS. TSAI:
3       Q.  Are you familiar with the Internal
4   Investigation File No. 2980?
5       A.  Yes.
6       Q.  Okay.  And you are aware of the
7   allegations made against that deputy?
8          MR. DOLAN:  I'm going to object to
9   this line of questioning for temporal overbreadth
10  and relevance.  It's two years after the incident in
11  question.
12         You may answer.
13         THE WITNESS:  Yes.
14  BY MS. TSAI:
15      Q.  Okay.  Do you believe the allegations made
16  against the deputy who is the subject of Internal
17  Affairs No. 2980 is -- constitutes misconduct of a
18  sexual nature?
19      A.  Yeah.  It was inappropriate.
20      Q.  And to be clear, when I use the term
21  "sexual misconduct," or "misconduct of a sexual
22  nature," I'm referring to a whole range of conduct
23  from making sexually explicit comments to, you know,
24  the other extreme, which is the criminal sexual
25  assault.  Do you -- is that how you understood my

Page 90

1   definition?
2       A.  No.
3       Q.  Okay.  What -- using that definition, do
4   you believe that the deputy who is the subject of
5   Internal Affairs No. 2980 -- that his action was
6   misconduct of a sexual nature?
7       A.  Well, I think it was of a sexual
8   harassment nature.
9       Q.  Okay.  And --
10         MR. ROONEY:  Can we go off the record
11  really quick?
12         (Discussion had off the record.)
13  BY MS. TSAI:
14      Q.  Can you briefly describe the inappropriate
15  conduct that the deputy who is the subject of IA
16  File 2980 engaged in?
17      A.  Well, if this is the same case that I'm
18  remembering, I believe that he made reference to a
19  bra strap that was exposed and some other piece of
20  clothing that she was wearing, that they matched.
21  And he made -- he made comment to that effect.
22      Q.  Okay.
23      A.  That it -- I think he said it matched and
24  it looked nice on her, maybe.
25      Q.  And -- and you believe that that was

Page 91

1   inappropriate conduct; correct?
2       A.  Yes.
3       Q.  And you categorized that as sexual
4   harassment?
5       A.  Correct.
6       Q.  Okay.  And would you agree that one form
7   of sexual harassment is using -- is making comments
8   that has a sexual undertone?
9       A.  I can't say for sure -- you know, I can't
10  say for sure what his intent was.  I don't believe
11  that he said anything else that would cause any
12  further action.  It was just an inappropriate
13  comment that falls under -- under sexual harassment.
14      Q.  And -- and I'm not asking you about his
15  intent.  You obviously can't testify to his intent.
16         My question to you is whether making
17  comments that have sexual undertones falls under the
18  category of sexual harassment?
19      A.  I believe that was sexual harassment, yes.
20      Q.  Would you agree with me that those types
21  of -- the comments that the deputy made were
22  comments with a sexual undertone?
23      A.  I don't know what his intent was.
24      Q.  Would you agree with me that the comments
25  that he made could be perceived as comments with a

Page 92

1   sexual undertone?
2       A.  Could be perceived, yes.
3       Q.  Okay.  And I believe one of the
4   recommendations for the disciplinary action was for
5   him to attend mandatory sexual harassment training.
6   Do you recall that?
7       A.  Correct.
8       Q.  Okay.  And the sexual harassment training,
9   that is specifically tailored to sexual harassment
10  in the workplace; correct?
11      A.  Well, it's presented that way.  But, I
12  mean, it's -- it's an over- -- it's an overview of
13  what should and -- what actions and conversations
14  should and should not be had.
15      Q.  If the deputy who is the subject of
16  investigation -- Internal Investigation File 2980
17  made the same types of comments that he did to a
18  female citizen, would his actions be considered
19  sexual harassment?
20      A.  Yes.
21      Q.  Okay.  And it would still be
22  inappropriate?
23      A.  Correct.
24      Q.  And some kind of disciplinary action would
25  be warranted?

23 (Pages 89 to 92)

DUNNING - Direct (By Ms. Tsai)

Page 93

1      A.  Correct.
2      Q.  Okay.  Is it true that the recommendation
3   would not be to attend sexual harassment training
4   because that training is tailored to a workplace
5   professional environment?
6      A.  No.  He would still be assigned to that
7   training.
8      Q.  To your knowledge, has there ever been any
9   recommendations for disciplinary action to attend
10  sexual harassment training when the underlining [as
11  spoken] complaint was between a law enforcement
12  officer and a private citizen?
13     A.  How far back are we going?
14     Q.  As far as your memory will allow.
15     A.  I'm old.
16        Well, for a law enforcement officer I -- I
17  can only think of one other case.  Yeah.  I can only
18  think of one other case.
19     Q.  Where he was -- he -- the law enforcement
20  officer was issued mandatory sexual harassment --
21     A.  Correct.
22     Q.  -- training as a result of --
23     A.  Correct.
24     Q.  -- as a result of a interaction between
25  him or her and the private citizen?

Page 94

1      A.  Correct.
2      Q.  Okay.  And in that particular case, where
3   did the interaction take place?
4      A.  Where did what?
5      Q.  Where did the interaction between the law
6   enforcement officer and the private citizen take
7   place?
8      A.  I believe this is in -- the one I'm
9   referring to is an off-duty deputy working at a
10  hospital.  I believe it was the University of
11  Nebraska Med Center, and he made a comment to -- I
12  think it was a nurse.
13     Q.  Okay.  The department doesn't have any
14  training that is specific to sexual misconduct by a
15  law enforcement officer against a private citizen;
16  correct?
17     A.  Well, other than the academy and the
18  training provided by the HR department, no.  But, I
19  mean, that training -- I've taken that training, and
20  it's -- it's not just employee specific.  I believe
21  it -- it would reference your -- your behavior --
22  even if I was off duty and I was at a restaurant and
23  I would make a comment, it would still be
24  inappropriate.
25     Q.  Does the sexual harassment training that

Page 95

1   you're referring to -- to your knowledge, is that
2   training that all Douglas County employees take?
3      A.  Yes.
4      Q.  Okay.  That training is not tailored to
5   law enforcement officers; correct?
6      A.  I don't believe there was any law
7   enforcement characters in it.
8      Q.  Okay.  So it's true that Douglas County
9   Sheriff's Office does not offer any sexual
10  harassment training tailored to the deputies and --
11  to the deputies?
12     A.  I guess I'm not clear.  I'm not clear on
13  that question.
14     Q.  I can phrase it better.
15        Is there any training that's offered to
16  the deputies that discuss sexual misconduct while on
17  duty?
18     A.  Well, it would be the same as the other
19  training that they received.
20     Q.  And when you're -- when you refer to
21  "other training that they received" --
22     A.  Unwanted comments are unacceptable, and
23  the -- and the examples given in the HR training and
24  the training that he received at the Nebraska Law
25  Enforcement Training Center would be the same.  It

Page 96

1   would be whether -- really, if you -- unless you
2   were a complete moron, it would be whether you're on
3   duty or off duty.
4      Q.  Would you agree with me that throughout
5   the years, in the course of getting updates
6   regarding internal affair investigations, that there
7   have been complaints of individuals who received
8   unwanted comments from deputies, and the deputies'
9   responses were that they did not think that it would
10  bother the individual?
11     A.  You know, without seeing the reports I
12  don't recall what their responses were.  But
13  people -- when people are in trouble, they downplay
14  what they do.
15     Q.  Okay.  You would agree with me, then, that
16  there have been, at least with -- some of the
17  deputies' responses to these types of complaints
18  have been, "I didn't think it was a big deal"?
19     A.  Yeah.  Without reading the -- rereading
20  those reports, I couldn't say for sure what they
21  said.
22     Q.  But that's the general idea?
23     A.  Until I read the reports, I can't --
24        MR. DOLAN:  Objection.
25        THE WITNESS:  I just can't say

24 (Pages 93 to 96)

DUNNING - Direct (By Ms. Tsai)

Page 97

1  specifically what they said without seeing that
2  report.
3  BY MS. TSAI:
4      Q.  Okay.  Well, you said -- you testified
5  earlier that, you know, the department doesn't get
6  that many complaints, and you have a pretty good
7  memory.
8          I'm not asking about specifically what
9  they are saying.  But you would agree with me that
10  there have been incidents where there has been
11  internal investigation where the complainant
12  indicated that she received comments from deputies
13  that she perceived as having a sexual undertone and
14  that made her uncomfortable, and the deputies'
15  response to those allegations were something to the
16  nature of, "I didn't think it was a big deal"?
17      A.  Yeah.  Again, I would have --
18          MR. DOLAN:  Object --
19          THE WITNESS:  -- to see the report.
20          MR. DOLAN:  Wait.  I'm going to
21  object.  The question has now been asked and
22  answered.  The witness has repeatedly said now for a
23  third time he would have to see the reports.
24          So your answer stands, but I wanted to get
25  my objection in.

Page 98

1  BY MS. TSAI:
2      Q.  Okay.  Would you agree with me that there
3  are certain inherent concerns when a male deputy
4  interacts with a female citizen?
5      A.  There are certain inherent what?
6      Q.  Concerns.
7      A.  Yeah.  Say that again, that question.  I
8  don't --
9      Q.  Yeah.  I will rephrase it.
10          So, for example, Lieutenant Martin
11  testified that it would be good practice for male
12  deputies, when they are transporting a female
13  arrestee, to have the in-car camera on.
14      A.  Correct.
15      Q.  And one of the reasons -- and why would
16  you believe -- and you agree that's a good practice?
17      A.  Yes.
18      Q.  Okay.  Why do you believe that that's a
19  good practice?
20      A.  You've got a witness.
21      Q.  For -- and what's the concern there?
22      A.  Just in case something would take place.
23  And by "taking place," I mean, a -- it would be --
24  it would verify that the citizen complaint was
25  valid, or it would -- it would verify that the

Page 99

1  citizen was -- complaint was not true.
2      Q.  Is it the practice of the department to
3  turn on the in-camera video when a male deputy is
4  transporting a male arrestee?
5      A.  I believe they do as well.
6      Q.  Okay.
7      A.  Because you could have the -- you could
8  have an opportunity to record a confession.
9      Q.  And isn't the policy of the department to
10  always have a -- have the in-car video camera on
11  whenever a deputy is transporting any individual --
12  private citizen in his or her vehicle?
13      A.  I believe so.
14      Q.  Has the department taken any steps to
15  confirm that the deputies are, in fact, following
16  the policy and having the in-car video on whenever
17  they are transporting a private citizen?
18      A.  It would be -- we're -- we're doing that
19  as we speak.
20      Q.  Okay.  Lieutenant Jones in his IA report
21  regarding Cooper and E. P.       wrote that Cooper
22  placed himself in a detrimental position ethically
23  by entering the apartment alone with a female party.
24  Do you recall reading that statement in Lieutenant
25  Jones' IA report?

Page 100

1      A.  Yes.
2      Q.  Okay.  And do you agree with that
3  statement?
4      A.  I have -- absolutely.
5      Q.  What is the detrimental ethical position
6  that Cooper placed himself in when he entered an
7  apartment alone with a female party?
8      A.  Well, he leaves himself to the mercy of
9  the complaint.
10      Q.  Can you explain that further?
11      A.  Well, if, in fact, she was going to make a
12  complaint about something, his lack of having that
13  video or -- or even that sound puts him in jeopardy.
14  It was -- it was stupid.
15      Q.  Would you agree, then, that when male
16  deputies have interactions with female citizens,
17  there is an inherent risk of allegations relating to
18  sexual misconduct?
19          MR. DOLAN:  Object to the form of the
20  question.  Calls for speculation.
21          You may answer.
22          THE WITNESS:  Just -- you know, it
23  would depend on the situation.  For example, if a --
24  a deputy working the courthouse is interacting with
25  people, I don't -- I don't see the jeopardy there

25 (Pages 97 to 100)

DUNNING - Direct (By Ms. Tsai)

Page 101

1  because you have a lot of witnesses.  But a -- but
2  a one-on-one on the street, that's a whole different
3  ballgame.
4  BY MS. TSAI:
5      Q.  And going back -- in 2006, 2007, the
6  department had a theory that drug dealers were using
7  females to transport drugs because they believed
8  that individual females who were driving alone were
9  less likely to get pulled over.
10         Do you recall that?
11     A.  I don't know that it was just a theory for
12  2006, 2007.  I worked narcotics in the 1980s, and we
13  held that belief at that time as well.
14     Q.  During -- during the years -- well, in the
15  2000s, did the department have a practice of pulling
16  over women who were driving alone on Highway 80
17  because they thought that they may be transporting
18  drugs?
19     A.  Just -- just strictly because they were a
20  female?
21     Q.  Female driving alone.
22     A.  No.
23     Q.  That was not a practice at --
24     A.  We've never had a profiling practice.
25     Q.  Because that would be improper?

Page 102

1      A.  Correct.
2      Q.  And -- and if you received a complaint or
3  a investigation -- internal investigation file that
4  indicated that that was a practice of the
5  department, what steps would you have taken to make
6  sure that was not occurring anymore?
7      A.  We would investigate it, and it would
8  stop.
9      Q.  And is it your testimony today that you
10  are not aware that in 2006, 2007, there were
11  complaints made by women who felt uncomfortable
12  because they were pulled over by deputies simply
13  because they were female?
14     A.  I would have to see the report.  I don't
15  recall any specific case like that.
16     Q.  Okay.  Part of the Douglas County
17  Sheriff's Office training -- are there any specific
18  trainings that teaches deputies how to ask citizens
19  personal questions while interviewing them?
20     A.  Training to -- training to garner
21  information from a female citizen?
22     Q.  Yeah.
23     A.  Well, I mean, it isn't just generic to
24  females.  It's a -- it's a question that you
25  would -- you would train for both -- ask male and

Page 103

1  females to garner information.
2      Q.  Does Douglas County Sheriff's Office have
3  any sort of sensitivity training programs?
4      A.  I believe we have received some
5  sensitivity training from HR, but I couldn't tell
6  you how long ago that was.
7      Q.  And --
8      A.  But I know there was some in the academy.
9      Q.  And what was covered in the sensitivity
10  materials that the department received from HR?
11     A.  I don't recall.
12     Q.  Did the material explain that men and
13  woman react to certain things differently?
14     A.  I think it was more of a diversity
15  training than -- than calling it sensitivity
16  training.  I think it had to do with cultural
17  differences and how people might react.  You know, I
18  just don't recall the specifics of that training.
19     Q.  Do you -- does Douglas County Sheriff's
20  Office have any training specific to gender
21  differences?
22     A.  I'm sure that's covered in the academy.
23     Q.  Okay.  And what's covered at the academy
24  relating to gender differences?
25     A.  I don't recall specific -- I would have to

Page 104

1  see the curriculum.
2      Q.  Okay.  And the academy is not run by
3  the -- Douglas County; correct?
4      A.  It's run by the State.
5      Q.  So specific to Douglas County, are there
6  any training or written policies that touches upon
7  the topic of gender differences?
8      A.  I don't recall.
9      Q.  Do you think it's a good idea to have
10  training relating to gender differences?
11     A.  Well, I think the gender differences
12  are -- are also covered in the HR training --
13     Q.  Is that --
14     A.  -- as to was it -- as to what may be
15  considered inappropriate.
16     Q.  And when you use the term "HR training,"
17  are you referring to the sexual harassment training
18  that you were referencing before?
19     A.  Correct.
20     Q.  Has there ever been any attempts to
21  promulgate a rule that makes it clear to deputies
22  that conduct of a sexual nature between deputies and
23  private citizens will not be tolerated?
24     A.  That conduct what?
25     Q.  That conduct of a sexual nature between

26 (Pages 101 to 104)

DUNNING - Direct (By Ms. Tsai)

Page 105

1   deputies and private citizens will not be tolerated.
2        A.   Nor dogs or cats.  I mean, we don't
3   have -- we don't have a policy like that.  It's --
4   it's against the law.  It's against our ethics.
5   It's against our creed.  They -- they can't break
6   the law.
7        Q.   Has there been any attempts to make
8   policies to make it clear to deputies that conduct
9   of a sexual nature that does not reach to a level of
10  a criminal act between deputies and private citizens
11  will not be tolerated?
12       A.   That would still be sexual harassment.
13       Q.   In your view is it two categories where
14  it's either -- it's all conduct that is not of a --
15  all conduct of a sexual nature that does not rise to
16  a level of a criminal act falls under the category
17  of sexual harassment?
18       A.   Yeah.  Any -- any unwanted comments are --
19  as far as I am concerned are sexual harassment.
20       Q.   Okay.  And also included in sexual
21  harassment is any unwanted physical contact?
22       A.   Physical contact, correct.
23       Q.   Right.  Okay.
24            COURT REPORTER:  When we get a
25  chance, could I use the bathroom?

Page 106

1            MS. TSAI:  Oh, sure.  Sorry.
2   Yeah.  Let's take a break.
3            (11:40 a.m. - Recess taken.)

Page 107

1        (At 11:54 a.m., with all the parties
2   present as before, the following proceedings were
3   had, to-wit:)
4   BY MS. TSAI:
5        Q.   Has there ever been any attempt to
6   establish a stand-alone general order that
7   specifically addresses the issue of conduct of a
8   sexual nature by deputies?
9        A.   No.
10       Q.   Does the Douglas County Sheriff's Office
11  have a stand-alone general order regarding sexual
12  harassment?
13       A.   We have a code of conduct.
14       Q.   Outside -- well, so the code of conduct,
15  to my understanding -- the general order code of
16  conduct covers a wide variety of conduct; correct?
17       A.   Uh-huh.  Yes.
18       Q.   And then there are certain conduct that
19  have a stand-alone general order.  For example, use
20  of force?
21       A.   Yes.
22       Q.   My question is does Douglas County
23  Sheriff's Office have a stand-alone general order
24  relating to sexual harassment?
25       A.   I believe we do on sexual harassment.  And

Page 108

1   I believe that it would also be covered in our code
2   of conduct.  And as I mentioned earlier, all these
3   things are reviewed by all employees on PowerDMS.
4   They have to sign off.
5        Q.   Are you aware of any deputies from 2005 to
6   present who have violated the general order relating
7   to sexual harassment?
8            MR. DOLAN:  I'm going to object to
9   the term "to the present."  It's overly broad.
10           You may answer, if you know.
11           THE WITNESS:  Well, the two that we
12  talked about previously.  But I -- I already can't
13  say whether -- whether -- well, the one for sure was
14  in that time frame.  The first one that was at the
15  hospital, I don't remember if that's in that time
16  frame or not.
17  BY MS. TSAI:
18       Q.   And would you find it surprising, then, if
19  I was to tell you in those two incidents the notice
20  of violation from the internal -- from OPS show
21  violations of -- to the code of conduct general
22  order and not violations to the sexual harassment
23  general order?
24       A.   Well, I think it's covered in the code of
25  conduct.

