## UNITED STATES DISTRICT COURT
### DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MEGAN MCGUIRE, | ) | |
| | ) | Case No. 8:16-cv-00004 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Senior Judge Joseph Bataillon |
| | ) | |
| CORY COOPER, TIMOTHY DUNNING, | ) | Magistrate Judge Susan M. Bazis |
| Individually and in his official capacity as | ) | |
| Sheriff of Douglas County, Nebraska, and | ) | |
| DOUGLAS COUNTY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS TIMOTHY F. DUNNING'S
AND DOUGLAS COUNTY'S MOTIONS FOR SUMMARY JUDGMENT**

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MEGAN MCGUIRE, )
 )
   PLAINTIFF, )
 )
 vs. ) CASE NO. 8:16 CV 00004
 )
CORY COOPER, TIMOTHY )
DUNNING, INDIVIDUALLY AND )
IN HIS OFFICIAL CAPACITY )
AS SHERIFF OF DOUGLAS )
COUNTY, NEBRASKA, AND )
DOUGLAS COUNTY, )
 )
   DEFENDANTS. )

_____

## Expert Report of John J. Ryan

1. My name is John Ryan.  I have been actively involved in police practices and law enforcement since 1981.  I was an active police officer for twenty years.  In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002 I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island.  In that capacity I was responsible for graduate courses on

1

Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. Since 2000, I have written several manuals for use by police officers. Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are: Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000. The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees. These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010, 2013 and 2016 editions, Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009 and 2016 editions.

5. I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement. This field guide provides officers with a

2

legal update on critical tasks such as search, seizure, use of force, pursuit, investigations and interrogations.  This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter.  In that capacity I author and edit the institute's legal update service for law enforcement.  This update service and an archive of all articles that I have written can be found at www.patc.com and www.llrmi.com.  Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States.  These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations.  As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges.  I have provided training in the following areas:

    a. Policy development for public safety agencies.

3

b. Legal Issues in police use of force.

c. Legal Issues in internal affairs investigations.

d. Police misconduct/civil liability.

e. Legal/Liability Issues in Narcotics Operations.

f. Arrest, Search and Seizure, & Interrogation.

g. Racial profiling.

h. Legal issues in public schools.

i. Media relations for public safety agencies.

j. Constitutional update for law enforcement officers.

k. Basic training for detectives.

l. Law enforcement officers' bill of rights/due process in administrative investigations.

m. Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

n. Legal and policy Issues for hostage negotiators.

o. Legal and liability issues for SWAT operations

p. Legal and liability issues for jails

q. High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9. I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002. During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol

4

Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002 I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers.   Participants in these courses have come from thousands of law enforcement agencies around the United States.  Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands.  These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

5

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill. In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

6

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments.  One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program.  I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches.  I have been published annually in materials from Georgetown Law Center related to this program.  The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007 I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program.  My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan.  It is noted that my materials have been included in their annual publication related to this program.

25. In 2008 I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009 I was a featured speaker for the national conference for public risk managers.

27. In 2009 I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009 I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009 I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012 I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death.

9

This program, which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide. As part of this program I have trained thousands of officers with respect to the expected and appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012 I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association. The

presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and Training.  My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law

11

enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas of the road and jail operation. I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

1. Complaint
2. Civil Deposition Transcripts and Exhibits
   1) Matt Martin
   2) Cory Cooper
   3) Kristine Love
   4) Molly Keane
   5) Rob Jones
   6) Lance Worley
   7) Megan McGuire
   8) Sheriff Dunning
   9) Matt Martin 30 (b) (6)
   10) Sheriff Dunning 30 (b) (6)
   11) David Galvan 30 (b) (6)
   12) Greg Sampson 30 (b) (6)
3. Court Filings
   1) Complaint. (Document #1)
   2) County Defendants' Answer. (Document #30)
   3) Cooper's Answer. (Document #31)
   4) Discovery Answers

5) Defendant Timothy F. Dunning's Answers to Plaintiff's First Set of Interrogatories to Timothy F. Dunning
6) Defendant Douglas County's Answers to Plaintiff's First Set of Interrogatories to Douglas County
7) Plaintiff's Responses to Defendant Douglas County's First Set of Interrogatories to Plaintiff Megan McGuire
8) Plaintiff's Responses to Defendant Timothy F. Dunning's First Set of Interrogatories to Plaintiff Megan McGuire
9) Plaintiff's Responses to Defendant Timothy F. Dunning's Second Set of Interrogatories to Plaintiff Megan McGuire
10) Plaintiff's Responses to Defendant Timothy F. Dunning's Third Set of Interrogatories to Plaintiff Megan McGuire (with signed verification sent on 11/29/16)
11) Plaintiff's Responses to Defendant Timothy F. Dunning's First Set of Requests for Admission to Plaintiff Megan McGuire

4. Documents Produced During Discovery
1) Internal Affairs File No. 1594.  (3154-3197)
2) Internal Affairs File No. 1704.  (3198-3495)
3) Internal Affairs File No. 1771.  (3496-3527)
4) Internal Affairs File No. 1941.  (3528-3542)
5) Internal Affairs File No. 1965.  (3543-3546)
6) Internal Affairs File No. 1984.  (3547-3585)
7) Internal Affairs File No. 2325.  (3586-3599)
8) Internal Affairs File No. 2462.  (3600-3729)
9) Internal Affairs File No. 2840.  (3730-3732)
10) Internal Affairs File No. 2980.  (3733-3739)
11) Internal Affairs File No. 3030.  (3740-3744)
12) Internal Affairs File No. 3051.  (3745-3787)
13) Internal Affairs File No. 3053.  (3788-3810)
14) Internal Affairs File Nos. 1884 and 2021 (regarding in-car video).  (6081-6357)
15) Internal Affairs File No. 1086 (regarding).  (6518-6755)
16) Internal Affairs File No. 1999 (involving Cooper).  (3811-3832)
17) Internal Affairs File No. 2113 (involving Cooper).  (3833-3836)
18) Internal Affairs File No. 2137 (involving Cooper).  (3837-3843)
19) Internal Affairs File No. 2171 (involving Cooper).  (3844-3851)
20) Internal Affairs File No. 2210 (involving Cooper).  (3852-3854)
21) Internal Affairs File No. 2236 (involving Cooper).  (3855-3868)
22) Internal Affairs File No. 2261 (involving Cooper).  (3869-3877)
23) Internal Affairs File No. 2282 (involving Cooper).  (3878-3884)
24) Internal Affairs File No. 2286 (involving Cooper).  (3885-3893)
25) Internal Affairs File No. 2628 (involving Cooper).  (3894-3897)
26) Internal Affairs File No. 2630 (involving Cooper).  (3898-3927)
27) Internal Affairs File No. 2653 (involving Cooper).  (3928-3933)
28) Internal Affairs File No. 2658 (involving Cooper).  (3934-3935)
29) Internal Affairs File No. 2670 (involving Cooper).  (3936-3937)

30) Internal Affairs File No. 2673 (involving Cooper).  (3938-3939)
31) Internal Affairs File No. 2709 (involving Cooper).  (3940-3941)
32) Table of DCSO Internal Affairs Investigations from 2005 to present
33) DCSO General Order GO-20-2012 (Code of Conduct in effect on February 10, 2013). (328-340; also produced at 1616-1628)
34) DCSO General Order GO-18-2008 (Law Enforcement Role and Authority 2008 in effect on February 10, 2013). (341-343)
35) DCSO General Order GO-27-2008 (Administrative Investigation of Complaints in effect February 10, 2013). (344-349; also produced at 1705-1710)
36) DCSO General Order GO-27-2012 (Search and Seizure in effect February 10, 2013). (350-358)
37) DCSO General Order GO-24-2008 (In Car Video System 2008 in effect February 10, 2013). (359-361; also produced at 4826-4828)
38) DCSO General Order GO-5-2012 (Communications) in effect February 10, 2013. (362-367)
39) DCSO General Order GO-18-2009 (Early Intervention System in effect October 2, 2009 through May 8, 2016). (4846-4850)
40) Official Oath signed by Mr. Cooper on August 12, 2008 with attached copy of the DCSO Code of Ethics referenced therein. (372-374)
41) DCSO Internal Affairs File No. 2705. (375-793)
42) Notification of Termination dated May 13, 2013. (371)
43) Nebraska Crime Commission Letter regarding Decertification Request by DCSO for Cory Cooper, dated 05-21-13.  (1924)
44) DCSO Personnel File for Cory Cooper.  (1736-1920)
45) DCSO AIM Report for Cory Cooper.  (2717-2720)
46) Collective Bargaining Agreement Between The Fraternal Order of Police, Lodge #2, Douglas County, Nebraska and the Douglas County Sheriff in effect for the time period encompassing February 10, 2013 through May 13, 2013. (294-327) (also produced at 4980-5013)
47) DCSO In-service Training – Search & Seizure outline, 2009.  (6358-6361)
48) DCSO – 507 Code of Conduct – PowerPoint.  (6362-6465)
49) DCSO Employee Development Division Training Attendance Log, April 2008.          (6466)
50) DCSO Employee Development Division Training Attendance Log, September     2009.  (6467-6473)
51) DCSO In-Service Training Lesson Plan, Ethics, 2012.  (6474-6479)
52) DCSO In-Service Training Lesson Plan, Ethics, June 2011.  (6480-6516)
53) DCSO Training Material Distribution Log, Ethics Training, 2010.  (6517)
54) Douglas County Human Resources Skillsoft Records for Cory Cooper.  (1717)
55) Plaintiff's Expert Report by Thomas R. Tremblay with attachments
56) Plaintiff's Rule 26a2 disclosure

