## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MEGAN MCGUIRE, | ) | |
| | ) | Case No. 8:16-cv-00004 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Senior Judge Joseph Bataillon |
| | ) | |
| CORY COOPER, TIMOTHY DUNNING, | ) | Magistrate Judge Susan M. Bazis |
| Individually and in his official capacity as | ) | |
| Sheriff of Douglas County, Nebraska, and | ) | |
| DOUGLAS COUNTY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS TIMOTHY F. DUNNING'S
AND DOUGLAS COUNTY'S MOTIONS FOR SUMMARY JUDGMENT**

# EXHIBIT 61

```
 1              IN THE UNITED STATES DISTRICT COURT
                      DISTRICT OF NEBRASKA
 2
     MEGAN MCGUIRE,              ) CASE NO. 8:16 CV 00004
 3                               )
                 PLAINTIFF,      ) DEPOSITION OF
 4                               ) TIMOTHY DUNNING
         VS.                     )
 5                               )
     CORY COOPER, TIMOTHY        )
 6   DUNNING, INDIVIDUALLY AND   )
     IN HIS OFFICIAL CAPACITY    )
 7   AS SHERIFF OF DOUGLAS       )
     COUNTY, NEBRASKA, AND       )
 8   DOUGLAS COUNTY,             )
                                 )
 9               DEFENDANTS.     )

10   - - - - - - - - - - - - - - -

11              DEPOSITION OF TIMOTHY DUNNING, taken

12   before Morgan M. Catania, RPR, CSR(IA), General

13   Notary Public within and for the State of Nebraska,

14   beginning at 12:07 p.m., on February 15, 2017, at

15   Douglas County Attorney, Civil Division, 909 Civic

16   Center, 1819 Farnam Street, Omaha, Nebraska.

17

18

19

20

21

22

23

24

25
```

Timothy Dunning                                                              2
2/15/2017

                                                                           2

     1                    A P P E A R A N C E S

     2     FOR THE PLAINTIFF:
           MS. CINDY TSAI
     3     LOEVY & LOEVY
           311 North Aberdeen, Third Floor
     4     Chicago, Illinois 60607
           (312) 243-5900 (Phone)
     5     (312) 243-5902 (Fax)
           cindy@loevy.com
     6
           FOR THE DEFENDANTS SHERIFF TIMOTHY DUNNING AND
     7     DOUGLAS COUNTY:
           MR. TIM DOLAN
     8     MS. MEGHAN M. BOTHE
           MR. WILLIAM ROONEY, III
     9     DOUGLAS COUNTY ATTORNEY'S OFFICE
           909 Civic Center
    10     Omaha, Nebraska 68183
           (402) 444-7622 (Phone)
    11     (402) 444-6817 (Fax)
           tim.dolan@douglascounty-ne.gov
    12     meghan.bothe@douglascounty-ne.gov

    13

    14                    A L S O   P R E S E N T

    15     Mr. Matthew Martin

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

3

1                              I N D E X

2    CASE CAPTION ..........................   Page    1
     APPEARANCES ...........................   Page    2
3    INDEX .................................   Page    3
     TESTIMONY .............................   Page    4
4    REPORTER CERTIFICATE ..................   Page    74

5

     DIRECT EXAMINATION:
6         By Ms. Tsai .....................   Page    4

7    CROSS-EXAMINATION:
          By Mr. Dolan ....................   Page    45
8
     REDIRECT EXAMINATION:
9         By Ms. Tsai .....................   Page    55

10   RECROSS-EXAMINATION:
          By Mr. Dolan ....................   Page    68
11
     FURTHER REDIRECT EXAMINATION:
12        By Ms. Tsai .....................   Page    71

13                            E X H I B I T S

14   EXHIBIT NO.                                       MARKED

15   117. GENERAL ORDER GO-38-2005                     44

16   *** (Exhibit Nos. 113-116 previously marked for
     identification.)
17

18

19

20

21

22

23

24

25

```
 1                (Whereupon, the following proceedings were

 2   had, to-wit:)

 3                    TIMOTHY DUNNING,

 4              having been first duly sworn,

 5          was examined and testified as follows:

 6                   DIRECT EXAMINATION

 7   BY MS. TSAI:

 8        Q.   Good afternoon, Sheriff Dunning.

 9        A.   Good afternoon.

10        Q.   You were here yesterday for your

11   deposition?

12        A.   Yes.

13        Q.   The same rules apply today.  Okay?

14        A.   Pardon?

15        Q.   The same rules apply today.

16        A.   Yeah.

17        Q.   Great.

18             And you are aware that you have been

19   designated by Douglas County to testify about

20   certain topics relating to Douglas County Sheriff

21   Office's policy, practices, and procedures?

22        A.   Yes.

23        Q.   Okay.  And you are here to provide binding

24   testimony on certain topics on behalf of the County?

25        A.   Okay.
```

```
 1        Q.   Okay.  If you don't mind, take a look at

 2   Exhibit 114.  That's the notice of deposition.

 3        A.   115?

 4        Q.   14.

 5                  MR. DOLAN:  14.

 6                  THE WITNESS:  Okay.

 7   BY MS. TSAI:

 8        Q.   And if you turn to the second page, No. 2,

 9   it states, "The method and manner by which

10   supervisors monitored, reported, and disciplined

11   subordinate deputies for potential violation of

12   departmental rules or state federal laws" [as read].

13             It is your understanding that you have

14   been designated by Douglas County to testify on this

15   topic?

16        A.   Yes.

17        Q.   Okay.  What did you do in preparation to

18   testify about this topic today?

19        A.   Just know the policies and procedures of

20   my agency.

21        Q.   Okay.  Did you review any policies or

22   documents in preparation to testify about this

23   topic?

24        A.   I couldn't be -- I couldn't be specific as

25   to which one, but I've read a lot.
```

 1          Q.   Specifically for today's testimony or just

 2     in your capacity of doing your job?

 3          A.   In -- in general, in preparation for the

 4     whole deposition.

 5          Q.   For the deposition yesterday and today?

 6          A.   Yeah.

 7          Q.   I see.  Okay.

 8               Is there a written policy or directive

 9     that governs the process in which supervisors

10     discipline subordinates for violations of department

11     rules or state or federal laws?

12          A.   Well, when they -- they can't discipline.

13     They can only present the facts upward -- up through

14     the chain of command.

15          Q.   And when you use the term "discipline,"

16     does that include verbal reprimands?

17          A.   That -- that would still have to be -- be

18     approved.

19          Q.   Okay.  So is it the sheriff's office

20     policy that, when a supervisor believes that a

21     subordinate deputy violates either department rule

22     or state or federal law, that the supervisor needs

23     to notify his supervisor and up through the chain of

24     command?

25          A.   Correct.

```
 1          Q.   And prior to that, the supervisor is not

 2   to give any sort of discipline to the subordinate

 3   deputy because of the violation?

 4          A.   He could -- he could initiate a counseling

 5   session, which isn't disciplinary, but it's to

 6   improve work performance or behavior.  He could

 7   provide some facts as to what the incident was and

 8   then provide that information up.

 9          Q.   Through the command chain?

10          A.   Yeah.

11          Q.   But --

12          A.   Because on our form it will say action

13   taken, and right at that point in time it may -- it

14   may say verbal warning or something like that.  And

15   then it goes up for further recommendation as to

16   whether we're going to take that farther.

17          Q.   So when the recommendation is verbal

18   warning, the -- the verbal warning has not occurred

19   yet?  That's just the recommendation that --

20          A.   Well, it's --

21          Q.   -- the supervisors --

22          A.   Yep.  They are on notice that, if whatever

23   has taken place is inappropriate, that -- or action

24   that they took, if it's inappropriate, they need to

25   stop that now and -- and change it and conform to
```

1    policy.  Further discipline may be recommended by

2    that party.  As it -- as it goes up the chain of

3    command, other comments are made or recommended.

4          Q.    So I think I'm a little lost here.

5                How is the deputy who has violated

6    department rules or law given notice of that

7    violation prior to the supervisor issuing a

8    disciplinary action to go through chain of command?

9          A.    I think probably the best way for me to do

10   this is to provide an example.

11         Q.    Sure.

12         A.    So a deputy doesn't -- we feel that this

13   deputy hasn't -- hasn't turned on his red lights

14   soon enough and the siren and let dispatch know that

15   he -- he or she is going to be in pursuit.  The

16   immediate supervisor would inform that person that,

17   "This is the policy, and this is the way you'll --

18   you'll operate.  I'm writing this up to the --

19   through the chain of command."

20               As it goes up the ladder, further comments

21   are made or recommendations are -- are made.  And

22   then, obviously, I'm the -- the final decision

23   maker.  And then that flows back down.

24               So say we're going to reprimand for that.

25   That -- that reprimand will be written.  He will

1    sign it, and then it will come back up, and I'll

2    sign it.

3         Q.   Is it -- is it against the department's

4    policy for a supervisor to talk to the deputy and

5    say, using your example, "You need to turn on your

6    lights earlier," and have that conversation with him

7    without submitting a disciplinary -- or without

8    submitting any kind of paperwork?

9         A.   Could.  But then he would -- he would make

10   that -- that supervisor then would make the

11   recommendation no further action recommended, and we

12   could over -- override that or concur with it.

13        Q.   Right.

14             So my question is, though, using your

15   example where this deputy is not turning the light

16   on fast enough -- earlier enough, can the supervisor

17   simply have that discussion with the deputy without

18   having any sort of paperwork that documents this

19   conversation?

20        A.   That would -- that would depend on the

21   severity of it.

22        Q.   So, for example, not turning the light on

23   soon enough, is that something that a supervisor can

24   have a conversation with his subordinates without

25   documenting the conversation?

```
 1        A.   You know, in -- in that particular

 2   example, it would depend on how soon or, you know,

 3   how long they were into it before all that -- all

 4   those other things occurred -- the red lights, the

 5   siren, the radioing in.

 6        Q.   How are supervisors trained to know when

 7   they need to submit documentation of a verbal

 8   warning or reprimand versus having discretion to

 9   just have the conversation without documentation?

10        A.   Well, they are trained because we have

11   policies and procedures in that area.

12        Q.   Does the policy -- well, what policy and

13   procedure are you referring to?

14        A.   Well, I think we -- both in -- in policy

15   and in our Merit Commission rules we address that.

16   I -- I can't tell you the name of the policy.  Yeah.

17   I just -- I can't think of the title of it.

18        Q.   It's your understanding that there is a

19   stand-alone policy that outlines when supervisors

20   can --

21        A.   I don't know that it's stand-alone.  It

22   could be within another policy.

23        Q.   Okay.  If you can take a look at

24   Exhibit 113, that's the code of conduct policy.

25        A.   Okay.
```

```
 1          Q.    If you look at page 3, Section C,

 2    "Supervisory responsibility"?

 3          A.    Okay.

 4          Q.    Is that the policy you were thinking of,

 5    or were you thinking about something else?

 6          A.    Well, that's part of it.

 7          Q.    Okay.

 8          A.    But it's also in the union contract.  It's

 9    also in the --

10          Q.    Merit?

11          A.    -- Merit Commission rules.

12          Q.    Do you believe that there is another

13    general order that provides more detail than what's

14    described here?

15          A.    General order, I don't believe there is.

16          Q.    Okay.  So it's your testimony that

17    Section C of the code of conduct general order where

18    it says "Supervisory Responsibility" along with the

19    rules from the Merit Commission --

20          A.    Right.

21          Q.    -- and the union contract --

22          A.    Correct.

23          Q.    -- outlines the procedure that supervisors

24    have to take when they believe that a subordinate

25    deputy violated a department rule or a state or
```

```
 1    federal law?

 2         A.    Correct.

 3         Q.    Okay.  Are there any other written

 4    policies or procedures that outline the supervisory

 5    responsibilities?

 6         A.    There could be, but I can't think of any,

 7    off the top of my head.

 8         Q.    Okay.  Are there any Douglas County

 9    Sheriff's Department specific training on

10    supervisory discipline -- supervisory

11    responsibilities?

12         A.    We -- the sergeants, lieutenants, and

13    captains all go through supervisory and management

14    training -- management training for lieutenants and

15    captain, supervisor training for sergeants.

16         Q.    And is this an ongoing training, or do

17    they attend the training when they receive the

18    promotion?

19         A.    Within -- within a year of being --

20         Q.    Promoted?

21         A.    -- promoted they get that training.  And

22    then ongoing training.  It just depends where we

23    send them for -- for additional training.  We

24    utilize LEEDS quite a bit; so we -- I would say most

25    of our supervisors have been through LEEDS training.
```

```
 1        Q.   Do all of the sergeants attend the same

 2   outside training?

 3        A.   If it's LEEDS, it would be the same.

 4        Q.   Okay.

 5        A.   It might be different -- you know, a

 6   different product.  Southern Police Institute.  It

 7   could be -- I mean, there is just -- there is just a

 8   variety of them out there.

 9        Q.   How does Douglas County Sheriff's Office

10   confirm that the training from these outside

11   agencies are consistent with the written policies of

12   the department?

13        A.   Well, that's just over and above what

14   the -- the training that they receive in

15   Grand Island, the Nebraska Law Enforcement Training

16   Center.

17        Q.   Well, so your -- if I understand

18   correctly, sergeants are sent to outside training

19   seminars that discuss how to be an effective

20   supervisor?

21        A.   Leadership styles and techniques.

22        Q.   Right.

23             And what does Douglas County Sheriff's

24   Department -- what steps does the department take to

25   ensure that the styles and techniques that are being
```

