IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

MEGAN MCGUIRE,

                    Plaintiff,

      v.

CORY COOPER, TIMOTHY F. DUNNING,
Individually and in his official capacity as
Sheriff of Douglas County, Nebraska; and
DOUGLAS COUNTY,

                 Defendants.

**8:16CV4**

**MEMORANDUM AND ORDER**

This matter is before the court on the defendants' motions for summary judgment, Filing No. 120 and Filing No. 121.  This is an action for constitutional tort claims brought pursuant to 42 U.S.C. § 1983.  The plaintiff alleges she was sexually assaulted by Cory Cooper ("Cooper"), an employee of the Douglas County Sheriff's Office acting under the color of the law.[1]

I.     BACKGROUND

 On February 10, 2013, Megan McGuire ("McGuire") and her boyfriend, Kyle Worland ("Worland") spent part of their evening in Worland's parked truck at Zorinsky Lake Park in Omaha, Nebraska.  They entered the park during public hours between 5 a.m. and 11 p.m.  Around 8 p.m. Cooper, an on-duty Deputy officer for Douglas County, arrived at the scene without warning; he did not flash his lights, sound his sirens, or issue a command.  Cooper approached the passenger side of the truck, alleging he smelled

---

[1] The Douglas County attorney's office filed criminal charges against Cory Cooper on behalf of the State of Nebraska.  Cooper pleaded no contest and was found guilty of third degree assault and attempted tampering with physical evidence, both of which are class I misdemeanors.  Cooper then served six months in jail.

marijuana.  Cooper Deposition ("Cooper Dep."), Filing No. 125-2.   After Cooper approached the truck, he shone his flashlight on the center console onto a mason jar of marijuana.  He then asked for the jar and for McGuire to step out of the car, leaving Worland in the driver's seat.  He proceeded to walk McGuire back to his cruiser, placing the jar on top of his cruiser.  Cooper ran McGuire's and Worland's information in the police database.  At this point, Cooper did not call for backup, which was inconsistent with the Douglas County Sheriff's Office ("DCSO") training. Cooper Dep., Filing No. 125-2, Ex.2, 256:4-13.  Furthermore, he also did not conduct questioning in front of the cruiser with the camera rolling or turn his microphone pack on.  Cooper Dep., Filing No. 125-2, Ex. 2. 271:17-23.

After Cooper ascertained information about McGuire and Worland he retrieved Worland from the front seat of his truck and placed him next to McGuire in the back of his cruiser.  At this point, the marijuana jar had blown off the cruiser's roof.  Cooper proceeded to search Worland's truck and found drug paraphernalia.  After the search, Cooper took Worland out of the cruiser and back to his truck where he spoke to Worland out of McGuire's earshot.  Cooper then returned to his cruiser and informed McGuire that he had "found stuff" or something to that extent, and that Worland could go to jail if Cooper reported the incident.  Instead of reporting the incident, Cooper began peppering McGuire with questions about how she could keep her boyfriend out of jail.  Simultaneously, Worland began walking toward the lake away from the cruiser, intending to discard the paraphernalia into the lake at Cooper's suggestion.

Once Worland threw the drug paraphernalia into the lake, Cooper no longer had a reason to keep either Worland or McGuire in custody.  Cooper asked McGuire again what

she would do to keep her boyfriend out of jail.  McGuire was confused and scared by this line of questioning, which she found unusual for a police officer.  He continued to batter her with questions, asking her to "think of something" she could do to keep Worland out of trouble. McGuire Deposition ("McGuire Dep."), Filing No. 130-4, Ex. 7, 104:17-21.  McGuire was visibly distressed at Cooper's questions and began to cry.

Cooper continued to press McGuire, asking what she would do. Eventually, after nearly an hour McGuire asked Cooper if he wanted her to undress.  He allegedly replied I am not going to say "no" or something to that effect.  McGuire removed her shirt and bra. Cooper stared at her through his review mirror.  He then got out of the front seat, walked to McGuire's passenger side door, and reportedly unzipped his pants and asked McGuire what else she would do.  McGuire performed oral sex on Cooper for five seconds.[2]  He let her go and as she ran back to her boyfriend's truck he yelled, "this never happened," or something similar.  McGuire was hysterical but did not reveal what occurred until a few days later to her father.

McGuire reported the sexual assault to the Omaha Police Department ("OPD") on February 14, 2013.  OPD then contacted the DCSO around one week later, explaining it was investigating an incident involving the sexual assault in Lake Zorinsky Park by someone who claimed to be a law enforcement officer.  DSCO did not engage in its own investigation; it did not investigate any DCSO Deputy's cruiser recordings, Daily Activity Reports, vehicle location information, or information regarding persons whose names had been checked by Deputies, allegedly for cautionary purposes.  Meanwhile, Cooper

---

[2] Although Cooper maintains he is not guilty, he pleaded no contest and was found guilty of third degree assault and attempted tampering with physical evidence, both of which are class I misdemeanors.