27 (Pages 105 to 108)

DUNNING - Direct (By Ms. Tsai)

Page 109

1    Q.  My question is a little bit different.
2         Are you -- would it be surprising to you
3    that it does -- it also does not indicate that the
4    deputy in those two cases violated the general order
5    relating to sexual harassment?
6    A.  No.  It doesn't surprise me.
7    Q.  Why not?
8    A.  Because it's covered under the code of
9    conduct.  It's a greater umbrella.
10   Q.  Why wouldn't you want the violation to
11   include the more specific violation?
12   A.  I don't have an answer for that.
13   Q.  Would you agree with me, by using the
14   violation that is more specific to -- strike that.
15        Do you agree that using -- indicating the
16   violation that is more specific than the general
17   umbrella -- umbrella provides more information to
18   the deputies and his or her colleagues as to what he
19   was actually disciplined for?
20        MR. DOLAN:  I'll object.  Calls for
21   speculation as to "colleagues."
22        You may answer.  You may answer.
23        THE WITNESS:  I lost track of the
24   question.
25        MS. TSAI:  Do you mind reading that

Page 110

1    back?
2         (Whereupon, the pending question
3              was read back by the court
4              reporter.)
5         THE WITNESS:  No.
6    BY MS. TSAI:
7    Q.  Why not?
8    A.  Because I think it's -- I still believe
9    it's covered -- it's covered under the code of
10   conduct.  And for tracking purposes, any code of
11   conduct violation is going to be looked into further
12   when we're -- when we're, say, trying to track a
13   pattern.
14   Q.  Violations of excessive force, that falls
15   under the code of conduct general order; correct?
16   A.  Correct.
17   Q.  Why is it in those cases that the notice
18   of violations indicate -- uses the violation of the
19   general order specific to excessive force and not
20   code of conduct?
21   A.  I don't have a good answer for that.
22   Q.  Is that something that you believe should
23   be changed, then, based on your previous answer
24   relating to sexual harassment?
25   A.  No.
26   Q.  Okay.  So it's your opinion that, despite

Page 111

1    the fact that there are two conducts -- sexual
2    harassment and excessive force -- that have their
3    own stand-alone general order, that in the case of
4    sexual harassment, the violation should be
5    characterized under code of conduct, and in the case
6    of excessive force, the violation should be
7    characterized under the specific general order of
8    excessive force?
9         MR. DOLAN:  I'm going to object.
10   This -- the whole -- the whole line of -- I'm
11   objecting to the whole line of questioning for
12   pre-supposing that, in every situation, the
13   sheriff's office workplace sexual harassment office
14   policy would have an application.
15        The line of questioning pre-supposes that
16   might apply to somebody outside of the sheriff's
17   office, and so it's objectionable on that ground.
18   BY MS. TSAI:
19   Q.  You can go ahead and answer.
20   A.  I don't remember the question.
21        MS. TSAI:  Can you read that back,
22   please.
23        (Whereupon, the pending question
24              was read back by the court
25              reporter.)
26        THE WITNESS:  No.  I mean, I don't --

Page 112

1    I don't see anything wrong with the process that we
2    have been following.
3    BY MS. TSAI:
4    Q.  Why make the distinction?  Why -- why
5    would you have two different processes for conduct
6    violations?
7    A.  I don't have -- I don't have a good -- a
8    good answer for that right now.  I'm on information
9    overload.
10   Q.  Do you need to take a break?
11   A.  No.  No.  I'm just -- that's not going
12   to -- unless you're going to give me eight hours of
13   sleep, that's not going to do anything for me.
14   Q.  Well, my understanding, you are actually
15   coming back tomorrow, so...
16        Is your understanding that a general order
17   relating to sexual harassment applies to both the
18   workplace and interactions between law enforcement
19   officers and private citizens?
20   A.  Yes.
21   Q.  Okay.  And it's your belief, then, that,
22   if there is a finding that a police officer sexually
23   harassed a private citizen, he or she is in
24   violation of the general order relating to sexual
25   harassment?

28 (Pages 109 to 112)

DUNNING - Direct (By Ms. Tsai)

Page 113

```
1      A.  Yes.  And the code of conduct.
2      Q.  And the code of conduct.  Right.
3          Do you believe that it would be best
4   practices, then, in situations like that where a
5   deputy is found to have sexually harassed a private
6   citizen, that the violation be characterized --
7   well, that there should be notice of violation of
8   the code of conduct policy and notice of violation
9   for the sexual harassment policy?
10     A.  I don't see what you gain.
11     Q.  Do you believe that that's not necessary?
12     A.  Right.
13     Q.  Do you see any benefit to notifying --
14  well, let me take a step back.
15         Results of OPS investigations are
16  submitted to what's -- the commission that has the
17  accreditation; correct?
18     A.  The Merit Commission.
19     Q.  The Merit Commission?
20     A.  Yep.
21     Q.  It's also submitted to the commission
22  of -- it's also submitted to the Commission on
23  Accreditation for Law Enforcement Agencies; correct?
24     A.  Correct.
25     Q.  And that information provides CALEE -- is
```

Page 114

```
1   that right?
2      A.  CALEA.
3      Q.  CALEA.
4      A.  Okay.
5      Q.  That information provides CALEA
6   information about the types of complaints that the
7   department is receiving; correct?
8      A.  Yes.
9      Q.  Don't you think it would be beneficial for
10  CALEA to have more detailed information regarding
11  the type of policy violation that is occurring at
12  the department?
13     A.  The -- the detail sits in the file.  They
14  have the ability to look at the whole file for
15  whatever period of time they are -- they are doing
16  their look.  Usually it's a -- it's a three-year
17  look back.  And so it's right there for them to see
18  it.  They are not going to just look at the title.
19  They are going to look at the report.
20     Q.  So why is it that in excessive force cases
21  the violation that is indicated is the violation
22  relating to the use of force general order as
23  opposed to violation of the code of conduct general
24  order?
25     A.  I -- I can't give you that reason.
```

Page 115

```
1      Q.  Do you agree with me that that is -- that
2   the practice of coding the violation, then, is
3   somewhat arbitrary?
4      A.  No.  I'm sure there is a -- there is a
5   reason for it.  I just don't know it.
6      Q.  Have you ever had any discussions with any
7   OPS investigators and line investigators as to how
8   they have to code violations of orders?
9      A.  I have not.  I have not.
10     Q.  Why not?
11     A.  Because I haven't.  I mean, I don't have
12  another reason for that.  I have not had any
13  discussion in that regard.
14         So if CALEA during the inspection process
15  and the mock inspection process would make a
16  recommendation that we change our practice, we would
17  certainly do it.
18     Q.  You mentioned earlier that by putting
19  these violations under the code of conduct
20  violation, this allows the department to track a
21  pattern of all misconduct that fall under the code
22  of conduct policy; correct?
23     A.  Correct.
24     Q.  A sick leave -- someone who takes
25  advantage of the sick leave policy, does that fall
```

Page 116

```
1   under code of conduct?
2      A.  It could, yeah, if they violated it.
3      Q.  When an investigator is asked to
4   investigate whether a certain deputy is abusing the
5   sick leave policy, is there any significance to if
6   the deputy also violated the sexual harassment
7   policy?  Are those two at all relevant or related to
8   each other?
9      A.  Well, I mean, at that -- it would be
10  case-specific.  I wouldn't be able to put that in a
11  general category.
12     Q.  Is it true that, when trying to identify a
13  pattern of behavior of a deputy abusing the sick
14  leave policy, a history of other misconducts is not
15  going to help establish the pattern?
16     A.  I -- I don't understand that question at
17  all.
18     Q.  Sure.
19         If you're looking for a pattern of a
20  deputy taking advantage of the sick leave policy,
21  his -- a violation found that he sexually harassed a
22  co-worker does not help establish a pattern that he
23  abused the sick leave policy; correct?
24     A.  Correct.
25     Q.  Okay.  And the vice versa is true;
```

29 (Pages 113 to 116)

DUNNING - Direct (By Ms. Tsai)

Page 117

1    correct?
2        A.  Correct.
3        Q.  Okay.  And the code of conduct policy
4    covers a large umbrella of conduct?
5        A.  Correct.
6        Q.  If you're looking for a pattern in a
7    certain area -- for example, excessive force --
8    again, you wouldn't look to every code of conduct
9    violation to establish a pattern that a certain
10   deputy may have a pattern of using excessive force?
11       A.  Well, I'm sure that if we would go back
12   and look at John -- John Jones, hypothetically, and
13   we would want to see what -- what -- "Give me a --
14   give me a look back on John Jones.  We have a
15   discipline hearing coming up," it would -- I don't
16   think when -- when I would get a list back from
17   Lieutenant Martin, I think if there was code of
18   conduct violations, there would be a hyphen and what
19   that code of conduct violation was.
20       Q.  Okay.  And that's your expectation --
21   that, when they use -- they indicate a violation of
22   a code of conduct, that there would be a further
23   descriptor of what that violation entails?
24       A.  Correct.  And the other flag for me would
25   be when he's preparing a form like that for me, in

Page 118

1    the far right column it has a disposition as to
2    exonerated, sustained, not sustained, unfounded.
3    And if I have a lot of sustained and not sustained,
4    that -- to me, there is a potential for a -- for a
5    pattern.
6        Q.  What if there was an overwhelming number
7    of complaints that were unfounded?  Would that be a
8    red flag as well to establish a pattern?
9        A.  If it was in that same specific area, yes.
10   Excuse me.
11       Q.  So you agree with me that there is
12   benefits to establishing violations to specific
13   areas of conduct?
14       A.  I'm -- I'm fine with how -- how we do it
15   now.
16       Q.  I understand that.  Because if you
17   weren't, you would have made changes; right?
18       A.  Right.
19       Q.  My question is do you agree with me that
20   there are benefits to categorizing certain
21   violations to a more specific conduct?
22       A.  Not necessarily.  Like I say, if I go back
23   and ask him for -- give me -- "Give me John Jones'
24   history," if he has got code of conduct down, it's
25   going to have a hyphen, and it's going to have

Page 119

1    whatever it is that -- that was in there.
2        Q.  Is there always a hyphen -- well, let me
3    take a step back.
4            When there is a violation that said code
5    of conduct, hyphen, and you're looking for that more
6    specific misconduct, are you looking for the
7    subcategories that are within the code of conduct
8    policy?
9        A.  Sure.
10       Q.  So, for example, a category like conduct
11   unbecoming of an officer?
12       A.  Correct.
13       Q.  Would you agree with me that conduct
14   unbecoming of an officer is also a relatively broad
15   category?
16       A.  Yes.
17       Q.  So would you want a subcategory to --
18       A.  I would -- we would get all the -- all the
19   past anyway.  I mean, there -- there are recorded,
20   documented reports, and we would have the ability to
21   have all of that.  We're -- we're not that big where
22   somebody gets lost in the shuffle.  That just
23   doesn't happen.
24       Q.  Well, you do meet the requirements to be a
25   Major County Sheriffs' -- to be part of the Major

Page 120

1    County Sheriffs' Association; correct?
2        A.  Right.
3        Q.  And so you're not that small?
4        A.  Well, in comparison to the -- my larger
5    counterparts that I'm sitting with in the Major
6    County Sheriffs' Association, I'm -- I'm one of the
7    smallest.  Fargo, North Dakota, is probably the only
8    thing smaller than me.
9        Q.  But there are some who just don't meet the
10   requirements and cannot be part of the Major County
11   Sheriffs' Association?
12       A.  There is some that can't what?
13       Q.  There --
14       A.  Yeah.  Yeah.
15       Q.  -- is some departments that just don't
16   meet that requirement?
17       A.  Right.  Right.  Yeah.
18       Q.  Okay.  Does the County publish -- make
19   available to the public the list of complaints that
20   have been investigated by OPS?
21       A.  I believe we do on our website.
22       Q.  Okay.  And that's part of the annual
23   report?
24       A.  Yes.  And we also -- anything that would
25   fall into -- I don't think we give them all of the

30 (Pages 117 to 120)

DUNNING - Direct (By Ms. Tsai)

Page 121

1  complaints because we're not required to. But I
2  think anything of a sexual harassment nature we have
3  to also file that with the -- County HR
4  department.
5      Q. Do you know if the County HR department
6  makes those reports available to the public?
7      A. I believe it -- I don't -- I don't know
8  for sure, but I believe that is made public because
9  I think they have to give that to the County board,
10 and they do that in open session. So that would be
11 a public record.
12     Q. Okay. Going back to the annual report by
13 OPS that's published on the website, what
14 information is provided?
15     A. Oh, it's -- begins with demographics. And
16 I would have to see it. I haven't looked at it for
17 a while. But it provides demographics, and it would
18 go down to citizen complaints. It would go down to
19 accomplishments. It would go down to maybe capital
20 projects.
21     Q. Can you -- is -- is the annual report more
22 than a few pages long?
23     A. No. It's not -- it isn't a lengthy thing.
24     Q. And does it provide a brief summary of the
25 violations that -- the alleged violations that --

Page 122

1      A. Well, the summary would be exonerated --
2      Q. Okay.
3      A. -- unfounded and so on.
4      Q. Okay. Would it provide details as to what
5  the actual allegation was?
6      A. You know, I don't recall.
7      Q. It's your understanding that the website
8  provides more than just a percentage of the number
9  of complaints that were founded, exonerated, and
10 stuff like that?
11     A. You know, I haven't looked at that website
12 in a while, and I just couldn't tell you. I know
13 we're trying to make more -- more available as we go
14 on. There was some suggestions from the American
15 Civil Liberties Union to -- to change something. We
16 immediately changed it because we wanted that --
17 that transparency. Even though I'm not a fan of the
18 ACLU, you know, if there is something that will make
19 the public happier, let's do it.
20     Q. Why are you not a fan of the ACLU?
21     A. Pardon?
22     Q. Why aren't you a fan of the ACLU?
23     A. I don't -- I think a lot of times they do
24 things just to justify their existence.
25     Q. Has the ACLU ever approached you about

Page 123

1  making certain policy changes relating to how
2  deputies interact with private citizens?
3      A. You know, the only example I can give
4  recently is the -- and it wasn't just to -- to us;
5  it was agencies across the state of Nebraska. It
6  had to do with bias-based profiling data, and we
7  were trying -- we were trying to show them that that
8  data is -- is skewed, but they didn't want to hear
9  that.
10     Q. And the bias is based on racial profiling?
11 Gender profiling? Age profiling? What was it?
12     A. All.
13     Q. All?
14     A. Yeah.
15     Q. Okay. And so you along with the other law
16 enforcement agencies in Nebraska received
17 information from ACLU that there is a statewide
18 problem with profiling?
19     A. Well, no. This -- actually, where this
20 came about was the bill for -- for collecting that
21 data had a -- had a sunset, and they wanted to
22 continue it. We didn't necessarily mind whether
23 they continued it or not. We just wanted them to
24 have real data instead of skewed data.
25     Q. Did you and the other law enforcement

Page 124

1  agencies in Nebraska provide the data to ACLU?
2      A. Oh, yeah. We're required by law to -- to
3  give it to the crime commission, who, in turn,
4  releases it to the public.
5      Q. Do you provide to -- well, other than the
6  HR department and CALEA, which we've already
7  discussed, do you provide your internal affairs data
8  to any other organizations or agencies?
9      A. I don't believe so. HR, CALEA, the
10 website. I don't -- we may -- we may give it to the
11 crime commission, but I don't believe we do. I
12 think that's all that I'm aware of.
13     Q. Okay. And it's your understanding that,
14 when you provide the OPS findings to CALEA, you're
15 providing them the entire internal affairs file for
16 each of these complaints?
17     A. When -- when they -- when they are here to
18 inspect, they have access to everything.
19     Q. Outside of them coming in to inspect, do
20 you submit a report to CALEA about the OPS
21 investigations on a yearly basis?
22     A. No.
23     Q. Okay. Are you required by CALEA to submit
24 a report at all? Yearly?
25     A. The report -- we do -- there is a

31 (Pages 121 to 124)

DUNNING - Direct (By Ms. Tsai)

Page 125

1   annual -- I believe there is an annual report that
2   we do give them.  And the report that is submitted
3   back to the CALEA commissioners comes from the lead
4   assessor on the -- on the on-site.
5       Q.  And the on-site is only once every three
6   years; right?
7       A.  Correct.
8       Q.  In between the on-site visit, you're not
9   required to provide CALEA with data relating to your
10  department?
11      A.  Just -- you know, no.  I mean, there is
12  some because I just signed one here in the last two
13  days.  But I don't remember what all was in there.
14  I don't even know if that was a report.  That may
15  have been -- because we're -- we're up for -- our --
16  our mock is going to be in March or April and our
17  on-site, I believe, is in August of this year.
18      Q.  Who would know if the department submits
19  summary -- summary reports to CALEA relating to OPS
20  investigations during the years where there isn't an
21  on-site investigation?
22      A.  Excuse me.  Rob Sofie.  Anything CALEA, it
23  would be Rob Sofie.
24      Q.  Okay.  When you report OPS findings to the
25  County, do you provide them with the entire

Page 126

1   investigation file?
2       A.  No.
3       Q.  What's provided to them?
4       A.  I believe just -- just the numbers.
5       Q.  Just the numbers?
6       A.  Maybe -- I don't -- I'm not even sure they
7   get an IA number.  But I just know that we have
8   the -- this incident, and this was the disposition.
9       Q.  And when they are notified of the
10  incident, are they provided with a narrative of the
11  incident or provided with an outline of violation --
12  alleged violations?
13      A.  I think they are just looking for
14  numerical data.  They have to file a report with
15  the -- with the County board, and it's not a lengthy
16  thing that we give them.
17      Q.  In other words, you're providing them
18  with, hypothetically, 2016, investigated 20 --
19      A.  Correct.
20      Q.  -- things.  Five founded, three unfounded?
21      A.  Correct.
22      Q.  They are not given any information about
23  the subject matter of each --
24      A.  About the what?
25      Q.  The subject matter of each of the

Page 127

1   complaints?
2       A.  What was that again?
3       Q.  They are not provided any information
4   about the subject matter of these complaints?
5       A.  Oh.  I mean, they would know what kind of
6   complaint it is.
7       Q.  What do you mean?
8       A.  Whether it's use of force, sick leave
9   violation.  I don't even think the sick leave
10  violation.  It's just anything that would fall under
11  the sexual -- County sexual harassment policy, I
12  believe, is what we have -- have to report.
13      Q.  So they would get information that's use
14  of force, sexual harassment --
15      A.  I don't even think they get use of force.
16      Q.  Oh, just sexual harassment?
17      A.  Yeah.  Use of force I've got to report to
18  the State.
19      Q.  I see.
20      A.  Yeah.  Use of force and pursuit data I
21  have to report to the State.  But anything that
22  would fall under the County as sexual harassment
23  policy, that I have to report to HR on an annual
24  basis.
25      Q.  So in cases where there is an internal

Page 128

1   investigation -- well, strike that.
2           How do you gather the data on sexual
3   harassment violations?
4       A.  Well, we would go to Lieutenant Martin and
5   say -- I'm sure he does this.  Because he has been
6   doing it so long, he just does it as his
7   assignment -- that he reports this to them.  He
8   would go back to his files and look.
9       Q.  And is the mandate to report to the County
10  relating to sexual harassments, those are violations
11  against the County sexual harassment policy; is that
12  right?
13      A.  Uh-huh.
14      Q.  You have to say --
15      A.  Yes.
16      Q.  Okay.  Is the general order regarding
17  sexual harassment identical to the sexual harassment
18  policy by the County?
19      A.  I'm sure we have at least what they have
20  and probably more.
21      Q.  Okay.
22      A.  And I know that when we -- we just
23  recently, I think, updated ours, and we -- we had
24  the -- we had the County Attorney's Office and HR
25  take a look at that to see if we were missing

32 (Pages 125 to 128)

DUNNING - Direct (By Ms. Tsai)

Page 129

1  something.
2      Q.  If a deputy was found in violation of the
3  department's sexual harassment policy that was --
4  that was not covered in the County sexual harassment
5  policy, is that -- is that reported to that county?
6      A.  Yeah.  Everything -- our policy would
7  contain everything that the County --
8      Q.  Right.
9      A.  -- HR has.
10     Q.  Right.
11     A.  Plus whatever CALEA -- CALEA's best
12  practice is that we need to have in there.
13     Q.  So my question is, if an individual -- a
14  deputy was found in violation of a sexual harassment
15  policy that falls outside of Douglas County sexual
16  harassment policy -- in other words, the additional
17  standard that's recommended by CALEA, would that be
18  reported to the County?
19     A.  Yeah.
20     Q.  Okay.  Even though that's beyond their
21  policy?
22     A.  Yeah.
23     Q.  Why?
24     A.  Just -- that's just what we're required to
25  do.