14

50. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses.  In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

52. The law enforcement event reviewed in this report began on February 10, 2013 when Cory Cooper, a deputy of the Douglas County, Nebraska Sheriff's Office sexually assaulted Megan McGuire, the plaintiff in this case.

53. Ms. McGuire described being with Mr. Worland in Worland's truck smoking marijuana on February 10th before the events involving Cooper.   McGuire indicated that Kyle Worland was a boyfriend that she had met while working at Walmart. (McGuire 53-54).  Ms. McGuire acknowledged that she and Worland ended up at Lake Zorinsky. (McGuire 60-61).  Ms. McGuire indicated that after

15

a sexual encounter with Worland in the parking area, she got partially redressed. (McGuire 64-65).   McGuire testified that Worland noticed a law enforcement vehicle, she started "mentally" "freaking out" because of the weed in the car and the fact that they had just finished having sex. (McGuire 66).  McGuire agreed that she then tried to put her pants back on. (McGuire 67).   McGuire acknowledged that Cooper did not do anything i.e. lights, siren, announcement etc. to indicate that she and Worland had to remain in the lot. (McGuire 68-69). McGuire said she did not believe that Cooper blocked Worland's vehicle in. (McGuire 69).  McGuire agreed that she never saw Cooper approach Worland's vehicle, but the next thing she knew Cooper was at the window. (McGuire 71).

54. Megan McGuire testified that when Cooper shined his flashlight in the window, they rolled down the window to speak with Cooper. (McGuire 73).  McGuire acknowledged that Cooper had shined the flashlight right on the marijuana in the vehicle and that it was likely he saw it. (McGuire 74).  McGuire agreed that Cooper asked her to step out of the vehicle and she asked him if she could put her pants on first. (McGuire 77-78).  McGuire indicated that Cooper allowed her to put her pants back on. (McGuire 78).  McGuire described: "He walked me back to the—his cop car and put me in the backseat." (McGuire 78).  McGuire was aware as she was walked to the cruiser that Cooper had seized the marijuana. (McGuire 79-80).

55. Megan McGuire testified that after some period of time, Cooper took Worland from the truck, handcuffed him, and placed him in the back of the cruiser along with McGuire. (McGuire 83).   McGuire agreed that after Cooper searched

16

Worland's truck, Cooper took Worland out of the cruiser and walked him back to his truck. (McGuire 88).

56. Megan McGuire acknowledged that Cooper returned to the cruiser and engaged her in conversation that indicated that Worland had enough marijuana to be arrested and go to jail. (McGuire 90-91). McGuire indicated that Cooper began asking her what she would do to keep Worland out of jail. (McGuire 97). McGuire agreed that Cooper left the vehicle, went back, giving something to Worland and then Cooper and Worland towards the lake with Worland continuing down to the lake. (McGuire 98). McGuire acknowledged that when Worland came back up from the lake, he was returned to his truck and then Cooper returned to the cruiser. (McGuire 103-104). McGuire acknowledged that she heard Cooper say something to the effect of, "Okay, well, we just threw it all in the lake." (McGuire 104).

57. Ms. McGuire indicated that as Deputy Cooper continued to question what she would do to get Worland out of trouble, she asked Cooper what he wanted. (McGuire 112). McGuire agreed that she knew it was not right to exchange sex so that Worland would be released. (McGuire 114). McGuire agreed that she finally said, do you want to see me naked to which Cooper responded that he was not going to say no. (McGuire 115). McGuire indicated that she then took off her shirt and bra but put her coat back on because it was cold. (McGuire 115-116). McGuire agreed that Cooper, who was in the front seat, looked at her bare chest through his rear-view mirror. (McGuire 116). McGuire acknowledged that Cooper was not doing any kind of law enforcement related search, but rather

17

was just looking at her naked. (McGuire 117-118).  McGuire then described: "He got out of the car and came back to the driver's side—the—in the back of the driver's side… And opened the door and unzipped his pants… He, like—he, like, pulled his penis out and asked me what else I was going to do." (McGuire 118). McGuire said it was clear to her what Cooper was expecting and while she stuck his penis in her mouth for five seconds, she thought about biting him at which point Cooper said to stop and then said that she could go. (McGuire 119). McGuire said that as she walked away Cooper said "This never happened, right?" to which she responded: "Yes, Officer." (McGuire 120).

58. Megan McGuire acknowledged that after the sexual assault on February 10, 2013 she made a complaint to the Omaha Police Department. (McGuire 38). McGuire acknowledged that she never made a complaint to the Douglas County Sheriff's Office. (McGuire 38-39).

59. Megan McGuire acknowledged that Lieutenant Martin of the DCSO, contacted her and met with her on April 18, 2013. (McGuire 39).  McGuire acknowledged that when she met with Martin, Martin seemed sincere and tried to make her comfortable.  (McGuire 41).  McGuire acknowledged that Martin never challenged her credibility with respect to her allegations against Cooper. (McGuire 43).  McGuire agreed that Martin did nothing in the way of attempting to discourage her from making her complaint. (McGuire 44).

60. Megan McGuire testified that there was nothing in the DCSO complaint process that discouraged her from making a complaint.

61. Megan McGuire acknowledged that she knew that Deputy Cooper was terminated from the DCSO on May 13, 2013.

62. Molly Keane who prosecuted Cooper's criminal case relative to his sexual assault of McGuire indicated she first learned of a possible sexual assault by an officer from Kristy Love in passing but the officer was not yet identified. (Keane 22).

63. Sergeant Worley testified that he first learned of a possible sexual assault by law enforcement after a ranking officer at the OPD was called by the victim's father who indicated that he (the father) thought his daughter had been sexually assaulted. (Worley 30). Worley said he assigned the case to Detective Kristen Love. (Worley 32). Worley said that a sexual allegation against an officer was a rare occurrence and he assigned Love because he believed she was his best detective. (Worley 33-34).

64. Sergeant Worley testified that it was very difficult to determine from Megan McGuire's statement whether the subject was from OPD, a deputy, state patrol or a security guard. Worley 44).

65. Sergeant Worley said that based on McGuire's statement, he went out to the scene and found remnants of the broken jar (that had contained the marijuana and had fell of the cruiser) and had that documented. (Worley 47). Worley said he also notified IT and had them check as to whether an officer had run Worland and McGuire's names, however IT reported that there was no record that their names had been run. (Worley 48-49). Worley acknowledged that he never asked anyone from DCSO to run a similar check of the databases. (Worley 50).

19

Worley testified that he does not think he had any contact initially with DCSO because he "didn't want anybody to know about anything." (Worley 54). Worley indicated that he instructed Love to keep the investigation confidential. (Worley 54). Worley said the investigation Worley noted that he did not believe there was any contact with DCSO until about a week later. (Worley 54).

DCSO Notification and Involvement in Criminal Investigation

66. Lieutenant Martin of the DCSO Office of Professional Standards testified that he first learned of a possible sexual assault by a law enforcement officer when he received an email from the OPD, either Sergeant Worley or Lieutenant Rowland, around February 22, 2013. (Martin 184).