 1    taught at these seminars are consistent with the

 2    policies at Douglas County?

 3        A.   I can't say that we do anything for -- in

 4    that regard.

 5        Q.   Okay.

 6        A.   If -- if I could add to that?

 7        Q.   Sure.

 8        A.   Unless we would send somebody else with

 9    them or a -- of a higher rank or even a similar

10    rank, we would have no way of knowing.  All we do is

11    see the prospectus for the class and, if we think

12    that fits our needs, then that's how we send them.

13        Q.   Okay.  If you don't mind taking a look at

14    page 3, Section C2.  And we have already touched

15    upon this.

16        A.   Which are you on?  D2?  Is that what you

17    said?

18        Q.   C2; so it's the top right-hand corner.

19        A.   Okay.  All right.

20        Q.   It mentions that all disciplinary actions

21    taken under this policy will be consistent with

22    applicable law, administrative ruling, the Sheriff

23    Merit Commission rules, Civil Service Commission

24    personnel policy, and collective bargaining

25    agreements.

1           I think we talked about all of those

2    except for Civil Service Commission personnel

3    policy.

4         A.   Yeah.  Civil Service Commission personnel

5    policy doesn't apply to the sworn.  That only

6    applies to non-sworn.  Merit Commission fulfills

7    that for the sworn.

8         Q.   Okay.  So the -- this particular general

9    order applies to both sworn Douglas County Sheriff's

10   employees and non-sworn employees?

11        A.   Right.  All employees.

12        Q.   Okay.  Thank you.

13           One of the ways you indicated that a

14   supervisor can report its subordinate deputy

15   violating policy or law is a counseling session?

16        A.   Yes.

17        Q.   Tell me what's contained -- what's the

18   purpose of a counseling session?

19        A.   A counseling session is a method that we

20   use.  It's a product -- actually, it's a product

21   developed out of Developmental Dimensions

22   International.  I think it's out of Canada.  And we

23   had used it at Omaha Police before I came to the

24   sheriff's office; so I -- so I brought it to the

25   sheriff's office to use.

1              And what it does is it gives -- gives the

2     employee the opportunity to improve behavior or

3     improve performance.  And so we -- the supervisor

4     and the employee would sit down, talk about what

5     the -- what the situation was, the problem was, and

6     talk about ways and how to -- how to improve that,

7     and then set a -- set a monitoring period as -- to

8     check back to see if there has been improvement.

9          Q.   And how the --

10         A.   That's not discipline, but it's simply

11    that.  It's counseling.

12         Q.   Right.

13              And are there certain conduct that --

14    where it would not be appropriate to use a

15    counseling session versus to issue a -- a

16    disciplinary warning?

17         A.   Yeah.  It's for the very minor things that

18    would occur.  Maybe it might be incomplete reports.

19    You know, maybe they ran a red light and had an

20    accident.  And sometimes we will correspond the

21    counseling with incorporating other training.

22         Q.   Would being rude or discourteous to a

23    private citizen qualify for counseling sessions?

24         A.   Could, yes.

25         Q.   What about not radioing in your location?

```
1        A.   No.  That would -- that would go higher.

2   You know, and you can also -- I was thinking about

3   this.  You can also incorporate counseling into --

4   you could -- you can still do discipline, but do the

5   counseling session as well so you've got a

6   monitoring period.

7        Q.   Right.

8             But there -- there are a group of

9   violations where it's appropriate to have a

10  counseling session but don't -- but it doesn't rise

11  to the level where you need to have a disciplinary

12  action; correct?

13       A.   Correct.

14       Q.   So other -- so -- and those are minor

15  violations?  Is there -- is that right?

16       A.   Yes.  I'm sorry.

17       Q.   Is there a written document within the

18  department that outlines what is considered minor

19  violations?

20       A.   I think it's in here, but I got to find

21  it.  We just went over it yesterday, and I'm not

22  finding it.

23            Here we go.  Yeah.  This is in

24  Exhibit 115, page 2.

25       Q.   Okay.
```

```
 1          A.    Class I --

 2          Q.    Complaints?

 3          A.    -- would be under minor infractions.

 4          Q.    Okay.  And is that -- is that the extent

 5   of the -- is that an exhaustive list of minor

 6   infractions where counseling sessions would be

 7   appropriate?

 8          A.    Under Class I, yeah.

 9          Q.    Okay.

10          A.    Anything under Class II wouldn't fit.

11          Q.    And are there any documents or policies

12   that list what constitutes minor procedural

13   violations?

14          A.    Not further than III, B, 1, subsection a.

15          Q.    (2).

16          A.    Yeah.

17          Q.    And same question.

18                Is there other documents that further

19   outlined what is considered a minor conduct

20   difficulties?

21          A.    Not -- not past this, no.

22          Q.    Okay.  And you -- one of the first

23   examples you gave that you said would be a minor

24   infraction where a counseling session may be

25   appropriate is incomplete reports.  What about
```

```
 1    inaccurate reports or daily logs?  Would that be

 2    appropriate for a counseling session?

 3         A.   It would be case by case.  It would be

 4    dependent on whether it was incomplete or absent

 5    information that the person knew or should have

 6    known should have been in that report.

 7              So if you're -- you're intentionally

 8    omitting information from, say, your daily report,

 9    that wouldn't be susceptible to a counseling.  That

10    would be susceptible to discipline.

11         Q.   How does a supervisor go about monitoring

12    whether a deputy leaves out a certain activity in

13    the daily report?

14         A.   Well, they go on radio calls.  They

15    discuss calls.  The supervisor will go over dailies.

16    If somebody is intentionally omitting something and,

17    say, nobody else was on the call, you would have no

18    way of knowing.

19         Q.   Okay.  So if a deputy doesn't radio in his

20    or her location and then does not write down where

21    he or her -- where he or she is at that specific

22    time in the daily log, activity log, it's your

23    testimony that there is no way for the supervisor to

24    monitor that activity?

25         A.   Right.  If somebody intentionally wants to
```

```
 1    be a criminal and they are all alone, you're just

 2    not going to -- going to catch that person at that

 3    moment.

 4         Q.   So one of the things that -- well, strike

 5    that.

 6              Deputy -- patrol deputies work their shift

 7    alone.  They don't have a partner in --

 8         A.   For the most part, yes.

 9         Q.   For the most part.

10              And so the opportunity for them to be

11    inaccurate or to leave out activities is greater

12    than if he or she had a partner with her in the car;

13    correct?

14         A.   I suppose that's true.

15         Q.   Given that, for the most part, Douglas

16    County Sheriff's Office has their deputies work

17    their shift -- patrol shift on their own, has the

18    department developed any policies or practices to

19    make sure that deputies are not taking advantage of

20    that situation?

21         A.   Well, we -- we hope that we're hiring good

22    people.  We -- we've developed that process to the

23    point -- as I mentioned yesterday, I found some

24    questions in some of the information you provided

25    that we plan to add.  We polygraph.  We do
```

```
 1   background -- thorough background checks.  We do

 2   psychological evaluations.  So we hope that we're

 3   hiring good people.  And as we find new practices,

 4   we will include those.

 5        Q.   Okay.  Other than having an extensive

 6   hiring process, are there any other ways that the

 7   Douglas County currently -- Douglas County Sheriff's

 8   Office currently takes to ensure that their deputies

 9   do not take advantage of the fact that they patrol

10   what area on their own and without a partner?

11        A.   No.  I mean, we -- there is a -- there is

12   a sergeant out there that makes calls, and, in the

13   absence of the sergeant, there is a lieutenant that

14   makes calls.  And in the absence of both of those

15   two, for whatever it might be, we have a -- we have

16   what's called a acting sergeant, and that person

17   makes calls.

18             And, you know, they make a after-shift

19   report.  I get a after-shift report three times a

20   day on all radio calls or any -- even on initiated

21   stops that would amount to an arrest or something of

22   a serious nature.

23             But if somebody decides to hide behind a

24   tree and they are doing it all by themselves, I

25   don't -- I don't know how you stop that.
```

1        Q.   When you say that a sergeant makes calls,

2   what do you mean by that?

3        A.   They'll hear -- they monitor radio

4   traffic, and they'll -- they'll go out and attend

5   calls.

6        Q.   So if a sergeant hears, you know, pursuit

7   at whatever intersection, the sergeant can make the

8   decision to go out and support the --

9        A.   Most likely will, unless they are on

10  another call.

11       Q.   Okay.

12       A.   But if it was a pursuit, they are probably

13  going to leave that other call and go to that

14  because they need to manage that situation to be

15  able to decide whether we're going to terminate that

16  pursuit or let it proceed.

17       Q.   During the shift does the sergeant have --

18  strike that.

19            Does Douglas County Sheriff's Department

20  have a policy or procedure where their -- the person

21  in charge for a particular shift, whether it's a

22  sergeant or a lieutenant, is able to monitor each

23  deputy's whereabouts at any given time?

24       A.   No.  You would have to have -- you would

25  have to have a sergeant for every deputy, and you

```
 1    would have to have a lieutenant for every sergeant

 2    because who's -- who's watching the watchers?

 3         Q.   Do sergeants ever call into the radio

 4    during mid-shift and say, "Deputy X, where are you?"

 5         A.   Oh, sure.

 6         Q.   Okay.  And what's the purpose of doing

 7    that?

 8         A.   Might want -- want to know their location

 9    to see if they are closer for something to be

10    checked.

11         Q.   Okay.

12         A.   And I can give you another good example of

13    that.  We had a situation where a deputy was -- the

14    sergeant felt that this deputy was hanging out at

15    a -- at a Kwik Shop too much.  Went back to the

16    radio room and looked, and sure enough, that's --

17    that's where the person was.  So he -- he monitored

18    that from that location and then was able to address

19    it.

20         Q.   What's the radio room?

21         A.   The -- the 911 communications room.

22         Q.   Okay.  And in that room what information

23    is available to the sergeant?

24         A.   Well, there is call takers and then there

25    is dispatchers.  The dispatchers have on their
```

1    screen -- they have the ability to see -- to see

2    where everyone is at.