3

continued to work for DCSO.  It was not until April 1, 2013, that attention was drawn to Cooper after a fellow Deputy reported that Cooper had a suspicious interaction with a woman with an arrest warrant whom he asked to meet at a secluded park at 9:00 p.m. DCSO then placed Cooper on limited duty status on April 4, 2013. DCSO began an administrative investigation and discovered that Cooper had run a computerized record check on both Worland and McGuire and that the GPS in his cruiser placed him at Lake Zorinsky Park on February 10, 2013, at the time of the alleged assault.

On May 13, 2013, DCSO fired Cooper.  Timothy Dunning ("Dunning") the Sheriff of Douglas County approved the Nebraska Crime Commission's revocation of Cooper's law enforcement certification.  On June 10, 2013, Cooper was charged with first degree sexual assault and attempted tampering with evidence.   In mid-April 2014, Cooper pleaded no contest and was found guilty of third degree assault and attempted tampering with evidence.

At the time of this incident DCSO concluded that it did not need a policy of reviewing employees' behavior to determine if some employees were at risk for sexual misconduct.  Dunning Brief, Filing No. 124.  DCSO also did not have a comprehensive policy which specifically addressed sexual misconduct toward members of the public, though it did have a sexual harassment policy.  The DCSO also has a citizen complaint process where citizens can submit complaints for review.  Since Dunning's appointment as Sheriff in 1995, he has been aware of at least fifteen complaints of sexual misconduct.[3]

---

[3]Complaint I in 1998 concerned a Deputy trading cigarettes for a detainees' display of her breasts; Complaint II in 2002 concerned a Deputy who licked his juvenile step-daughter's nipple while horse playing; Complaint III concerned the same deputy as Complaint II who took a juvenile detainee to his apartment and threatened her; Complaint IV in 2006 concerned a female driver who was stopped on Interstate 80 by a Deputy and asked deeply personal and inappropriate questions; Complaint V in 2007 concerned another female driver on Interstate 80 who was asked personal and inappropriate questions; Complaint VI in 2007 concerned a Deputy working in his secondary employment position as a security officer at UNMC who

Filing No. 134, page 20-22; Filing No. 131, page 77.  In each case Dunning made the decision whether to take further action or to investigate the claims.  Most of the claims were investigated.  Accordingly, Dunning was aware of each sexual misconduct complaint filed with the DCSO.

On January 8, 2016, McGuire filed a claim to redress the deprivation of her constitutional rights alleging three counts against each Defendant:  Cooper, Dunning, and Douglas County Municipality, pursuant to 42 U.S.C. § 1983.  Filing No. 1.  For each count McGuire alleges the misconduct undertaken by Cooper was within the scope of his employment and under color of law such that his employer, Douglas County, is liable.  The first count alleges a fourth amendment violation to be free from unreasonable search and seizure; the second count alleges an Equal Protection Clause violation motivated by gender animus that constituted purposeful discrimination; and the third count alleges a Due Process Clause violation that deprived McGuire of her liberty and was so malfeasant as to shock the conscience.   McGuire seeks compensatory damages against each defendant; punitive damages against Cooper in his individual capacity; and attorney's fees. Each Defendant then filed a motion to dismiss, which this court denied. Filing No.

---

allegedly took photos of a young female patient, made inappropriate comments to female staff, and used crude nicknames for female staff members and was subsequently terminated by UNMC; Complaint VII in 2008 concerned a building security officer who verbally sexually harassed a female; Complaint VIII in 2008 concerned a different building security officer who attempted to kiss a woman in an elevator; Complaint IX in 2008 concerned a Deputy who was transporting three female inmates who played inappropriate music and brushed his hand against one of the women's breast; Complaint X in 2010 concerned the same building security officer as in Complaint VI and occurred when the building security officer called to inquire about a fire alarm that had gone off at her place of employment and he asked her on a date; Complaint XI in 2011 concerned a complaint regarding a DCSO supervisor's actions in his romantic relationships, including having sex at the office and abusing his work hours to conduct personal business; Complaint XII in 2012 concerned a school resource officer's sexual remarks to a student about her mother at her school; Complaint XIII in 2015 concerned a deputy working security at the courthouse who sexually harassed a female court employee by remarking her bra strap was exposed and inquiring if her underwear matched; Complaint XIV in 2015 concerned a school resource officer who sexually harassed a teacher; and Complaint XV in 2015 concerned the same school resource officer as in complaint XIV who asked a female student questions about her parents work schedule that made her uncomfortable.