Page 130

1      Q.  I guess I'm a little confused.  Is the
2  requirement to report to the County violations of
3  the County sexual harassment policy or violation of
4  the department's sexual harassment policy?
5      A.  Well, the -- every -- our policy contains
6  everything that the County wants.
7      Q.  Sure.  Right.
8      A.  And we probably have -- I'm sure that we
9  have a more stringent requirement --
10     Q.  Right.
11     A.  -- because of CALEA.
12     Q.  Right.
13     A.  And it's the right thing to do.
14         So when they would ask for any sexual
15  harassment complaints for 2016, that's what we would
16  give them.  Even -- even if ours was over and above
17  --
18     Q.  Okay.
19     A.  -- we would still give it to them.
20     Q.  So even if the County may not view a
21  certain complaint to be sexual harassment based on
22  its policy, you still provide that information?
23     A.  We still -- we still have their whole
24  policy in our policy.
25     Q.  Right.  Yours is more inclusive?

Page 131

1      A.  Correct.
2      Q.  Is there any -- when you submit a report
3  like that, do you indicate to the County, "This
4  particular complaint goes -- is more -- violates a
5  portion of the department's sexual harassment policy
6  that is not included in the County sexual harassment
7  policy"?
8      A.  No.  We give them everything.
9      Q.  Do you indicate to them that --
10     A.  No.
11     Q.  Okay.
12     A.  No.
13     Q.  And so has the County ever come back to
14  you -- well, and you're only providing numbers to
15  them; correct?
16     A.  You know, I don't remember what it
17  looks -- what it looks like.  But, I mean, it's a
18  document that's alive and well sitting in HR.  So, I
19  mean, it's something you can get ahold of.
20     Q.  That I personally could get ahold of?
21     A.  I think you can.  They -- they present
22  that to the County board; so I think it's a matter
23  of public record.
24     Q.  Do you know?  Was the incident that
25  resulted in the termination of Mr. Cooper reported

Page 132

1  to the County as a violation of sexual harassment
2  policy?
3      A.  I couldn't tell you for sure.
4      Q.  Okay.  Would you agree that that falls --
5  that would be a case where you would be required to
6  report that?
7      A.  I'm sure it probably was.  I don't -- I
8  don't doubt that it was.
9      Q.  Deputies have discretion on how to best
10  handle a criminal infraction; correct?
11     A.  How best to handle criminal infractions?
12     Q.  Uh-huh.  By a private citizen.
13     A.  Give me an example that you're going on.
14     Q.  Well, I believe I read -- it's my
15  understanding that the Douglas County Sheriff's
16  Office has a policy that gives deputies leeway to
17  use informal resolutions when they are investigating
18  or -- well, investigating or deciding whether to
19  charge a individual for a crime.
20     A.  Well, it's not -- it's not that broad of a
21  discretion.
22     Q.  And can you describe -- and can you
23  explain that a little bit?
24     A.  Sure.
25         In the case at hand, destroying evidence

33 (Pages 129 to 132)

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

DUNNING - Direct (By Ms. Tsai)

Page 133

1    is a crime, and so he should have been charged with
2    that and was. And whether you stop someone or not
3    is based on probable cause. So that discretion is
4    pretty limited.
5         Whether you're going to take somebody in
6    on a warrant or not, that's not your choice. If he
7    has a warrant, which is a court order, you follow
8    that court order.
9         Q. What about something like if a deputy has
10   an encounter with an individual who's underage and
11   has an open bottle of alcohol? Does the deputy have
12   discretion as to how to resolve that situation?
13        A. No. It needs to -- that's evidence. He
14   needs to put it in property, and he needs to be
15   writing a ticket for MIP and notifying parents.
16        Q. Okay. And is that something that you have
17   communicated to the deputies through --
18        A. Policy and procedures?
19        Q. Yes.
20        A. Yes.
21        Q. And how do you go about communicating to
22   deputies about policies and procedures?
23        A. We have PowerDMS. All of our policies and
24   procedures on are there. Everybody is required
25   to -- to read it and sign off in a -- in a required

Page 134

1    time frame. And if they get backlogged on that,
2    we -- we remind them every week.
3         Q. How do you decide what policies and
4    procedures to put on PowerDMS to have --
5         A. All policies and procedures go on there.
6    All notifications involving employees go on there.
7         Q. So when a deputy first joins the
8    department, they have to review all the policies and
9    procedures?
10        A. Correct. Once they get out of the
11   academy -- a week before they go into the academy,
12   we indoctrinate them on County -- you know, their
13   benefits and, you know, some of the little
14   intricacies of what you do on the job.
15        Once they get out of the academy, we keep
16   them for another two weeks, and we go back over
17   things. They completely know that SOP before they
18   go out on the street.
19        Q. After they complete their probationary
20   period, are they ever asked to review policies and
21   procedures through the PowerDMS?
22        A. Yeah. As -- as we update them -- and
23   there is some that we -- we automatically do by
24   state law -- pursuit policies, use of force
25   policies. I just did one yesterday, a nuke alert

Page 135

1    policy. Bias-based profiling policies.
2         There is some that we redo. We have tests
3    on PowerDMS. I just took two in the last week.
4         Q. How do you decide which policies are
5    revised and then re-presented to deputies?
6         A. Could be a -- could be a state law change.
7    Could be a best practice change through CALEA. Or
8    if we hear that something is coming down the pike
9    that we ought to start looking at, we begin working
10   on that process right away. Lineups and showups,
11   blind administration and all of that. We were
12   already working on that before it became mandated.
13        Q. Other than having the deputies review the
14   policy and procedures on PowerDMS, are there any
15   other ways you communicate to the deputies the
16   policies and practices of the department?
17        A. Some are reviewed at roll call.
18   In-service training. Our people get 48 hours of
19   in-service training every year.
20        Q. And who conducts the roll call?
21        A. The sergeant, or the lieutenant in their
22   absence. Or it could be somebody from the Criminal
23   Investigation Bureau that's maybe giving a briefing
24   on -- on -- say they want more deputies in a
25   particular area because we're having a lot of

Page 136

1    construction theft. So there is -- maybe somebody
2    from traffic talking about a high accident
3    intersection or somebody that we should be watching
4    for. Maybe a crew out there stealing copper that we
5    need to be watching.
6         Q. And how is it determined which policies or
7    practice to review during roll call?
8         A. Maybe -- maybe if it comes up and we don't
9    think that everybody is following it, we -- we want
10   to remind them that they need to. It might not be
11   that we necessarily know that they're not following
12   it, but we want to make sure that they are. Sexual
13   harassment, for example, is being covered through
14   the entire department right now.
15        Q. What triggered that?
16        A. Just -- we just need to be doing it.
17        Q. Prior to this round of coverage, when was
18   the last time sexual harassment was covered at roll
19   call?
20        A. I can't give you an exact date, but I know
21   it's been covered.
22        Q. Would you say it's over five years ago,
23   or...
24        A. You know, I can't be specific to roll
25   call, but I know it's been covered on PowerDMS. Rob

34 (Pages 133 to 136)

DUNNING - Direct (By Ms. Tsai)

Page 137

1    Sofie would have a tracking date for that on
2    PowerDMS.
3        Q.   And that's to review the sexual harassment
4    general order?
5        A.   Uh-huh.  Particularly if we have a
6    revision.
7        Q.   Right.
8            Do you know when was the last time the
9    sexual harassment general order was revised?
10       A.   I couldn't tell you, off the top of my
11   head, no.
12       Q.   Was it within the last couple of years or
13   more than five years?
14       A.   I couldn't tell you.
15       Q.   Okay.  And you can't --
16       A.   I would say that I think it's been revised
17   in the -- I think it's been revised in the past
18   year.
19       Q.   And you don't recall when was the last
20   time sexual harassment was covered at roll call;
21   correct?
22       A.   No.
23       Q.   When a deputy receives a disciplinary
24   action or a verbal warning about certain behavior,
25   is that behavior covered at roll call?

Page 138

1        A.   Just depends on what it is.
2        Q.   What do you mean?
3        A.   I'm trying to think of -- of an example.
4    A pursuit, maybe, that, you know, you need to get
5    your lights on right away.  You need to be radioing
6    right away.  We might be reminding them, you know,
7    it's wintertime.  Maybe reminder that we don't -- we
8    don't pursue for any reason during high traffic
9    areas or school areas.  That sort of thing.
10       Q.   Do you recall whether it's ever been
11   covered at roll call that -- communicated to the
12   deputies that conduct of a sexual nature between
13   deputies and private citizens will not --
14       A.   What -- what was that?
15       Q.   That conduct of a sexual nature between
16   deputies and private citizens will not be tolerated
17   by the department?
18       A.   No, I don't think we've covered that.
19   That's covered under state law that -- they would
20   have gotten that in their training in --
21       Q.   At the academy?
22       A.   Well, in the academy.  But it's also state
23   law, and they have to know state law.
24       Q.   Is there a review of state law at roll
25   call?

Page 139

1        A.   If there is law changes, yes.
2        Q.   Do you recall whether there has been
3    coverage about state law relating to sexual
4    misconduct?
5        A.   I don't think we've covered that at roll
6    call.  They are supposed to know that.  There is
7    a -- there is a moral code as well, and there is --
8    they are supposed to have it, otherwise we wouldn't
9    have hired them.
10       Q.   The moral code, does that get revised from
11   time to time?
12       A.   The moral code?
13       Q.   Uh-huh.
14       A.   No.
15       Q.   Okay.  And so my understanding is the
16   deputy -- after -- during the application process
17   and training, they review the code; correct?
18            You have to say "yes."
19       A.   Yes.
20       Q.   And they sign a document that verifies
21   that they have read the code, understand the code,
22   and will follow the code?
23       A.   Correct.
24       Q.   That occurs at the beginning of their
25   employment at the deputy's office?

Page 140

1        A.   It -- it -- no.  That happens at their
2    swearing in.
3        Q.   Okay.
4        A.   They -- we -- we hire them.  They are
5    there for a week to go over some things.  Then they
6    go to the academy.  Immediately before they go to
7    their next assignment, we have a swearing-in
8    ceremony.
9            Well, there is actually two swearing-in --
10   they are sworn in as Nebraska certified officers at
11   the academy.  And then they come back to us, and we
12   have one that's just for the sheriff's office.  And
13   at that time they -- we -- they get the code of
14   ethics then.
15       Q.   And after they get the code of ethics in,
16   at that period, after that do they ever have
17   occasion to review that code again?
18       A.   If -- you know, I -- I don't know if we
19   republished that on PowerDMS or not.  If we have an
20   update in anything of that nature, they would
21   certainly have to sign off --
22       Q.   Sure.
23       A.   -- on that.
24       Q.   But it's your memory that that has not
25   been -- the moral code has not been updated

35 (Pages 137 to 140)

DUNNING - Direct (By Ms. Tsai)

Page 141

1    recently?
2        A.  Not -- not -- not to my knowledge, if I
3    can recall.
4        Q.  Has it been updated within -- to your
5    recollection, within the last ten years?
6        A.  I couldn't say for sure.
7        Q.  That's not one of the documents or
8    policies or codes that gets updated frequently;
9    correct?
10       A.  It could, depending if we wanted to add --
11   add language to it.  There is no reason that
12   couldn't be revised.  But I don't know that we have
13   revised it recently.
14       Q.  Okay.  And I understand that it could be
15   revised.  I guess my question is more towards has
16   the department revised that code on a regular basis
17   since you've became sheriff of the department?
18       A.  I don't recall.  I don't think so.
19       MS. TSAI:  Do you guys want to break
20   for lunch, or -- it's 10 to 1:00.
21       MS. BOTHE:  Sure.  Just, like, 20
22   minutes?
23       MR. DOLAN:  Sure.
24           (12:49 p.m. - Recess taken.)
25

Page 142

1           (At 1:20 p.m., with all the parties
2    present as before, the following proceedings were
3    had, to-wit:)
4               (Exhibit No. 110
5           marked for identification.)
6    BY MS. TSAI:
7        Q.  Sir, have you seen this document before?
8        A.  Yes.
9        Q.  And what -- and this is a general order?
10       A.  Yes.
11       Q.  And what's the subject of this general
12   order?
13       A.  "In car video system."
14       Q.  Okay.  And, to your knowledge, was this
15   the general order that was in effect in 2013 -- in
16   February of 2013?
17       A.  Yes.
18       Q.  Okay.  And this general order describes --
19   provides the deputies directives as to how to use
20   the in-car video system and when to use it; correct?
21       A.  Yes.
22       Q.  And if you will look at page 1,
23   Section III, "Procedure," Subsection A, "Situations
24   for Use," under 2b, it provides an exception for
25   when the officers can remove their mic pack and

Page 143

1    leave it in the car; correct?
2        A.  An exception?
3        Q.  Right.
4           So I'm looking, actually, specifically at
5    the example.  If a deputy has suspects secured in
6    the back of the seat in the vehicle and the deputy
7    wishes to record their conversation while he or she
8    is out of the vehicle --
9        A.  Okay.
10       Q.  -- he could remove his mic pack and put it
11   in the car; correct?
12       A.  Yes.
13       Q.  And that's an accepted behavior?
14       A.  Yes.
15       Q.  Okay.  And you indicated previously that
16   you read the transcript for Mr. Cooper's deposition?
17       A.  Yes.
18       Q.  Do you recall him testifying that he
19   removed his mic pack and put it in -- in the
20   driver's seat because he had both Kyle and Megan in
21   the back seat while he searched Kyle's vehicle?
22       A.  I recall him saying that.
23       Q.  Okay.  And that is consistent -- that --
24   that particular action is consistent with the
25   policies and procedures of Douglas County?

Page 144

1        A.  No.  No, it's not.
2        Q.  How is that not consistent?
3        A.  He should -- he should have had that
4    because he was -- once he has spotted the
5    marijuana -- I mean, everything he did all the way
6    up to that vehicle was wrong.
7        Q.  Can you --
8        A.  And so this particular thing -- he should
9    have had that on so he could have recorded any
10   conversation that he had with them.  And especially
11   if he's going to be recovering some evidence and so
12   on, that would have been important to have those
13   conversations.
14       Q.  I'm a little confused here.  So at the
15   moment when he puts -- he has Megan and Kyle in
16   custody in his vehicle and he goes to search Kyle's
17   car, it was improper for him --
18       A.  Oh, he could have put it in there, but he
19   didn't turn it on.
20       Q.  I -- I understand.
21           So -- but that -- the actual action that
22   he took to take the mic pack off and to put it in
23   the -- his marked car --
24       A.  Not on.
25       Q.  -- so that he could record Megan and

36 (Pages 141 to 144)

DUNNING - Direct (By Ms. Tsai)

Page 145

1    Kyle's conversation, that was a proper procedure,
2    but for the fact that he didn't have the mic on?
3        A.  He didn't have it on.  Correct.
4        Q.  Okay.  And is there anything that would
5    have -- did he have to manually turn it on, the mic
6    pack?
7        A.  Yeah.  Yeah.  He would have had to turn it
8    on.
9        Q.  And how -- how does he go about turning on
10   the mic pack?  Or any deputy.  How does a deputy
11   turn on a mic pack?
12       A.  Push the button.
13       Q.  On the mic pack itself?
14       A.  Yeah.
15       Q.  And once you turn it on, is there any
16   indicator light to show that the mic pack is on?
17       A.  You know, I don't know that answer.
18           MS. TSAI:  Okay.  Okay.  Can we mark
19   this 111?
20           (Exhibit No. 111
21           marked for identification.)
22   BY MS. TSAI:
23       Q.  Exhibit 111 is a Douglas County Sheriff's
24   Office general order relating to the subject matter
25   of law enforcement role and authority; correct?

Page 146

1        A.  Correct.
2        Q.  And this was the general order that was in
3    effect in February of 2013?
4        A.  Yes.
5        Q.  Okay.  And if you go to the second page,
6    Section D, "Use of Discretion."
7        A.  Okay.
8        Q.  This section outlines for the deputies the
9    discretion that they have on the job; correct?
10       A.  Correct.
11       Q.  Okay.  And would you say that your
12   testimony earlier about officer discretion is
13   consistent with your interpretation of this general
14   order?
15       A.  Yes.
16       Q.  Okay.  If you go to page 3, Section E,
17   "Alternatives to Arrest/Confinement/Release."
18       A.  Yes.
19       Q.  Would you agree with me the general order
20   allows certain discretion to the deputies regarding
21   arrests and confinement?
22       A.  Where does it say that?
23       Q.  Section E is titled "Alternatives to
24   Arrest/Confinement/Release."
25       A.  Section -- what was it?  D?

Page 147

1        Q.  Section E.
2        A.  Oh, E.  Okay.
3        Q.  It's on page 3, the top of your left-hand
4    corner.
5        A.  I don't have a Section E.  D?  Oh, E.
6    Okay.  Over here.
7            And then what section?
8        Q.  So my question is do you agree that this
9    general order gives deputies the discretion and
10   outlines certain alternatives to arrest,
11   confinement, and release?
12       A.  No.  I think it just says minor traffic
13   violations in the third line of Subsection a(1).
14   They have the discretion whether to write somebody
15   a --
16       Q.  A traffic citation?
17       A.  -- a traffic ticket or not.
18       Q.  And Section 1a, also they have the
19   discretion to give someone an oral or written
20   warning; is that right?
21       A.  For a traffic violation.
22       Q.  Where -- I see.
23           And so it's your interpretation that
24   Section E of this general order applies only to
25   traffic violations?

Page 148

1        A.  Correct.  You know, where another would
2    be -- discretion would be that, if you have a drunk
3    driver and you have the ability to turn them over to
4    a responsible, sober person, you could cite them as
5    opposed to book them, as long as it wasn't a -- a
6    second offense or above.
7        Q.  And if there is an individual who is found
8    in the vehicle with alcohol but is able to pass the
9    sobriety test, would there be any discretion to
10   release the individual to a responsible person
11   instead of issuing a traffic violation?
12       A.  If they passed the sobriety test, sure,
13   you could release them.
14       Q.  Okay.
15       A.  Unless -- unless they were a minor and
16   they had that alcohol.
17       Q.  Okay.  And how do you make that
18   distinction between a minor with alcohol that you
19   have to issue a citation versus a adult who passes
20   the sobriety test and you allowed them to be
21   released?
22       A.  Well, in your example you said they passed
23   the sobriety test; so I don't have a violation now,
24   other than -- other than if I had a other traffic
25   violation that I was stopping them for.