67. It is noted that at 10:08 a.m. Lieutenant Rowland of the OPD emailed Martin indicating: "I need to give you some info on a potential investigation that could involve a Deputy." (Bates 004401).   At 1:39 p.m. on February 22, 2013 Lieutenant Martin of DCSO emailed Rowland of the OPD and reported: "I checked daily reports for 10 Feb 13 on the C shift. We did have a deputy working that area at that time who matches the description.  It shows that he made a stop of two parties in a suspicious occupied vehicle at 2050 to 2100 at 156th and F. He also stopped a male party at 168 and H at 2115 to 2125 at 168th and H.  I also noticed that he assisted OPD at 168 and Pasadena from 2130 to 2155.  There is no video to substantiate the traffic stop from 2115 to 2125. There is also no video of the other two above listed item in that time frame.  He did have video of an earlier traffic stop and he had video from an incident the following day so the video was working.  The two parties from 156 and F were

20

Channing Roth, wtf, 06 Sep 95 and Tom Von Terch 01 Jun 94.  No record in NCJIS from Von Tench, there was an OLN for Roth" (Bates 004401).   At 3:25 p.m. Lieutenant Rowland OPD, notified Sergeant Lance Worley and Detective Kristine Love (the officers handling the investigation for OPD) of the information provided Lieutenant Martin and making an introduction of the officers as well as directing the investigators that if they had further questions to contact Martin. (Bates 4400).   Lieutenant Martin stated that he learned during his investigation, which started in April (following the EP incident) that he learned that the OPD assist did not occur. (Marin 187-188).  Martin noted that when he provided information about Cooper to OPD "they did not know if it was a deputy. They didn't know that it was—if it was an Omaha police officer, if it was a state trooper. They didn't know if it was some security guy. They didn't know if it was someone who just bought an old cruiser and was using it.  I just gave them Cooper's information in February 22nd because he was working in that district, and I wanted to work with Omaha and the criminal investigation, you know, if there is information I can give to assist."  (Martin 203).

68. On February 27, 2013, Lieutenant Martin emailed Sergeant Worley offering assistance and asking that the DCSO be kept apprised of the investigation. (Bates 004400).  Sergeant Worley responded on February 27, 2013 writing: "Absolutely, I will keep you posted if the investigation points to any of your employees.  Thanks for your cooperation." (Bates 004399).

69. On March 29, 2013 Lieutenant Martin again reached out to Sergeant Worley by email asking the following questions: "1) Has Cooper been eliminated as a

21

suspect? 2) Has Cooper been notified that he has come under suspicion of this? We have not told anyone. 3) Have you identified any other DCSO people as potential suspects? 4) Did you inform the victim that she could complain with our IA and have it investigated internally?" (Bates 004399).  On March 29, 2013 Sergeant Worley responded: "Lt—The victim in this case had inconsistencies in her story. We ran data base checks on the named parties involved and have no evidence that any officer from any agency ran the victim's names run NCIC or IMS mainframe.  We requested a polygraph and another follow up interview with the victim and her boyfriend and neither are cooperating in the investigation. Their stories were different and they could not come up a 'cruiser or a uniform description' that gave us any indication what agency (if any were involved.)  At this point we do not have any DCSO people as suspects, so I did not inform her of the DCSO IA procedures.  The assigned detective has made several attempts to gain cooperation without success. The last contact with the victim was on on the 14 March 2013, and she is not responding to our contacts. I hope this answers your questions. If not fee free to give me a call if needed." (Bates 004399).  It is noted that Lieutenant Martin was asked questions related to why he did not determine if Cooper had run the names McGuire and Worland back in February. (Martin 198-199).  It is noted that at the time, OPD had not provided names to Martin and more importantly, OPD had the capability to check the NCIC and IMS system for the same information as part of the overriding criminal investigation.  (Martin 198-199).  Martin acknowledged that DCSO may have received a different result on whether Cooper ran Worland and

McGuire, because he searched by Cooper's computer rather than by the names. (Martin 211).   Sergeant Worley testified that the big lead came in the case when the DCSO ran the same database search of the IMS that he had requested Mr. Truckenbrod to do, but this time, it resulted in information. (Worley 56).

70. Martin also noted that if he began an administrative investigation of Cooper, he would have to provide Cooper notice. (Martin 201).

71. Sergeant Worley testified that during the investigation, Detective Love compared OPD officers' daily reports and kept coming up short. (Worley 57). Worley testified that OPD did not have global positioning on their vehicles at that point in time. (Worley 57).

72. Sergeant Worley testified as to his contact with Lieutenant Martin testifying: "In my contact, there were a couple phone calls between myself and Lieutenant Martin, and I think we had a clear understanding between ourselves that the criminal investigation was a priority and he went out of his way to say that he did not want to interfere with that at all." (Worley 63).

73. Detective Love testified that DCSO was trying to assist from the beginning of the investigation. (Love 24). Love noted that based on McGuire's description of uniform, there was "quite a time period" where she did not know someone from DCSO was involved. (Love 26-27).

74. On April 4, 2013 Lieutenant Martin emailed Sergeant Worley making a further request stating: "Based on new information which I have received, I have been assigned to complete an internal investigation into the alleged sexual assault/oppression under the color of office incident at Lake Zorinsky.  Internal

investigations may use items from a criminal investigation. With this I am asking for information to include interviews, case notes, reports, and contact information from your criminal case so that it may further this internal investigation. Please advise me when and where I can pick this up." (Bates 004398). Four days later, on April 8, 2013 Sergeant Worley emailed Martin indicating: "Lt. Martin--It is my understanding that Lt. O'Brien is staffing this investigation with Central Police Headquarters Command. He understands your urgency and situation and we will get back to you as soon as possible with an answer to your request. I will attempt to find out a timeline and get back to you today. Sorry for the delay." (Bates 004398).

EP Incident

75. Lieutenant Jones testified that the first complaint he had ever received about Cory Cooper was in April of 2013. Jones indicated that it was not until after the EP incident that he learned that the Omaha Police Department was investigating a possible sexual assault by a law enforcement officer. (Jones 62).

76. Lieutenant Jones testified that he was called by a 911 operator, (Karin Crum), who was relaying concerns reported to Crum by EP. Crum told Jones that: "EP expressed concerns to Karin Crum that Deputy Cooper had come to her address in an attempt to serve a warrant, entered her residence, had performed a search of the residence, and then did not arrest her on the warrant and specifically asked her not to tell anyone that he was there. She did not feel that that was appropriate and was concerned." (Jones 65). Jones said that he had not heard Cooper call out on a warrant so there would be a violation of policy. (Jones 66).

Jones acknowledged that there was some mention in the complaint of Cooper meeting EP later at a Park. (Jones 79).

77. Jones described that his next step was to call Cooper on the phone to get information from him as to whether he had attempted to serve a warrant at the location of the complaint. (Jones 71).   Jones reported that Cooper admitted going to EP's and indicated that Cooper felt bad for her because she was going to have child care issues if immediately arrested. (Jones 74). Jones also noted that Cooper had confiscated EP's identification. (Jones 82).  Jones indicated that he initially told Cooper that it wasn't proper to attempt warrant service alone, not call out on the radio, and not arrest someone that has a valid warrant. (Jones 74).  Jones also questioned Cooper about why he would try to arrange a 9:00 meeting at a secluded park. (Jones 80).  Cooper had responded that he picked the later time and location because he felt bad for her and did not want her to be embarrassed in front of her apartment. (Jones 80-81).

78. Lieutenant Jones testified that he spoke with EP and verified what she had reported to Crum and he arranged a meeting with EP to serve the arrest warrant. (Jones 94).  Jones said he also met with Cooper and ordered him to complete an "internal affairs report based on his actions and that I was removing him from any further contact with EP…" (Jones 94).

79. Lieutenant Jones indicated that he drafted an Internal Affairs report (exhibit 83) as well to be forwarded up the chain of command.  (Jones 106).  Jones testified that he completed the IA report without being directed to do so because he is aware of the procedures for an Internal Affairs investigation. (Jones 106-107).

25

Jones noted that he also reviewed Cooper Internal Affairs report and told Cooper that he had left information out of the report, so at some point Cooper added information. (Jones 108). Jones said that at the end of the shift, he was told by Cooper that EP "had made sexual innuendo or advances towards him [Cooper] or the—she alluded to, if she performed a certain sex act, that he would forego the warrant. That information was never brought to my attention. Obviously, it raised concerns, you know, from his angle, you know, why he didn't tell me that." (Jones 109). Jones said this further information from Cooper heightened his concern about Cooper wanting to meet EP at the park. (Jones 110).

80. It is noted that EP told the two officers who transported EP to jail on the warrant, what had occurred. (Martin 190). Deputy Birkhofer reportedly called Lieutenant Jones and apprised him of what EP had told them. (Martin 190).