3         Q.   Because of the GPS tracker?

4         A.   Right.  But you -- in order to track each

5    deputy, the sergeant would have to be there in that

6    room and not supervising.

7         Q.   So potentially, if a sergeant did not make

8    any calls that day, the sergeant can essentially

9    monitor all the deputies that's on shift at that

10   time by looking at this computer screen?

11        A.   If that's all they were doing, I would

12   probably discipline that sergeant for not doing

13   their job.

14        Q.   Sure.

15             But that is available?

16        A.   Sure.

17        Q.   Okay.  And there is no department policy

18   or practice that tells the supervisor that they

19   should monitor their deputies' whereabouts

20   throughout a shift?

21        A.   They are supposed to monitor them, but

22   not -- there is no policy -- if you're asking if

23   there is a policy that they sit in the radio room,

24   there is not.

25        Q.   Because they have other responsibilities?

```
 1        A.   Correct.  Well, they have to watch that
 2   shift.  I mean, we have people that are in the field
 3   making decisions on open hand to deadly force and
 4   driving a 2,000-pound car at high speeds.  So we
 5   want somebody managing those situations as closely
 6   as possible.
 7        Q.   On any given shift, how much time is the
 8   sergeant out on the field versus at the office?
 9        A.   You know, that would -- I couldn't tell
10   you, on average, what that is because day by day
11   they -- I mean, they've got to do bias-based
12   profiling cards.  They've got to enter -- enter in
13   time and attendance.  They've got reports they got
14   to read and review and sign.  And a lot of times
15   they will call the people out in the field to meet
16   them somewhere so they can get whatever reports they
17   have at that time.  So there is also a meeting that
18   generally takes place every shift.  I lost where I
19   was.
20             So it would be day by day.  I couldn't
21   give you an average amount of time.
22        Q.   Okay.
23        A.   You know, if somebody gets -- some people
24   get to work early and get their stuff -- paperwork
25   done early, and they are out in the field almost --
```

Timothy Dunning                                                           26
2/15/2017

 1    almost the whole time.

 2        Q.   And is there -- is there a policy or

 3    practice to have the supervisors either come in

 4    early or stay after their shift to complete the

 5    paperwork so that, during their actual shift, they

 6    are able to supervise the deputies?

 7        A.   Depending on what's taking place, they

 8    could wait and do their reports on the next shift.

 9             When the -- when the sergeant is getting

10    off, there is another sergeant that's coming on; so

11    there is always somebody there.

12        Q.   Is there -- and I -- you anticipated my

13    next question.

14             Is there any overlap between when one

15    sergeant's shift ends and another sergeant's begins?

16        A.   No.

17        Q.   Okay.

18        A.   Other than we have -- you know, we have

19    roll call 15 minutes before the shift.  So that --

20    that preceding -- the shift sergeant is there early;

21    so they would still interact with us -- with the

22    outgoing sergeant.  And the lieutenants' hours are

23    such that they overlap shifts.

24        Q.   Okay.  So if a sergeant was to handle all

25    of his or her administrative work, the paperwork

1    that you spoke about, at the end of a shift, during

2    that time is there anybody else supervising the

3    deputies who are out in the field?

4         A.   Not at that point in time.

5         Q.   Okay.

6         A.   But, like I say, they are monitoring the

7    radio traffic.  So if something would come out, they

8    could -- they could easily leave and go to the

9    scene, and do.

10        Q.   But in cases where the problem is where

11   the deputy is not calling in the radio, the

12   supervisor would not be able to monitor that -- that

13   behavior; correct?

14        A.   Wouldn't because they would have no

15   knowledge that that person was not acting

16   appropriately.  You know, unless you have -- like I

17   say, unless you have a sergeant for each deputy, I

18   don't -- I don't know how you would monitor

19   100 percent.

20        Q.   We spoke yesterday about the early

21   intervention program.  Are supervisors asked to look

22   for a pattern in behavior in their subordinate

23   deputies?

24        A.   I know they have some responsibilities in

25   that area.  I couldn't tell you exactly what they

 1    are.   Lieutenant Martin would probably be a better

 2    person to ask.

 3         Q.    We just finished asking him questions.

 4         A.    Pardon?

 5         Q.    We just finished asking him questions.

 6               Other than listening to the radio

 7    activity, does the supervisor in charge of that

 8    shift -- how else does the supervisor in charge of

 9    that shift monitor deputies' activities?

10         A.    By reading dailies, reading reports, the

11    interaction at roll call, or the interaction after a

12    shift.   There is conversations as to what took

13    place.

14         Q.    Is there an expectation by the department

15    for a deputy to have a certain amount of activity on

16    their log on a daily basis?

17         A.    Yeah, there is.   I mean, there is no

18    reason to have an empty log.   There is special

19    attentions that should be checked in your district.

20    You know, we don't mandate they write tickets, but I

21    don't know how you go a whole shift without

22    ever having any kind of a contact with a car,

23    whether it be even a mere verbal warning or a field

24    interrogation card or -- or some suspect or

25    suspected activity.

```
 1                    MS. TSAI:  Can you read back the last

 2    answer.

 3                         (Whereupon, the previous answer
                           was read back by the court
 4                         reporter.)

 5    BY MS. TSAI:

 6        Q.    The daily log -- strike that.

 7              Is it the department's policy to have

 8    deputies note on their daily log every interaction

 9    that they have with a private citizen?

10        A.    Yeah, I would say so.

11        Q.    Okay.  And when a deputy interacts with a

12    private citizen, there are -- in addition to the

13    daily log, there are other ways to document that

14    interaction, depending on what the interaction was;

15    correct?

16        A.    Yeah.  It could be -- it could be an

17    information report.  It could be a field

18    interrogation card.

19        Q.    It could be an arrest report?

20        A.    Or what?

21        Q.    Or an arrest report; right?

22        A.    Yeah.  Correct.  Sorry about that.

23        Q.    That's okay.

24              Is the supervisor responsible for

25    comparing the daily activity log to the other types
```

```
 1    of reports and make sure that every activity that

 2    warrants a field interrogation card or that warrants

 3    some sort of report is completed?

 4         A.    They weren't doing that then, but we're

 5    doing that now.

 6         Q.    When you refer to "then," are you

 7    referring to February of 2013?

 8         A.    Correct.

 9         Q.    Okay.

10         A.    I can't say that no sergeant did that, but

11    it wasn't mandated.  It's mandated now as an

12    inspection, as an audit process.

13         Q.    Okay.  What triggered this new mandate?

14         A.    This.

15         Q.    Okay.  And by "this," you're referring to

16    this lawsuit?

17         A.    Pardon?

18         Q.    And by "this," you're referring to this

19    lawsuit?

20         A.    I shouldn't say just this.  It was also

21    recommended as a -- as a practice by CALEA.

22         Q.    Okay.  Do you recall when CALEA

23    recommended this practice?

24         A.    I don't.  Rob Sofie would be the best to

25    ask.
```

```
1        Q.    Okay.  Does the -- is there a policy or

2   practice that requires the supervisor to

3   cross-reference the daily activity log with that

4   deputy's radio calls to make sure that, when

5   appropriate, radio calls were made?

6        A.    No.

7        Q.    Is there a reason why such a practice is

8   not required?

9        A.    Because we trust them.

10       Q.    How do supervisors monitor to make sure

11  that the deputies are using their in-car equipment

12  properly?

13       A.    Well, I know we do an -- an equipment

14  check to make sure that it's working, because we

15  would take a -- we wouldn't allow somebody to take a

16  car out that's not working.

17       Q.    And the equipment check is conducted at

18  the beginning of the shift by the deputy; correct?

19       A.    By the deputy, yes.

20       Q.    Okay.  Is there any --

21       A.    But then -- but then there is other

22  audit -- I don't remember how often the sergeant

23  does it.  I want to say it's quarterly.  There is a

24  quarterly audit on -- it's not just that equipment.

25  It's all equipment.
```

Timothy Dunning                                                    32
2/15/2017

 1        Q.    How does the sergeant monitor its -- his

 2    or her deputies' use of in-car equipment?  For

 3    example, that they turn on the camera when policy

 4    requires them to do so.

 5        A.    I guess the only way that they would know

 6    is if they went back to check and -- and they hadn't

 7    recorded something that should have been recorded.

 8    Then they would know that either there is a

 9    malfunction or it's -- they didn't do it.  And, at

10    that point, we would discipline.

11        Q.    Does Douglas County Sheriff's Department

12    have a policy that requires the supervisor to

13    conduct random checks or audits to make sure that

14    the deputies are using the in-car video camera when

15    they are supposed to?

16        A.    Yeah.  I think I testified to that

17    previously, that we are -- we are doing that now.

18        Q.    Back in February of 2013, such a policy or

19    practice did not exist; is that right?

20        A.    Correct.

21        Q.    Okay.  And what about the mic pack?  Is

22    there a way -- well, is there a policy or practice

23    for the supervisor to conduct audits or random

24    checks to make sure that his or her deputy is

25    turning on the mic pack when policy requires?

Thomas & Thomas Court Reporters                 1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                  Tel: (402) 556-5000 | Fax: (402) 556-2037

1      A.   No.  Like I say, we are doing that now,

2   and we still do an equipment readiness inspection.

3   I believe it's made quarterly.

4      Q.   Okay.  Do supervisors have the

5   authorization and access to review in-car video and

6   audio on its -- on his or her deputy?

7      A.   I believe the supervisors do.

8      Q.   Okay.  And --

9      A.   But after -- I mean, it would be after the

10  shift.

11     Q.   Right.

12          They don't have the ability to --

13     A.   Or unless it's -- you know, there -- if

14  there is an incident, they may -- oh, I don't know.

15  What the heck is that?  I think it's a -- I don't

16  know if it's a flash drive or something that they

17  can pull out that they can -- they can save to

18  preserve that so it's not -- not erased.

19     Q.   And that would happen after the shift once

20  the car comes back; right?

21     A.   After the shift or after -- actually,

22  probably -- probably would -- on a serious incident,

23  they would probably do it -- probably do it

24  immediately.

25     Q.   Because they would be on the call?

1          A.    Yeah.

2          Q.    Okay.  And the supervisors don't have the

3    ability to remote in to any deputy's car to look at

4    the video; correct?

5          A.    Not -- not now.  But they should be by

6    the -- not -- the not-too-distant future because we

7    will be going live with our records management, and

8    there's a -- that's a -- that's a feature that we're

9    going to take advantage of.

10         Q.    And that's true for the mic -- the audio

11   portion?

12         A.    I don't know if it will be for the audio

13   portion, but it will be for location determination.

14         Q.    Location determination and remoting --

15   remoting into the in-car video camera, that's two

16   separate equipment; correct?

17         A.    The mic pack is separate from the --

18         Q.    From the camera?

19         A.    Right.

20         Q.    And does the camera provide location?

21         A.    No.  They have a -- they have a computer

22   in their car, and that's -- that's what's providing

23   the location.

24         Q.    Right.

25               So --

1        A.   But right now the sergeants don't have the

2   ability to -- in their own laptop to locate

3   cruisers, but they will.

4        Q.   I see.

5             So if the sergeant is in his or her

6   vehicle, currently they do not have the ability to

7   look at their screen and see where all the different

8   vehicles are?

9        A.   Right.  Yeah.  We just don't have that

10  feature yet.