19; Filing No. 26; Filing No. 28.   Subsequently, Douglas County and Sheriff Timothy Dunning filed motions for summary judgment.  Filing No. 120; Filing No. 121.

II.   STANDARD OF REVIEW

A.   Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  "Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  *Crozier v. Wint*, 736 F.3d 1134, 1136 (8th Cir. 2013).  Summary Judgment is not disfavored and is designed for every action.  *Briscoe v. Cty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012).  In reviewing a motion for summary judgment, the court will view "all evidence and mak[e] all reasonable inferences in the light most favorable to the nonmoving party."  *Inechien v. Nichols Aluminum, LLC*, 728 F.3d 816, 819 (8th Cir. 2013).  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts.  *Id.*; *see Briscoe*, 690 F.3d at 1011 (stating that the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial).

Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

6

(1986). Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011); *see Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (stating "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

B. Qualified Immunity

Courts conduct a two-part inquiry to determine whether qualified immunity protects a government official from liability: 1) whether the facts taken in a light most favorable to the non-moving party make out a violation of a constitutional right; and (2) whether that right was clearly established at the time of the alleged violation. *Hoyland v. McMenomy*, 869 F.3d 644, 652 (8th Cir. 2017). The court has discretion in deciding which part of the inquiry to address first. *Id.* "'The determination of whether an officer is entitled to qualified immunity requires consideration of the "objective legal reasonableness" of the officer's

7

conduct in light of the information he possessed at the time of the alleged violation.'" *Id.* (quoting *Winters v. Adams*, 254 F.3d 758, 766 (8th Cir. 2001). "'[I]n the light of pre-existing law,' the unlawfulness of the officer's conduct 'must be apparent.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "To determine whether a given officer falls into either of those two categories, a court must ask whether it would have been clear to a reasonable officer that the alleged conduct 'was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 205 (2001). "If so, then the defendant officer must have been either incompetent or else a knowing violator of the law, and thus not entitled to qualified immunity." *Id.* "If not, however—i.e., if a reasonable officer might not have known for certain that the conduct was unlawful— then the officer is immune from liability." *Id.*

Also, liability under § 1983 is personal. *White v. Jackson*, 865 F.3d 1064, 1080 (8th Cir. 2017); *see Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005) (en banc). "[V]icarious liability is inapplicable to …. § 1983 suits[.]" *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). "[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation. *White*, 865 F.3d at 1081. *See Madewell v. Roberts*, 909 F.2d 1203, 1208 ("Liability under § 1983 requires a causal link to, and direct responsibility for, the deprivation of rights."). "Thus, '[t]he doctrine of qualified immunity requires an individualized analysis of *each* officer's alleged conduct.'" *S.M. v. Krigbaum*,

808 F.3d 335, 340 (8th Cir. 2015) (emphasis in original) (quoting *Walton v. Dawson*, 752 F.3d 1109, 1125 (8th Cir. 2014)).

    C.    4th Amendment

It was clearly established at the time of the incident at issue that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment. *Hoyland*, 869 F.3d at 652. "If the complaint is that a form of legal process resulted in pretrial detention unsupported by probable cause, then the right allegedly infringed lies in the Fourth Amendment." *Manuel v. City of Joliet, Ill.*, — U.S. —, —, 137 S. Ct. 911, 919 (2017) (stating that if a plaintiff was initially arrested without probable cause, he can bring a claim for wrongful arrest under the Fourth Amendment, as well as a claim for wrongful detention—because any subsequent time in custody is also unsupported by probable cause and also constitutionally unreasonable.) "'A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least arguable probable cause.'" *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017) (quoting *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1008–09 (8th Cir. 2017) (internal quotation marks omitted)). "Probable cause exists when the totality of facts known at the time of the arrest would justify a reasonable person in believing that the individual has committed or is committing an offense." *Id.* Probable cause exists when, in light of the circumstances at the time of arrest, a law enforcement officer has "trustworthy" information that would cause a reasonable person to believe that the suspect committed or was committing a crime. *United States v. Luke*, 686 F.3d 600, 605 (8th Cir. 2012). Arguable probable cause "is a mistaken but objectively reasonable

belief the suspect committed a criminal offense.'" *Dowell v. Lincoln Cnty.*, 762 F.3d 770, 777 (8th Cir. 2014).