37 (Pages 145 to 148)

DUNNING - Direct (By Ms. Tsai)

Page 149

1    Q.  If you look at Subsection d of -- it's on
2  the second column.
3    A.  Okay.
4    Q.  "Informal resolution."  Part (2) states
5  "Informal resolution is an excellent method to deal
6  with minor violations.  It should be used in
7  disputes such as neighborhood squabbles,
8  landlord/tenant disagreements, when victims do not
9  wish to pursue criminal charges, et cetera."
10        Do you see that?
11    A.  Yes.
12    Q.  Based on that section, is it still your
13  understanding that alternatives to arrest,
14  confinement, and release -- that entire section is
15  limited only to traffic violations?
16    A.  And what's spelled out here, neighborhood
17  squabbles, landlord/tenant disagreements, when
18  victims do not wish to pursue criminal charges.
19    Q.  And then it says et cetera?
20    A.  Would not fit into a criminal.
21    Q.  Well, so do you agree that certain types
22  of neighborhood squabbles can rise to a level where
23  there could be criminal charges?
24    A.  Then this wouldn't -- this wouldn't apply,
25  then, if it rose to a criminal action.

Page 150

1    Q.  When you use the term "criminal action,"
2  are you referring to all types of violations -- all
3  types of city, state, county, federal law, or are
4  you referring to significant -- or are you referring
5  to, like, state and federal?
6    A.  I'm referring to state law.
7    Q.  Okay.  If someone is in violation of a
8  city ordinance or a county law, do the deputies have
9  discretion when to arrest or to use an alternative
10  to arrest?
11    A.  We only file under the state law.  If --
12  if it's a minor violation that could potentially go
13  to the city prosecutor, he could charge under the
14  city ordinance and the fact we were in the city.
15    Q.  How is a deputy or anyone who is reading
16  this general order supposed to know that this
17  applies only to traffic violations and incidents not
18  relating to criminal violations?
19    A.  I think it's -- I think it's pretty clear
20  in the order.
21    Q.  Well, would you agree with me that when
22  one of the examples is when victims do not wish to
23  pursue criminal charges, that means that there is a
24  incident where criminal charges can be made?
25    A.  You know, neighborhood -- a neighborhood

Page 151

1  squabble could escalate into an assault.  A
2  landlord/tenant disagreement could escalate into a
3  theft or an assault.
4    Q.  Right.  So these are examples --
5    A.  Uh-huh.
6    Q.  -- of incidents that can rise to the level
7  of a criminal prosecution?
8    A.  Yes.
9    Q.  Okay.  And so my question goes back to how
10  is it clear that this section of the general order
11  is not applicable to incidents where there is a
12  criminal violation?
13    A.  It's because it doesn't give them leeway
14  to do that.
15    Q.  It doesn't specify?
16    A.  Well, it says except for minor traffic
17  violations, and it says neighborhood squabbles,
18  landlord/tenant disagreements.
19    Q.  And victims who do not wish to pursue
20  criminal charges.
21    A.  Right.
22    Q.  Et cetera.
23    A.  I don't see where there is any latitude.
24    Q.  So if there was an incident of battery --
25  okay?  You agree with me that rises to the level of

Page 152

1  a criminal charge?
2    A.  If -- what was that?
3    Q.  A battery.
4    A.  Okay.
5    Q.  Okay.  That -- that's an event that rises
6  to a level of a criminal charge; correct?
7    A.  Correct.
8    Q.  If the victim of the battery does not wish
9  to pursue criminal charges, doesn't that fall under
10  this particular section?
11    A.  Well, we arrest without the victim wanting
12  to pursue charges, anyway, on domestic violation
13  when, in fact, we see evidence of an assault.
14    Q.  Right.
15        So you -- so officers have the discretion
16  to pursue criminal charges, even if the victim does
17  not want to press charges; correct?
18    A.  Say that again.
19    Q.  Deputies have the discretion to arrest and
20  pursue criminal charges in cases, even when the
21  victim does not --
22    A.  Correct.
23    Q.  -- want to issue charges?
24    A.  Correct.
25    Q.  In this particular section it states that

38 (Pages 149 to 152)

DUNNING - Direct (By Ms. Tsai)

Page 153

1   informal resolution is an excellent method to deal
2   with minor violations such as when victims do not
3   wish to pursue criminal charges.
4       A.   Yeah.  I think it would be excellent for
5   neighborhood squabbles and landlord/tenant
6   disagreements.
7       Q.   But -- so putting aside for the moment the
8   neighborhood squabbles, the landlord/tenants
9   disagreements and focusing on where it says "when
10  victims do not wish to pursue criminal charges,"
11  this portion of the general order gives officers the
12  discretion to find informal resolutions; correct?
13      A.   Just -- just in these instances.
14      Q.   Well, it does also end with et cetera;
15  correct?
16      A.   Well, we'll -- I'll have that word changed
17  when we get back.
18      Q.   Okay.  Well, as the order currently
19  stands, that list is not meant to be an exclusive
20  list of incidents where this general order applies;
21  correct?
22      A.   Well, that's how I read it.  I would be
23  asking questions of my supervisor if I was going to
24  let -- let somebody go that had evidence.
25      Q.   Can you say that again?

Page 154

1       A.   Pardon?
2       Q.   Can you repeat that?  I didn't hear it.
3       A.   I would be -- I would be contacting my
4   sergeant or my lieutenant if I was going to be
5   letting somebody go that had evidence.
6       Q.   Because the reading of this order can be
7   interpreted in more than one way?
8       A.   It doesn't fit.  It doesn't fit when
9   somebody has evidence of a crime.
10      Q.   Well, if -- a victim who was battered, the
11  victim obviously has evidence of a crime -- physical
12  injuries?
13      A.   Then it's not up to them.
14      Q.   But in this particular case, the reading
15  of this order gives the deputy discretion to use
16  informal resolutions if the victim does not want to
17  pursue the criminal charges?
18      A.   In disputes such as neighborhood
19  squabbles, landlord/tenant disagreements.
20      Q.   It also says, "when victims do not wish to
21  pursue criminal charges, et cetera"; correct?
22      A.   Well, is that --
23      Q.   I guess you're -- you're stopping at
24  landlord/tenant disagreements, but there is a comma
25  and it says "when victims do not wish to pursue

Page 155

1   criminal charges, et cetera."
2           So these are -- it doesn't -- it's not
3   limited to neighborhood squabbles and
4   landlord/tenant disagreements; correct?
5       A.   It is for me.
6       Q.   Would you agree that the plain reading of
7   this section doesn't read that way?
8       A.   That what?
9       Q.   It doesn't read that way?
10      A.   I'm not having any trouble reading it.
11  I -- I think you're reading into it.
12      Q.   So it's your testimony, sitting here
13  today, that this only applies to disputes where
14  there is a neighborhood squabble and a
15  landlord/tenant disagreement?
16      A.   And minor traffic violations.
17          And then if you skip down to No. 2 below,
18  "Deputies also must consider the following factors
19  when -- when exercising alternatives:  The presence
20  or absence of probable cause; existing law and the
21  elements of the offense; the level of cooperation by
22  victims and witnesses; the severity of the offense
23  involved; available resources; and department
24  policy, procedures, regulations, and written
25  directives and orders" [as read].

Page 156

1       Q.   And so "a" through "f" are factors to
2   consider?
3       A.   Pardon?
4       Q.   "A" through "f" of Section 2 are just
5   factors for deputies to take into consideration --
6       A.   Right.
7       Q.   -- whether they are going to use an
8   alternative to arrest and confinement?
9       A.   Let me get rid of this.  Okay.
10      Q.   Is that right?
11      A.   Yes.
12      Q.   All right.
13          MR. DOLAN:  Wait.  To be clear, when
14  you said, "Let me get rid of this," you were
15  referring to a ringing telephone call?
16          THE WITNESS:  Yeah.
17  BY MS. TSAI:
18      Q.   You're not going to get rid of this entire
19  general order, but you are going to get rid of the
20  term "et cetera"; is that right?
21      A.   I'm going to what?
22      Q.   You're going to remove that word
23  "et cetera" in Section d(2)?
24      A.   Yeah.  Because it apparently causes
25  confusion for some.

39 (Pages 153 to 156)

DUNNING - Direct (By Ms. Tsai)

Page 157

1    Q.  Okay.  And it's important to have very
2  clear general orders to provide deputies with clear
3  directives and guidelines?
4    A.  Correct.
5    Q.  And you agree with me, at least in this
6  particular case, you and I had a different
7  interpretation of this general order?
8    A.  Correct.
9        MS. TSAI:  Let's mark this as
10  Exhibit 112.
11        (Exhibit No. 112
12        marked for identification.)
13  BY MS. TSAI:
14    Q.  Exhibit 112 is the general order from
15  Douglas County Sheriff's Office, subject matter
16  search and seizure; correct?
17    A.  Correct.
18    Q.  And this particular general order was
19  amended in November of 2012 -- or amended in 2012?
20    A.  Yes.
21    Q.  Okay.  And was this the general order that
22  was in effect in February of 2013?
23    A.  Yes.
24    Q.  Okay.  And I am really going to test your
25  memory.  Do you recall what caused there to be a

Page 158

1  amendment on this policy in 2012?
2    A.  No, I don't.
3    Q.  Okay.  How frequently is the search and
4  seizure general order revised?
5    A.  Again, as law changes take place or if we
6  experience something that would be a grey area that
7  we need to spell out further.
8    Q.  The stop -- well, it's not even a stop.
9  Strike that.
10        The search and seizure that occurred in
11  February of 2013 between Mr. Cooper and
12  Megan McGuire and Kyle, would you characterize that
13  as a traffic stop?
14    A.  No, not in my mind, I would not.
15    Q.  Because the vehicle was not moving?
16    A.  Well, he didn't radio it in so nobody knew
17  where he was.  And for officer safety, he should
18  have done that so that he -- he knows prior to
19  walking up to that vehicle whether it's a stolen
20  car, it's full of gangbangers, or a serial killer,
21  or whatever it is.  He didn't -- he didn't do that.
22    Q.  So putting aside that he didn't follow
23  protocol --
24    A.  Officer safety.
25    Q.  -- for officer safety -- the stop itself,

Page 159

1  though, that -- you wouldn't put -- would you
2  characterize that as a traffic stop?
3    A.  I can't remember if he -- yeah.  It wasn't
4  moving; so I wouldn't say it was a traffic stop, no.
5    Q.  Would that be characterized as a
6  investigation stop?
7    A.  Check of a suspicious vehicle.
8    Q.  Yeah.  Is check of a suspicious vehicle --
9    A.  Yeah.
10    Q.  -- a investigation stop?
11    A.  Right.
12    Q.  Okay.  And so the section relating to
13  investigation stop in this general order would be
14  applicable?
15    A.  Yes.
16    Q.  Except for the fact I don't see it.  It
17  must have been in a different -- is another term for
18  investigatory stop a stop and frisk?
19    A.  Could be.
20    Q.  Looking at page 2 --
21    A.  Okay.
22    Q.  -- on the left-hand column, No. 3, "Stop
23  and Frisk."  Can you just take a second to review
24  that portion?
25    A.  Okay.

Page 160

1    Q.  Based on your review of that -- of the
2  stop and frisk section of this general order, did
3  the search and seizure event between Mr. Cooper and
4  Megan McGuire fall under this type of interaction?
5    A.  Well, as I recall, he -- he articulated
6  that he -- he had smelled the odor of marijuana, had
7  eventually seen a jar which contained -- I think he
8  said buds or something like that.  And he got them
9  out of the vehicle so he could further search the
10  vehicle.  And that would have been because he had
11  found the -- the marijuana.
12        I guess I don't know what else you want me
13  to say.
14    Q.  No.  My question was simply does that
15  interaction fall under the category of an
16  investigatory stop as described in Section 3 of this
17  Section A -- b3 of this order?
18    A.  Well, I don't think he had -- he walked up
19  on the vehicle and he smelled the -- the marijuana.
20  Absent that, I don't know that he had the -- he
21  could -- he could shine his light in the vehicle to
22  make sure everybody was okay.  But he didn't have --
23  but other than the smell of marijuana, he had no
24  business doing anything else.
25    Q.  Okay.  The smell of marijuana gave him

DUNNING - Direct (By Ms. Tsai)

Page 161

1  reasonable suspicion --
2       A.  Correct.
3       Q.  -- to search the vehicle?
4       A.  Yes.
5       Q.  He stated that it was his practice to
6  approach parked vehicles in parking lots and parks.
7  Do you recall that?
8       A.  Yes.
9       Q.  Is that a practice -- is that an
10 acceptable practice within Douglas County Sheriff's
11 Office?
12      A.  You know, it's -- there is nothing against
13 it.  I mean, you could certainly do parks.  And
14 people do construction sites.  Other people do
15 traffic stops on the main thoroughfares, other
16 people stay in neighborhoods.
17      Q.  Is there anything suspicious about a
18 vehicle parked in a park parking lot?
19      A.  It could be.
20           MR. DOLAN:  Object to the form of the
21 question.  Pre-supposes suspicion is required.
22           But you may answer.
23           THE WITNESS:  It could be.
24 BY MS. TSAI:
25      Q.  Okay.  And why do you say that?

Page 162

1       A.  Well, I mean, a vehicle in a -- in a park
2  at night could be doing dope, could be disposing of
3  stolen property, or taking a look at stolen
4  property.  It could be a sexual assault.  Just --
5  there is a whole variety of things.
6       Q.  What about a parked vehicle in the park
7  parking lot during the daytime?
8       A.  In what?
9       Q.  During the daytime.  Would that be
10 reasonably suspicious behavior?
11      A.  In the daytime I wouldn't have as much
12 suspicious -- I wouldn't have as much suspicion
13 there, other than it might be stolen, and, you know,
14 what are they -- what are they doing there.
15      Q.  And does -- does a deputy need reasonable
16 suspicion to approach an occupied parked vehicle in
17 a parking lot?
18      A.  Does he have a right to do that?  Yeah.
19 He can -- he can approach.  It's not -- it's not
20 wise the way he did it.
21      Q.  And what do you mean by "the way he did
22 it"?
23      A.  Well, he didn't radio in that -- the
24 license plate of the car.  He didn't -- he didn't
25 await available backup.  I mean, he didn't -- he

Page 163

1  didn't do anything right here.
2       Q.  Okay.  He testified that he approached the
3  vehicle and it was his practice to approach the
4  vehicle -- parked vehicles in their blind spot.  Do
5  you recall that testimony?
6       A.  Sure.
7       Q.  Is that a smart practice?
8       A.  Well, for officer safety that's the best
9  way to go.  But he -- from the get-go he wasn't --
10 he apparently wasn't concerned with officer safety
11 because he didn't radio in.  He didn't ask for any
12 backup.
13      Q.  And if he decided to approach the parked
14 vehicle -- the occupied parked vehicle at night in
15 the dark, should he have turned on his lights?
16      A.  I would.
17      Q.  In terms of training received by the
18 department, should he have turned on the lights?
19      A.  He should have turned on the lights so
20 that anybody in the area could have spotted him.
21      Q.  Okay.  But that included the individuals
22 who are sitting in the parked vehicle; correct?
23      A.  That what?
24      Q.  That includes the individuals sitting in
25 the parked vehicle; correct?

Page 164

1       A.  Yeah.
2       Q.  Okay.  And for these types of encounters,
3  deputies aren't necessarily trying to sneak up on
4  the occupants of the car; correct?
5       A.  I think there is some stealth involved in
6  it.  I think they do want to sneak up somewhat to
7  see what's going on there.
8       Q.  Okay.  If that's the case, then wouldn't
9  you agree that, by having his vehicle lights on, he
10 would alert occupants in the car that -- of his
11 approach and gave them the opportunity to
12 potentially hide any activity that they didn't
13 want --
14      A.  I don't know what he was thinking.  We
15 don't think alike.
16      Q.  Okay.  In terms of best practices, if a
17 deputy decides to approach a occupied parked car at
18 night -- and we established, one, he or she should
19 radio in; correct?
20      A.  And he didn't.
21      Q.  Right.
22           And I'm just talking about best practices.
23 We are putting Mr. Cooper aside right now.
24           So, one, he or she should radio in?
25      A.  Yes.

41 (Pages 161 to 164)

DUNNING - Direct (By Ms. Tsai)

Page 165

1      Q.  It's acceptable to drive and park in
2  the -- in the private citizen's blind spot?
3      A.  Sure.
4      Q.  Okay.  There is some level of wanting
5  to -- not giving the occupants any opportunity to
6  dispose of any wrongdoing?
7      A.  Correct.
8      Q.  Okay.  How is that achieved if the officer
9  is suppose -- should have also turned on his lights?
10     A.  I don't think he did it right.
11     Q.  I'm not talking about Mr. Cooper.
12     A.  Okay.
13     Q.  I'm talking about based on what you've --
14     A.  Well, whatever instance, if you're not
15  turning on your red lights and you're out by
16  yourself, you're -- you're being stupid if you're
17  not -- if you're not calling for backup, if you're
18  not asking -- if you're not making your -- your
19  location made known.
20     Q.  I guess where I'm trying -- what I'm
21  trying to understand is how is a law enforcement
22  officer supposed to approach with that element of
23  surprise if the officer is expected to turn on --
24  that best practices would dictate that they turn on
25  your car vehicle lights?

Page 166

1      A.  Well, if he sees the car in the park, why
2  not drive around the block, call -- call for backup,
3  and then -- and then drive in?  You can still -- you
4  can still get out of that car pretty quickly.
5      Q.  Wouldn't two approaching cop cars with
6  their lights give the occupants even more --
7      A.  Where can they go?
8      Q.  So your concern is that they would leave,
9  not so much that they would dispose of any evidence
10  of wrongdoing?
11     A.  They might -- they might, but they never
12  get rid of all of it.
13     Q.  Then when you indicate that you believe
14  that there should be a element of -- it would be
15  helpful to have an element of surprise, that is
16  geared towards making sure that occupants do not
17  leave and not that they dispose of evidence of a
18  criminal activity?
19     A.  My officer safety is the No. 1 concern.
20     Q.  I understand that.
21        But going back to my question, officer --
22  so officer safety is obviously No. 1 concern, and
23  that's why you call in radio for backup.
24        Another element of any deputy's job is to
25  enforce the law?

Page 167

1      A.  Correct.
2      Q.  And that includes catching individuals
3  during a criminal activity?
4      A.  Correct.
5      Q.  Okay.  And one way to do that is by
6  introducing the element of surprise so that they do
7  not know that you're approaching?
8      A.  It would be nice if you can.
9      Q.  Okay.  But that is not the main reason why
10  you believe the element of surprise is important?
11     A.  Yeah.  It's important, but officer safety
12  still comes back to be No. 1.  I'm not going to
13  sacrifice my safety for something that I may not
14  have any control over.  If I have a backup come, now
15  I'm -- now I'm secure.  If I lose a little evidence,
16  so what.
17     Q.  Okay.  What's the purpose of pulling up in
18  an individual's blind spot if there is a back-up
19  vehicle fastly approaching and the occupant can see
20  that vehicle?
21     A.  Well, if they don't see them approaching,
22  then the occupants think that it's just one person
23  approaching; so they may feel free to exit one side
24  of the car or the other, whichever they see the
25  opportunity at.