81. Lieutenant Martin testified that he was assigned to investigate Cooper when the EP incident was reported. (Martin 188). Martin said that Jones instructed Birkhofer to write an IA on what EP had said, Jones wrote an IA and as previously noted ordered Cooper to write one. (Martin 190). The entire matter was forwarded up the chain of command through Captain Wheeler to the chief deputy and the Sheriff, which led to Martin being assigned to investigate the EP incident on April 4, 2013. (Martin 190). Martin testified that incident with EP sounded, in some ways, similar to what occurred with the OPD case in February so he expanded his investigation to include the OPD report. (Martin 190-191). Martin said that he spoke to Sergeant Worley from OPD and advised him of the incidents. (Martin 191).

26

82. Lieutenant Martin testified that when he learned that he could get the GPS information on the cars, he asked the IT person, Galvan to run Cooper's vehicle and he was able to put the vehicle at the McGuire scene, rather than the area where Cooper indicated on his daily that he was assisting OPD. (Martin 219-220).  Martin indicated that it was during his April investigation that he learned of his ability to check the GPS and that when he found out Cooper's location, he notified Sergeant Worley of OPD.  (Martin 219-220).

83. Lieutenant Martin testified that when he spoke to Rowland in February, after reviewing the daily activity reports, he provided Rowland with Cooper's name. (Martin 193).    Martin reported that he did not get McGuire's name from Rowland because: "I didn't want to interfere if they have a criminal investigation going. I did not want to interfere in the criminal investigation whatsoever…But I didn't want to do anything to tip off Cooper that there could be an active sexual assault investigation in case he was, you know, involved in it."

84. Lieutenant Martin testified that when he expanded the investigation after being assigned on April 4th, he did not even have a name for who had made the allegation. (Martin 191).  It is noted that in an email from Lieutenant Martin (DCSO) to Sergeant Worley (OPD), Lieutenant Martin asked for several items including the contact information for the parties. (Bates 004398)


Complaints Reviewed


27

85. As part of my review in this case I reviewed a number of internal complaint/citizen complaint files.   It is well known in law enforcement that when looking for patterns or practices by examining complaints, a police practice expert must look at the substance of each complaint, the manner of investigation, the remoteness of the complaint, and the conclusion before using the complaint as the substance of an opinion.

86. Complaint re:IA # 1086  (October 2002).

    a. It was reported that Deputy FW was assigned to transport a juvenile (CM) from DCYC to an orthodontics appointment. CM reported to her mother hat upon leaving he appointment, FW took her to McDonalds and then to an apartment where he took her handcuffs and shackles off and touched her in a way that made her feel uncomfortable.   CM reported to her mother that when she refused to take a drink from FW he got upset; told her to put the cuffs back on herself and threatened to shoot her if she told anyone.

    b. It is noted that Sheriff Dunning, upon receiving the complaint from CM's mother, turned the matter over to the Nebraska State Patrol for investigation.

    c. In a report by the Nebraska State Patrol it was indicated that both FW and CM denied any sexual or physical contact of any form.   CM reported that FW took her to the Burger King drive-thru after her appointment and then to his apartment where they

ate their lunch.  CM said that FW removed her restraints before they entered the apartment and told her if she told anyone what he was doing he would shoot her.  CM said they were in the apartment for about 15 minutes while they ate their lunch and then they left.  CM denied that FW touched her or propositioned her.  CM indicated that FW had her put the restraints back on herself and they drove directly back to the youth detention facility.

87. FW- stepdaughter MM(Reported July 2002).

 a. BW reported that her daughter, MM had told her that her step father FW had inappropriately touched her by "licking her boob."

 b. MM told investigators that she was wrestling with FW and he put her hands over her head, pulled her shirt up and licked her boob.  She also reported that he had recently come into the shower wearing his underwear while she was showering and asked her to scrub his back.

 c. It is noted that it was the opinion of the investigator, Sergeant Christensen of the Nebraska State Patrol, "that what occurred between FW and his step-daughter MM was an accident during horseplay."

88. CD Complaint IA 1594

29

a. CD filed a complaint on May 22, 2006. CD reported being stopped twice by the same K-9 officer and complained of questions the officer asked, and comments the officer made that she considered personal in nature, including whether she was married; whether she had children, and telling her, based on a review of her license, that she did not look her age. CD said the officer also asked if she had a boyfriend and whether the relationship was serious. It is noted that CD initially made her complaint to the Omaha Police Department.

b. I note that the enforcement portion of the stop as well as consensual contact regarding CD asking questions about the police K-9 were captured on audio, and as reported appear to be contrary to Ms. CD's complaint. It is noted in the report that when CD began walking back to her truck after looking at the K-9, the officer's body mic was turned off. It is noted that the Deputy reported that it was CD who raised questions about children and where the dog slept.

c. Deputy B reported that when Ms. CD continued to ask questions about the K-9 he offered to give her a demonstration by placing a training aid somewhere on the outside of her truck, but she then became nervous about it, so he did not do the demonstration. The officer acknowledged that he and CD did

discuss her boyfriend and his girlfriend in the course of the conversation.

d. Lieutenant Gentile from the DCSO Office of Professional Standards investigated the matter. Gentile notified CD as well as the K-9 officer, Deputy B that he was responsible for this investigation on June 1, 2006 within 10 days of the complaint being made.

e. Through his investigation, Gentile determined that the two stops occurred on May 16, 2006 and May 18, 2006. Gentile recorded his telephonic interview of CD. CD reported her opinion with respect to the personal nature of the questions and comments made by the deputy including alleging that he made comments about his sex life with his girlfriend. It is clear from the report that because CD did not know what agency was involved, she complained to Omaha PD, who then turned it over to the Nebraska State Patrol, who then turned it over to DCSO.

f. As a result of the investigation, Deputy B was exonerated of inappropriate conduct but found to have violated agency policy by turning off his audio recording before the stop was concluded. As noted, it appears from my review of the investigation done by Gentile, emphasis was placed on the recording of the first stop as well as the partial recording of the

31

second stop, which, based on Gentile's summary were blatantly inconsistent with Ms. CD's allegations. Gentile also noted that many of the questions asked by the deputy were consistent with drug interdiction practices.

89. Deputy MH-University of Nebraska Medical Center IA #1704

a. Deputy MH was terminated from the University of Nebraska Medical Center for two incidents on two different dates while working off-duty at the University of Nebraska Medical Center as armed security. The investigation opened under #1704 was the result of a complaint that MH had returned to the medical center in his DCSO uniform in an attempt to get statements concerning the incidents that caused his termination and which he need for his appeal of the termination.

b. Upon receiving the report of MH's seeking statements at UNMC the DCSO began an immediate investigation that included ordering MH to do a report that included details of his termination from UNMC. The DCSO included the two UNMC incidents in their investigation. I note that when Lieutenant Gentile began his investigation of MH's attempt to take statements, he learned the substantive allegations that led to MH's termination from UNMC and determined that those matters also need to be investigated. I also noted that Gentile had to have clearance from the Medical Center's legal counsel

and obtain a subpoena before he could question staff or obtain records relating to MH's termination.

c. On May 25, 2006 MH allegedly took photos of a 14-year-old female with his cell phone.   During the investigation, Lieutenant Gentile learned that MH and another security officer were making motions as if they were going to photograph a "nice looking" 14-year-old.

d. On September 7, 2006, MH allegedly made inappropriate comments to a staff member.  In this incident, it was alleged MH "egged" a patient on to "come-on" to a staff member. Gentile was told that MH indicated he was just trying to be a good guy by telling the patient to talk to the "pretty one."

e. During the IA investigation MH was interviewed and reported that he did not notify command officers at DCSO of his termination from UNMC because he had been advised to appeal the termination.

f. It is noted that as the result of this investigation MH was determined to have violated numerous provisions of the DCSO policies.