11       Q.   Okay.  And that's the feature that you

12  guys are taking advantage of --

13       A.   Correct.

14       Q.   -- and will be using?  Okay.

15            And is there any department policy or

16  procedure that mandates sergeants or the supervisor

17  in charge to monitor how deputies use their

18  emergency lights?

19       A.   There is on use of emergency equipment.

20  We have -- it should be in our pursuit policy, I

21  believe.

22       Q.   My question is is there a policy -- well,

23  is there a way for sergeants to monitor how the

24  deputies are using their emergency lights?

25       A.   No.  Not -- not unless we're -- you know,

1    not unless you're doing a review of some kind.

2         Q.   And a review would only be triggered if

3    there is some sort of event; correct?

4         A.   Correct.

5         Q.   Okay.  There is no practice to do a random

6    audit or to check on a monthly or quarterly basis?

7         A.   Not at that time.  That's in -- in place

8    now.

9         Q.   And when did this new policy take into

10   effect?

11        A.   Recently.  Again, that's something that

12   we -- we implemented as a result of this case, but

13   also as a result of CALEA's best practices.  I think

14   they -- they call for a review every six months, and

15   we've -- we've tuned ours up to quarterly.

16        Q.   Okay.  When a supervisor believes that his

17   or her subordinate deputy violated a policy -- a

18   department policy or a federal or state law, other

19   than using a counseling session, there is also a IA

20   report that they can use; correct?

21        A.   Well, the -- the IA is used to report the

22   incident.

23        Q.   I see.

24             And within the IA does the supervisor also

25   indicate his or her recommendation for discipline?

```
 1        A.    Could.   We encourage that to happen.

 2        Q.    Are there any other forms that supervisors

 3  use to indicate a -- a violation of policy by a

 4  subordinate?

 5        A.    Well, it's possible that they could use an

 6  interoffice memo, but that wouldn't -- that wouldn't

 7  trigger an IA number; so that's why we want them to

 8  use the IA form.

 9        Q.    Okay.  And is there a form -- is there a

10  disciplinary action form that the County -- the

11  sheriff's department uses?

12        A.    The discipline -- yeah, there is.  I

13  couldn't tell you what form number that is.  But if

14  we were going to issue a suspension or something of

15  that nature -- maybe they were going to agree to

16  some sort of discipline.  Usually my chief deputy is

17  the one that issues that.

18        Q.    So that's not a form that's completed by a

19  deputy supervisor, like a sergeant or a lieutenant?

20        A.    No.

21        Q.    Okay.

22        A.    There is a personnel advisory form that

23  they would use to briefly provide facts.  Usually it

24  would also be occupied by whatever reports were

25  involved in that particular incident.
```

```
 1          Q.    When --

 2          A.    And then they might make a recommendation

 3    up the -- up the chain of command.

 4          Q.    When does a supervisor use a PA versus a

 5    IA?

 6          A.    I think the personnel advisories are

 7    usually for minor actions, and the IA will trigger a

 8    further investigation.  You know, it might be

 9    something that occurs that the -- that the -- it

10    doesn't need any further investigation because

11    it's -- the -- it's --

12          Q.    It's done?

13          A.    All the facts are known --

14          Q.    Okay.

15          A.    -- and so it wouldn't require anything

16    further.

17          Q.    When --

18          A.    Like, if I -- like, if I -- if I got into

19    a car accident, and it was my fault --

20          Q.    Uh-huh.

21          A.    -- once the accident is investigated,

22    there are no other facts to surface, so...

23          Q.    When would you use a PA versus a

24    counseling session?

25          A.    The example I just gave, a counseling
```

 1   session could be used for that.

 2        Q.   Okay.  So the two -- there are situations

 3   where either one would be appropriate?

 4        A.   Right.

 5        Q.   Are there -- does the department provide

 6   supervisors with any guidance or training as to when

 7   it would be better to use a counseling session form

 8   versus a PA?

 9        A.   There is a period of time when people get

10   promoted that they -- they are with a senior person

11   of that rank, and I would say that the training

12   takes place there.

13        Q.   And in terms of who is notified of a PA

14   versus a counseling form, is it the same people

15   going up the chain, or...

16        A.   Correct.

17        Q.   It is.  Okay.

18             Do counseling session forms, PAs, and IAs

19   all go up the chain of command?

20        A.   Yes.

21        Q.   Okay.  You mentioned earlier that, when a

22   supervisor gives a deputy a counseling session, that

23   there is a monitoring plan; correct?

24        A.   Correct.

25        Q.   And how does the supervisor develop the

```
 1   monitoring plan?

 2       A.   It would just depend on the situation,

 3   again.  You know, say, incomplete reports.  Maybe --

 4   maybe the supervisor is going to monitor the --

 5   his -- the report-writing activities for, say,

 6   90 days.

 7            And that -- that monitoring would be

 8   the -- that he's -- every single report is going to

 9   be checked for -- you know, for completeness and

10   accuracy.  And, if not, then we've got to take some

11   other type of remedial action or discipline.

12       Q.   If the counseling session is for being

13   discourteous, how does a supervisor go about

14   monitoring that particular behavior?

15       A.   Being on calls.  I mean, most likely

16   would -- they would show up on traffic stops, if

17   they weren't already doing that.

18       Q.   Okay.  In other words, the supervisor

19   would follow the deputy's activities more closely?

20       A.   Wouldn't follow them, but if they are

21   going to hit out on a traffic stop, the sergeant

22   could show up as a backup and a monitor.

23       Q.   What's the difference between using a

24   counseling session and establishing a monitoring

25   plan versus the early intervention program?
```

 1        A.   Well, I would say they are -- they could

 2   be interrelated.

 3        Q.   Okay.  Are there additional requirements

 4   for one versus another?

 5        A.   Not necessarily.  They are pretty --

 6   pretty similar.  You know, even though, for example,

 7   a person that -- that we suspect is abusing sick

 8   leave time, we might -- that also might include a

 9   early intervention plan or a counseling plan, and --

10   even though it's kind of putting the employee on

11   notice that we are watching you -- so before and

12   after days off, before and after holidays and things

13   like that.  We already have that ability because we

14   have it on the computer.  It kind of, hopefully,

15   raises the mental flag for them that they are being

16   watched closely.

17        Q.   Is there any policy or practice by the

18   department to ensure that the supervisors' reports,

19   whether it's a counseling session, IA, or PA, are

20   accurate?

21        A.   Yeah.  They -- the plan -- if the sergeant

22   writes up a counseling form and session, they are

23   going to provide that to their supervisor to make

24   sure that everything is in place.  Maybe there is

25   more verbiage that needs to be added.

```
 1          Q.   And are there any policies or practice

 2     where the supervisors -- supervisor or up through

 3     the command chain is critiquing the supervisor's

 4     report?

 5          A.   Yeah.  That occurs, and it's -- it's

 6     reflected in their annual performance evaluation.

 7     Like, we even take that further.  We -- even in the

 8     performance evaluations, we monitor -- say you're a

 9     sergeant and you have eight people working for you.

10     When you're doing performance evaluations, we want

11     to see what the curve is for, you know, how -- how

12     you're evaluating your -- your subordinates --

13          Q.   Right.

14          A.   -- so that we kind of calculate to make

15     sure that they are not showing favoritism or showing

16     excessive disfavor to somebody.

17          Q.   In the -- in the case involving

18     Mr. Cooper, Lieutenant Jones completed an IA;

19     correct?

20          A.   Okay.  That was on E.P.   .

21          Q.   Right.

22          A.   Correct.

23          Q.   And -- and his comment was that he made a

24     recommendation, and he stated that Cooper did not

25     intend to break policy.
```

1              Did anyone speak to Lieutenant Jones about

2    that statement not being accurate?

3         A.   Well, he was interviewed by -- by the

4    Office of Professional Standards.

5         Q.   Do you know if anyone spoke to

6    Lieutenant Jones and said that, "When you write your

7    reports, you have to" -- you know, "This is a

8    statement that is not true because Cooper told

9    E.P.     , 'Don't tell anyone because I'm not supposed

10   to do that,' and that that directly contradicts the

11   statement 'Cooper did not intend to break policy'"?

12        A.   Right.  But -- but Cooper is lying that he

13   didn't know -- he didn't know that at that time.

14        Q.   I'm not sure I understood your answer.

15   Can you go ahead and elaborate?

16        A.   Cooper was being deceptive in everything

17   that he did, and so he had no way of knowing that.

18        Q.   At the time that --

19             MR. DOLAN:  I'm going to also object.

20   Your question assumes facts not in evidence,

21   Counsel.  Your question assumes that at the time

22   Lieutenant Jones wrote his comment, he was aware

23   that Cooper had told Ms. E.P.   what you just said.

24   BY MS. TSAI:

25        Q.   I'm going to represent to you that on

DUNNING - Cross (By Mr. Dolan)                          44

1    page 2 of Lieutenant Jones's IA report, Bates

2    stamped No. 379 -- unfortunately, I don't have a

3    copy of it.

4         A.   Oh.

5         Q.   He writes, Cooper further admitted to

6    knowingly violate policy by not immediately

7    arresting E.P.     for her outstanding warrant or

8    making an attempt to confirm the warrant.

9              Later on in the same report -- I take

10   that -- strike the part about "later on in the same

11   report."

12             I will also represent to you that

13   Lieutenant Jones's IA report is dated April 2nd,

14   2013.  Deputy Cooper -- or Mr. Cooper was asked by

15   Lieutenant Jones to complete a IA regarding his

16   interaction with E.P.        , and Mr. Cooper

17   completed that report on April 1st.  Lieutenant

18   Jones had an opportunity to review that IA report

19   and, in response to that -- actually, strike the

20   line of questioning.

21             I think I'm done for Topic No. II.

22             MR. DOLAN:  I have cross.

23                   (Exhibit No. 117

24                   marked for identification.)

25

DUNNING - Cross (By Mr. Dolan)                          45

1                          CROSS-EXAMINATION

2    BY MR. DOLAN:

3        Q.   Sheriff Dunning, I'm going to asking you

4    to take a look at what has just been marked as

5    Exhibit No. 117.

6        A.   Yes.

7        Q.   Do you recognize Exhibit No. 117, sir?

8        A.   Yes.

9        Q.   Can you tell me what Exhibit No. 117 is?

10       A.   Our disciplinary system dated

11   September 14th, 2007.

12       Q.   During the preliminary portions of your

13   questioning today, I believe Counsel asked if there

14   were any other written policies aside from the code

15   of conduct, the other documents that you had

16   indicated, including, I believe, the Merit

17   Commission and union contract outlining supervisors'

18   disciplinary responsibilities.

19            Sir, is it accurate to say that the --

20   that the Exhibit No. 117 is also a policy outlining

21   supervisors' responsibilities vis-à-vis the

22   disciplinary process?

23       A.   Yes.

24       Q.   And is it accurate to say that this policy

25   addresses counseling, training, punitive actions?

DUNNING - Cross (By Mr. Dolan)                     46

1        A.    Yes.

2        Q.    And provides general guidelines on when

3   each should be applied?

4        A.    Yes.

5        Q.    If you take a look at page 4, Sheriff

6   Dunning --

7        A.    Okay.

8        Q.    -- on the lower left-hand column there is

9   a Subsection C marked "Consideration of Factors"; is

10  that correct?

11       A.    Yes.

12       Q.    So this does provide a little bit of

13  guidance on when certain corrective measures ought

14  to be taken; is that correct?