A court considers the totality of the circumstances faced by the officer at the time of arrest, giving the officer "substantial latitude in interpreting and drawing inferences from factual circumstances." *Royster v. Nichols*, 698 F.3d 681, 688 (8th Cir. 2012). "'When an officer is faced with conflicting information that cannot be immediately resolved, he may have arguable probable cause to arrest a suspect." *Hosea*, 867 F.3d at 956 (quoting *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011)). In considering information given, "an officer need not conduct a 'mini-trial' before effectuating an arrest although he cannot avoid 'minimal further investigation' if it would have exonerated the suspect." *Borgman*, 646 F.3d at 523 (quoting *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999). "Probable cause is a question of law that is determined at the moment the arrest is made, and 'any later developed facts are irrelevant to the probable cause analysis.'" *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017) (quoting *Gilmore v. City of Minneapolis*, 837 F.3d 827, 833 (8th Cir. 2016)); *see also Joseph v. Allen*, 712 F.3d 1222, 1226 (8th Cir. 2013) ("The fact that the person arrested is later found innocent is not material.").

D.    Supervisory Liability

"'When a supervising official who had no direct participation in an alleged constitutional violation is sued for failure to train or supervise the offending actor, the supervisor is entitled to qualified immunity unless plaintiff proves that the supervisor (1) received notice of a pattern of unconstitutional acts committed by a subordinate, and (2) was deliberately indifferent to or authorized those acts.'" *Mendoza v. United States Immigration and Customs Enf't*, 849 F.3d 408, 420 (8th Cir. 2017) (quoting *Krigbaum*,

808 F.3d at 340)).  "This rigorous standard requires proof that the supervisor had notice of a pattern of conduct by the subordinate that violated a clearly established constitutional right" and "allegations of generalized notice are not sufficient."  *Krigbaum*, 808 F.3d at 340.  "When the issue is qualified immunity from individual liability for failure to train or supervise, deliberate indifference is a subjective standard that 'entails a level of culpability equal to the criminal law definition of recklessness.'"  *Id.* at 341 (quoting *B.A.B., Jr. v. Bd. of Educ. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012).  "To be deliberately indifferent, an 'official must both be aware of facts from which the inference could be drawn that a substantial risk of [unconstitutional] harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

There must first be an obvious need for the training before a failure to have it will be considered a constitutional violation.  *Mendoza*, 849 F.3d at 420.  If there is generalized training, lack of particularized training that might have prevented the alleged violation does not establish a constitutional violation.  *Id.*  Liability for failure to supervise will not attach in section 1983 actions unless individual liability is first found on an underlying substantive claim.  *Schoettle v. Jefferson Cty.*, 788 F.3d 855, 861–62 (8th Cir. 2015); *see Moore v. City of Desloge*, 647 F.3d 841, 849 (8th Cir. 2011).

E.    Municipal liability

"In *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993) the Supreme Court made it 'quite clear that, unlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified— under § 1983.'"  *Sample v. City of Woodbury*, 836 F.3d 913, 917 (8th Cir. 2016).  A municipality may be liable under § 1983 "if the governmental body itself 'subjects' a

11

person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."
*Connick v. Thompson*, 563 U.S. 51, 60 (2011).  Municipalities, however, "are responsible
only for 'their own illegal acts.'"  *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479
(1986)).  A municipality cannot be held liable solely because of the acts of its employees,
but "the municipality may be held liable 'when execution of a government's policy or
custom . . . inflicts the injury.'"  *Los Angeles County v. Humphries*, 562 U.S. 29, 36 (2010)
(quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. at 658, 691, 694
(1978)).  A municipality cannot be held liable under on a respondeat superior theory.
*Monell*, 436 U.S. at 694.  *See also Sample*, 836 F.3d at 917 n.3 (holding that
municipalities can only be liable under § 1983 if municipal policy or custom caused the
unconstitutional injury and noting that "immunity from suit and freedom from respondeat
superior liability are separate doctrines").  "Official municipal policy includes the decisions
of a government's lawmakers, the acts of its policymaking officials, and practices so
persistent and widespread as to practically have the force of law."  *Connick*, 563 U.S. at
61.  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a
municipality—a 'policy' as defined by our prior cases—can a city be liable for such a
failure under § 1983."  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Municipal
liability will not attach in section 1983 actions unless individual liability is first found on an
underlying substantive claim.  *Schoettle*, 788 F.3d 855, 861-62 (8th Cir. 2015).