Page 168

1      Q.  Okay.  Turn to page 7 of the search and
2  seizure general order, Exhibit 112.
3        There is a section -- Section F is
4  "Interview, Interrogation, and Right to Counsel."
5  Do you see that?
6      A.  Section what?  Oh, F.
7      Q.  F.
8      A.  Okay.  Yes.  Yes.
9      Q.  And Subsection 1 of Section F defines
10  interviews; correct?
11     A.  Okay.
12     Q.  And it states that interviews are
13  non-accusatory structured conversation during which
14  specific behavior-provoking questions are asked with
15  the purpose of eliciting interpretable behavior
16  symptoms that are typical of truth or deception.
17  Additional factual information concerning the case
18  and/or suspects may also be developed during not --
19  this non-accusatory exchange.
20        Do you see that?
21     A.  Yes.
22     Q.  And in other words, the interviews are a
23  more informal way of gathering information rather
24  than interrogation?
25     A.  Correct.

42 (Pages 165 to 168)

DUNNING - Direct (By Ms. Tsai)

Page 169

1     Q.  Okay.  And when you conduct interviews,
2  you do not need to give the individual their Miranda
3  rights?
4     A.  Not at that point.
5     Q.  Okay.  Because they are not under arrest?
6     A.  Right.
7     Q.  And so conducting these non-accusatory
8  structured conversations can happen -- it's not
9  required -- it doesn't have to be incident to
10  arrest; correct?
11     A.  Correct.
12     Q.  Okay.  And it can happen at any moment
13  when a deputy is having an encounter with a private
14  citizen?
15     A.  Correct.
16     Q.  Okay.  And it can happen at anyplace where
17  the deputy has an encounter with a citizen?
18     A.  Correct.
19     Q.  Okay.  And the interview doesn't have to
20  stem from any sort of traffic or investigatory stop?
21     A.  Yeah.  It could be just as simple as, "How
22  are you doing?"
23     Q.  Okay.
24     A.  Or, "Everyone okay?"
25     Q.  Does the department encourage community --

Page 170

1  community policing?
2     A.  Uh-huh.  Yes.
3     Q.  And how are deputies trained to engage in
4  community policing?
5     A.  Well, we -- we engage -- we engage them on
6  many levels.
7     Q.  Well, I should back up.
8        Does -- do deputies receive any sort of
9  training on community policing?
10     A.  In the academy, yes.
11     Q.  Okay.  What about any training from the
12  department?
13     A.  I can't recall anything specific.
14     Q.  Would you consider deputies approaching
15  occupied parked vehicles as a form of community
16  policing?
17     A.  Could be, if their intent there was to
18  help someone out.  And if they needed some help,
19  find some further resources for them.
20     Q.  What about if they are approaching the
21  vehicle based on suspicion that there is some
22  criminal activity?
23     A.  I don't -- I don't see where that's
24  community policing.
25     Q.  That's just policing?

Page 171

1     A.  Yeah.
2     Q.  And in incidents where officers are
3  approaching parked vehicles that are occupied, are
4  those considered consensual encounters?
5     A.  Well, at -- it just depends.
6     Q.  What do you mean by that?
7     A.  Well, it's -- he doesn't need consent to
8  walk up on the vehicle because he's suspicious of
9  what may be taking place.  If he -- if he would want
10  to just search the vehicle for just -- because he --
11  because he wanted to, he can't.  So that would be
12  nonconsensual.
13     Q.  Okay.  The encounter that Mr. Cooper
14  engaged with Megan McGuire when he approached the
15  vehicle, based on his description and your
16  understanding of events that occurred, would the
17  approach of the vehicle be considered a consensual
18  encounter?
19     A.  Well, he didn't need to have a consensual
20  encounter.
21     Q.  I understand that.
22     A.  Yeah.
23     Q.  But --
24     A.  Well, then, I don't know how I could call
25  it that because he didn't need it.

Page 172

1     Q.  Did he -- well, what gave him the right to
2  approach that vehicle?
3     A.  He thought it was suspicious.
4     Q.  And what was the basis of that suspicion?
5     A.  I don't recall what he -- what he stated,
6  other than -- I mean, for me, a parked car in a park
7  could mean a variety of things.  It could be just
8  two people talking.  It could be people doing dope.
9  It could be people committing a sexual assault.
10  There is a whole variety of things.
11     Q.  Right.
12        So because there is a whole, big spectrum
13  of what individuals can be doing in a parked
14  vehicle, can a deputy simply approach that car
15  without any more information than the fact that
16  it's --
17     A.  Yeah.  He can -- he can approach.
18     Q.  Okay.  And he doesn't need to have a
19  suspicion of wrongdoing for him to approach the
20  vehicle; correct?
21     A.  It would be nice, but he -- if he in the
22  end articulates that he did it to make sure they
23  were okay or there wasn't any illegal activity
24  occurring --
25     Q.  That's okay?

43 (Pages 169 to 172)

DUNNING - Direct (By Ms. Tsai)

Page 173

```
1       A.  Yeah.
2       Q.  In incidents where a deputy expressed that
3   they were just concerned about occupants in a parked
4   vehicle, is that characterized at a consensual
5   encounter?
6       A.  If -- what was the first part of that?
7       Q.  If a deputy indicates that he or she
8   approached a vehicle because he or she was concerned
9   about the occupants of the vehicle --
10      A.  Sure.
11      Q.  -- does that fall into the category of a
12  consensual encounter?
13      A.  Sure.
14      Q.  Okay.  And that's even though the
15  individual didn't ask for the deputy to approach the
16  car?
17      A.  Right.
18      Q.  If the occupant inside the vehicle says,
19  "I'm fine.  Go away," does the deputy have a right
20  to interact with the private citizen any further?
21      A.  On a -- on a parked car, if there is no --
22  if he has no -- no signs of illegal activity, he
23  should be walking away.
24      Q.  Okay.  It's against the department's
25  policy for a deputy to proposition a person for
```

Page 174

```
1   sexual favors in exchange for favorable police
2   treatment; correct?
3       A.  Is that okay?  Is that what you said?
4       Q.  It's against the department's --
5       A.  Absolutely.
6       Q.  -- policy?
7       A.  Yes.
8       Q.  Okay.  And where -- what rules and
9   policies covers that behavior?
10      A.  State law, for one.  And -- and we follow
11  state law.  It's under the code of conduct and the
12  code of ethics.
13      Q.  How frequently is the code of conduct
14  general order revised?
15      A.  I think fairly -- fairly frequently.
16      Q.  Okay.  And what prompts the revision?
17      A.  I couldn't tell you offhand what
18  specifically prompts it.
19      Q.  Would it be for the same reasons that you
20  indicated earlier about when other general orders
21  are revised?  For example, if there is a change in
22  the law?
23      A.  Correct.
24      Q.  Or if there is an incident that occurs and
25  there is belief amongst you and -- well, and there
```

Page 175

```
1   is a belief that -- you believe that there is a grey
2   area in the policy, you can also facilitate a
3   revision?
4       A.  Correct.
5       Q.  Okay.  And then just to make sure I did
6   cover this, are there any orders or policies that
7   specifically address the issue of conduct of a
8   sexual nature by a law enforcement --
9       A.  Conduct unbecoming?
10      Q.  Whether there is a -- any order or a
11  policy that specifically addresses the issue of
12  conduct of a sexual nature by law enforcement
13  officers.
14      A.  Well, I think it's still covered under the
15  code of ethics, under the code of conduct.
16      Q.  Okay.  There is nothing that specifically
17  talks just about behaviors of a sexual nature?
18      A.  You've got to follow the laws of the state
19  of Nebraska.
20      Q.  Right.
21          But the law of the state of Nebraska
22  covers more than just sexual --
23      A.  Right.
24      Q.  -- crimes?
25      A.  But it does specifically address --
```

Page 176

```
1       Q.  Right.
2       A.  -- sexual assault.
3       Q.  But the general order does not
4   specifically say follow the state laws relating to
5   sexual assault.  It just simply says follow the
6   state laws; correct?
7       A.  Must follow all state laws and applicable
8   federal laws.
9       Q.  Okay.  And -- and the code of conduct
10  covers a wide variety of behaviors?
11      A.  Correct.
12          MS. TSAI:  Okay.  Let's mark this as
13  113.
14          (Exhibit No. 113
15          marked for identification.)
16          MR. DOLAN:  This is a duplicate to
17  Exhibit 31, I believe.
18          MS. TSAI:  Thank you.
19  BY MS. TSAI:
20      Q.  This is a Douglas County Sheriff's Office
21  general order relating to the subject matter of code
22  of conduct; correct?
23      A.  Yes.
24      Q.  And the date on this general order is
25  July 24, 2012?
```

44 (Pages 173 to 176)

DUNNING - Direct (By Ms. Tsai)

Page 177

1      A.  Yes.
2      Q.  And was this the applicable general order
3  relating to code of conduct in February of 2013?
4      A.  Yes.
5      Q.  Okay.  And it's your testimony today that
6  this is the general order that covers conduct of law
7  enforcement officers that are sexual in nature;
8  correct?
9      A.  Yes.
10      Q.  Okay.  And take a couple of minutes to
11  look through the general order, and tell me which
12  sections of the general order covers officers'
13  conduct of a sexual nature.
14      A.  Well, No. 7, Subsection -- I just had it
15  here -- Subsection a, Subsection k, Subsection n.
16          Section E, Subsection 1.
17          D4.
18      Q.  4D you said?
19      A.  Section D, No. 4b.
20      Q.  It says the "Members will be accurate,
21  complete, and truthful in all matters."  Is that
22  what you're referring to?
23      A.  Which was that?
24      Q.  When you said 4b.
25      A.  Yeah.

Page 178

1      Q.  "Members will be accurate, complete, and
2  truthful in all matters"?
3      A.  Yes.
4      Q.  Okay.  Just so that the record is clear,
5  that's in Section E, 4b.
6      A.  And same, Section D, No. 10.
7  Subsection -- actually, in some form all of these a
8  through d occur, but especially d.
9          Section 11, Section -- Subsection b and c.
10      I think we are still on D, No. 36, a, b,
11  c.  Subsection e.
12      Q.  That's the section on reporting; right?
13      A.  Yes.
14      Q.  Okay.
15      A.  43.  I think that's probably it.
16      Q.  And you've had time to go through
17  the entire order, and I didn't rush you through it;
18  right?
19      A.  Right.
20      Q.  Okay.  And you've identified a number of
21  provisions in this general order that you believe
22  addresses law enforcement officers' conduct of a
23  sexual nature?
24      A.  Yes.
25      Q.  Okay.  I believe the first section that

Page 179

1  you identify is on page 2, No. 7, "Code of Ethics"?
2      A.  Yes.
3      Q.  And specifically you called out
4  Subsection a.
5      A.  Okay.
6      Q.  And tell me how Subsection a relates to
7  law enforcement officers' conduct of a sexual
8  nature.
9      A.  The whole section applies.  It's a public
10  trust.  He has violated the public trust.
11      Q.  Okay.  You agree with me that there are
12  more than one way to violate public trust?
13      A.  Sure.
14      Q.  Sexual misconduct is not the only way to
15  violate the public trust?
16      A.  But it is one way.
17      Q.  It is one way, but it's not the only way;
18  correct?
19      A.  Correct.
20      Q.  Okay.  And in the entire section of the
21  code of ethics, there are no explicit guidance or
22  directives relating to law officer conduct of a
23  sexual nature?
24      A.  No.
25      Q.  Okay.  And, in fact, within the section of

Page 180

1  the code of ethics, they -- it prescribes certain
2  conduct that would violate this particular section.
3  For example, if you look at k, it specifically calls
4  out that they should not oppress or intimidate
5  private citizens?
6      A.  Correct.
7      Q.  Okay.  And that -- okay.
8          And then in Section n, it specifically
9  says, "I will not engage in acts of corruption or
10  bribery" [as read].  Do you see that?
11      A.  Correct.
12      Q.  Okay.  And in the code of ethics section
13  here, there are no mentions of specifically not
14  engaging in acts of a sexual nature?
15      A.  Just the state law.
16      Q.  Right.  And I'm just asking in
17  Section 7 --
18      A.  That verbiage is not used, no.
19      Q.  Right.  Okay.
20          Has there been ever any discussions about
21  adding language to include saying "not to engage in
22  acts of sexual misconduct"?
23      A.  Against?
24      Q.  Generally.
25          Well, let's start against other law

45 (Pages 177 to 180)

DUNNING - Direct (By Ms. Tsai)

---

Page 181

1    enforcement officers.
2        A.   No.  I don't think we need to specifically
3    say that.  They should know that.  That's a --
4    sexual assault is a felony.
5        Q.   Okay.  You agree with me that engaging in
6    acts of corruption or bribery is also a criminal
7    act; correct?
8        A.   Correct.
9        Q.   Okay.  Has there ever been any discussions
10   to include language in Section 7 of the code of
11   conduct to prohibit law enforcement officer conduct
12   of a sexual nature against private citizens?
13       A.   Nor dogs or cats.
14       Q.   I understand.
15            But there has never been any discussions
16   to include language such as that?
17       A.   No.
18       Q.   Okay.  The next area that you identified
19   that prescribes direction as to how a officer should
20   conduct themselves relating to activities that could
21   be construed as sexual in nature is Section E,
22   "Rules of Conduct."  Specifically I think you
23   identified Subsection 1, "Abuse of Authority."
24   That's on the right-hand column of the bottom of
25   page 3.

---

Page 182

1        A.   E, No. 2?
2        Q.   E, No. 1, "Abuse of Authority."
3        A.   Oh, okay.  All right.
4        Q.   Okay.  Tell me how this section pertains
5    to providing direction regarding -- to officer
6    conduct relating to sexual -- of a sexual nature.
7        A.   Well, obtaining privileges and otherwise
8    available to them -- not otherwise available to them
9    except in the performance of duty and avoiding the
10   consequence of illegal acts.  Because he used his --
11   he was hoping to use his badge as a -- as a symbol
12   to prey on a human being.
13       Q.   And you recognize that there is a level of
14   authority when you carry a badge?
15       A.   Yes.
16       Q.   Private citizens are often intimidated
17   just by having an encounter with a law enforcement
18   officer; correct?
19       A.   Yes.
20       Q.   Okay.  And has there been any training or
21   roll call discussion about -- to -- that officers --
22   deputies should be aware of this authority that they
23   carry over private citizens when they interact with
24   them?
25       A.   They get that in the academy.

---

Page 183

1        Q.   Okay.  Outside of the academy, does the
2    Douglas County Sheriff's Office provide any specific
3    training on how -- on how deputies should be aware
4    of their authority when they interact with private
5    citizens?
6        A.   Nothing comes to my mind.  Rob Sofie would
7    probably be the expert in that area.
8        Q.   Okay.  The next area that you noted that
9    provides some authority over conduct of a sexual
10   nature is on page 4, top of Section 4,
11   "Accountability."  Part b, "Members will be
12   accurate, complete, and truthful in all matters."
13            Explain to me how that is related to
14   conduct by law enforcement officers of a sexual
15   nature.
16       A.   Well, in this particular instance he -- he
17   lied and tried to hide what he was doing by -- by
18   misrepresenting his intentions.
19       Q.   Okay.  And would you agree with me that
20   not all -- well, strike that.
21            Do you agree that the example that you
22   gave in this incident relates to his behavior and
23   conduct during the investigation and not so much his
24   encounter with Ms. McGuire?
25       A.   Correct.

---

Page 184

1        Q.   Okay.  Section 10, "Conduct Toward the
2    Public," is also a section that you identify that
3    discuss how officers should conduct themselves and
4    provides guidance as to conduct of a sexual nature.
5            Would you agree with me that in this
6    particular section, there is no verbiage that
7    specifically states that officers should not engage
8    in conduct of a sexual nature with private citizens?
9        A.   Specifically sexual nature, right.
10       Q.   Right.  It does not; correct?
11       A.   Right.
12       Q.   Okay.  And explain to me what -- what
13   does -- what types of activities are covered under
14   conduct towards the public?
15       A.   They will be courteous and professional
16   and will foster public respect.  That they will
17   observe the people's civil rights.  I think that
18   basically covers it.
19       Q.   And violating an individual's civil rights
20   is not necessarily going to be conduct of a sexual
21   nature?
22       A.   I think so.
23       Q.   It doesn't always have to be, I mean.
24       A.   I disagree with that.  Anytime you -- you
25   sexually assault somebody I think you're violating

---

46 (Pages 181 to 184)

DUNNING - Direct (By Ms. Tsai)

Page 185

1    somebody's civil rights.
2         Q.  I meant the reverse.
3              When you violate someone's civil rights,
4    it doesn't necessarily mean that that conduct was of
5    a sexual nature?
6         A.  Well, sure.
7         Q.  For example, if you violate their First
8    Amendment right, it doesn't necessarily mean that
9    there was any conduct of a sexual nature?
10        A.  Of a sexual nature?
11        Q.  Right.
12        A.  Sure.
13        Q.  Okay.  And so when someone sees that a
14   deputy violated this particular provision of the
15   policy, they are not provided with any additional
16   information as to what the actual violation was;
17   correct?
18        A.  Who?  The victim?
19        Q.  Not the victim.  Just the public.
20             When a -- when a individual learns that an
21   officer has violated this provision of the general
22   order, all they are told is that this officer
23   violated -- engaged in conduct toward the public
24   that -- that the department frowned upon; correct?
25             MR. DOLAN:  I'm going to object to

Page 186

1    the form of the question.  Calls for speculation as
2    to --
3              THE WITNESS:  Well, when we -- in a
4    Laudermill hearing notice and a subsequent
5    determination of what took place at the Laudermill,
6    the -- that decision, we're going to cite the code
7    of ethics -- you know, the code of conduct, code of
8    ethics violation, but we'll specifically put
9    verbiage in there that we're relying on.
10   BY MS. TSAI:
11        Q.  Verbiage from the code; right?
12        A.  Correct.  I mean --
13        Q.  Right.  From the general order?
14        A.  Verbiage of -- of his actions.
15        Q.  Okay.  There was a media release relating
16   to the termination of Mr. Cooper; correct?
17        A.  Correct.
18        Q.  And the media release stated that he was
19   terminated for violation of the code of conduct
20   general order, specifically conduct unbecoming.  Do
21   you recall that?
22        A.  I don't recall what was said, other than
23   my last line was, "We are obligated to protect the
24   public, not prey on them."
25        Q.  Okay.  And would you agree with me that

Page 187

1    that line on its own does not trigger -- does not
2    inform the public as to what Mr. Cooper did that
3    caused his termination?
4         A.  Well, I don't think that -- I mean, it was
5    in the paper.  It was on the news.
6         Q.  I understand that.
7         A.  Yeah.
8         Q.  Putting that aside, my question is would
9    you agree with me that that last line that you
10   recall stating does not inform the public of the act
11   that caused Mr. Cooper to be terminated from the
12   office?
13        A.  Correct.  Correct.
14        Q.  Okay.  Would you also agree with me that
15   being told that Mr. Cooper was terminated because he
16   violated the County's code of conduct policy also
17   does not provide anyone with more information about
18   Mr. Cooper's actions that caused him to be
19   terminated?
20        A.  Correct.
21        Q.  Okay.  And the term "conduct toward the
22   public" covers a wide range of conduct, both sexual
23   and not sexual in nature?
24        A.  Sure.
25        Q.  Okay.  If you look at 10b --

Page 188

1         A.  Okay.
2         Q.  -- it states "Members will not use coarse,
3    violent, profane or insolent language or gestures
4    and will not express any prejudice concerning race,
5    religion, politics, national origin, lifestyle or
6    similar personal characteristics in the performance
7    of their duties."
8              Do you see that?
9         A.  Yes.
10        Q.  Okay.  And this specific provision does
11   not address prejudice concerning -- based on gender;
12   correct?
13        A.  Correct.
14        Q.  Okay.  Is there any particular reason why
15   gender was not mentioned in this provision?
16        A.  No.
17        Q.  Okay.  Do you believe that it would be a
18   good idea to include gender in this provision?
19        A.  We'll -- we'll certainly take a look at
20   it.
21        Q.  Okay.  The next section, "Conduct
22   Unbecoming."  And we spoke about this a little bit.
23   Can you describe for me what it means for deputies
24   to engage in conduct unbecoming?
25        A.  Well, it's a catchall that 1a -- or,

47 (Pages 185 to 188)

DUNNING - Direct (By Ms. Tsai)

Page 189

1    excuse me, 11a is a catchall that we recognize that
2    we can't reasonably itemize all forms of conduct
3    that may be considered damaging to members of the
4    sheriff's office and incorporates those acts --
5    conduct unbecoming incorporates those acts that may
6    not be specifically identified by policy that could
7    be reasonable -- that -- that could be -- could
8    reasonably be regarded as so improper or
9    inappropriate by their nature and in their context
10   that they are harmful to the agency's and the
11   officers' reputations.
12        So what you're asking me is what I meant
13   by that?
14        Q.  Right.
15        A.  Well, he was wearing our badge, and he
16   sexually assaulted a woman, which is horrendous, and
17   so he can't work there anymore.
18        Q.  Okay.
19        A.  And then in Section C he -- he brought us
20   into disrepute.  I don't -- and -- and reflected a
21   discredit on all -- all members of our agency.
22        Q.  And so, for example, if a deputy was
23   involved in an accident because he was drunk
24   driving --
25        A.  Because he was drunk driving?