90. Complaint IA #1771  April 29, 2007

a. An investigation was conducted by Lieutenant Gentile where he was told by Mr. L that his wife, RL had been unlawfully stopped and had been asked inappropriate questions such as if

33

she was married and how long she had been married.  Mr. L alleged that the officer, Sergeant V told Mrs. L that the only reason he stopped her was because she was a blonde female. Mr. L also indicated that the officer had his wife exit the vehicle and a police K-9 scratched various parts of his vehicle while pawing at the car.

b. Lieutenant Gentile reported that when he explained why certain questions were asked in relation to drug interdiction i.e. drug dealers using woman to transport drugs, Mr. L seemed satisfied.

c. Gentile indicated that when he spoke, in a recorded conversation with Mrs. L, she was adamant that she was stopped because of her looks and that the officer had acted inappropriately thus, Gentile continued his investigation by opening a formal complaint.  In the investigation, Gentile learned that a female, who was in the front seat of V's cruiser during the stop, was V's wife, who was participating in a ride-along that day.

d. During the stop, V's in car audio was working but his body-mic was not.  The report noted that when the dog alerted on the vehicle, a search was conducted.

e. On May 17, 2007 Mrs. L notified Lieutenant Gentile that she did not want to pursue a complaint against V.  During this call

34

Gentile explained that the female L had seen in V's cruiser was actually V's wife.  Gentile noted in his report that upon hearing this, L's entire demeanor changed and she seemed to come to the realization that V had not engaged in unprofessional conduct.  It was also noted following this investigation that V's body-mic was faulty and therefore it was replaced.

91. Complaint of MA IA # 1941 Building Security Officer B  May 20-2008

a. MA who knew BSO (Building Security Officer) B said that during a conversation at the security area where B was working he asked her if the rumor he heard was true at which point she responded that she had married a pastor.   She said that B then said she did not look like a pastor's wife.  MA said that B then asked his co-worker if she looked like a pastor's wife and the co-worker responded why? Because he has good taste and then asking what does a pastor's wife look like?  MA then said that B said: "you're fast" at which point she told him to watch it, but he responded "She's really fast."  MA said that she then replied "I've never been that."   MA then said that B then accused her of being a little bit touchy and then she changed the conversation to new bikes she had bought.  MA said that after she completed her business she saw B again and he asked if she was going to be mean again.  MA said she told B that he had made a sexual comment to her in public and warned him never

to speak to her that way again.  MA said that B responded that he would never speak to her again and then asked how she knew his comment was not related to her bike. MA said she told B he could lie, but he knew what he did.

b. B reported a different version of events that included the fact that MA's ex-husband had come through a few minutes before her and told him that MA had gotten remarried.  B said that he did ask MA when she came through if the rumor was true and she said yes.  B did not remember asking a co-worker if she looked like a pastor's wife and said that it was he who brought up motorcycles asking her if she still rode.  B said that his comment about being fast related to her riding motorcycles and was not sexual.  B said that when he saw MA later he tried to explain that to her but she did not want to hear it.

c. The complaint in this case, because of the conflicting stories of B and A was not sustained however B was counseled on being more careful as to what he says in the future.

92. Complaint of LV  IA # 1965

a. LV is an employee of the public property department of Douglas County.  LV said that on July 8th while on the elevator, BSO (Building Security Officer) SH, put his hands on her hips and moved in face-to-face in what she believed was an attempt to kiss her, but she turned her head.  LV said the elevator

opened and someone else got on and SH got off. It was reported that LV said that she had known SH for quite some time and they have been "cordially friendly and playfully flirtatious, but never anything that would amount to more than casual conversation."  LV also reported that a month before, SH had gotten into her car uninvited and rode down the ramp with her.

93. Complaint of JS IA #1984 July 23, 2008

    a.  JS reported that while being transported one of the transporting deputies commented on her clothing and asked what she had on under her T-Shirt.  JS said that when she complained about the tightness of the handcuff the deputy came to the back of the transport vehicle and "as he was loosening the handcuffs 'his arm was rubbing against my right breast, he was way to close for comfort.' JS said the comments he also made the inmate traveling with her uncomfortable, as did the words in the music being played on the I-pod."

    b.  It is noted that the Chief Deputy was advised of the allegation and he determined that a criminal investigation should be conducted concurrently with the administrative investigation.

    c.  Deputy Y reported that when interviewing JS, "JS said she didn't feel as though a crime had been committed, and DEPUTY N 'may not have even realized he did it.'"

94. Complaint from MG (e-mail)  IA #2325

a.  According to an email from MG, a call came into the library reporting an alarm, however before the caller spoke about the alarm he asked the staff member out on a date or to meet him at a bar.  The caller then indicated he was from the DCSO.  The person who answered the call at the library was identified as MM.  MM said she answered the phone asking if she could help the caller and a "male voice responded that could help him by meeting him after work at a bar for a drink—his voice was very seductive and made me uncomfortable—he then asked me again to meet him for a drink maybe at a 'vodka bar.'  MM said when she asked again if she could help him, he introduced himself as J from the Sheriff's Office indicating that there had been a call from the lobby elevator.

b.  BSO B indicated that he could have been joking around with library personnel when he called them about the alarm but he did not remember saying anything that would be taken out of context.

c.  According to documents this was treated as a Class I violation.

95. Anonymous complaint on SL IA #2462 July 2009-July 2011

a.  An anonymous caller who did not want to get involved made a number of allegations regarding SL related to womanizing. The caller reported that SL "has affairs with married women and manipulates then into leaving their families for him; the

caller said SL sends numerous text messages while working; the caller said SL stalked a woman that he was dating; and the caller said she had information that could get SL fired on the spot but would not share the information.  Captain Conlon, who received the information from the caller met with Sheriff Dunning and Chief Bilek and decided that this anonymous information would be investigated.  The case was assigned for investigation the same day it was received, May 20, 2011.

b. The DCSO conducted an extensive investigation that included a two-week surveillance of SL that determined that he was leaving work throughout the day on personal business while being paid.

c. As a result of the investigation the Office of Professional Standards recommended numerous charges against SL.

96. Complaint on Deputy A   IA # 2840 occurred around October 2012 reported February 6, 2014

a. School Principal AC indicated that an angry parent reported to her that it had been reported to angry parent (unidentified) that Deputy A was speaking with a student G and G told A that her mother was Dominican.  The angry parent told AC that A responded that Dominican women were beautiful and when G showed him a photo, A made a statement like, I'd like to fuck her.

39

b.  Principal AC said that she interviewed the student, G.  G told AC that A did not make the statement as reported by the angry (unidentified) parent.  "AC stated that G told her that when she said her mother was from the Dominican Republic, Dep. A said that women from there were beautiful.  G told AC that when Dep. A saw her mother's picture he said something like, 'What I could do to her.'"

c.  Deputy A was interviewed and said that he was involved in conversations with a number of students and G was one of them.  He said that G showed him a picture of her mother who G said was from the Dominican Republic but was now living in New York.   A said that when G showed him her mother's picture he said words to the effect of: She's very beautiful I'd like to meet her."  A said he was trying to be positive because in the photo, the mother appeared very short, possibly a midget.

d.  Sergeant Sampson determined that because there was no formal complaint and the fact the conversation occurred nearly a year and a half earlier, no follow-up investigation was necessary.

97. Complaint re: January 16, 2015 IA #2980

a.  C reported that a statement he made to CB while in Courtroom 25 he observed B with a green colored top and also observed a green strap showing on her shoulder.  C indicated that he liked the color green and he asked CB if the "top matched the

bottom." C said that later in the day when he heard that CB was upset about his comment, he took a female co-worker with him and apologized to B.

98. Complaint IA #3030 May 12, 2105

   a. H.R. Director reported that a female teacher contacted HR with concerns conduct and statements of Deputy B including: purchasing and bringing the teacher a hot tea; witnessing a student hugging a teacher and Baker saying I wish you would hug me like that; asking questions of a personal nature; running into the teacher at various locations such as the gym and grocery store; spending too much time in the teacher's classroom conversing with her; making a comment "If I was your age, I would be into you;" and, students getting the idea that the teacher and B were in a relationship of at least one liked the other.

   b. It was noted that other female teachers had concerns about B, but they did not feel he had crossed any boundaries.

   c. Deputy B denied making the statements reported but did note that there was a teacher, B, who he had brought tea to and who had texted him and asked him to pick up tea.

   d. Sergeant Sampson determined that B would receive an Employee Counseling Form documenting the events and the corrective action taken.

41

99. Complaint re: Deputy B- IA 3051 February/March 2015

    a. This complaint was reported by Deputy X regarding information B received alleging improper contact between B and a student identified as MD.

    b. It was reported that MD had indicated that she and some of her friends were uncomfortable with questions that Deputy B asked them to include: "Where do you live? Where do your parents work? Are you ever home alone?" MD reported that B had never asked the question regarding whether she was ever home alone.

    c. When interviewed B indicated he was unfamiliar with D and did not remember the conversation, noting that he talks to hundreds of students daily.

    d. A review of training that B had been given revealed the recommended practice of using social media to connect with students.

    e. B was exonerated.

100. Complaint of PS Complaint #3053

    a. PS complained that Deputy C sexually assaulted him while conducting a pat-frisk. Due to the fact that the entire incident was captured on video it was determined that personal interviews were not necessary.