15       A.    Yes.

16       Q.    Are supervisors within the Douglas County

17  Sheriff's Office expected to know Exhibit No. 117?

18       A.    Yes.

19       Q.    Are they given the opportunity --

20  supervisors within the Douglas County Sheriff's

21  Office, that is -- to ask questions of either you or

22  your chief deputy or anybody else within the chain

23  of command if they have any questions regarding the

24  content of No. -- of Exhibit No. 117?

25       A.    Yes.  All -- all employees would have that

Timothy Dunning                                                          47
2/15/2017

DUNNING - Cross (By Mr. Dolan)                          47

1    opportunity.

2         Q.   And in a particular situation, if a

3    sheriff's sergeant or lieutenant has a question

4    about a specific instance, whether -- a specific

5    instance of conduct, is there an open-door policy as

6    to permitting them to go up the chain of command to

7    ask what discipline or what level of corrective

8    measure may be advisable?

9         A.   Yes.

10        Q.   Now, I would ask you to take a look, sir,

11   at Page 5 of Exhibit No. 117.

12        A.   Okay.

13        Q.   And does Exhibit No. 5, under

14   Subsection F -- or, I'm sorry, Exhibit 117, page 5,

15   Subsection F --

16        A.   Okay.

17        Q.   -- refers to a "Uniform Guide of

18   Discipline."

19        A.   Yes.

20        Q.   Is the Uniform Guide of Discipline

21   attached to --

22        A.   Yes.

23        Q.   -- Exhibit No. 117?

24        A.   Yes.  It's page 6, 7, and 8.

25        Q.   Now, the Uniform Guide of Discipline -- I

DUNNING - Cross (By Mr. Dolan)                              48

1   believe it states right on the face of Exhibit

2   No. 117, Subsection 5 [sic], that this is not

3   intended to replace sound supervisory judgment?

4          A.    Subsection 2?

5          Q.    Subsection F1b.

6          A.    Okay.  2.  Yes.

7          Q.    So this is not intended to replace

8   people's discretion; correct?

9          A.    Correct.

10         Q.    At some level, Sheriff Dunning, in running

11  the sheriff's office, do you have to rely on

12  people's common sense?

13         A.    Yes.

14         Q.    And do you have to rely on their

15  willingness to ask question if they have questions?

16         A.    Yes.

17         Q.    Okay.  For example, if you take a look at

18  that Uniform Guide of Discipline, listed within the

19  offenses that are covering three pages, there is not

20  an offense marked sexual misconduct towards a

21  citizen, is there?

22         A.    Correct.

23         Q.    There is nothing in there that talks

24  about -- there is not a separate discipline carved

25  out for pressuring a -- using the threat of arrest

DUNNING - Cross (By Mr. Dolan)                            49

1    in order to pressure a citizen into taking off her

2    clothes, is there?

3          A.    Correct.

4          Q.    There is nothing in there specifying that

5    using the threat of arrest to pressure a citizen for

6    any kind of sex act is an offense, is there?

7          A.    Correct.

8          Q.    Yet they both are; correct?

9          A.    Correct.

10         Q.    If they are not listed, Sheriff Dunning,

11   how do you expect deputies to know that it is

12   unacceptable conduct for a deputy to use the threat

13   of arrest to either pressure a person into taking

14   off her clothes or performing any kind of sex act?

15         A.    Because it's -- because it's law, and it's

16   human dignity, and we hope we are hiring people that

17   respect human dignity.

18         Q.    You don't go through and list every single

19   behavior the deputies are expected to refrain from;

20   correct?

21         A.    No.

22         Q.    Again, at some level deputies, like their

23   supervisors, are expected to exercise some level of

24   common sense and good judgment?

25         A.    Correct.

DUNNING - Cross (By Mr. Dolan)                       50

1      Q.   But even then, there is -- if you look at

2   page 2 of Exhibit No. 117, Subsection 2, portion b

3   does provide some guidance for when training or

4   counseling will be used?

5      A.   Yes.

6      Q.   Again, to be clear, there is the

7   opportunity, if any supervisor is -- has a question

8   about a particular situation, they have the ability

9   to ask; correct?

10     A.   Yes.

11     Q.   Now, did -- did Cory Cooper throughout the

12  internal affairs investigation -- actually, even

13  before that, at any point during Cooper's time with

14  the sheriff's office, including when he was

15  suspended, did he ever indicate confusion as to

16  whether or not it was permissible to pressure -- to

17  use the threat of arrest to pressure a citizen into

18  taking off her clothes?

19              MS. TSAI:  Objection to the form and

20  calls for speculation.

21              Go ahead and answer, if you can.

22              THE WITNESS:  No.

23  BY MR. DOLAN:

24     Q.   To your knowledge, did Cooper ever

25  indicate any question or confusion as to whether or

DUNNING - Cross (By Mr. Dolan)                          51

 1   not it was acceptable to use the threat of arrest to

 2   pressure a citizen into performing any kind of sex

 3   act at all?

 4       A.   No.

 5       Q.   Okay.  In fact, he never did express any

 6   confusion on that point, did he?

 7       A.   No.

 8              MS. TSAI:  Objection:  Calls for

 9   speculation.

10   BY MR. DOLAN:

11       Q.   To your knowledge, did he ever express any

12   confusion on that point?

13       A.   No.

14       Q.   In fact, he simply has denied ever doing

15   it; correct?

16       A.    Correct.

17       Q.   Wouldn't that kind of indicate that he

18   knows damn well it's wrong?

19              MS. TSAI:  Objection:  Calls for

20   speculation.

21              THE WITNESS:  Yes.

22   BY MR. DOLAN:

23       Q.   With respect to the various -- you also

24   provided testimony regarding various supervisory

25   practices, such as random visits to deputies in the

DUNNING - Cross (By Mr. Dolan)                         52

1  field, comparing daily activities logs to other

2  written reports.  Do you remember the questioning on

3  that point?

4       A.   Yes.

5       Q.   Prior to February 10th of 2013, Sheriff

6  Dunning, did you believe that, failing to have

7  supervisors compare daily activity logs to other

8  written reports or to cruiser video or to radio

9  calls created a risk that any one of your patrol

10  deputies would actually go out and use the threat of

11  arrest to force a young woman to disrobe and then

12  force her into performing oral sex on him?

13       A.   No.

14       Q.   At any point on or before February 10th,

15  did you ever believe that not having supervisors

16  comparing daily activity logs to radio traffic

17  written reports, any combination of these records,

18  or comparing -- or even doing random visits in the

19  field, did you believe that not having a formal

20  policy requiring that -- not at -- the sheriff's

21  office not having these comparisons in place created

22  a risk that one of your deputies would go out into

23  the field and then would use the threat of arrest to

24  force a young woman to take off her clothes and then

25  perform oral sex on him?

DUNNING - Cross (By Mr. Dolan)                    53

1        A.   No.

2        Q.   Did you believe that prior to

3   February 10th of 2013 -- were you aware of any facts

4   that suggested to you that Cory Cooper might do

5   something like that?

6        A.   No.

7             MR. DOLAN:   I have no further

8   questions.

9             MS. TSAI:   Counsel, was this

10  particular general order ever produced in discovery?

11            MR. DOLAN:   I believe it was, but we

12  will have to check and see if it's responsive to any

13  of the document requests that you guys have hit us

14  with six different times.

15            MS. TSAI:   Well, you also have a

16  obligation to produce any documents that you intend

17  to rely on in litigation --

18            MR. DOLAN:   At trial.

19            MS. TSAI:   -- as well.

20            MR. DOLAN:   At trial.

21            MS. TSAI:   At trial.  Okay.

22        Given that this is the first time I have

23  seen this document and it's provided to me without a

24  Bates stamped number and I'm under the belief that

25  this has not produced -- has not been produced

DUNNING - Cross (By Mr. Dolan)                    54

1    previously, I just ask that we take a couple of

2    minutes so that I could review the order --

3                    MR. DOLAN:  Absolutely.

4                    MS. TSAI:  -- the order to see if

5    there is any follow-up questions.

6                    MR. DOLAN:  Let's go off the record.

7                       (1:27 p.m. - Recess taken.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DUNNING - Redirect (By Ms. Tsai)                    55

1           (At 1:36 p.m., with all the parties

2       present as before, the following proceedings were

3       had, to-wit:)

4                     REDIRECT EXAMINATION

5                 MS. TSAI:  Okay.  Before I follow up

6       my question, Counsel and I had a conversation off

7       the record where Counsel indicated that he did not

8       appreciate that I insinuated that the County and the

9       sheriff's department have not been complete in their

10      discovery responses.  My previous comment on the

11      record was not intended to indicate or suggest that

12      the sheriff or the County has not been responsive to

13      their -- and have met their discovery obligations.

14      BY MS. TSAI:

15          Q.   Okay.  I've had a chance to take a look at

16      Exhibit 117.  That's the disciplinary system general

17      order?

18          A.   Yes.

19          Q.   It's dated -- it looks like it was revised

20      in 2007.  Do you know whether this was the

21      controlling general order in February of 2013?

22          A.   Yes, it was.

23          Q.   And how is it that you're able to

24      determine that?

25          A.   Because it's originally General

DUNNING - Redirect (By Ms. Tsai)                    56

1    Order 38-2005.

2         Q.    And how are you able to confirm that there

3    was no subsequent revisions to this general order

4    between September of 2007 and February of 2013?

5         A.    Because there has been -- other than the

6    2007 revisal, there have been no other.

7         Q.    Okay.  So is this, then -- is this the

8    general order that is currently in effect relating

9    to the subject matter disciplinary system?

10        A.    Yes.

11        Q.    Okay.  The last three pages of this

12   general order is the Uniform Guide of Discipline;

13   correct?

14        A.    Yes.

15        Q.    And who was involved in developing this

16   guideline?

17        A.    Well, the author of it is -- was

18   Captain Russ Torres.  R -- it says "RT."

19        Q.    Okay.  And you believe that Captain Torres

20   was also the individual who set the guidelines in

21   Figure 1 of this general order?

22        A.     In fact, I should -- let me -- let me go

23   back on that.  It was actually -- at that time he

24   was a lieutenant.

25        Q.    Okay.  And so is it your understanding

DUNNING - Redirect (By Ms. Tsai)                         57

1    that Lieutenant Torres at that time was the

2    individual who set the guidelines for discipline

3    that is outlined in Figure 1?

4         A.   With our approval, yes.  It would -- it

5    would have been vetted throughout the department.

6         Q.   And who would have been involved in the

7    vetting process?

8         A.   Myself, my chief deputy, all -- all

9    captains, all lieutenants, probably all sergeants,

10   and the -- probably the Fraternal Order of Police,

11   Lodge 1 -- or Lodge 2.

12        Q.   And, to your knowledge, how is it that he

13   developed these ranges for discipline?

14        A.   I couldn't tell you.  I'm sure he's --

15   we -- I'm sure he got this guidance from someplace

16   else.  Maybe CALEA.

17        Q.   Does CALEA mandate a uniform guideline of

18   discipline?

19        A.   Does CALEA what?  I don't -- let me see if

20   there is CALEA standard on here.

21             Yeah.  The CALEA standard would be just

22   left of the -- of the Douglas County Sheriff's logo.

23        Q.   Okay.  And that just indicates that this

24   particular general order meets the standard -- the

25   CALEA standard 26.1.4 through 26.1.8; correct?

DUNNING - Redirect (By Ms. Tsai)                    58

1       A.   It just addresses that standard, correct.

2       Q.   Right.

3            It's not -- it doesn't mean to indicate

4  that this is the standard that CALEA drafted?

5       A.   Correct.

6       Q.   Okay.  And so it's possible that this

7  matrix in Figure 1 was something that came from

8  CALEA?  It's also possible that it did not; correct?

9       A.   I couldn't -- I couldn't answer for

10  now-retired Captain Russ Torres.