A plaintiff may assert § 1983 claims against a public official acting in his individual
capacity and in his official capacity.  *Hafer v. Melo,* 502 U.S. 21, 27, 30–31 (1991) (stating
"the distinction between official-capacity suits and personal-capacity suits is more than a
mere pleading device").  Because suits against state officials in their official capacity

12

should be treated as suits against the state, the entity's "policy or custom" must have played a part in the violation of federal law. *Id.* The only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses. *Id.* at 31. Only states and arms of the state possess sovereign immunity from suits authorized by federal law. *Northern Ins. Co. of New York v. Chatham County, Ga.,* 547 U.S. 189, 193 (2006). The Supreme Court has repeatedly refused to extend sovereign immunity to counties. *Id.*

    F.    Indemnification

Under Nebraska law, county employees are indemnified for negligent acts in the course of their employment. *See* Neb. Rev. Stat. § 13-1801. That statute provides as follows:

> If any legal action shall be brought against any municipal police officer, constable, county sheriff, deputy sheriff, firefighter, out-of-hospital emergency care provider, or other elected or appointed official of any political subdivision, who is an employee as defined in section 48-115, whether such person is a volunteer or partly paid or fully paid, based upon the negligent error or omission of such person while in the performance of his or her lawful duties, the political subdivision which employs, appoints, or otherwise designates such person an employee is defined in section 48-115 shall defend him or her against such action, and if final judgment is rendered against such person, such political subdivision shall pay such judgment in his or her behalf and shall have no right to restitution from such person.

A political subdivision shall have the right to purchase insurance to indemnify itself in advance against the possibility of such loss under this section, and the insurance company shall have no right of subrogation against the person.

This section shall not be construed to permit a political subdivision to pay for a judgment obtained against a person as a result of illegal acts committed by such person.

Neb. Rev. Stat. § 13-1801.  "The clear language of § 13–1801 limits its scope to the defense of civil actions for damages based upon negligent error or omission on the part of certain public officials." *Guenzel-Handlos v. County of Lancaster*, 655 N.W.2d 384, 388 (Neb. 2003).

Under Nebraska law, the act of an employee is deemed to be within the scope of his or her employment if it is of the kind he or she is employed to perform, it occurred substantially within the authorized time and space limits, and it is actuated, at least in part, by a purpose to serve the master. *Sampson v. Kofoed*, No. 8:08CV107, 2016 WL 7971575, at *14 (D. Neb. Mar. 30, 2016) (citing *Strong v. K & K Investments*, 343 N.W.2d 912, 916, (Neb. 1984)).

III.    DISCUSSION

A.    DOUGLAS COUNTY MUNICIPAL LIABILITY

Douglas County is a Nebraska municipal corporation that operates the Douglas County Sheriff's Office. Filing No. 1, page 2.  As a municipal corporation, Douglas County cannot claim either absolute or qualified immunity under 42 U.S.C. § 1983. *Sample*, 836

F.3d at 917.  However, there remain certain limitations on the DCSO's degree of liability under § 1983.

For a municipality to be liable, it must be due to its "own illegal acts."  Connick, 563 U.S. at 60 (quoting Pembaur, 475 U.S. at 479).  A municipality cannot be liable simply because it "employs the tortfeasor."  Los Angeles County, 562 U.S. at 36 (quoting Monell, 436 U.S. at 691).  As such, Douglas County is not liable solely for Cooper's actions.  However, if the injury was inflicted through the municipality's own "policy or custom," then the DCSO can be held liable.  Id. (quoting Monell, 436 U.S. at 694).  Although there is no evidence in the record supporting that DCSO had an official policy permitting sexual misconduct, an unofficial "custom" or a "deliberately indifferent failure to train or supervise" may also suffice to hold a municipality liable.  Corwin v. City of Independence, MO., 829 F.3d 695, 699-700 (8th Cir. 2016) (citing Monell, 436 U.S. at 691; City of Canton, OH v. Harris, 489 U.S. 378, 389 (1989)).

The court finds that the fifteen instances of sexual misconduct at the DCSO create genuine issues of material fact concerning the municipality's unofficial custom or failure to train or supervise its employees on sexual misconduct.  The DCSO was on notice of these sexual misconduct incidents through the office's complaint and investigation process.  Yet, similar sexual misconduct incidents continued to recur over a nearly twenty-year period.  There is sufficient evidence for a reasonable jury to find that DCSO failed to meaningfully address the incidents by implementing additional training.[4]   Dunning Declaration, ("Dunning Decl.") Filing No. 125-3, Ex. 3, ¶ 86a-m.  Additional training consists of new information or information that was not previously given to the DCSO

---

[4] There was one instance of the fifteen where additional harassment training was given to the DCSO employee.