Page 190

1        Q.  Because he was driving drunk.
2        A.  Okay.
3        Q.  That would fall under --
4        A.  On duty or off duty?
5        Q.  Does it make a difference?
6        A.  Well, I'm just asking.  I didn't hear what
7    you said.
8        Q.  Oh, I didn't say.
9        A.  Okay.
10       Q.  So it's actually a question for you.
11        Does it make a difference whether an
12   officer was driving under the influence and involved
13   in an accident -- either way would that fall into
14   this category of conduct unbecoming?
15        A.  Subsection c?
16        Q.  Just Section 11 in general.
17        A.  Yes.
18        Q.  Okay.  And so you agree with me, like
19   Section 10, "Conduct Toward the Public," Section 11,
20   "Conduct Unbecoming," covers a whole slew of
21   ill-advised conduct?
22        A.  It --
23        Q.  It covers a whole slew of misconduct?
24        A.  Okay.
25        Q.  Do you agree with that?

Page 191

1        A.  Yes.
2        Q.  Okay.  In your media release relating to
3    the termination of Mr. Cooper, why didn't you say,
4    "We terminated him because he sexually assaulted a
5    citizen while on duty"?
6        A.  I was just going by what was stated on the
7    termination order.
8        Q.  Okay.  Why didn't the termination order
9    indicate that he was being terminated because he
10   sexually assaulted a private citizen while on duty?
11        A.  Because this -- this particular general
12   order is more encompassing.
13        Q.  And you said Section 11, "Conduct
14   Unbecoming," is a catch-all provision; correct?
15        A.  Yes.
16        Q.  Okay.  And what do you mean by a
17   "catch-all provision"?
18        A.  Well, in Subsection a it says that it
19   cannot reasonably itemize all forms of conduct.
20        Q.  And so anything that does not have its own
21   general order would fall into this --
22        A.  Yes.
23        Q.  -- category?
24        And even conduct that has its own general
25   order can still be in violation of this particular

Page 192

1    section; correct?
2        A.  Yes.
3        Q.  Okay.  So any kind of police misconduct is
4    covered under Section 11?
5        A.  Yes.
6        Q.  Okay.  To your knowledge, do deputies
7    learn about other -- about disciplinary actions
8    given to other deputies?
9        A.  No.  I mean, if they do, I -- I don't know
10   how -- I don't know how they do.  Sometimes they do;
11   sometimes they don't.
12        Q.  Okay.
13        A.  We didn't -- we don't post it.
14        Q.  Is there a particular reason why you don't
15   post it?
16        A.  I just don't think you ought to have a
17   wall of shame.
18        Q.  Would you agree that deputies being
19   informed about other individual's conduct and
20   their -- and any disciplinary action they receive
21   would provide them with a understanding as to how
22   the department views certain conduct?
23        A.  They would -- they would know because we
24   would retrain in some fashion if it was something
25   that we thought was a pattern or a grey area.

48 (Pages 189 to 192)

DUNNING - Direct (By Ms. Tsai)

---

Page 193

1    Sexual assault is not a grey area.
2        Q.  So after the termination of Mr. Cooper,
3    was there any discussion with the deputies about
4    conduct of a sexual nature by law enforcement?
5        A.  I believe we reaffirmed -- reaffirmed
6    about hitting out on traffic stops and backup. I
7    believe that was a roll call item.
8        Q.  Okay.  And when that was communicated to
9    the deputies, was it communicated to them in the
10   form of, "You should make sure you radio in because
11   of officer safety"?
12       A.  Well, and for their own protection in case
13   there is a false allegation.  Predominately officer
14   safety.
15       Q.  Uh-huh.
16       A.  Because we want -- we have to know where
17   they are at.
18       Q.  There was discussion about the importance
19   of having backup when you're alone with a private
20   citizen of the opposite sex because of potential
21   allegations of sexual misconduct?
22       A.  Sure.  That's been covered before.
23       Q.  Was it -- when was it last covered?
24       A.  I couldn't tell you for sure.
25       Q.  Was it prior to Mr. Cooper's termination?

---

Page 194

1        A.  The officer safety is covered a lot.  I
2    think we have some in-service training on that.
3        Q.  When you use the term "officer safety,"
4    does that include precautions officers should take
5    when they interact with private citizens of the
6    opposite sex because of potential allegations of
7    sexual misconduct?
8        A.  I -- I believe that's covered.
9        Q.  And what exactly is said about that issue?
10       A.  That -- that you should let radio know
11   that you -- that -- you know, you give your mileage
12   and your location and your destination.
13       Q.  Do you -- do you --
14       A.  And --
15       Q.  Oh, go ahead.
16       A.  And your ending mileage.
17       Q.  Do you go into details as to why it's
18   important to document this, because of potential
19   allegations of sexual misconduct?
20       A.  I -- I believe that's covered.
21       Q.  And what's told on that?
22       A.  Pardon?
23       Q.  And what specifically do you tell your
24   deputies about that?
25       A.  You know, I don't -- I don't do the

---

Page 195

1    training myself.  Probably the -- probably the best
2    person right now would be Sergeant Sampson.
3        Q.  Is he the training officer?
4        A.  He's training sergeant, yes.
5        Q.  And how long has he been the training
6    sergeant?
7        A.  He's just been the training sergeant -- I
8    don't remember.  He hasn't been the training
9    sergeant that long, but he worked in training for a
10   number of years.
11       Q.  Okay.  Turn to page 8 of the general
12   order.  No. 36, "Reporting."
13       A.  Okay.
14       Q.  You indicated that that is also a section
15   in the general order that pertains to contact of law
16   enforcement -- conduct of a sexual nature by law
17   enforcement officers.
18       A.  Yeah.
19       Q.  Can you explain to me how this section
20   pertains to that topic?
21       A.  Well, all reports have to be truthful and
22   accurate because that's -- that's what -- that's
23   what is expected of them.  And we -- we cite Brady
24   versus Maryland as one of the examples why, and
25   that -- you know, just -- that we just can't accept

---

Page 196

1    that.
2            We also -- we also explain -- explain to
3    them -- I think within the last couple of years
4    we've explained to them either on PowerDMS and roll
5    call or both about the importance of Brady Giglio
6    and the -- and the implications of that.
7        Q.  And is that explained to them through a
8    written directive through PowerDMS only, or was
9    there in-person discussion about that?
10       A.  I -- I believe that has been a roll call
11   item as well.
12       Q.  It's not a simple concept.  That's why I
13   asked.
14       A.  Yeah.
15       Q.  Okay.  Would you agree with me Section 36
16   does not specifically mention conduct of a sexual
17   nature in its verbiage?
18       A.  Correct.
19       Q.  Okay.  Then, I believe, the next section
20   you identify is Section 43.  It's on page 9, top of
21   the right-hand column, "Truthfulness."  Explain to
22   me how this section applies to officer conduct of a
23   sexual nature.
24       A.  Well, just goes through the truthfulness
25   of -- whatever they've been involved in, they need

---

49 (Pages 193 to 196)

DUNNING - Direct (By Ms. Tsai)

Page 197

1   to -- to tell the truth, whether it's their command
2   officer or eventually the lieutenant in the Office
3   of Professional Standards.
4       Q.  Okay.  And this provision, then, relates
5   more towards reporting and investigation and not so
6   much the actual sexual -- the actual conduct of a
7   sexual nature?
8       A.  Correct.
9       Q.  Okay.  I believe that was the last
10  provision that you identified in this order that you
11  believe applies to officer conduct of a sexual
12  nature.
13          I want to go back to something that we
14  talked about earlier that we kind of glimpsed over.
15  It's your testimony that there has never been any
16  practice within the department where highway patrol
17  or canine officers would pull over women driving
18  alone on the highway because they thought that
19  perhaps they are transporting drugs?
20      A.  Not absent some probable cause of some
21  kind, whether that be a -- a traffic stop -- I mean,
22  a traffic violation or -- I mean, there has to be
23  some probable cause for the stop.
24      Q.  Okay.  Was there ever any directives
25  that -- to encourage deputies to look for traffic

Page 198

1   violations when they see a female driving alone on
2   highway -- on the highway?
3       A.  Not to my knowledge.
4       Q.  Okay.  You were never involved in
5   developing questions for deputies to ask women that
6   they pulled over -- well, strike that.
7           Were you ever involved in developing
8   questions for deputies to ask women that -- that
9   they have pulled over for traffic violations that
10  are personal in nature to see if they are being
11  truthful?
12      A.  No.
13      Q.  Okay.  Were you -- are you aware that
14  there were complaints made by women who indicated
15  that they felt uncomfortable by officers asking them
16  questions of a personal nature when they were pulled
17  over for a traffic violation?
18      A.  I vaguely remember one.
19      Q.  And upon learning that some women who are
20  pulled over for a traffic violation were
21  uncomfortable answering personal questions, was
22  there any discussion about identifying other types
23  of questions that can help the deputy determine if
24  the individual is being truthful?
25          MR. DOLAN:  I'm going do object to

Page 199

1   the form of the question, Counsel.  He just said he
2   was aware of one.  He was aware of one.  Your
3   question misstates the witness's testimony.  It is
4   misleading.  He never testified that he was aware of
5   some.  He testified that he was aware of one
6   complaint.
7   BY MS. TSAI:
8       Q.  That you recall today; correct?
9       A.  Correct.
10      Q.  It's possible that prior to -- sometime
11  prior to today, you were aware of more than one
12  complaint where an individual -- a female individual
13  indicated that she was uncomfortable by the
14  questioning of deputies during a traffic violation?
15      A.  I only recall one.
16      Q.  Okay.  Are you -- you are notified of all
17  citizen complaints; correct?
18      A.  I was what?
19      Q.  You are notified of all citizen
20  complaints; correct?
21      A.  Yes.
22      Q.  Okay.  Has there been ever any discussions
23  about the types of questions deputies should ask
24  female citizens who are pulled over for a traffic
25  violation and not to discuss things of a personal

Page 200

1   nature?
2       A.  I don't -- I don't ever remember anything
3   that you're describing.
4       Q.  Approximately how many OPS investigations
5   are conducted a year?
6       A.  I would have to see the chart.
7       Q.  You testified earlier you guys don't get
8   that many complaints.
9       A.  Correct.
10      Q.  Can you give me a range?
11      A.  I can't -- I don't recall.  We have a
12  chart.  I can -- if you can show me the chart, I can
13  verify it.
14      Q.  Are all OPS investigations reported to
15  CALEA?
16      A.  Yes.
17      Q.  Okay.  Internal investigations can be
18  triggered by both a citizen making a complaint as
19  well as the department learning about possible
20  officer misconduct; correct?
21      A.  Correct.  And -- and we take complaints
22  anonymously.
23      Q.  Okay.  And so you don't need a victim to
24  come forward to begin an administrative
25  investigation?

50 (Pages 197 to 200)

DUNNING - Direct (By Ms. Tsai)

Page 201

1     A.  Correct.
2     Q.  Okay.  Were you informed that -- back when
3  Megan McGuire reported the incident to OPD, were you
4  informed that the potential officer that she was
5  referring to could have been someone from your
6  department?
7     A.  We didn't know which department.  It
8  could -- initially we knew that it was an incident
9  that occurred at Zorinsky Park and that it was a law
10  enforcement officer.  We didn't -- that's about all
11  the information we had.
12     Q.  Okay.  So you didn't have any information
13  that included or excluded any of your officers?
14     A.  Correct.
15     Q.  Okay.  At that time did you or anyone in
16  your department take any steps to try to find out if
17  this was an officer from your department?
18     A.  Yes.  We had -- we hadn't heard back from
19  OPD, and I believe that I had asked
20  Lieutenant Martin to make contact with them to see
21  where they were.
22     Q.  Any other measures?
23     A.  Pardon?
24     Q.  Did you take any -- did the department
25  take any other steps, other than to follow up with

Page 202

1  OPD?
2     A.  You know, we didn't have enough
3  information, but I do believe Lieutenant Martin
4  did -- did do some checking on his own.
5     Q.  Okay.  Do you know what was done?
6     A.  He would know.
7     Q.  And for every administrative
8  investigation, you do a final review of the outcome?
9     A.  Yes.
10     Q.  And it's not something that you
11  rubber-stamp?
12     A.  No.
13     Q.  Okay.  You read it carefully and
14  thoroughly?
15     A.  No -- right.
16     Q.  And there are times when you approve the
17  recommendation for the disciplinary action?
18     A.  Yes.
19     Q.  And there are times where you would modify
20  the disciplinary action?
21     A.  Yeah.  I don't do that by myself.  I mean,
22  I -- I obviously have the final decision, but I
23  usually incorporate others in that conversation.  My
24  chief deputy, the captain of that particular peer
25  will be part of that conversation.

Page 203

1        And what we are -- besides reading the
2  body of the reports, we will review the conclusion
3  as to -- and usually Lieutenant Martin will list --
4  "These are the allegations I can -- I can prove,"
5  or, "This is what occurred according to that
6  allegation."  So I've got a pretty clear
7  understanding of what took place.
8     Q.  Have you ever changed the final
9  disposition of any internal investigation?
10     A.  I guess I'm not sure what you -- what you
11  mean by that.
12     Q.  When you receive the final report, have
13  you ever reviewed the -- the report and decided that
14  the disposition -- whether it's founded, unfounded,
15  sustained, exonerated -- that you don't agree with
16  that outcome?
17     A.  Yeah.  I can't think of ever doing that.
18     Q.  Okay.  I know you mentioned that you have
19  frequent interactions or regular interactions with
20  your chief deputy -- chief and Lieutenant Martin
21  about ongoing OPS investigations.  Do you -- and you
22  review the final report once the investigation is
23  completed; correct?
24     A.  Correct.
25     Q.  Do you ever receive statistical summaries

Page 204

1  and analysis of -- of these internal investigations?
2     A.  Well, we -- I get a quarterly report.
3     Q.  What's -- what's contained in the
4  quarterly report?
5     A.  Just the number of investigations and what
6  took place.  There might be -- I think that's
7  basically it, the number of investigations and
8  whether they were founded, unfounded, sustained.
9     Q.  You don't get reports tracking any kind of
10  analysis on the type of complaint, do you?
11     A.  No.  That would be on a -- on a individual
12  basis.  If we have a -- an alert, then I would get
13  that.
14     Q.  You testified earlier that at times
15  when -- on -- certain policies or procedures are
16  reaffirmed during roll call or through the
17  PowerDMS --
18     A.  Uh-huh.
19     Q.  -- when the -- when you identify that
20  there is a pattern, that there's some sort of issue
21  department wide.  How do you go about finding those
22  patterns?
23     A.  Well, if we're seeing from a review
24  that -- I guess, the -- the one that most comes to
25  my mind is on pursuits.  Something is -- something

51 (Pages 201 to 204)

DUNNING - Direct (By Ms. Tsai)

Page 205

1    is taking place that is maybe a broad
2    interpretation, that sort of thing.  We need to
3    address it more specifically.
4        Q.  Who does the review?
5        A.  We have a pursuit review committee.
6        Q.  Okay.  What other kinds of committees
7    review certain behavior or -- or pattern?
8        A.  Well, there is another committee that
9    Lieutenant Martin is the chair of that I think
10   reviews the alerts.  I can't remember -- EIS
11   committee, I think it's called.
12       Q.  What do you mean by "the alerts"?
13       A.  Pardon?
14       Q.  What do you mean by "alerts"?
15       A.  Alerts on our Guardian Tracking.
16       Q.  Are there any other committees that will
17   track certain officer behavior or conduct?
18       A.  Not that I can specifically recall right
19   now.
20       Q.  Okay.  Is there anyone or a committee
21   tracking patterns of sexual harassment or conduct of
22   a sexual nature by officers?
23       A.  That would be done by the Office of
24   Professional Standards.
25       Q.  And do they issue a quarterly analysis or

Page 206

1    report?
2        A.  Quarterly report.
3        Q.  Relating specifically to sexual assault,
4    or...
5        A.  Whatever has happened in that quarter.
6        Q.  Well, so just to clarify, the quarterly
7    report that you receive from OPS, my understanding
8    is that just covers the number of investigations and
9    the outcome; correct?
10       A.  Right.
11       Q.  Okay.  Is there a different quarterly
12   report where they are producing information about
13   sexual harassment or allegations of sexual
14   misconduct?
15       A.  No.
16       Q.  Okay.  Then, in the quarterly report that
17   you are referring to, you previously testified that
18   you're only given information about the disposition;
19   correct?
20       A.  Correct.
21       Q.  So how do you take that report and
22   identify a pattern or if there is a pattern of
23   sexual misconduct or sexual harassment?
24       A.  Well, I'm -- I'm aware of every
25   investigation that takes place with regards to

Page 207

1    internal affairs types of investigations; so I'm
2    going to know the names.  As I said, we're not
3    that -- we're not that big that I don't know
4    every -- the name of every employee.  And so just
5    haven't had anything that would need -- need
6    tracking of that nature.
7        Q.  So is it fair to say that you don't
8    receive any sort of analysis or reports on a regular
9    basis that is looking at allegations of sexual
10   misconduct department wide?
11       A.  Just -- just on an individual --
12       Q.  Right.
13       A.  -- basis.
14       Q.  Okay.  The pursuit committee, do they
15   provide you with a report that shows a trend or
16   analysis of what's going on relating to a pursuit
17   department wide?
18       A.  Well, we don't have that many pursuits; so
19   that's not a -- that's not a big report either.
20       Q.  Okay.
21       A.  And it's just a matter of, you know, do we
22   need to address more training and -- pursuit
23   training, or is it just an individual problem, and
24   we just need to address that party.
25       Q.  If it's -- if there aren't that many