42

b. The investigation noted that a second officer did not see anything inappropriate on the part of C and more importantly, the video showed nothing inappropriate.

c. The complaint was therefore determined to be unfounded.

Internal Affairs Reports Deputy Cooper

101. IA #1999-Use of Force September 6, 2008

a. E Complaint-Use of Force-Attempt to apprehend E regarding an assault.  Cooper initially ordered him from bushes at gunpoint, E fled on foot.  Cooper attempted a TASER deployment which was unsuccessful and ultimately used empty hand strikes to take E into custody.

102. IA #2113-Use of Force May 23, 2009

a. Cooper responded to a call of minors in possession at an apartment and was allowed in.  A subject, VM fled out the back door with Cooper in pursuit.  When VM reached for his waistband Cooper deployed his TASER.  Once on the ground it is reported that VM continued trying to put his hands under his body while refusing to comply with commands. Cooper deployed his TASER 4-5 more times.

103. IA # 2137-Use of Force June 14, 2009

a. Cooper responded to assist OPD with a disturbance.  A complainant informed Cooper that he head been assaulted by 3 males.  Cooper made contact with a male subject with blood on

43

his hands and face.  Several individuals identified this subject as one of the suspects.  The suspect TS fled on foot with Cooper in pursuit until at one point TS ran at Cooper and tried to wrestle him to the ground.  Cooper deployed his TASER to gain control of TS.

104.   IA #2171-Damaged Property- October 22, 2009

     a.   Cooper's glasses were accidentally broken when Deputy Stehlik bumped his head into Cooper while the two were dealing with a potentially suicidal subject.

105.   IA #2210-Injured Deputy Accident involving County Cruiser-January 2. 2010

     a.   Unclear how this involves Deputy Cooper and involves a cruiser being hit by a vehicle that could not stop on the snow and ice.  The report is signed JM.

106.   IA #2236- Use of Force February 13, 2010

     a.   While investigating a domestic assault Cooper ordered the male party, K to stay outside in the driveway while he spoke with the female party.  It is reported that K who was outside when Cooper arrived, continued to try and come into the residence and was told that if he did not stop his actions he would be arrested for obstruction.  When K entered the residence, Cooper went after him and K began running down the stairs.  Cooper attempted to apprehend K on a landing however K fought

44

Cooper's attempts at which time Cooper used strikes to attempt to gain custody.  K was taken into custody when Deputy B arrived to assist and deployed his TASER.

107.  IA # 2261-Use of Force February 14, 2010

a.  While investigating minors in possession and learning that several had fled, Cooper followed footprints in the snow and located 3 males, one of whom was S.  As Cooper conducted a consensual pat-down of S and felt a wallet, S began to resist. Cooper and Deputy W attempted to control S and took him to the ground where S pulled his hands under his body and refused to submit to handcuffing.  Prior to handcuffing Cooper delivered knee strikes to S as distraction strikes.

108.  IA #2282- Use of Force- Pepperball Gun April 25, 2010

a.  Deputy Cooper as part of a response team trying to take custody of a subject who reportedly was making both homicidal and suicidal statements.  Cooper was assigned to utilize a pepper-ball gun   When the subject fled on foot, Cooper fired 4-6 pepperballs which appeared to have no effect.  The subject was subsequently apprehended by a K-9.

109.  IA #2286- Cruiser Damage April 30, 2010

a.  While responding to a shots fired call, Cooper's vehicle hydroplaned causing him to lose control of the vehicle striking the curb and the raised median.

45

110.  IA #2628- Cruiser Damage October 7, 2012

    a.  Cooper while exiting his cruiser slipped and in trying to regain his balance grabbed the vehicle mirror causing it to break away from the vehicle.

111.  IA #2630- Pursuit October 6, 2012

    a.  This was an IA review of a pursuit that was initiated and terminated by Deputy Cooper.

112.  IA #2653-Use of Force/Damaged County Property December 26, 2012

    a.  Deputy Cooper responded to a domestic violence call involving a known gang member who was threatening harm to the caller. Cooper arrived after Deputy O and observed the suspect C, ball his fists and take a fighting stance.  When O took hold of C's right arm, C cocked his left arm back, at which point Cooper grabbed C's arm and the officers forced C back onto a couch. As C continued to fight the officers, Cooper delivered three short jabs (distractionary) to C's jaw line.  The officers were then able to get C handcuffed.  Once in the cruiser, C kicked a window out and had to be placed in shackles.

113.  IA #2658-Deputy Injury Documentation December 28, 2012

    a.  Cooper was involved in a traffic stop where the driver fled. Cooper struck the front driver's side window with his flashlight causing a laceration to his right index finger.

114.  IA #2670-Potentially Damaged County Property December 7, 2012

      a.  Cooper deployed his patrol rifle on a call and when getting back in his cruiser, the butt stock of the rifle hit the mouse pad of the MDT causing a dent.

115.   IA #2673- Vehicle Tow January 6, 2013

      a.  Cooper slid down a hill in the snow and the cruiser had to be towed out, with no damage.

116.   IA #2709 Damaged County Property March 21, 2012

      a.  Cooper had driven a vehicle that was found to have damage of unknown origin on the bumper.

In-Car Video IA Nos. 1884 and 2021

117.   IA-1884 Deputy AK was investigated and counseled for failing to turn on his microphone pack during a traffic stop in which a complaint had been made.

118.   IA-2021 Deputy JM was notified of a pre-disciplinary hearing relative to policy violations with respect to use of audio and video equipment as well as properly calling out the stops to dispatch as well as other violations. The violations were part of a pattern discovered by the Sheriff's Office over a three-week period spanning from September 30- October 22, 2008.

Policies/Training

119.   Under the DCSO disciplinary policy, similar to agencies throughout the United States, supervisors have to recommend discipline up the chain of command for approval. (Dunning P. 6 30 (b) (6)). A supervisor is authorized to initiate counseling sessions for improvement of work performance or behavior. (Dunning P. 7 30 (b) (6)). Dunning indicated that counseling sessions are

47

authorized for minor events that occur. (Dunning P. 16 30 (b) (6)).   Sheriff
Dunning indicated that not radioing in locations or omitting or being inaccurate
in a log based on information which is known or should be known to the officer
would be disciplinary rather than counseling.   (Dunning P. 16-17/19   30 (b)
(6)). Sheriff Dunning described that supervisors can uncover where information
is being omitted because they go on calls. (Dunning P. 19 30 (b) (6)).

120.   Sheriff Dunning testified that: "the sergeants, lieutenants, and captains all go
through supervisory and management training-management training for
lieutenants and captain, supervisor training for sergeants. (Dunning P. 12 30 (b)
(6)).

121.   Sheriff Dunning testified that the communications center can see where each
patrol vehicle is and a supervisory can, and in an instance cited by the Sheriff
has monitored a deputy's whereabouts from there. (Dunning P. 23-24   30 (b)
(6)).

122.   Lieutenant Jones testified that when he was promoted to sergeant in the
DCSO he was required to go back to the state academy (Nebraska Law
Enforcement Training Academy) in Grand Island for supervisors' school and
that when promoted to lieutenant he was required to go to Grand Island for
management school. (Jones 9-10).   With respect to the sergeant's training he
received, Jones recounted that the training included: "Basic first-line supervision
training of managing personnel, evaluating their performance, delegation, just
general supervision.   You know, there was subject matter on interpersonal
skills." (Jones 12). Jones reported that he was trained to ensure that officers

were properly doing what they said they were doing by monitoring calls. I note that this is the type of supervision that is utilized by the vast majority of agencies in the United States. Lieutenant Jones reported that the training instructed that supervisors should make unannounced appearances at calls to check on the conduct of officers. (Jones 18). Jones noted that he also attended a course put on by Douglas County related to supervision/human resources that was a more general course for all Douglas County supervisors. (Jones 21-22).

123.   Lieutenant Jones testified that everyone in the DCSO was required to take sexual harassment training and then once promoted to a supervisory position he was required to take additional training on identifying, reporting, and alleviating harassment. (Jones 24).

124.   Jones testified that even when he was a lieutenant he would monitor calls and go to them. (Jones 15). Jones said that he had been on calls that were assigned to Cory Cooper. (Jones 16-17). Jones indicated that as a lieutenant he would randomly show up at calls where deputies were assigned four to five times per week. (Jones 50).

125.   Lieutenant Jones testified that he had received ongoing training that he was required to take put on by the Douglas County Human Resources. (Jones 13).