11      Q.   When you reviewed the draft of this

12  general order --

13      A.   Correct.

14      Q.   -- you carefully reviewed the language in

15  the order?

16      A.   Yes.

17      Q.   And you reviewed Figure 1 and the list of

18  offenses outlined?

19      A.   Correct.

20      Q.   And then you also carefully reviewed the

21  range of the punitive action that would be

22  appropriate for each of these offenses?

23      A.   Correct.

24      Q.   Okay.  How did you make the determination

25  that these guidelines for punitive action was

DUNNING - Redirect (By Ms. Tsai)                    59

1    appropriate for each offense?

2        A.   Well, I'm sure at the time I would have

3    had a conversation as to where these recommendations

4    came from.  And I don't recall now where that was.

5    I would have to, again, refer to that -- that

6    person.

7        Q.   Okay.

8        A.   But it -- it seemed appropriate.

9        Q.   And in terms of the list of offenses,

10   there are three pages of offenses listed; correct?

11       A.   Yes.

12       Q.   And how was it determined which offenses

13   would be listed in this matrix?

14       A.   Again, I couldn't tell you at this time.

15   I'm sure we had a conversation, but I don't recall

16   what that conversation was now.

17       Q.   Okay.  Were there discussions about adding

18   or removing certain offenses that were listed in the

19   matrix?

20       A.   Was there a discussion about removing?

21       Q.   Adding or removing certain offenses to

22   this matrix.

23       A.   I don't recall that conversation.  Excuse

24   me.

25       Q.   Is this matrix intended to cover all types

DUNNING - Redirect (By Ms. Tsai)                    60

1   of police misconduct?

2        A.   It's trying to capture as much as we

3   possibly can.  I mean, you know, in the City of

4   Omaha, spitting on the sidewalk is a violation of

5   the City ordinance.  Probably not important to

6   include that here, specifically.

7        Q.   Okay.  What category would you look under

8   in this matrix for -- oh, strike that.  Just found

9   it.

10            Since 2007, when this matrix was put

11  together, has there been any discussion about the

12  need to revise the range of punitive action for any

13  of the offenses listed?

14       A.   Not to -- not to my knowledge.

15       Q.   Has there been review by the department to

16  determine whether the range of punitive action

17  suggested by Figure 1 is still appropriate?

18       A.   What was that last part?

19       Q.   Has there been any review by the

20  department to look at Figure 1 to determine whether

21  the range of punitive action suggested is still

22  appropriate, given the change in law enforcement

23  these days?

24       A.   No.  No.

25       Q.   Okay.

DUNNING - Redirect (By Ms. Tsai)                    61

1      A.    Excuse me.

2      Q.    You were asked previously by Counsel

3  whether or not -- prior to February 10th of 2013,

4  whether you felt there was a need for supervisors to

5  monitor deputies' activity logs to make sure that it

6  was accurate.  Do you remember that line of

7  questioning by Counsel?

8      A.    I don't remember -- I don't remember it

9  being worded that way exactly.

10     Q.    Do you recall that line of questioning

11  relating to the topic of what you believe was

12  necessary in terms of supervisor monitoring prior to

13  February of 2013?

14     A.    Yes.

15     Q.    Okay.  And would you agree with me that,

16  prior to February 2013, that, based on your

17  experience and your training and just common sense,

18  that, if deputies know that they are not being

19  monitored regarding their daily activities, that

20  they have the opportunity to take advantage of, for

21  example, using work time to take care of personal

22  matters?

23     A.    I don't know how they think.

24     Q.    Would you agree with me, based on your

25  experience, knowledge, and training and common

Timothy Dunning                                                    62
2/15/2017

DUNNING - Redirect (By Ms. Tsai)                    62

1    sense, that it's possible for deputies to be able to

2    identify areas where they could take advantage of

3    the lack of monitoring by their supervisors?

4        A.   No.  I wouldn't agree because I -- I trust

5    the people I hire.  So I assume, when I send someone

6    out to work a shift, that they are going to do their

7    job.  I don't -- I don't send them out thinking

8    is -- are they going to screw up today?  Are they

9    going to go out and play today?

10       Q.   If -- if that is the case, where you hire

11   individuals who you trust, why is it that you have a

12   department dedicated to internal investigation of --

13   dedicated to investigating wrongdoings by your

14   employees?

15       A.   Because we want -- we want to make sure

16   that we take corrective action wherever necessary.

17       Q.   So you agree with me, though, that,

18   despite the fact that you trust your employees,

19   prior to February of 2013, you recognized the need

20   for supervision and accountability?

21       A.   I recognized that when -- when I first

22   became sheriff, and we didn't have an internal

23   affairs department.

24       Q.   Right.

25            And you put in a internal affairs

Thomas & Thomas Court Reporters                    1321 Jones Street, Omaha, NE 68102
and Certified Legal Video, LLC                     Tel: (402) 556-5000 | Fax: (402) 556-2037

DUNNING - Redirect (By Ms. Tsai)                    63

1   department because you recognized that there was a

2   need to hold your employees accountable for doing

3   their job?

4        A.   Because we are dealing with human beings.

5        Q.   Right.

6             Because human beings make mistakes?

7        A.   Correct.

8        Q.   And human beings will -- some human beings

9   will take advantage of a certain situation?

10       A.   Correct.

11       Q.   Okay.  And your employees are no

12   exceptions to those flaws -- human flaws?

13       A.   Well, I would say that we are actually

14   held to a -- to a higher standard.

15       Q.   But you agree that your employees are not

16   perfect?

17       A.   I agree.  Nobody is perfect.

18       Q.   Right.

19            And that, despite the fact that you have

20   done extensive -- you have -- your department has an

21   extensive hiring practice, that your employees are

22   susceptible to human flaws?

23       A.   Absolutely.

24       Q.   And that --

25       A.   Priests, lawyers, bankers, everybody.

DUNNING - Redirect (By Ms. Tsai)                64

1       Q.    No one is perfect; correct?

2       A.    Right.

3       Q.    And that includes people taking advantage

4   of the situation that they find themselves in?

5       A.    I didn't hear that -- I saw that as a

6   statement, not a question.

7       Q.    Sure.

8             And your employees, because they are human

9   and have the same human flaws as everyone else, are

10  susceptible to engage in activities that may violate

11  department policies?

12      A.    That was the longest question I've ever

13  heard.

14      Q.    I'm pretty sure yesterday I had a longer

15  one.

16             MS. TSAI:  Do you mind repeating the

17  question for the sheriff?

18                   (Whereupon, the pending question
                     was read back by the court
19                   reporter.)

20             THE WITNESS:  That's possible.

21  BY MS. TSAI:

22      Q.    Okay.  And so prior to February of 2013,

23  you were aware of the fact that, even though you

24  trust your deputies, that they may take advantage of

25  the fact that they are patrolling alone and that

DUNNING - Redirect (By Ms. Tsai)                    65

1    they know that their supervisors are not monitoring

2    their activities?

3         A.   Did I know that they were -- that I had

4    supervisors that weren't specifically monitoring

5    each deputy's activities?  Is that -- it that what

6    you asked me?

7         Q.   My question is, even though you trust your

8    employees, you knew prior to February of 2013 that

9    there was the possibility that your employees would

10   take advantage of the fact that there was no direct

11   supervision from the sergeants?

12        A.   I don't -- I live every day thinking that

13   nothing is going to happen and hope it ends up that

14   way.

15        Q.   And we are all hopeful for that, but you

16   also take certain precautions in case that is not

17   the case; correct?

18        A.   Correct.

19        Q.   And, for example, you put in an internal

20   affairs department?

21        A.   Right.

22        Q.   Okay.

23        A.   And sergeants and lieutenants?

24        Q.   Right.

25             And the purpose of having layers of

DUNNING - Redirect (By Ms. Tsai)                    66

1    supervisors is so that, if any of your employees

2    happen to engage in wrongdoings, that hopefully

3    someone will become aware of it; correct?

4        A.    Correct.

5        Q.    Okay.  So back in -- prior to February of

6    2013, you were aware of the risk of deputies

7    possibly not documenting all of their activities on

8    their daily activity logs?

9        A.    I think that's a stretch.  I don't -- I

10   don't think -- I don't think that something is going

11   to happen.  I take care of it when it does happen.

12   But we have all sorts of monitoring things in place.

13   We have sergeants that -- they go to calls.  They go

14   on traffic stops.  We have the officers make daily

15   reports.  We put in an in-car video system.  We

16   didn't have to do that.  We are now doing audits.

17   We didn't have to do that.

18       Q.    So it's your testimony, sitting here

19   today, that you believe prior to February of 2013

20   you had no reason to believe that there were any

21   loopholes where a deputy would not document all of

22   his or her activity on a daily activity log?

23       A.    Well, any -- any loopholes that I ever

24   became aware of, we -- we crossed those out.  And,

25   specifically, that's why we went with CALEA, is to

DUNNING - Redirect (By Ms. Tsai)                    67

1   fill that gap.  And we do a constant review of

2   policies and procedures to fill -- fill -- fill gaps

3   or update as technology and law changes.

4        Q.   When was the last time that this

5   disciplinary system policy was reviewed?

6        A.   Annually.  All policies and procedures

7   are -- are reviewed annually.

8        Q.   And what is that process of review?

9        A.   You would have to ask Rob Sofie.  He's

10  the -- he's in charge of that; so I don't know what

11  his frequency is.

12       Q.   You're not involved in the review of

13  revisions of policy?

14       A.   I would, if there was going to be -- he

15  might -- he might suggest that we do something.  He

16  might suggest that we make a revisal, maybe, because

17  of some new -- some new best practice, or if -- if

18  he's heard of a loophole that occurred in some other

19  agency.  We belong to a couple of pacts of -- for

20  CALEA, a "pact" being a number of agencies that

21  belong to a group, and they discuss this stuff all

22  the time.

23       Q.   I see.

24            And are you involved in these

25  conversations?

DUNNING - Recross (By Mr. Dolan)                        68

1      A.   I will when he -- when he finds that stuff

2  out, yeah, or if I hear something from conferences

3  that I go to.

4      Q.   Prior to February of 2013, you were aware

5  of your employees -- inherently, by being law

6  enforcement officers, that there is a potential for

7  them to abuse their authority; correct?

8      A.   I -- I know that there is a potential that

9  they may abuse their authority, yes.

10     Q.   Okay.  And prior to February of 2013, you

11 were aware that there is a potential for your sworn

12 officers to not follow policies to -- in terms of

13 turning on the emergency light?

14     A.   Anything is a possibility.

15     Q.   Okay.

16     A.   Thunderstorms, rain.

17          MS. TSAI:  Right.  Okay.  I have no

18 further questions.

19          MR. DOLAN:  Brief recross.

20               RECROSS-EXAMINATION

21 BY MR. DOLAN:

22     Q.   Were you aware of your -- or did you ever

23 draw the conclusion that your employees' potential

24 to abuse their authority might result in one of them

25 using the threat of arrest to force a young woman to

DUNNING - Recross (By Mr. Dolan)                    69

1    disrobe and then perform a sex act upon that deputy?

2         A.   No.

3         Q.   Were you aware that -- or, I guess, did --

4    did your awareness of your sworn deputies' failure

5    to follow policies in terms of activating their

6    lights lead you to conclude that one of those

7    deputies would eventually use the threat of arrest

8    to force a young woman to disrobe and then perform a

9    sex act upon that deputy?