employee as part of their standard training.  The DCSO deputies' degree of autonomy and lack of supervision also supports the municipality's failure to adequately train or supervise its employees.  For example, DCSO had no policy that supervisors were required to monitor deputies' locations. Dunning Decl., Filing No. 125-3, Ex. 3; Dunning Dep. Filing No. 125-3, Ex. B.  Supervisors also did not compare daily activity reports by deputies with other reports to corroborate them so that if a deputy failed to include information in his daily report, DCSO would have no way to know it.  *Id.*, Ex. B, 29:24-30:8; Martin Deposition ("Martin Dep."), Filing No. 130-2, Ex. 3, 112:8-14.  Indeed, supervisors were not mandated to compare the daily activity report to other types of reports thereby ensuring that every activity in the field was accounted for.  Dunning Decl., Filing No. 125-3, Ex. B, 29:11-30:11.  Furthermore, even though it was DCSO policy that every citizen interaction required the in-car video camera to be turned on, deputies did not always do so because there were no repercussions when they did not.  Cooper Dep., Filing No. 125-2, Ex. 2, 89:8-9.  Finally, although DCSO had the ability to randomly audit deputies in the field while they performed their duties, DCSO did not do so until 2015. Tremblay Report, Filing No. 94-4; Dunning Decl., Filing No. 125-3, Ex. 3, ¶ 66.

There is sufficient evidence for a jury to find that DCSO failed to adequately train or supervise its employees.  Because there are genuine issues of material fact regarding the municipality's liability, a jury's determination of the evidence is appropriate.  Therefore, Douglas County's motion for summary judgment is denied.

B.    SHERIFF TIMOTHY DUNNING IMMUNITY

As a government official, Sheriff Dunning claims qualified immunity as an affirmative defense to McGuire's three counts.  Qualified immunity is a legal question.

16

*Saylor v. Nebraska,* 812 F.3d 637, 642 (8th Cir. 2016) (quoting *Turney v. Waterbury,* 375 F.3d 756, 760 (8th Cir. 2004)).   As such, it is appropriate for this court to consider. Additionally, if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment. *Jones v. McNeese,* 883 F. Supp. 2d 897, 910 (D. Neb. 2012), *rev'd,* 746 F.3d 887 (8th Cir. 2014).

The Eighth Circuit adheres to the standard qualified immunity test, asking 1) whether the facts shown by McGuire make out a violation of a constitutional right, and 2) whether that right was clearly established at the time of Cooper's alleged misconduct. *See*, *Winslow v. Smith*, 696 F.3d 716, 731 (8th Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).   In assessing a government official's immunity from suit, the court must conduct an "individualized analysis" of the officer's alleged behavior. *Krigbaum*, 808 F.3d at 340 (quoting *Walton*, 752 F.3d at 1125).    Dunning cannot be held individually responsible for Cooper's alleged misconduct without additional evidence because a government official can only be held liable for his own behavior. *Parrish*, 594 F.3d at 1001.  McGuire must demonstrate that Dunning had "personal involvement in the alleged violation" committed by Deputy Cooper.  *White*, 865 F.3d at 1081.  *See Dahl v. Weber*, 580 F.3d 730, 733 (8th Cir. 2009); *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006).

To overcome Dunning's qualified immunity defense based on his failure to train or supervise Cooper, McGuire must demonstrate that Dunning 1) noticed a pattern of unconstitutional acts committed by Cooper and 2) was deliberately indifferent to those acts.  *See Mendoza*, 849 F.3d at 420.  Additionally, McGuire must show that Dunning "acted with deliberate indifference" to her rights. *Krigbaum*, 808 F.3d at 341.  The Eighth Circuit defines deliberate indifference as a "subjective standard that entails a level of

17

culpability equal to the criminal law definition of recklessness." *Id.* (quoting *B.A.B., Jr. v. Bd. of Educ. of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012). McGuire must also establish there is a "causal link to, and direct responsibility for, the deprivation of [her Constitutional] rights" by Dunning. *Madewell*, 909 F.2d at 1208.

It is clear from the evidence presented that Sheriff Dunning was personally informed of contact by the Omaha Police Department following the incident in question. It follows that the Sheriff personally decided to not pursue an investigation at that time, relying on OPD to conduct said investigation. Thereafter, defendant Cooper had what appears to be an inappropriate interaction with A.H. and another with E.P. (watching her dress and attempting to get her to meet him at a park rather than arrest her under a pretextual warrant). DCSO then began to investigate Cooper's alleged misconduct although McGuire describes the investigation as minimal. Nonetheless, the investigation uncovered multiple inappropriate behaviors by Cooper.

Sheriff Dunning is notified of every citizen complaint and employee administrative investigation. This is a system created by his own design; he reviews all these complaints; and he is the responsible decision-maker. Sheriff Dunning was notified of other acts of a sexual nature and sexual misconduct by his deputies spanning a number of years, which a jury could find is a pattern and practice of deputies involved in inappropriate sexual misconduct. In fact, as plaintiff points out, Dunning was on actual notice of at least 11 prior complaints of sexual misconduct in his department. McGuire contends that the Sheriff failed to identify the warning signs of these happenings, failed to change its policies, and failed to enhance supervision of his officers. *See* Filing No. 131, at pp. 21–44.