Page 208

1    incidents relating to pursuits, why is there a need
2    for a pursuit committee?
3        A.  Because CALEA says you'll have a pursuit
4    review committee.
5        Q.  Okay.  Got it.
6            MS. TSAI:  I have no further
7    questions.
8            MR. DOLAN:  Can we break --
9            MS. TSAI:  Sure.
10           MR. DOLAN:  -- before I cross?
11               (3:12 p.m. - Recess taken.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

52 (Pages 205 to 208)

Page 209

```
 1          (At 3:22 p.m., with all the parties
 2     present as before, the following proceedings were
 3     had, to-wit:)
 4          MR. DOLAN:  I don't have any further
 5     questions.
 6          So, Sheriff Dunning, you have a right to
 7     read and sign a copy of your deposition transcript
 8     before it may be used in these proceedings.  Any
 9     changes you make in form or in substance must be
10     noted on a page in back by page and line number.
11          The right is personal to you.  It's up to
12     you to either exercise it or waive it, but the court
13     reporter will need to know which -- which one you
14     want to do.
15          THE WITNESS:  Yeah.  I would like to
16     read and sign.
17          (3:22 p.m. - Adjournment.)
18          ** ** ** **
19
20
21
22
23
24
25
```

Page 210

```
 1          C E R T I F I C A T E
 2     STATE OF NEBRASKA   )
                           ) ss.
 3     COUNTY OF DOUGLAS   )
 4          I, Morgan M. Catania, RPR, CSR(IA),
 5     General Notary Public within and for the State of
 6     Nebraska, do hereby certify that the foregoing
 7     SEALED testimony of Timothy Dunning was taken by me
 8     in shorthand and thereafter reduced to typewriting
 9     by use of Computer-Aided Transcription, and the
10     foregoing two hundred nine (209) pages contain a
11     full, true and correct transcription of all the
12     testimony of said witness, to the best of my
13     ability;
14          That I am not a kin or in any way
15     associated with any of the parties to said cause of
16     action, or their counsel, and that I am not
17     interested in the event thereof.
18          IN WITNESS WHEREOF, I hereunto affix my
19     signature and seal this 13th day of March, 2017.
20
21          _____
               MORGAN M. CATANIA, RPR
22             GENERAL NOTARY PUBLIC
23     My Commission Expires:
24
25
```

THOMAS & THOMAS COURT REPORTERS
AND CERTIFIED LEGAL VIDEO, L.L.C.

| GENERAL ORDER | | DATE 8/22/2008 | GO-18-2008 |
|---|---|---|---|

**DOUGLAS COUNTY SHERIFF'S OFFICE**
OMAHA * NEBRASKA
**TIMOTHY DUNNING SHERIFF**

CALEA STANDARD: **1.2.1, 2.2, 2.6, 2.7**   RE-EVALUATE: **AS NEEDED**

APPROVED: *Timothy F. Dunning*

CHAPTER TITLE:

SUBJECT: **LAW ENFORCEMENT ROLE AND AUTHORITY 2008**   AUTHOR **EL/DR**

---

This Directive supersedes <u>GO-13-2005</u>.

## I. PURPOSE

This Directive establishes policy and procedure regarding the legally mandated authority vested in sworn personnel, the use of individual discretion, and the alternatives to arrest.

## II. POLICY

Douglas County Sheriff's Office (DCSO) sworn personnel will properly use discretion in the performance of their duties. Use of discretion must be within the limits of legal, ethical, and moral behavior. DCSO sworn personnel will use only that amount of force that is reasonably necessary to effectively bring an incident under control while protecting the lives of the deputy or another.

## III. PROCEDURE

### A. Legally Mandated Authority

1. The Office of the Sheriff is created by the Nebraska State Constitution. The Office of Sheriff is an elected position pursuant to state statute and has the overall responsibility and authority as the chief executive officer of the Department.

2. The Sheriff receives his authority through the Constitution of the State of Nebraska and through the Nebraska State Statutes.

   a) Specifically, the power of arrest and duties of the Office of the Sheriff derive from *Nebraska State Statute 23-1710* which reads as follows:

*It shall be the duty of the sheriff by himself or deputy to preserve the peace in his county, to ferret out crime, to apprehend and arrest all criminals, and insofar as it is within his power, to secure evidence of all crimes committed in his county, and present the same to the county attorney and the grand jury; to file information's against all persons who he knows, or has reason to believe, have violated the laws of the state, and to perform all other duties pertaining to the office of sheriff.*

   b) The Sheriff may appoint one or more Sheriff's Deputies, and the Deputy must always act within the parameters justifiable for the circumstances.

### B. Carrying of Weapons

1. Pursuant to his authority as chief executive officer vested in him by Nebraska State Statute to carry out the defined duties listed in *Nebraska State Statute 23-1710*, the Sheriff is granted various commissions of law enforcement authority.

2. One of those commissions is the carrying of and use of various authorized weapons by appointed Deputies to assist them in the performance of those duties.

3. Regarding the carrying of pistols, Deputies must qualify once a year with the authorized pistol they choose to carry. This is mandated by *Nebraska State Statute 81-1412*.

---

111

000341

| GENERAL ORDER | DATE 8/22/2008 | GO-18-2008 |
| --- | --- | --- |

C. **Use of Force** - Nebraska State Statute and the Department's *Use of Force* policy authorizes and governs the use of force by Deputies.

D. **Use of Discretion**

1. **Definition** - Discretion is the ability to govern and discipline one's activities by the use of reason and prudence and includes concepts, including:

   a) Skill and judgment in the use of resources,
   b) The power of free decision,
   c) The latitude of choice, wisdom, experience, training, and
   d) The direction provided by law, Department policy, procedures, regulations, written directives and orders.

2. DCSO sworn personnel are encouraged to exercise discretion when dealing with their many duties.

   a) Use of discretion must be soundly based upon and be limited by the law, departmental directives, experience, and training.
   b) Deputies must correctly interpret the law and directives and realize that the use of discretion is not permitted when certain activities are mandated by statute, Department policy, or supervisory direction.
   c) Department members will seek direction from their Supervisor when the appropriate course of action is in doubt.

3. **Physical Arrest** - Of special concern is the matter of physical arrest and confinement of an individual.

   a) All DCSO personnel must consider such action as very serious.
   b) When a person is deprived of his liberty to move about, the Deputy must be certain that what s/he is attempting to do cannot be accomplished in any other way and that the law is fully behind the decision.
   c) Arrest must never occur first with the establishment of the facts afterwards.

4. **Language or Hearing Barriers** - People with language or hearing barriers.

   a) When a Deputy makes an arrest of a person who is foreign to this country and/or has a language or hearing barrier, the Deputy must make reasonable efforts to ensure all communication problems are resolved.

b) This may mean ensuring that when a person is arrested, family or friends are advised what the arrest procedure involves and details of how this person can or will be released.

c) In certain instances where language differences are present, the Deputy will contact their assigned duty supervisor and advise him of the language or hearing barrier.

d) The affected deputies assigned duty supervisor will attempt to arrange an interpreter for the person taken into custody prior to incarceration. Contact/attempts to contact will be documented.

e) Foreign language services are available by requesting assistance from the following:

   (1) An on-duty OPD supervisor/command officer to ask for assistance from an on-duty Spanish-speaking officer. This should be done only if the DCSO does not have a bi-lingual deputy available.
   (2) Language Line 1-800-523-1786, Client ID 535010, Organization name State of Nebraska 444-5800. This service will provide interpreters for a variety of different languages.
   (3) JONES, Ivonne 510-6914 or 573-9309. Available to assist with interviewing Spanish-speaking victims and witnesses. DO NOT give numbers out to the public.
   (4) CARRERA, Dora 599-2612wk., 515-8380cell, 734-1380hm. and/or MONTANO, Harlem 599-2608wk., 917-5323cell. Both work for DCSO Records division and are available to interpret for victims, witnesses and suspects. DO NOT give numbers out to the public.

f) For hearing impaired assistance contact:

   (1) The Nebraska Commission for the Deaf and Hard of Hearing (NCDHH) at 595-3991 or (877-248-7836) during normal business hours of M-F 0800-1700. An after hour emergency contact list is available online at www.ncdhh.ne.gov. Cheryl Poff with the Nebraska Dept. of Health and Human Services can be contacted via e-mail at cheryl.poff@ncbvi.ne.gov for further assistance.
   (2) Situations involving victim assistance, contact Jason Workman 320-3875 who is fluent in American Sign Language and is a DCSO Chaplain.

| GENERAL ORDER | DATE 8/22/2008 | GO-18-2008 |
|---|---|---|

E. **Alternatives to Arrest/Confinement/Release**

1. It is important to be aware of the alternatives to arrest and confinement.  Alternatives include:

   a) **Oral and written warnings** prohibiting continued misconduct.
      (1) Deputies are authorized to exercise discretion and issue written or oral warnings for minor traffic violations.
      (2) Warnings should generally NOT be used for major violations or those violations specifically addressed in a Department policy, procedure, or written directive.
   b) **Traffic citations** (State of Nebraska Uniform Citation and Complaint).
   c) **Referrals** to community service organizations.
      (1) Referral is the practice of referring a matter to another departmental component, government agency, or social service organization.
      (2) These may include, but are not limited to:
         (a) Federal law violations are referred to the proper federal authorities;
         (b) Persons with mental problems may be referred to a mental health organization via Allegent Health Psychiatric Association, phone # 1-888-334-8013.  Refer to the policy regarding Placement of Mentally Ill Persons.
         (c) All suspected child abuse cases MUST be referred to the Nebraska Department of Health and Human Services for concurrent investigations.
         (d) The Campus for Hope Detoxification Center located at 1490 N. 16th St., phone # 829-3517 for persons who may fall under the parameters of Civil Protective Custody.
   d) **Informal resolutions**
      (1) An informal resolution is the practice of resolving problems without arrest, citation, or referral.
      (2) Informal resolution is an excellent method to deal with MINOR violations.  It should be used in disputes such as neighborhood squabbles, landlord/tenant disagreements, when victims do not wish to pursue criminal charges, etc.
      (3) An essential element to informal resolution is the agreement by all involved parties that no arrest should take place or a determination by the investigating Deputy that inadequate probable cause exists.

2. Deputies MUST consider the following factors when exercising alternatives to arrest:

   a) The presence or absence of probable cause,
   b) Existing law and the elements of the offense,
   c) The level of cooperation by victims and witnesses,
   d) The severity of the offense involved,
   e) Available resources, and
   f) Department policy, procedures, regulations, written directives, and orders.

3. The decision to make an arrest or not will not be guided by the personal feelings of the Deputy.

4. No release of an arrestee is authorized where such person has been taken into custody on a valid warrant until such arrestee has satisfied appropriate bond requirements.

| LAW ENFORCEMENT ROLE AND AUTHORITY 2008 | PAGE 3 of 3 |
|---|---|

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
|---|---|---|

**DOUGLAS COUNTY SHERIFF'S OFFICE**
OMAHA * NEBRASKA
**TIMOTHY DUNNING SHERIFF**

| CALEA Standard: 1.2.4 | RE-EVALUATE: As Needed |
|---|---|

APPROVED: *Timothy F. Dunning*

CHAPTER TITLE:

| SUBJECT: SEARCH AND SEIZURE 2012 AMENDED | AUTHOR EL |
|---|---|

This Directive supersedes GO-22-2012.

## I. PURPOSE

This Directive sets forth the legal authority, guidelines, and prerequisites regarding warrantless searches and seizures and arrests with and without warrants by the Douglas County Sheriff's Office (DCSO) personnel.

## II. POLICY

Citizens of Douglas County will not be subjected to unreasonable searches and seizures as set forth by the United States Constitution under the Fourth Amendment. All persons detained or arrested by DCSO sworn personnel will be afforded full use of their constitutional rights, and will be treated in a professional manner.

## III. PROCEDURE

### A. Fourth Amendment

1. The Fourth Amendment guarantees the right for people to be free from unreasonable searches and seizures of their homes, person, and things. The Supreme Court is constantly interpreting the Fourth Amendment as it applies to police conduct.

2. Illegally conducted searches invite civil suits under the *Civil Rights Act*, and illegally seized items of evidence will not be admitted in court and may cause dismissal of a criminal case.

3. As search and seizure laws are continually evolving, DCSO sworn personnel will seek the most current information available from one or more of the following sources:

   a) Training bulletins and publications
   b) In-service training
   c) Douglas County Attorney's Office
   d) Current case law found on-line

### B. Search and Seizure Without a Warrant

### 1. Traffic Stops

a) **Traffic Infraction** - A vehicle should not be searched solely on the basis of a traffic infraction. Requesting permission to search on a random basis and absent any articulable suspicion is prohibited. Deputies must be able to articulate the suspicion that led to the request for permission to search.

   (1) Initial Investigation - Following a stop, deputies may conduct a preliminary investigation, of the driver and passengers, reasonably related to the stop.

   (2) The preliminary investigation may include requesting identification, vehicle information, and running data checks.

   (3) The driver is required to provide a driver's license or identification, vehicle registration, and/or proof of ownership and insurance.

b) **Passengers** - Passengers may *not* be ordered from a lawfully stopped vehicle without *'reasonable suspicion'* that the passenger violated the law. However, the passenger may be ordered from the vehicle if they interfere with the search of the vehicle or the conducting of an investigation.

   (1) An adult, front seat passenger, not wearing a vehicle restraint is *required* to provide identification.

   (2) A deputy may *request* identification from any other passengers in a vehicle, however, it is not required that the passenger comply, unless there is probable cause or reasonable suspicion that the passenger violated the law.

   (3) If a passenger is in close proximity to contraband in plain view, the deputy has probable cause to arrest the passenger.

| SEARCH AND SEIZURE 2012 AMENDED | EXHIBIT 112 | PAGE 1 of 1 |
|---|---|---|

000350

02114117 MC

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
|---|---|---|

c) **Expanded Inquiry** - Articulable facts are those facts that the deputy can verbalize which give rise to a reasonable suspicion that a person has committed, is committing or is about to commit a crime.
  (1) Reasonable suspicion is specific reasonable inferences, which the deputy is entitled to draw from the facts in light of his/her experience. Reasonable suspicion is something less than the probable cause standard, and will not support an arrest.
  (2) Probable Cause - Where the facts and circumstances within the deputy's knowledge are more probable than not to warrant a belief that the suspect has committed, or is in the process of committing a crime.
d) **Further Detainment** - Reasonable suspicion of criminal activity allows an officer to detain a person stopped for a traffic offense in order to obtain additional information regarding the deputy's observations and or suspicions. Absent any additional articulable reasonable suspicion, continued detention of a motorist is prohibited.

2. **Consent Searches**:

a) The consent must be voluntarily given by someone who has the authority to relinquish that right.
b) When exercising a consent search, the Deputy should get a written release on a **Consent to Search form (OSF-13)** whenever practical.
c) Deputies must be mindful that the individual can stop the search at any time.

3. **Stop and Frisk**:

a) Deputies may make an investigatory stop when there is reasonable suspicion supported by specific facts that a crime has been or is about to be committed by the person stopped.
b) Deputies may conduct a pat-down search for weapons for officer safety, provided the Deputy has reasonable articulable suspicion . The authority for a 'STOP and FRISK' search of the person is seated in State Statute and affirmed by court opinion, e.g., *TERRY vs. OHIO*.
  (1) *Nebraska State Statute 29-828* states: "Where the circumstances reasonably indicate to an officer of the law that a search of an individual for weapons is indicated in order to protect the life of

such officer, such search for weapons may lawfully be made."
  (2) **NOTE:**   In a Stop and Frisk situation, the justification of a warrantless search is based on a police officer's belief that the individual presents a potential danger to him/her.
c) *Nebraska State Statute 29-829* states "A peace officer may stop any person in a public place whom he reasonably suspects of committing, who has committed, or who is about to commit a crime and may demand of him his name, address and an explanation of his actions."
  (1) When a peace officer has stopped a person for questioning pursuant to this section and reasonably suspects he is in danger of life or limb, he may search such person for a dangerous weapon.  If the peace officer finds such a weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.
  (2) For purposes of this section, peace officer shall include credentialed conservation officers of the Game and Parks Commission.

4. **Movable Vehicle Exception**:

a) Motor vehicles, by nature of their mobility, may be searched without a warrant under certain circumstances.
b) The U.S. Supreme Court has recognized the impracticality of securing a search warrant prior to every search of a vehicle and has established exceptions to the warrant requirement (Carroll Doctrine).
c) A Deputy may conduct a warrantless search of a vehicle if he/she has probable cause to believe that the vehicle contains evidence of a crime or contraband, and there are exigent circumstances that would make obtaining a search warrant impracticable.
d) Exigency may be created by the mere mobility of the vehicle, and the likelihood that the vehicle's occupants will remove or destroy evidence or contraband.
e) The scope of a warrantless search is defined by the existing probable cause.
f) Deputies may search the entire vehicle, trunk, closed containers, or any place that the items to be seized could be kept, for which they have probable cause to believe are in that place in the vehicle.

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
|---|---|---|

g) If evidence of a crime or contraband is discovered, notation of the search and inventory of items seized will be documented.

5. **Crime Scenes**:

a) A warrantless search at a crime scene may be made when exigent circumstances exist, evidence is in plain view, or with consent (Consent to Search form should be used whenever practical).

b) At the "Scene of a Crime" the U.S. Supreme Court has ruled there are no exceptions to the 4th Amendment for crime scene searches. However, in responding to a homicide or serious assault scene, officers may:

(1) Make warrantless entry where they reasonably believe a dead body or injured person will be found. A suspected dead body may still be alive and entry is justified under the Emergency Doctrine.
(2) Examine the body itself.
(3) Search the premises for other victims or suspects.

c) Seize any evidence in plain view while inside the residence pursuant to any of the above permissible activities.

6. **Exigent (Emergency) Circumstances**:

a) Exigent circumstances exist when there is an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence.

b) Absent exigent circumstances, Deputies are prohibited from making a warrantless and nonconsensual entry into a private residence in order to make an arrest.

c) Emergency (exigent) entry is allowed only to prevent destruction/loss of evidence or when there is danger to the public.

d) The United States Supreme Court and the Nebraska Supreme Court have addressed situations regarding law enforcement officers' entry into private residences in arrest situations. Both courts have held that "absent **exigent circumstances**, the threshold may not reasonably be crossed without a warrant."