126.   Lieutenant Jones testified that the DCSO has a 14-week Field Training program for ne deputies where they must demonstrate proficiency in 31 categories. (Jones 49-50).

127.   Lieutenant Martin testified to numerous specialized trainings he was sent to for Internal Affairs related functions, including an Internal Affairs class in 2009,

AELE "Managing Police Discipline" in 2011, and the NIAIA conference in 2012, 2013, and 2014.

128.   Lieutenant Martin testified that the DCSO created a limited duty policy after the Cooper incident so that a deputy would be required to come to work but would not be allowed to go out on patrol during some administrative investigations. (Martin 179).

Supervision

129.   Lieutenant Jones testified that agency supervisors have authority to randomly review videos from mobile video recorders but the review is discretionary. (Jones 42). Jones testified that supervisors also have authority to review global positioning data from the law enforcement vehicle's AVL (Automatic Vehicle Locator) but that review is discretionary and not mandated. (Jones 44-45). Lieutenant Jones acknowledged that after Cory Cooper was discharged and as the result of the office seeking accreditation the policies have been changed so that supervisors are required to review in-car video on a regular basis. (Jones 61).

130.   Lieutenant Jones testified that officers are required to complete daily patrol logs that log calls, self-initiated activity, any anytime they are out of service in an official role. (Jones 56). Jones asserted: "We depend on our members to ethically, morally, and professionally document their activities." (Jones 56-57).

131.   Lieutenant Jones was asked whether he noticed that Cory Cooper was generating a lot of reports based on contacts in public parks to which Jones testified: "Not an unnecessarily volume, but Deputy Cooper was very active in

self-initiated activity. And, certainly it has been our experience in public parks that criminal behavior occurs, either possession of controlled substances or breaking into vehicles, that would make it prudent from time to time to patrol these areas." (Jones 131-132).  Lieutenant Jones, who had served in a supervisory capacity over Cooper did not find that Cooper's activity in parks was inordinate. (Jones 132).  Jones asserted: "There was not any suspicions that arose prior to the incident on April 1, 2013." (Jones 132).

Internal Affairs-Corey Cooper

132.   Lieutenant Martin testified that as part of the Internal Affairs investigation, he reviewed Corey Cooper's activity for the first quarter of the year. (Martin 19).   Lieutenant Martin described that one of the hopes with providing information to the media was that other persons may come forward regarding Cooper's conduct. (Martin 21-22).

133.   Lieutenant Martin noted that the EP incident happened April 1, 2013 and as a result of that investigation Cooper was terminated, decertified, and entered into the national decertification registry. (Martin 19).  Martin noted that the DCSO also fully cooperated with the OPD criminal investigation other than in the area precluded by Garrity v. New Jersey. (Martin 20).

134.   Lieutenant Martin testified that it was he who found AH by going through Cooper's daily activity reports and noting that she had been stopped in what appeared to be a park. (Martin 26).  It is noted that Ms. Keane, the prosecutor who prosecuted Cooper indicated that she thought Cooper's actions with respect to EP and AH were not criminal but were "shady." (Keane 28).

135.   Lieutenant Martin noted that the DCSO has numerous mechanisms for a citizen to file a complaint including phone, email, in person and that a person can choose to remain anonymous in their complaint.  (Martin 33-34).  Martin indicated that he did not think the DCSO had web-based forms in 2013 but he would mail them out when requested. (Martin 35).

Opinions

136.   It is my overall opinion, based upon my specialized background, training, education, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that there is no evidence in the materials that would indicate that Sheriff Dunning or the Douglas County Sheriff's Office deviated from any generally accepted policy, practice, supervision, discipline, training or the handling of criminal and internal investigations of officers.  The foregoing materials make clear that the Sheriff's Office has proper policies and training that meet or exceed generally accepted policies and training.

137.   I note that there are approximately 17,000 law enforcement agencies in the United States, and only approximately a thousand that are CALEA accredited. In fact, Douglas County, Nebraska is one of only 84 Sheriff's Offices in the United States that currently have been awarded accreditation.[1]

138.   It is also my opinion that Corey Cooper did not seize Ms. McGuire or Worland in terms of law enforcement training or policy until after he had already developed probable cause to arrest both McGuire and Worland.  In

---

[1] http://www.calea.org/content/calea-client-database

accord with Ms. McGuire's cited testimony, Cooper did not block Worland's vehicle with his cruiser, Cooper did not activate lights or siren; Cooper did not make any statements, but rather was suddenly standing at the parked vehicle, shining his light into the vehicle directly on the marijuana that was clearly visible.  All law enforcement officers are trained that where they approach a subject without showing through words or conduct any authority, the approach is consensual and no seizure has occurred.  Thus, Cooper's approach did not breach any law enforcement policy practice or training but instead was consistent with generally accepted policies, practices, training, and legal mandates.

139.  Based on the foregoing outlined facts, it is my opinion, based upon my specialized background, training, education, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the policies and practices of the Douglas county Sheriff's Office are consistent with generally accepted policy and practices nationwide.

140.  I note at the outset that plaintiff's expert; Mr. Tremblay has criticized the DCSO for not having a specific sexual misconduct policy or a specific provision in the code of conduct relating to sexual misconduct by officers in 2013.  In doing so, he cites to a study that was funded in 2005 but not published until 2011 by the International Association of Chiefs of Police.  It is noted that the IACP National Model Policy Center has numerous model policies.  These policies include a "Harassment and Discrimination" policy that, like all law

enforcement agencies throughout the United States covers conduct between employees to include sworn, non-sworn, persons conducting business with the agency, and volunteers and does not cover the type of conduct Ms. McGuire was faced with, specifically sexual misconduct by officers.[2] The IACP is currently revising their policy on sexual assault, however the existing policy covers only how law enforcement will investigate sexual assault. The IACP has no model on sexual misconduct by officers. Thus, notwithstanding the study cited by Mr. Tremblay, the IACP, who received grant money in 2005 and published a report in 2011, has not yet developed a model police on sexual misconduct by officers.

141. Due to lawsuits in this area, agencies are advised and some have developed sexual misconduct policies, however this type of policy is nowhere near an industry standard or the generally accepted practice.

142. More importantly, it is well known in law enforcement that agencies do not need policies or training for conduct that the common person would know that the conduct is prohibited without policy guidance or training. In training a policy development class throughout the United States, this is one of the basic tenets taught. Clearly the common person knows that a police officer cannot force a sexual favor on an individual in exchange for leniency of criminal charges or in lieu of criminal charges. It is clear from Megan McGuire's testimony that she knew that such conduct was improper and more importantly so did Deputy Cooper.

---

[2] Harassment and Discrimination, Model Policy IACP National Law Enforcement Policy Center June 1999, Revised January 2002.

54

143.   I have reviewed a number of DCSO policies as noted in the list of materials reviewed.   I found these policies were either consistent or exceeded generally accepted policies, practices, training and legal mandates.   For example, since 2009 the DCSO has had an Early Intervention System policy.   EIS policies are not disciplinary policies but instead set benchmarks on various topics such as use of force, civilian complaints, lawsuits, other discipline, and sick time and identify averages for most officers of similar assignments.   The EIS system is intended to identify officers who exceed the benchmark.   Exceeding the benchmark is not a conclusion that there is any issue, but rather is a starting point for supervisors to determine if the officer is facing any type of problem that has caused the officer to exceed the benchmark.   In many cases no such problem is found.   In cases where a problem is discovered, the agency tries to take corrective action before the problem becomes worse.   Although EIS is a recommended policy/system for agencies, there are still large numbers of agencies that do not have such a system in place. I would also note that sexual assaults are not one of the benchmark categories tracked by an EIS, due to the fact that EIS tracks conduct this regularly occurs, may be justified, and which is correctable.   A sexual assault is never justified, they do not regularly occur in law enforcement, and cannot be corrected such that the subject continues employment.   Simply stated, an agency does not need a system to identify benchmarks on sexual assault, if one occurs, everyone in the agency will be aware of it, once detected and the only reasonable response is what occurred in the case of Corey Cooper.

55

144.   The DCSO, like most agencies have Law Enforcement Role and Authority Policy.  The policy while giving officers a degree of discretion recognizes that discretion is not absolute but rather must be used consistently within the limits of legal, ethical, and moral behavior and its use "must be soundly based upon and be limited by law, department directives, experience, and training."  This policy which gives officers discretion, within legal limits, is consistent with generally accepted policies, practices, training, legal mandates and certainly would never extend to conduct such as Cooper's.