10        A.   No.

11        Q.   Same with accurately documenting

12   activities on daily activity logs.  Did you ever

13   link possible failure to accurately document

14   activities on daily activity logs with the risk that

15   one of your deputies was going to go out into the

16   field, use the threat of arrest, and pressure a

17   young woman into disrobing and then performing a sex

18   act upon that deputy?

19        A.   No.

20        Q.   No further questions.

21             Oh, actually, wait.  I do have one -- one

22   further question.

23             Is the code of conduct one of those

24   exhibits?

25                  MS. BOTHE:  It was marked as an

DUNNING - Recross (By Mr. Dolan)                    70

1    exhibit yesterday.

2                  MS. TSAI:  Exhibit 113.  Yeah.

3    BY MR. DOLAN:

4        Q.   If you could look at Exhibit 113 next --

5    and kind of put it side by side with Exhibit 117.

6        A.   Okay.

7        Q.   Specifically I'm looking at page 3 of the

8    rules of conduct on the -- I'm sorry.

9                  On Exhibit 113, the code of conduct that

10   was in effect in 2012, page 3 starts listing rules

11   of conduct.  Do you see those?

12       A.   Yes.

13       Q.   Can you compare the rules of conduct

14   listed beginning on page 3 of Exhibit 113 with the

15   various offenses listed beginning on page 6 of

16   Exhibit No. 117?

17       A.   Abuse of authority is there.  Abuse of

18   identity.  It would -- we probably folded that into

19   abuse of authority.  Abuse of process is there.

20   Accountability is there.  Address and telephone is

21   there.  Business cards are there.  Civil actions are

22   there.  Conduct and breach of the law is there.

23   Conduct towards fellow members is there.

24       Q.   I'm going to interrupt you for just a

25   quick moment.

```
      DUNNING - Further Redirect (By Ms. Tsai)        71
 1             As you've said -- you've listed an offense
 2   off of exhibit -- that's listed in page 100 -- or
 3   Exhibit No. 117.
 4        A.   Yes.
 5        Q.   And then you've said it out loud and then
 6   said, "It's there."  When you say, "It's there," are
 7   you referring to the exhibit that is the code of
 8   conduct, No. 113?
 9        A.   Yes.
10        Q.   Okay.  So, I guess, kind of skipping to my
11   ultimate question here, does it appear as though the
12   offenses listed in Exhibit No. 117 were drawn, at
13   least in part, from the sheriff's office code of
14   conduct?
15        A.   Yes.
16             MR. DOLAN:  Okay.  That's it for my
17   questions.  Thank you.
18             FURTHER REDIRECT EXAMINATION
19   BY MS. TSAI:
20        Q.   The general order on the code of conduct
21   that's Exhibit 113 that was updated in 2012, do you
22   know whether -- if the code of conduct general order
23   that was in effect in 2007 included under "Rules of
24   Conduct," Section E, the abuse of identity?
25        A.   You would have to ask Rob Sofie on that.
```

DUNNING - Further Redirect (By Ms. Tsai)          72

1    I wouldn't have that.

2        Q.   Would you agree with me that if -- as

3    you -- as the department is updating the code of

4    conduct general order, that they should revisit the

5    matrix to ensure that they are parallel?

6        A.   He -- if so, he would have done that.  I

7    wouldn't have had a hand in that.

8        Q.   Okay.  As the sheriff of the department,

9    do you agree with me that that would be a good

10   practice?

11       A.   Yes.

12              MS. TSAI:  Okay.  That's all I have.

13              MR. DOLAN:  Sheriff Dunning was the

14   produced witness for Point No. II.  We do have

15   Mr. -- we do have Mr. Galvan.  Mr. Galvan can pick

16   up with some of the finer details as Mr. -- as

17   Lieutenant Martin testified to regarding Point

18   No. VIII.

19              MS. TSAI:  Right.

20              MR. DOLAN:  And I believe he's also

21   able to testify to Points III, IV, and V.

22              MS. TSAI:  Okay.  Okay.

23              MR. DOLAN:  Would you -- again, same

24   advice as yesterday.  You have the right to read and

25   sign.

                                                                    73

1                    THE WITNESS:  Yes.  I would like to.

2                         (2:04 p.m. - Adjournment.)

3                    ** ** ** **

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

74

1              C E R T I F I C A T E

2    STATE OF NEBRASKA      )
                            ) ss.
3    COUNTY OF DOUGLAS      )

4            I, Morgan M. Catania, RPR, CSR(IA),

5    General Notary Public within and for the State of

6    Nebraska, do hereby certify that the foregoing

7    testimony of Timothy Dunning was taken by me in

8    shorthand and thereafter reduced to typewriting by

9    use of Computer-Aided Transcription, and the

10   foregoing seventy-three (73) pages contain a full,

11   true and correct transcription of all the testimony

12   of said witness, to the best of my ability;

13           That I am not a kin or in any way

14   associated with any of the parties to said cause of

15   action, or their counsel, and that I am not

16   interested in the event thereof.

17           IN WITNESS WHEREOF, I hereunto affix my

18   signature and seal this 13th day of February, 2017.

19

20                       _____
                         MORGAN M. CATANIA, RPR
21                       GENERAL NOTARY PUBLIC

22   My Commission Expires:

23

24

25

| GENERAL ORDER | DATE 10/08/2008 | GO-27-2008 |
|---|---|---|

**DOUGLAS COUNTY SHERIFF'S OFFICE**
OMAHA * NEBRASKA
**TIMOTHY DUNNING SHERIFF**

CHAPTER TITLE:

CALEA STANDARD:
**52.1-52.2**

RE-EVALUATE:

APPROVED: *Timothy F. Dunning*

SUBJECT:
**ADMINISTRATIVE INVESTIGATION OF COMPLAINTS 2008**

AUTHOR
**RT**

Superseded by GO-14-2013 on 8/14/2013.
This Directive supersedes GO 30-2005.

## I. PURPOSE

The Douglas County Sheriffs Office (DCSO) is committed to providing citizens and employees with a fair and effective avenue for redress of their legitimate complaints against employees of the DCSO and to protecting employees from false charges of misconduct or wrongdoing. The DCSO seeks to maintain its integrity and that of its employees.

## II. POLICY

A. The DCSO will impose appropriate disciplinary action, or remove from employment, any employee who violates the policy and procedures of this Office or proves to be unfit for service. The DCSO will also dismiss unjustified allegations against its employees and may seek prosecution of those who file false reports.

B. The DCSO will accept all complaints of employee misconduct or wrongdoing from any citizen or office employee. Following a thorough and impartial review of the factual information, a determination will be reached on whether to proceed with a formal investigation. All findings, including the validity of the complaint, will be reported to the Sheriff. (52.2.2)

## III. PROCEDURE

A. **Source of Complaint** - All complaints, including anonymous, against the DCSO or its employees will be accepted from any source and investigated.

1. The complaint, if made by a private citizen, will generally be made in person to a Bureau Captain or an assigned Command Officer. The citizen will be requested to sign and attest a *Citizen Complaint Form (ASF 134, 2005)* specifying the alleged misconduct of the

employee. The Sheriff or Chief Deputy Sheriff will review the complaint. The complaint will be categorized accordingly by the severity of the alleged misconduct. (52.1.1)

a) **Private citizen,** for the purpose of the complaint procedure, is defined as any person not employed by the DCSO or under the direction of the Douglas County Sheriff.

b) **A complaint** is defined as a written report (*using ASF 134, 2005*) alleging misconduct by an employee of the DCSO, and/or any expression of dissatisfaction regarding Sheriff's policy and procedure.

2. **Unusual circumstances** may necessitate that a complaint be taken over the telephone (i.e. complainant located in another state). In these situations a Command Officer will either complete the form and process it through the normal channels or make arrangements to have the form sent to the complaining party.

a) The complainant may take the form and return it at a later date.

b) **If the complainant is a minor** or the individual is physically unable (i.e. incapacitated) to file a complaint, a third party may file the complaint on behalf of the minor.

c) **A third party** witnessing alleged misconduct or who otherwise wishes to file a complaint may complete a *Citizen Complaint Form*.
   (1) The alleged victim will be contacted as soon as possible.
   (2) Generally, an investigation will only proceed when the alleged victim agrees to participate or assist in the investigation. However, the Sheriff may initiate an investigation on his own accord.

3. A complaint, if made by an employee, will be documented on an *Internal Affairs Information Report (ASF 149C)* and submitted to the employee's Bureau Captain. After an initial review of the complaint, the Bureau Captain will

000344

115

| GENERAL ORDER | DATE 10/8/2008 | GO-27-2008 |
|---|---|---|

forward the report to the Chief Deputy for a determination of action.

a) Should the Bureau Captain be the subject of the complaint, the report will be submitted directly to the Chief Deputy for review.
b) Should a member of the Office of Professional Standards be the subject of the complaint, the report will be submitted directly to the Sheriff for review.

4. The investigation of anonymous complaints will necessarily be limited, typically based upon the severity of the allegation and the reasonable ability to confirm information. (52.1.1)

B. **Category of Complaints**

1. Complaints will be generally categorized as either Class I or Class II complaints:

a) **Class I complaints** are considered minor infractions and include allegations of the following, but are not limited to:
   (1) Discourtesy
   (2) Minor procedural violations
   (3) Minor conduct difficulties
b) **Class II complaints** are more serious and include allegations of the following, but are not limited to:
   (1) Excessive force
   (2) Abuse of authority
   (3) Harassment
   (4) Discrimination
   (5) Civil rights violations
   (6) Serious or criminal misconduct
   (7) Commission of a criminal offense

2. Class I complaints may be investigated by the subject employee's line Supervisor (52.2.1a).

3. Class II complaints will be investigated by the Office of Professional Standards (52.2.1.b).

4. All complaints may be investigated by the Office of Professional Standards at the discretion of the Sheriff.

5. In addition to the procedures outlined in this directive, all complaints will be investigated according to the rules of the Civil Service/ Sheriff's Merit Commission, Bargaining Unit Contract, laws of the State of Nebraska, and Federal Law.

C. **Reporting Authority**

1. The current organizational structure requires that the Office of Professional Standards report directly to and receive case assignments from

the Chief Deputy Sheriff. The Office of Professional Standards also has the authority to report directly to the Sheriff on all internal investigation matters. (52.1.3)

2. The Sheriff and Chief Deputy Sheriff will be contacted immediately, or as soon as circumstances allow, upon receipt of any alleged Class II complaint. Notification should be made through the chain of command unless circumstances dictate otherwise (52.2.2).

3. The Sheriff and Chief Deputy need not be immediately notified regarding the receipt of any Class I complaint. The subject employee's Captain will make notification at the convenience of the Sheriff.

D. **Limitations on Complaint Investigations**

1. The DCSO will not solicit any written citizens' complaints against any employee; solicitation will not be construed to mean any follow-up of the first party complaint.

2. The DCSO will accept a complaint from any citizen. When making a determination of how/to what extent to proceed with an investigation, the Sheriff or Chief Deputy will evaluate:

a) The source of the complaint
b) The severity of the allegation
c) The time elapsed since the alleged complaint occurred, and
d) Any other aggravating or mitigating circumstances surrounding the complaint **Fairness to both the complainant and employee is of primary concern and will serve as a guiding principal during the evaluation of the complaint.**

3. Investigation of Class I complaints will be completed within 10 working days after the assignment of the complaint. (52.2.3)

4. Investigation of Class II complaints will be completed within 30 working days after the assignment of the complaint. (52.2.3)

5. If the investigation is not completed within the prescribed time limit, the Sheriff or Chief Deputy Sheriff may grant an extension. (52.2.3)

a) The investigating Deputy may request an extension, in writing, stating the reason(s) for prolonging the investigation.
b) If the extension is granted, both the complainant and the employee will be notified and given a status report.