18

Further, McGuire contends that Sheriff Dunning admits that the DCSO did not make sure "that supervisor training comports with DCSO policies.   Ex. 61, Dunning 2/15/17 Dep. at 13:23-14:12."   Filing No. 131, at p. 48, ¶ 71.   In fact, plaintiff contends that Sheriff Dunning had blind faith that his deputies would do the right thing.   Nor was there any in-the-field supervision of the deputies nor any audit of daily activity reports. Deputies were required to fill out interview cards on those they stopped in the field, but Cooper did not do so.   Cooper stated he did not turn on his radio/camera when searching cars, even though it was policy.   However, he was not disciplined for the same nor were his car or video recordings watched, even though they are on desktop screens. Apparently, the supervisors are not trained to do so.   Likewise, there were no audits of GPS data or dispatch records.

McGuire also argues that there is a total lack of policies on sexual misconduct.[5] She contends that this is evidence of deliberate indifference, relying on Filing No. 129, Ex. 45, Ryan Dep. at 131:2-3, 136:15-137:3, 178:9-22; Ex. 16, Tremblay Rebuttal Report at ¶ 29, (citing Sexual Misconduct, Sexual Harassment, and Sexual Discrimination, is subtitled: "Policy v. Custom / Operational Policy & Failure to Have a Policy," at 3, Ryan, John, ©2008 Article published in the free PATC E-Newsletter).   McGuire also lists a number of incidents that she says are indicative of the cavalier attitude and lack of

---

[5] In fact, "Defendants' police practices expert wrote a book chapter and four separate published articles, conducted trainings (since 2002), and drafted a model policy on the subject of sexual misconduct. Ex. 45, Ryan Dep. at 86:10-15, 165:23-166:21, 177:2-178:22, 179:2-25, 189:14-20; 191:5-19, 207:21:208:6; Ex. 75, Ryan Dep. Ex. 10 (2008 Article: Sexual Misconduct, Sexual Harassment, and Sexual Discrimination ("Ryan Article"), Part 1—"Introduction to Sexual Misconduct & Agency Liability"); Ex. 76, Ryan Dep. Ex. 11 to Ryan Dep. (Ryan Article, Part 2—"Policy v. Custom/Operational Policy & Failure to Have a Policy"); Ex. 77, Ryan Dep. Ex. 12 to Ryan Dep. (Ryan Article, Part 3—"Failure to Train & Failure to Supervise"); Ex. 78, Ryan Dep. Ex. 13 (Ryan Article, Part 4—"The Need for Policy and Training, and Avoiding Deliberate Indifference"); Ex. 79, Ryan Dep. Ex. 17 to Ryan Dep. (Training: Sexual Misconduct Involving Law Enforcement and Fire Personnel)."   Filing No. 131, at p. 88.

investigation into serious allegations of sexual misconduct by deputies.  *See* Filing No. 131, at pp. 48-52.

Likewise, there appears to be no specific training for sexual assault and misconduct.  The court agrees that in general it is common knowledge that sexual assault is a crime, but in this case, the plaintiff argues that there is a persistent pattern of this kind of behavior at the DCSO.

For these reasons, the court agrees with the plaintiff that there is sufficient evidence as a matter of law that would enable a jury to find deliberate indifference on the part of Sheriff Dunning.  As such, he is neither entitled to official or individual immunity at this point in the case.  The court's ruling herein does not prejudice the defendant's right to request reconsideration of this ruling at the close of plaintiff's case in chief or at the close of evidence.  However, the claims and evidence made thus far are sufficient to permit this case to proceed to trial.

Viewing the evidence in a light most favorable to McGuire on her due process claim as is required at the summary judgment stage, there is enough evidence to overcome Dunning's qualified immunity defense based on his failure to train and supervise Cooper. Dunning acknowledges that Cooper's conduct violated McGuire's clearly established due process rights.  Filing No. 134.  Additionally, the evidence shows a pattern of sexual misconduct at DCSO.   As Sheriff, Dunning reviewed each allegation of sexual misconduct.  Therefore, Dunning had personal notice of these unconstitutional acts. Because there is plausible evidence that the instances of previous sexual misconduct put Dunning on notice of a pattern of unconstitutional acts, McGuire has satisfied the first prong to overcome Dunning's qualified immunity defense.