7. **Inventory Searches**:

a) **Motor Vehicles**
(1) Deputies will conduct an inventory search of all vehicles that are in the lawful custody of the DCSO.
(2) The Nebraska Supreme Court has ruled that a warrantless search of a vehicle,

while in the possession of the police, violates neither state nor federal constitutional prohibitions of unreasonable searches.
(3) This ruling is in no way intended to encourage or allow deputies to conduct a general rummaging of a vehicle.
(4) The intent is to provide deputies with guidelines for conducting vehicle inventories, not to give deputies a general means of discovering evidence of a crime.
(5) The inventory search only serves to protect an owner's personal property while it is in the custody of the DCSO, to ensure against claims of lost, stolen, or vandalized property, and to guard the DCSO from danger.
(6) All vehicles impounded by the DCSO will be inventoried by the arresting or towing deputy.
(7) All compartments and containers accessible to the deputy will inventoried. The only exception will be those containers whose contents can be easily determined by the shape, size, or other characteristics of the container itself. For purposes of this order, "container" will mean an object capable of storing or concealing another object.
(8) The inventory search will cover all areas of normal access in which property could reasonably be placed in an automobile, including but not limited to, the vehicle trunk and glove compartment.

b) **Personal Property**:
(1) An Inventory search is conducted after the arrest, in detention, as a standard routine part of the booking procedure, preparatory to incarceration.
(2) It is for the purpose of inventorying and 'taking' of personal property for safekeeping.
(3) Any evidence found as a result of this 'standard practice' is admissible as evidence.
(4) The courts have held that the authorities are entitled not only to search but also to take a prisoner's property and keep it in official custody.
(5) The courts have also held that law enforcement officers are entitled to take "...any evidence of the crime in his [the prisoner] immediate possession, including his clothing."

000352

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
|---|---|---|

(6) In another ruling the courts have held "Most cases in the courts of appeals have long since concluded that once the defendant is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing on the one hand and the taking of the property for use as evidence on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" and at a later time searched and taken for use at the subsequent criminal trial."

c) An Inventory Search will be accomplished in the booking area as a part of the booking process, and will consist of a careful and complete search of the person for the purpose of taking and inventorying property as a necessary step preparatory to placing the person in a cell.

(1) During the course of the Inventory Search, deputies will ensure that cellular telephones are removed from an arrestee's person, as well as other items, such as those of evidentiary value, implements of escape, and items that could be used to destroy and conceal evidence (cellular telephones may be used to contact accomplices or associates).

(2) Drugs or dangerous weapons will be taken and secured from any arrestee/detainee.

(3) The suspect will not take property into a holding cell.

(4) Upon completion of the booking process, cellular telephones and related personal items will be placed with the individual's personal property and itemized as required by policy.

(5) Upon completion of the booking process, arrestees will be provided the use of telephones supplied by the DCSO within the confines of the booking/ temporary holding area.

d) **Abandoned Property**

(1) Deputies may search and seize abandoned property without a warrant after it has been reasonably determined that the property is abandoned.

(2) Deputies must articulate in their reports how they came to the determination that the property was abandoned.

8. **Other Situations**:

a) **Plain View**

(1) The deputy must be legally where he or she can discover fruits, instruments, evidence, or contraband, and the seizure must be inadvertent .

(2) The property must be recognized as fruits, instruments, evidence of a crime, or contraband.

b) **Incident to Arrest**

(1) When a deputy has made a lawful physical arrest where the statutes of the State of Nebraska and the policies of the Douglas County Sheriff's Office dictate the physical custodial incarceration of the violator, the Deputy may make a thorough search of the person and the surrounding area under the person's direct control.

(2) Areas readily accessible to the person, as determined by his/ her ability to 'grab' a weapon or to destroy evidence incident to the arrest may also be searched.

(3) Search incident to arrest will consist of a full search of the clothing and personal property in his/ her actual possession, e.g. briefcase, suitcase, or other items within his/ her reach, e.g. a desk drawer if he/ she is sitting at a desk.

(4) As a general rule, if the arrestee is in a house, the room where the arrestee is may be searched. If the arrestee is in an auto at the time, the part of the auto which is under the suspect's direct control may be searched, e.g. an unlocked glove compartment and/or under the seat.

(5) A search may be made for items that could be used for escape, to protect oneself, and/or to prevent destruction of evidence.

000353

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
| --- | --- | --- |

C. **Strip/Body Cavity Searches** - The use of strip searches and body cavity searches may, under certain circumstances, be necessary to ensure the safety of Deputies, civilians and detainees. The purpose of this type of a search is to detect and secure evidence of criminal activity and to safeguard the security and safety of the detention and holding facilities. Strip and/or body cavity searches may be conducted only with proper authorization and justification, and with the utmost regard for the dignity of those being searched.

1. **Definitions:**

   a) **Strip Search** - Any search of a person that requires the individual to remove or arrange some or all of his/her clothing to permit inspection of genitals, buttocks, female breasts or undergarments.

   b) **Body Cavity Search** - Any search involving not only visual inspection of skin surfaces but also the internal physical examination of body cavities and, in some instances, organs such as the stomach cavity.

2. **Procedures:**

   a) **Strip Searches** - A Command Officer at the rank of Lieutenant or above must approve all strip searches not pursuant to a search warrant. **Exception**: a Sergeant, on custodial narcotics arrests may approve strip searches.

      (1) Field strip searches of prisoners will be conducted only when exigent circumstances exist.

      (2) When authorized by the supervising authority, strip searches may be conducted only under the following:

      (3) By personnel who are familiar with the process.

      (4) In conformance with hygienic procedures and professional practices.

      (5) In a place that is not accessible to the public where general access is restricted, preferably in detention.

      (6) By fewest number of personnel necessary and only by those of the same sex.

      (7) Under conditions that provide privacy from all but those authorized to conduct the search.

      (8) Individuals arrested for traffic violations and other minor offenses of a nonviolent nature will not be subject to strip searches unless the arresting deputy has an articulable, probable cause to believe that the individual is concealing contraband or

weapons. Probable cause may be based upon, but is not limited to the following:

      (9) The nature of the offense(s) charged.

      (10) The arrestee's appearance and demeanor.

      (11) The circumstances surrounding the arrest.

      (12) The arrestee's criminal record, particularly past crimes of violence and narcotics offenses.

      (13) The discovery of evidence of a major offense, either in plain view or in the course of a search incident to arrest.

      (14) Detection of suspicious objects beneath the suspect's clothing during a field search incident to arrest.

   b) **Body Cavity Searches** - Should visual examination of a suspect during a strip search and/or other information lead a deputy to believe that the suspect is concealing a weapon, evidence or contraband within a body cavity, the following procedures will be followed:

      (1) If circumstances warrant, the deputy should advise the suspect of his/her Miranda rights and ask questions to determine the nature and location of the contraband. This approach may influence the suspect to voluntarily remove the evidence or contraband.

      (2) The suspect will be kept under constant visual surveillance until a body cavity search is conducted or an alternative course of action taken.

      (3) The deputy will consult with his immediate supervisor to determine whether probable cause exists to seek a search warrant for a body cavity search. The decision to seek a search warrant will recognize that a body cavity search is highly invasive of personal privacy and is reasonable only where the suspected offense(s) is of a serious nature and/or poses a threat to the safety of Deputies or others and/or the security of the Douglas County Corrections Center.

      (4) If probable cause exists for a body cavity search, an affidavit for a search warrant will be prepared that clearly defines the nature of the alleged offense and the basis for the deputy's probable cause.

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
|---|---|---|

    (5) On the basis a subsequent body cavity search as soon as practical.

  c) Following a strip search or body cavity search, the Deputy performing the search will submit an ***Investigative Supplementary Report (OSF-05)*** articulating the probable cause and, at a minimum, the following:

    (1) Identity of the deputy conducting the search.

    (2) Identity of the approving authority.

    (3) Identity date, time and place of the search.

    (4) Of the individual searched.

    (5) Those present during the search.

    (6) A detailed description of the nature and extent of the search.

    (7) Any weapons, evidence or contraband found during the search.

### D. Arrests With Warrants

1. *Nebraska State Statute 29-411* addresses arrests with warrants. The statute reads as follows:

  a) Warrants and arrests; powers of officer; direction for executing search warrant; damages.

  b) In executing a warrant for the arrest of a person charged with an offense, or a search warrant, or when authorized to make an arrest for a felony without a warrant, the officer may break open any outer or inner door or window of a dwelling house or other building, if, after notice of his office and purpose, he is refused admittance; or without giving notice of his authority and purpose, if the judge or magistrate issuing a search warrant has inserted a direction therein that the officer executing it shall not be required to give such notice, but the political subdivision from which such officer is elected or appointed shall be liable for all damages to the property in gaining admission.

  c) The judge or magistrate may so direct only upon proof without oath, to his satisfaction that the property sought may be easily or quickly destroyed or disposed of, or that danger to the life or limb of the officer or another may result, if such notice be given; but this section is not intended to authorize any officer executing a search warrant to enter any house or building not described in the warrant.

2. **Procedures**:

  a) **Forced Entry** - See the *Forced Entry* General Order, for legal prerequisites, procedure, and guidelines for executing arrest warrants regarding a potential "forced entry" situation.

  b) **Warrant Arrests by Other Agencies** - The following procedures will be used when persons are arrested by outside agencies on warrants issued by the Douglas County District or County Courts. Outside agencies include, but are not limited to, Ralston, Valley, Elkhorn, Waterloo, and Bennington Police Departments:

    (1) When an officer from an outside law enforcement agency arrests a subject on an active Douglas County warrant, that subject may be transferred to the custody of a DCSO deputy for transportation to booking.

    (2) This situation will most often occur when a police officer in a western Douglas County community makes a misdemeanor warrant arrest and meets with a patrol Deputy for prisoner transfer.

    (3) If a request is received by Communications for transportation of a Douglas County warrant arrest, the nearest DCSO deputy will be dispatched to receive that arrest. On weekdays, during normal working hours, a warrant unit may be dispatched, if nearby.

    (4) The transfer of the arrest will be made at a location suitable to both agencies. The receiving DCSO Deputy will book the arrested individual.

### E. Arrests Without Warrants

1. To justify an arrest without a warrant, a law enforcement officer must have probable cause prior to making the arrest.

  a) In determining whether probable cause exists, a law enforcement officer may take into account all facts and circumstances.

  b) These may include those facts based upon any expert knowledge or experience which the deputy in fact possessed which a prudent deputy would judge relevant to the likelihood that a crime has been committed, and that the person to be arrested has committed it.

2. The deputy may rely on information received from any informant whom it is reasonable under the circumstances to credit, whether or not at the time of making the arrest the deputy knows the informant's identity.

3. The deputy may rely on information provided by other deputies and in the dispatch.

                              SEARCH AND SEIZURE **2012** AMENDED

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
|---|---|---|

4. Probable cause cannot rest on a 'hunch' or 'mere belief 'but must be supported by specific information.

5. NSS 29-404.02 addresses warrantless arrests. The statute states "Except as provided in section 42-928, a peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed :

a) A felony;

b) A misdemeanor, and the officer has reasonable cause to believe that such person either will not be apprehended unless immediately arrested,

c) May cause injury to himself or herself or others or damage to property unless immediately arrested,

d) May destroy or conceal evidence of the commission of such misdemeanor, or

e) Has committed a misdemeanor in the presence of the officer; or

f) One or more of the following acts to one or more household members, whether or not committed in the presence of the peace officer:

(1) Attempting to

g) For purposes of this section:

(1) Household members shall include spouses or former spouses, children, persons who are presently residing together or who have resided together in the past, persons who have a child in common whether or not they have been married or have lived together at any time, other persons related by consanguinity or affinity, and persons who are presently involved in a dating relationship with each other or who have been involved in a dating relationship with each other; and

(2) Dating relationship means frequent, intimate associations primarily characterized by the expectation of affectional or sexual involvement, but does not include a casual relationship or an ordinary association between persons in a business

h) This statute covers warrantless arrests for domestic violence offenses such as assault.

6. NSS 42- 929 addresses "custodial" arrest for violation of a protection order:

a) "A peace officer making an arrest pursuant to section 42-928 shall take such person into custody and take such person before a judge

of the county court or the court which issued the protection order.

b) At such time the court shall establish the conditions of such person's release from custody, including the determination of bond or recognizance, as the case may be.

c) The court shall issue an order directing that such person shall have no contact with the alleged victim of the abuse or violation."

7. NSS 42-928 addresses violations of protection orders:

a) "A peace officer shall, with or without a warrant, arrest a person if

(1) the officer has probable cause to believe that the person has committed a violation of an order issued pursuant to section 42-924, a violation of section 42-925, a violation of an order excluding a person from certain premises issued pursuant to section 42-357, or a violation of a valid foreign protection order recognized pursuant to section 42-931 and

(2) A petitioner under section 42-924 or 42-925, an applicant for an order excluding a person from certain premises issued pursuant to section 42-357, or a person protected under a valid foreign protection order recognized pursuant to section 42-931 provides the peace officer with a copy of a protection order or an order excluding a person from certain premises issued under such sections or the peace officer determines that such an order exists after communicating with the local law enforcement agency."

F. **Interview, Interrogation, and Right to Counsel**
Interview and interrogation are distinct from one another. The effective use of interview and interrogation is often crucial in solving many types of crimes. Investigators should remember that by using innovative, yet proper methods, much valuable evidence can be obtained from victims, witnesses and suspects. A flexible and effective interview technique can elicit valuable evidence that might otherwise be lost.

1. **Interviews**: - Interviews are a non-accusatory, structured conversation during which specific behavior-provoking questions are asked with the purpose of eliciting interpretable behavior symptoms that are typical of truth or deception. Additional factual information concerning the case and/or suspects may also be developed during this non-accusatory exchange.

| SEARCH AND SEIZURE 2012 AMENDED | PAGE 7 of 7 |
|---|---|

000356

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
|---|---|---|

a) **Interview Procedure**:
   (1) Victim and witness interviews require detailed notes or tape recording.
   (2) Written statements should be made for further reference listing the time, date, location, officers present, etc.
   (3) The trauma/stress to which the victim or witness has been subjected should be considered and the interview conducted in such a manner as to reduce stress and minimize further problems.
   (4) The age, physical limitations, and credibility of witnesses should also be considered.
   (5) Miranda: Because the interview is a non-accusatory conversation, Miranda Warnings are not required.

b) **Field Interviews and Interrogations**:
   (1) The activity of inquiring into a suspicious person's identity and reason for being in a particular place at a particular time plays a large role in efforts toward crime prevention and crime solving.
   (2) When a deputy stops a person who is acting suspiciously or is unable to give a good reason for their presence, a "field interview card" (Form OSF-18/78) shall be completed. The purpose of the FI card is to document the identity of the suspicious person and his/her activities. This information is then computerized and made available to investigators and other patrol officers who may use this information to aid them in their investigation of other incidents, possibly involving the same subject.
   (3) The quality and frequency of a deputy's field contacts can contribute greatly to the success of the patrol force. However, there are legal considerations involved in the act of stopping and interviewing a person. If the deputy conducts the interview in good faith and has reasonable grounds for the intrusion, the stop will be considered justified. The courts have ruled that the maximum time limit for investigative detention is approximately 30 minutes. FI cards will be turned in at the end of a tour of duty and will be forwarded to C.I.D., along with any comments the reporting deputy wishes to include. (SOP 6:29)

2. **Interrogation** - An Interrogation is a conversation between the interrogator and the suspect, during which the suspect is accused of

involvement in a particular incident or group of incidents. The accusatory tone of the exchange is what distinguishes the interrogation from the interview.

a) **Interrogation Procedure**:
   (1) Miranda: Interrogations may require that Miranda warnings be given to the suspect. For Miranda to apply to an interrogation, it must meet two criteria.
      (a) First, the setting must be custodial in nature. The Court has defined custody to mean that the suspect's freedom of action has been curtailed in some significant way i.e. the suspect is not free to leave.
      (b) Second, for Miranda to apply, the individual conducting the questioning must be a law enforcement officer or acting as an agent for law enforcement.
   (2) Should such a situation arise, the suspect must be advised of the following:
   (3) His/her right to an attorney,
   (4) His/her right against self-incrimination, and
   (5) His/her right to remain silent. In short, custody + questioning = Miranda.
   (6) The Department's *Rights Advisory Form (OSF-12A)* should be used when practical.
   (7) The waiver of such rights made during a custodial interrogation at a place of detention that involve crimes resulting in death or felonies involving sexual assault, kidnapping, child abuse, or strangulation will be electronically recorded. (Source: S.S. 29-4503)
   (8) If a suspect makes an unequivocal request for counsel, all questioning must stop until the suspect's attorney is present.

b) Suspect interrogations must be conducted only after the following have been considered:
   (1) All Constitutional precautions must be taken and documented if the interview is to be used in court.
   (2) Detailed notes and/or a written statement should be made for future reference and court use, listing the time, date, location, officers present, waiver of rights, and time the interrogation ended.
   (3) Statements obtained during an interrogation must not be based on coercion, promises of leniency or special

| GENERAL ORDER | DATE 11/26/2012 | GO-27-2012 |
|---|---|---|

consideration, inducements, delays in arraignment, or deprivation of counsel.

(4) Incriminating Statements must be given freely and voluntarily.

(5) A free and voluntary statement may be given spontaneously or after reading the suspect his/her Constitutional protections per Miranda.

(6) The Investigator must be able to demonstrate that the suspect understood those rights and made a knowing and intelligent waiver of those rights.

(7) If the suspect makes an unequivocal request for counsel during the interrogation, the investigator will terminate questioning until the suspect's attorney is present.

(8) If there is more than one suspect in a crime, the suspects should be separated and interrogated individually.

c) When practical, two Investigators should be present to witness the *Rights Advisory Form* and *Statement*.

3. **Right to Counsel**:

a) **Right to Counsel Procedure** :

(1) When an accused person has invoked his right to have counsel present during custodial interrogation, the questioning must be terminated until counsel has been made available or until the accused initiates further communication.

(2) Coming back to the accused person after he has invoked his right to counsel and giving him the Miranda Warning again can invalidate any subsequent confession if the accused person has neither initiated further communication nor spoken to counsel in the time between the first meeting and the second meeting.

(3) If an accused person waives his right to counsel, and agrees to answer questions, a written waiver should be obtained.

b) **Juvenile** victims, witnesses, and suspects must be given the same constitutional protections afforded adults. Additional safeguards and procedures regarding juveniles may be found in the *Juvenile Operations* General Order.

4. **Conduct of Interviews** - Interview rooms located in the holding cell area should be used to interview all perpetrators (in custody) and all suspects.

a) Investigators will not wear weapons into an interview room.

b) No more than two Investigators should conduct interviews at the same time.

c) Whenever an interview is in progress, the door to the interview room should remain closed.

5. **Video and/or Audio Taping of Interviews** – DCSO Interview rooms are equipped with a DVR and video recording capability.

a) NSS 29-4503 mandates that all statements relating to crimes resulting in death or felonies involving sexual assault, kidnapping, child abuse, strangulation, or offenses being investigated as part of the same course of conduct as the offenses described above, or the waiver of such rights made during a custodial interrogation at a place of detention will be electronically recorded, duplicated onto a CD and handled as evidence.

b) Persons Crimes - All interviews-interrogations occurring in DCSO designated Interview Rooms involving person's crimes investigations will be electronically recorded, duplicated onto a CD, and handled as evidence.

c) Property Crimes Felony - Interviews-interrogations occurring in DCSO designated Interview Rooms involving property crimes felony investigations will be electronically recorded. Exceptions may be made on a case by case basis upon the pre-approval of the interviewing member's supervisor or command officer.

d) Interviewing juvenile victims (under the age of 17) of sexual assault or child abuse/neglect will be electronically recorded whenever practical.

e) As specified above, when used, the recording will be designated as evidence and will be handled in the following manner:

(1) The recording will be duplicated onto a CD.

(2) The CD will be handled, labeled, and stored in accordance with the DCSO's evidence handling and processing procedures. The copy of the CD will be used for future investigative activities and for clerical transcription.

000358