145.   Based on the foregoing outlined facts, it is my opinion, based upon my specialized background, training, education, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the training of the Douglas county Sheriff's Office is consistent with generally accepted policy and practices nationwide.

146.   At the outset I note that the clearest sign of proper training and policy is the actions of employees when faced with any given situation.  The actions of the involved personnel of the Douglas County Sheriff's Office in response to a call regarding EP is demonstrative of proper training, policy, practice, and supervision.  As noted when the communications call-taker received the call, she immediately notified Lieutenant Jones.   Jones took immediate action to investigate the allegations and removed Cooper from any contact with EP. Jones ordered Cooper to do an IA report and compiled one himself, pushing the investigation up the chain of command.  Deputy Birkhofer, who transported EP

56

to jail on a warrant was told what occurred by EP and, after delivering EP to the jail, immediately took steps to notify a supervisor, Lieutenant Jones.  It is clear that rather than disregarding potential wrongdoing, all of the involved DCSO personnel took steps to investigate the action and forward the information up the chain of command for resolution.

147.   I note that throughout cited testimony DCSO personnel testified to their basic training conducted by the State of Nebraska, a 14-week FTO program and continued training to include mandatory county training on sexual harassment. All deputies promoted to sergeant received supervisory training and lieutenants received management training.   In addition, Lieutenant Martin provides an example of officers receiving additional specialized training for their assigned function as he was sent to numerous internal affairs related training.

148.   More importantly, all officers are trained in the basic academy on the substantive criminal law.  This training is a pre-requisite to becoming an officer so that officers can determine what offense they are investigating, the elements of the offense, and when an arrest is appropriate based upon meeting the elements of a specific offense.  Cooper testified that three specific areas of his basic training covered law enforcement sexual harassment or sexual abuse of citizens.  Cooper noted that unit 1 subject matter of law, community relations, and ethics applied as did unit 4, which was arrest, search & seizure, and unit 7, which was sexual assault investigations.   It is clear that an officer cannot investigate and arrest for sexual assault until trained as to what conduct is unlawful.

149.   In 2012 Corey Cooper underwent Skillsoft training that included topics of Employee Sexual Harassment; Workplace Harassment for Employees; and, Workplace Diversity Simulation.  (Bates 001717).

150.   I note that I reviewed a PowerPoint 507 on Code of Conduct which significantly details ethical considerations by officers.  The PowerPoint includes scenarios one of which incorporates an officer who is pre-textually stopping lone females for purposes of getting dates.  While it is unclear the date of this training, it is clear that DCSO takes such matters seriously and is providing training on this topic.

Supervision

151.   Based on the foregoing outlined facts, it is my opinion, based upon my specialized background, training, education, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the supervision of the Douglas County Sheriff's Office is consistent with generally accepted policy and practices nationwide.

152.   It has been suggested by plaintiff's expert that the DCSO breached a law enforcement standard by not randomly reviewing logs, in-dash cameras, and GPS and cross-referencing the three in order to establish proper supervision. The problem with this conclusion is that the conclusion is inconsistent with the practical realities of law enforcement.  Many agencies throughout the United States do not even have in-car cameras or GPS, thus they would never be able to meet this ideal set forth by Mr. Tremblay.   While someday this ideal may

become an accepted practice, it is not currently industry standard or even a generally accepted practice.

153.  I note that I conduct audits of law enforcement agencies throughout the United States and train thousands of law enforcement officers annually.  I note that the vast majority of agencies that do have in-car cameras do not require supervisory personnel to conduct and document such random reviews.

154.  I would also note that Mr. Tremblay's opinion of a lack of supervision based on testimony of Corey Cooper lacks the foundation required of a police practices expert and is inconsistent with the materials provided in this case.  Tremblay cites to testimony that Cooper knew of no deputy who had a citizen complaint against them sustained.   It is clear from the IA files as well as the Table of DCSO Internal Affairs Investigations from 2005 to present that numerous deputies have been disciplined as the result of sustained charges.

### Investigation-McGuire

155.  It is my opinion, based upon my specialized background, training, education, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that the decision to forego any administrative or criminal investigation of Cooper while the Omaha Police Department was conducting an active investigation was consistent with generally accepted policy and practices nationwide.

156.  All law enforcement is trained that when an outside agency is conducting a criminal investigation of their officer then the agency serves in a support role and does not, in any way interfere with the outside agency.  The difficulty in

investigating officers under the type of circumstances that occurred here can be very difficult.  In many cases, investigative techniques including sting operations become necessary to catch the officer.  A parallel investigation by the DCSO, whether criminal or administrative would have undermined the ability of the OPD to use various techniques of investigation.

157.   It is clear from the materials, that notwithstanding the desire to avoid any interference, the DCSO through Lieutenant Martin continued to seek information from OPD so that the DCSO could undertake an administrative investigation if appropriate.  It is noted that once the DCSO became aware of a second incident, albeit not rising to the level of a sexual assault, OD was notified and the DCSO began an internal investigation.   Through that internal investigation, the DCSO learned of potential patterns with Cooper.

158.   Based on the materials, it is clear that the DCSO did exactly what would be expected of a professional law enforcement agency under the circumstances presented by McGuire's complaint to OPD and OPD's investigation of the complaint.

Patterns and Notice

159.   It is my opinion, based upon my specialized background, training, education, and experience as well as my continued research, authoring, auditing, consulting and training on law enforcement practices nationwide that there is no pattern of conduct that would put supervisors on notice that Corey Cooper or anyone else had a propensity to commit sexual assault, and that the DCSO response to all

complaints reviewed was consistent with general accepted policies, practices, training, and legal mandates.

160.   As outlined above I have reviewed and summarized a number of internal affairs investigations/reports conducted by the DCSO some of which date back to the early 2000s.

161.   Over the course of multiple years Deputy Cooper had 15 IA reports.  It is noted that one of these involved an injury he received, one involved his cruiser being towed out of the snow, six involved use of force, three involved damaged property, two involved accidents with his cruiser, one involved a pursuit, and one involved a use of force and property damage.  Cooper had no instances prior to discoveries made during the investigation undertaken by Martin that involved the possibility of targeting women for sexual assaults or any other type of sex related conduct.

162.   I also reviewed internal affairs investigations dating back to the early 2000s, which had some connotation of sex to them.  I note that not a single one ultimately led to a conclusion that a sexual assault had occurred. One was investigated as a criminal investigation by an outside agency. The incident, involving FW in 2002 occurred after he licked his step-daughter's chest during horseplay at home. This was not work related, and he was investigated for this assault.  It is important to note that the DCSO immediately referred this case to the State Patrol for an outside investigation. I note in that case the outside investigator from the Nebraska State Patrol concluded that FW's actions were accidental. Mr. Tremblay cites two cases involving FW including a second case

61

where he took a juvenile prisoner to his house and the two sat and ate lunch. Mr. Tremblay notes that the mother of this juvenile made a complaint of inappropriate touching.  Mr. Tremblay did not include the actual prisoner's statement in which she denied any inappropriate conduct or language and simply said they ate their lunch. A case, which involved inappropriate touching of a prisoner during transport, led to the prisoner saying that the touching may have been an accident when Deputy Y was loosening her cuffs that she was complaining about.  Two cases involving traffic stops on the highway included only questioning and conversations that the female drivers thought was inappropriate.  In an incident involving Ms. CD, the stop was partially recorded and the partial recording did not support her version of events according to a summary provided in the material.  In a second instance, a similar allegation was made about Sergeant V and it was determined that his wife, who was on a ride-along, was present for the entire event. It is noted that in a number of instances the involved officers were disciplined where their actions, which in many of the reviewed cases involved statements to co-workers or other persons they knew, were deemed inappropriate.  It is noted that Mr. Tremblay failed to include the fact that even in some of the instances he cited, the DCSO did take action of both investigating and disciplining the involved officers.

163.   I note that in my review I found that all of the internal affairs investigations were thorough and that conclusions were reached based on the evidence available to the agency. Additionally, it is clear that the agency takes corrective action through discipline where such action is appropriate.

164.    Based on the foregoing I have found no evidence in the materials presented to date that would put a supervisor on notice, in accord with generally accepted policies, practices, and training, that Deputy Cooper or any other Deputy was going to use their position as an officer to sexually assault a female.

165.    At this stage of my review I do not know if I may be asked to review additional documents.  Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

166.    At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.  Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

167.    My fees for these professional services are outlined in the attached retainer agreement.


        This report is signed under penalty of perjury on this 22nd  day of June 2017, in Greenville, R.I..


                                        *s/John J. Ryan*
                                        John J. Ryan