000345

| GENERAL ORDER | DATE 10/8/2008 | GO-27-2008 |
|---|---|---|

(1) The status report will not provide interim determinations.
(2) The notification will merely state that the investigation continues and that the complainant and the employee will be contacted upon completion.

c) The extension request and response will be maintained in the case file.

6. The limitations listed above will not affect management rights or the discretion of the Sheriff to investigate internal complaints or act upon his/her own initiative. The listed limitations on the investigation of complaints apply exclusively to complaints received from the public (52.2.3).

### E. Complainant Status Report

1. Upon assignment of a complaint, the Office of Professional Standards will send a letter to the complainant acknowledging receipt of the complaint.

a) A copy of the complaint will be furnished to the complainant.
b) The complainant will be asked to sign a *Citizen Complaint Receipt (ASF 134A 2005)*, which includes an attached explanation of the general investigative process. This will verify that the complaint was received for processing. (52.2.4a)
c) The complainant will also be furnished with a *Citizen Complaint FAQ brochure (ASF-134B 2004)*.

2. Complainants will receive periodic status reports in the event the investigation extends beyond the required time limit.

a) Status reports will be mailed to the complainant every 30 days after the initial notification of extension.
b) A copy of this report will also be given to the subject employee(s).
c) The status report will not provide any preliminary conclusions, but simply inform the complainant that the investigation is continuing. (52.2.4b)

3. Upon conclusion of the investigation, the complainant will be notified, in writing, and informed of the results of the inquiry. (52.2.4c)

a) The notification will occur within ten working days after the conclusion of the investigation.
b) The letter will be sent by the Sheriff or his designee.

4. All letters of correspondence to the complainant will be sent via certified mail, return receipt requested. Copies of all correspondence will be maintained in the case file, as will all original certified mail documentation. (52.2.4)

### F. Employees Rights and Responsibilities

1. Upon assignment of a citizen complaint, the Office of Professional Standards will notify the employee's Bureau Captain or Supervisor that an internal investigation involving the subject employee has been initiated. The notification will be made by *Inter-Bureau Communication (ASF 118)* and include: (52.2.5)

a) The type of complaint (Citizen, Internal, etc.)
b) Name of the employee
c) Internal Affairs report number
d) Allegation(s)
e) Name of complainant (if available), and
f) Location and date of occurrence

2. If a private citizen brings forth the complaint, a copy of the *Citizen Complaint Form* will be attached to the notification. The subject employee will endorse the notification. The employee's Bureau Captain or designee will witness the signature.

3. If an employee brings forth the complaint, the *Internal Affairs Information* report detailing the complaint will not accompany the notification. The notification will be made by *Inter-Bureau Communication* and include:
a) The type of complaint
b) Name of the subject employee
c) Internal Affairs report number
d) Allegation(s), and
e) Location and date of occurrence

4. The subject employee's Bureau Captain or designee will return the original notification (after the appropriate endorsements) to the Office of Professional Standards in a sealed envelope.
a) The subject employee may retain a copy of the notification.
b) If applicable, the subject employee may retain a copy of the *Citizen Complaint Form*.

5. At the time of the notification, or as soon as possible thereafter, the investigating Deputy will arrange, using official DCSO letterhead correspondence, for an interview with the subject employee within ten working days, but not within the first 24 hours after notification. The 24 hour time period may be waived if the

| GENERAL ORDER | DATE 10/8/2008 | GO-27-2008 |
|---|---|---|

complaint alleges intoxication or drug incapacitation during "on duty" status.

6. The official letter requesting an interview will include: (52.2.5)
   a) A brief explanation of the allegation(s); and,
   b) Information that the subject employee is entitled to protections afforded by the *Police Officers Bill of Rights*, and that they may have union representation or legal counsel present during the interview.
   c) It is the subject employee's responsibility to arrange for representation.

G. **Evidence Collection**

1. Upon the order of the Sheriff or the Sheriff's designee, an employee under internal investigation will submit to:

   a) Any medical or laboratory examination (52.2.6a)
   b) Ballistics test
   c) Chemical, or other test
   d) Photographs, and (52.2.6b)
   e) Lineups (52.2.6c)

2. All procedures associated with such tests, photos or lineups will be specifically directed and narrowly related to the particular internal investigation being conducted by the Department.

3. Upon the order of the Sheriff or the Sheriff's designee, employees will submit to a polygraph examination.

   a) The examination must be specifically directed and narrowly related to a particular internal investigation being conducted by the Department.
   b) Whenever a complaint from a citizen is the basis for the investigation, the matter is non-criminal, and no corroborating information has been discovered, an employee will not be required to submit to a polygraph examination unless the citizen also submits to a polygraph examination that is specifically directed and narrowly related to the complaint. (52.2.6e)
   c) Failure to submit to a polygraph examination may result in disciplinary action up to and including dismissal.

4. Financial records or disclosure statements may be required only with a search warrant or subpoena. (52.2.6d)

H. **Employee Relieved of Duty**

2. A Supervisor who becomes aware of a violation of the Department's written directives is responsible for initiating disciplinary action. Failure to do so may result in disciplinary action up to and including dismissal.

3. All Supervisors have the authority to discipline subordinates verbally or in writing. Supervisors are empowered to immediately relieve from duty with pay any subordinate who commits a violation necessitating immediate suspension or who is physically or emotionally unable to discharge his/her duties. (52.2.7)

4. An employee who refuses to make a written or verbal statement to a Supervisor or refuses to prepare a required report will not be disciplined for such refusal, provided that the employee asserts and reasonably believes that he/she will be implicated in a criminal act.

   a) Should an employee refuse in such matters, the Supervisor will provide the employee with an administrative warning, per *Garrity*, which guarantees the employee's constitutional protection.
   b) Any employee who refuses to make a statement to a Supervisor or prepare a required report after being informed of the administrative warning may be subject to discipline up to and including dismissal.

5. When required to complete an *Internal Affairs Information* report regarding an investigation that, in the judgment of the employee, could result in a criminal inquiry, an employee may complete a statement explaining that the statement is being given at the direction of a Supervisor.

6. In the event that a Supervisor relieves one of his/her subordinates from duty, the Supervisor will immediately contact his/her Command Officer. The Supervisor will complete an *Internal Affairs Information* report documenting the reason(s) for the action.

7. The authority to suspend without pay, demote, or discharge is vested solely in the Sheriff.

8. The Sheriff will make all final departmental decisions in any case necessitating disciplinary action.

000347

| GENERAL ORDER | DATE 10/8/2008 | GO-27-2008 |
|---|---|---|

I. **Recommendations of Conclusions** - The Office of Professional Standards will complete an investigative report summarizing individual interviews, reports supporting evidence, and records. The investigative report will include a detailed analysis and a conclusion recommending one of the following dispositions:

1. **Sustained**: The investigation supported the conclusion that the employee engaged in the alleged conduct and violated Department directives by doing so.

2. **Sustained on Policy**: The investigation disclosed a lapse in the Department's Standard Operation Procedure rather than misconduct by the employee.

3. **Not Sustained**: The investigation did not prove or disprove the alleged conduct.

4. **Unfounded**: The investigation supported the conclusion that the employee did not engage in the alleged misconduct and did not violate a written directive.

5. **Exonerated**: The investigation supported the conclusion that the incident did occur, but the actions were legal, proper and reasonable.

6. When the employee's Supervisor has been assigned to investigate a complaint, the Supervisor will report his/her findings (including any action taken) on an *Internal Affairs Information* report attaching all related documentation to the report, and forward the information to the Chief Deputy for review. Refer to Section N for further information.

J. **Report Conclusions/Conclusion of Fact**

1. A 'Conclusion of Fact' will be prepared upon investigative conclusion of each allegation of misconduct. (52.2.8)

2. The Office of Professional Standards will make no recommendations regarding discipline of any member of the classified service.

3. The investigative report will be forwarded to the Chief Deputy Sheriff, who may approve the disposition, recommend a different judgment, or prescribe additional investigation.

4. The complainant will be notified of the final disposition by letter.

5. The subject employee will be notified of the disposition by written correspondence within ten days of the investigation's conclusion. The employee's Bureau Captain or Supervisor will also be notified of the disposition.

6. Any disciplinary action resulting from the investigative findings will be accomplished according to the rules of Civil Service, the Sheriff's Merit Commission, Bargaining Unit Contracts, and State and Federal Law.

7. If the investigative conclusions determine a lapse in DCSO Standard Operating Procedure or training, the Office of Professional Standards may make recommendations regarding policy, procedure, or the modification/expansion of employee training. The recommendations will be included in the investigative report. (52.2.8)

K. **Records Management**

1. The DCSO will maintain a record of all complaints against the agency or employees. The complaints and Internal Affairs files will be securely maintained in the office of the Sheriff's Administrative Coordinator.

2. The Office of Professional Standards will maintain any complaint pending or undergoing investigation in a secure file cabinet.

   a) When unattended, the Office of Professional Standards will be locked and all investigative files secured.
   b) All computerized files will be assigned a password known only to the investigator. Computers will not be left unattended with open sensitive documents.
   c) All evidence, cassette tapes and videotapes related to investigations will be secured when not in use. (52.1.2)

3. Internal Affairs files, records, and investigative reports are for the internal administrative purposes of the Department and will not be released, or maintained outside the Department, including to the news/press media or for any public disclosure request.

4. Access to Internal Affairs files within the Department will be restricted to those individuals with a need to know the content of the files. The Sheriff must approve access. This paragraph does not pertain to Internal Affairs reports that are completed for purposes other than internal investigation.

000348

| **GENERAL ORDER** | DATE **10/8/2008** | **GO-27-2008** |
|---|---|---|

5. Upon completion of an investigation, the employee involved may obtain a copy of his/her statements/transcripts, or have a right of access to the tape-recorded interview according to the rights stated within labor agreements.

6. The County Attorney-Civil Division will be contacted regarding any court order for the release of Internal Affairs information.

L. **Annual/Quarterly Statistical Summaries and Analyses**

1. The Office of Professional Standards will provide a detailed annual analysis will also be provided to the Sheriff, which identifies any trends or patterns that may indicate department training needs, equipment upgrades, or policy modifications. (52.1.5)

2. The Office of Professional Standards will provide the Sheriff a summary report each quarter listing each administrative investigation and the corresponding complaint, status and disposition. The report may include any suggested training needs, equipment upgrades, or policy modifications. (52.2.2)

M. **Informing the Public** - The DCSO will post the procedures for registering a formal complaint against an employee of the Sheriff's Office on the DCSO Internet web-site, the Douglas County City/County Building, Douglas County Court House, 1616 Leavenwoth, and other places as directed by the Sheriff. (52.1.4)

N. **Bureau/Division Administrative Investigations**

1. In the event that a citizen complaint, an employee complaint, or any other type of administrative investigation, including Supervisor initiated queries related to minor rules violations, is assigned for investigation to a member of the Command Staff/Administration other than the Office of Professional Standards:

   a) The subject employee will be notified in writing of the investigation and the specific allegation or rule violation;

   b) The subject employee may be required to complete an Internal Affairs Information report responding to the complaint / allegation(s) prior to an interview.

c) If required, subject employee interviews will be tape-recorded. The subject employee will be allowed union representation during the interview.

d) Upon completion of the investigation, the investigating Supervisor will contact the Office of Professional Standards and provide the IA number (if assigned), the complaint / allegation(s), and a disposition as listed under Section I of this order.

2. The Office of Professional Standards will include Bureau/Division administrative investigation information in annual and quarterly reports.

ADMINISTRATIVE INVESTIGATIONS OF COMPLAINTS 2008

000349