20

The record also demonstrates sufficient evidence that Dunning's failure to train or supervise amounted to deliberate indifference to constitutional rights violations committed by his employees.   As supervisor, there is sufficient evidence that Dunning did not consistently monitor his employees or adhere to DCSO procedures.   Dunning Decl., Filing No. 125-3, Ex. 3, ¶ 66; Ex. B, 24:17-24.   This may indicate indifference to his employees' behavior.   *See e.g.*, *Merriweather v. Zamora*, 569 F.3d 307, 318 (6th Cir. 2009) (asserting there was no qualified immunity defense when a supervisor encouraged an atmosphere of disregard for proper procedures).

Dunning also failed to investigate readily accessible DCSO information after he was alerted to the OPD investigation regarding McGuire's sexual assault.   Nebraska county sheriffs make "final policy with regard to law enforcement investigations."   *Dean v. County of Gage, Neb.* 807 F.3d 931, 941 (8th Cir. 2015).   The Eighth Circuit has held that Sheriffs are entitled to qualified immunity when there is no "patently obvious need to train an officer not to sexually assault women," however the court conditions its general rule, "where there is *no* notice at all that such behavior is likely."   *Parrish*, 594 F.3d at 999 (emphasis added).   Unlike in *Parrish*, there is substantial evidence that Dunning has been on notice of sexual misconduct for the past 20 years.   Therefore, Dunning's alleged deliberate indifference to the unconstitutional acts committed by his employees is a question of material fact, and summary judgment is inappropriate.   A reasonable jury could conclude that Dunning was reckless in his disregard for McGuire's constitutional rights.

Finally, there is sufficient evidence of a causal link between Dunning's failure to train or supervise and Cooper's assaultive behavior.   For Dunning to be liable, McGuire

must show Dunning's reckless indifference to not adequately train deputies to sexually assault women caused her sexual assault.  As Dunning was on notice that his lack of training posed a risk that Cooper would commit unconstitutional acts, he can be the direct cause of McGuire's due process violation.  Dunning Decl., Filing No. 125-3, Ex. B, 49:4-13; Cooper Dep., Filing No. 125-2, Ex. 2, 43:3-16.  At this stage in the proceedings, there is some evidence that adequate supervision or training might have prevented the deputy's action. Filing No. 94-4, page 10-11.  Accordingly, the court finds Dunning is not immune from McGuire's due process claim.  Therefore, Dunning's motion for summary judgment is denied.

Similarly, McGuire must have sufficient evidence demonstrating Dunning violated her equal protection rights based on his failure to train or supervise to overcome his qualified immunity.  For the reasons previously stated regarding Dunning's failure to train or supervise Cooper, there is sufficient evidence to overcome Dunning's qualified immunity and hold him deliberately indifferent to his employees' misconduct.  *See Mendoza*, 849 F.3d at 420.  Furthermore, sufficient evidence demonstrates Dunning had notice of deputies that committed gender-motivated sexual misconduct.  Accordingly, the court finds Dunning is not immune from McGuire's equal protection claim.  Therefore, Dunning's motion for summary judgment is denied.

Finally, for McGuire to succeed on her Fourth Amendment claim for failure to train or supervise, she must also overcome Dunning's qualified immunity.  There is sufficient evidence to find that Dunning's training or supervision permitted deputies to conduct unreasonable searches and seizures by seizing citizens without cause and prolonging such exposure.  Cooper Dep., Filing No. 125-2, Ex. 2, 42:17-19.  There is also sufficient

evidence demonstrating Dunning was on notice of a pattern of deputies committing unreasonable searches and seizures, that he may have been deliberately indifferent to those seizures without cause and that his training and supervision caused Cooper to carry out McGuire's unreasonable search and seizure.   *See* Mendoza, 849 F.3d at 420. Accordingly, the court finds Dunning is not immune from McGuire's Fourth Amendment violation claim.  Therefore, Dunning's motion for summary judgment is denied.

C.    INDEMNIFICATION

McGuire's indemnification claim may proceed as liability should be established prior to determining indemnification.  *See* Netherlands Ins. Co. v. Main St. Ingredients, LLC, 745 F.3d 909 (8th Cir. 2014) (asserting the difficulty to indemnify a party when the underlying action did not first establish liability).  As such, it is premature to deal with this claim at this stage in the proceedings.  Moreover, contrary to defendants' assertion, this court will have ancillary jurisdiction over the indemnification claim if a judgment is obtained against them.   The Supreme Court has held that a federal district court possesses ancillary jurisdiction in two situations:  "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 379–80 (1994).  Therefore, Douglas County's motion for summary judgment is denied.

THEREFORE, IT IS ORDERED THAT:

1.   The defendant Douglas County's motion for summary judgment (Filing No. 120) is denied.

2.   The defendant Sheriff Timothy Dunning's motion for summary

judgment (Filing No. 121) is denied.

Dated this 20th day of August, 2018.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge