## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MEGAN MCGUIRE, | ) | |
| | ) | Case No. 8:16-cv-00004 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Senior Judge Joseph Bataillon |
| | ) | |
| CORY COOPER, TIMOTHY DUNNING, | ) | Magistrate Judge Susan M. Bazis |
| Individually and in his official capacity as | ) | |
| Sheriff of Douglas County, Nebraska, and | ) | |
| DOUGLAS COUNTY, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

### PLAINTIFF'S TRIAL BRIEF

Plaintiff, Megan McGuire, through her attorneys, Loevy & Loevy, under

the Court's Order on Final Pretrial Conference (Dckt. 162) submits the

following Trial Brief:

### I.   PLAINTIFF'S CLAIMS

Plaintiff brings claims under 42 U.S.C. § 1983 against Defendants Douglas

County, Douglas County Sheriff Tim Dunning,[1] and former Douglas County

Sheriff's Deputy Cory Cooper to vindicate the violation of her constitutional rights.

The underlying deprivation of Plaintiff's rights stems from Defendant Cooper's

violation of Plaintiff's right to: (1)  equal protection under the law; (2) substantive

due process; and (3) be free from unreasonable search and seizure.

Plaintiff's claims against County Defendants stem from their role in being

the driving force behind their deputy's violation of Plaintiff's rights. Defendant

---

[1] Collectively, Plaintiff will refer to Defendants Douglas County and Dunning as
"County Defendants."

Dunning is liable to Plaintiff because he failed to supervise and train his deputies (including Defendant Cooper) despite having knowledge of the risk of harm that Deputy Cooper and the other officers under his command could abuse their power for their own sexual gratification. Plaintiff, similarly claims that Douglas County is liable because its practices in providing inherently harmful and otherwise deficient training and its utter failure to supervise deputies in its Sheriff's Office, both through woefully inadequate day-to-day supervision and through their failure to hold deputies accountable for abusing their power for sexual purposes, were the driving force behind Defendant Cooper's violation of Plaintiff's rights.

## II.   SUMMARY OF THE FACTS

### A.   Defendant Cooper Violated Plaintiff's Rights[2]

On February 10, 2013, Plaintiff was sitting with her boyfriend, Kyle Worland, in his truck in Zorinsky Park in Omaha, Nebraska. Defendant Cooper was working alone as a Douglas County Sheriff's Office ("DCSO") Deputy that evening. As was a customary practice for Deputy Cooper, he drove to Zorinsky Park to confront people who were lawfully parked in cars there.

Even though he could not see that Plaintiff or Mr. Worland were doing anything unlawful, Cooper got out of his DCSO police car and approached the passenger side of Mr. Worland's truck. He claims that when he got to the truck door

---

[2] The facts in this section are based primarily on Plaintiff's testimony. The evidence related to police records is based on witnesses from Douglas County and/or the Omaha Police Department. County Defendants do not dispute that Deputy Cooper abused his police authority as described below by coercing Plaintiff to engage in an unwanted sexual act. Defendant Cooper disputes that he engaged in that abuse of police authority. He did, however, plead guilty to assault in the third degree.

2

he both smelled burnt marijuana and saw a jar with suspected marijuana in the truck.

Deputy Cooper told Plaintiff to get out of the car and he proceeded to place her in the locked back seat of his police car while he allowed Mr. Worland to remain unsupervised inside his truck. Deputy Cooper sat in the police car with Plaintiff. While he searched the records of the couple through a computer dispatch-records database. Deputy Cooper peppered Plaintiff with questions about her history. He determined that she was a 19-year-old young woman who seemed to him to be naïve and vulnerable.

After spending time alone with Plaintiff in the DCSO police car, Deputy Cooper returned to Mr. Worland while leaving Plaintiff locked in the back of the police car. Cooper asked Mr. Worland whether there was anything illegal in the truck and Worland handed Cooper a jar and said it had marijuana in it. Deputy Cooper then placed Mr. Worland with Plaintiff in the back of the police car as Cooper searched Worland's truck.

After the search, Deputy Cooper came back to the police car and told the couple that he found a marijuana pipe and scale and that the possession of those items could send Mr. Worland to jail. Deputy Cooper, however, allowed Worland to throw the pipe and scale into the lake at the park and to dispose of the suspected marijuana (the jar had fallen off the police car and the plants were crushed into the pavement).

Cooper then took Mr. Worland and placed him, unsupervised, in the

truck again. Cooper then returned to the DCSO police car, where Plaintiff continued to be locked in the back seat. Deputy Cooper, as he had been trained by DCSO, began to threaten the arrest of Mr. Worland while also asking Plaintiff what she could do to prevent that arrest.

County Defendants had trained Deputy Cooper to use this tactic and reaffirmed that the use of it was important "self-initiated activity." County Defendants had not, however, trained Deputy Cooper about the restrictions on this tactic or that they would be monitoring the use of the tactic to make sure that Deputy Cooper did not abuse it. Nor did DCSO train its supervisors to monitor officers' behaviors to ensure that they were not abusing the police powers and procedures provided to them by DCSO.

Plaintiff understood that Deputy Cooper was asking her to provide sexual favors in order for him to not arrest Worland. She tried to put off Cooper by not responding initially and then offering random actions such as jumping in the lake or eating cookies. Undeterred and displeased, Deputy Cooper pushed her harder to offer something he would want from her. Ms. McGuire, whose will was broken, whispered words to the effect of, "You want to see me naked?" Deputy Cooper responded to that suggestion that he would "not say no."

Deputy Cooper peered through the rear-view mirror and watched Plaintiff take off her shirt and bra. After seeing that he could coerce Plaintiff to expose her breasts, Cooper escalated his abuse of power. He got out of the

4

police car and came to the rear door. He opened the back door, unzipped his pants, exposed his penis, and then said, "What else are you going to do?"

Deputy Cooper put his penis in Plaintiff's mouth and after about five seconds of oral sexual gratification, Deputy Cooper told Plaintiff to stop and he removed his penis. Deputy Cooper then told Plaintiff that she could go. As Plaintiff ran to Mr. Worland's truck, Deputy Cooper warned Plaintiff to say nothing, telling her, "this never happened."

At no time during this whole episode did Deputy Cooper notify any dispatcher that he was engaging in this police action with the couple in the park. Nor did he turn on his audio or video recorder equipment. His movement was, however, being tracked by a global positioning system ("GPS") device, though nobody from DCSO was monitoring it. Moreover, he falsified his daily report by claiming (falsely) that at the time he was violating Plaintiff's rights he was providing backup for a (fictitious) Omaha Police Department ("OPD") traffic stop at a different location.

**B.      Consistent with its Practice of Failing to Properly Investigate Sexual Abuse of Power Complaints, DCSO Withheld Key Evidence from OPD[3]**

On or about February 14, 2013, Plaintiff did report Cooper to the Omaha Police Department. As early as February 22, 2013, OPD Sergeant Lance Worley contacted DCSO's only Office of Professional Standards investigator,

---

[3] The evidence to establish the facts in this section are based primarily on testimony from officers in the DCSO and OPD as well as police reports and e-mail messages documenting their activity. Plaintiff intends to call Deputy Cooper's other victims as witnesses as well.

Matt Martin, and reported that Plaintiff had been sexually assaulted by an unknown officer from an unknown agency who abused his police power to threaten her into performing the unwanted sex act. Shortly after that initial report, Martin admitted to OPD that there was a DCSO deputy, Deputy Cooper, who was near Zorinsky Park.

Martin also discussed with Defendant Dunning that Deputy Cooper was near the scene of Zorinsky Park on the night that Plaintiff's rights were violated. Martin, Defendant Dunning, and/or any DCSO supervisor could have pulled the irrefutable evidence that it was Deputy Cooper who had violated Plaintiff's rights—it was in the records of the DCSO. Those records included: (1) documentation that it was Deputy Cooper who ran Plaintiff and Kyle Worland's names through dispatch on February 10, 2013; and (2) GPS data that placed Deputy Cooper's DCSO police car at Zorinsky Park when Plaintiff was there. In fact, that irrefutable evidence was the "big break" in OPD's investigation.

The big break almost never happened. By the end of March 2013, with DCSO sitting on the treasure trove of evidence linking its deputy to the assault, the OPD investigation was going cold. By e-mail on March 29, 2013, OPD told Martin that the case was going nowhere.

On April 1, 2013, another abuse of police power by Deputy Cooper left DCSO no choice but to finally investigate Deputy Cooper—notice of his abuse of power had now moved outside of DCSO control to a 911 dispatcher. As

officers who are trained in investigating sex offenses (as almost all police officers are) know, predators often test systems and victims and escalate their behavior. Deputy Cooper was no exception. On March 24, 2013, Deputy Cooper unsuccessfully used the exact same *modus operandi* that he used with Plaintiff when he tried to coerce a young woman, Autumn Hudnall, into offering something of value in exchange for him not following through on his threat to arrest her. Luckily for Ms. Hudnall, as Cooper used his DCSO training to pressure her to offer him something, an OPD officer pulled up.

On April 1, 2013, Deputy Cooper escalated his behavior when he tried to lure a young woman, Emily Palmer, to a park after dark. He was able to do this because DCSO gave him warrant books with biographical data and photos so he could pick out women to target. Deputy Cooper chose Palmer and went to her apartment. He told her he was going to arrest her, but agreed not to do so; instead telling her that she had to meet him alone in a park after dark. To ensure that she came, he took her driver's license. He also told her not to tell anyone about the plan. Fortunately, Ms. Palmer did call 911 and report to the operator, Karin Crum, what Deputy Cooper was trying to do.

Aware now that someone outside DCSO knew about Deputy Cooper's abuses of power, County Defendants had no choice but to provide to OPD the concrete evidence that it was Cooper who abused Plaintiff. Once that "big break" occurred, OPD was able to conclude its criminal investigation. Deputy Cooper was prosecuted criminally and pled guilty to Attempted Tampering

with Physical Evidence and Assault in the Third Degree.

### C. DCSO Had a Long History of Sexual Abuse of Power Complaints Putting County Defendants on Notice of the Risk[4]

Defendant Dunning has been sheriff of Douglas County for decades. He oversaw a department that had substantial serious complaints related to officers abusing their police power to harass and intimidate women.

In 1998, Defendant Dunning employed an officer who traded cigarettes to a woman in exchange for her showing him her "private parts." Not only did County Defendants not punish that officer or seek his prosecution, they simply let him resign. Compounding that slap on the wrist, County Defendants set about training their officers that serious misconduct like what that officer engaged in would be met only by resignation.

In 2002, County Defendants again were faced with serious abuse of power allegations. One of their deputies was accused of sexually inappropriate behavior with two separate teenage girls. In the first instance, the deputy was accused of holding his teenage step-daughter's arms up and licking her breasts, walking in when the teenager was showering, and asking the teenager to scrub his back while she was in the shower. County Defendants simply accepted that those repeated behaviors were "horseplay." A few months later, that same deputy was accused of taking a teenage girl prisoner to his

---

[4] The evidence to establish the facts in this section are based primarily on police records and testimony from Plaintiff and County Defendants' retained experts, Defendant Dunning, and/or DCSO OPS Investigator Matt Martin.

8

apartment, touching her in a way that made her feel uncomfortable, and then threatening to shoot the girl if she told anyone. Again County Defendants responded to those serious allegations with a slap on the wrist—allowing the deputy to simply resign, without seeking any criminal prosecution or even performing remotely sufficient investigations.

Another repeat offender in abusing police power for sexual purposes was reported twice by women. In the first incident, the deputy harassed a woman at the courthouse saying that she did not look like a minister's wife and that she was "fast." In the second incident, that same deputy on a duty-related call responded to a librarian answering the phone saying that that she could help him by going to a bar with him. That deputy was not disciplined in either incident, nor was he investigated to determine if these were (unlikely) isolated incidents.

County Defendants were also aware of a DCSO deputy who took photographs of a 14-year old girl he did not know, as well as making inappropriate and sexual comments. Multiple witnesses corroborated that abuse of power.

A female prisoner reported to DCSO that a deputy transporting her inappropriately touched her breast and made lewd comments. A review of that investigation file reveals that her allegations were not fully investigated.

County Defendants were made aware of a claim by a woman that a DCSO officer put his hands on her hips and tried to kiss her involuntarily in

an elevator. County Defendants did not even investigate that complaint.

County Defendants also received complaints from multiple women complaining about DCSO deputies asking inappropriate personal questions and talking about their own personal lives during traffic stops.

### D.   DCSO Trained its Officers to Shake Down Women, but not how to Ensure that Officers did not abuse that Tactic[5]

As stated above, Deputy Cooper admits that he was expressly trained by DCSO to ask suspects and loved ones of suspects what those people could do to avoid jail for themselves or their loved ones. This training was not coupled with any training to ensure that the tactic did not lead to abuses.

For instance, there was no training about when this tactic would cross the line or be likely to cross the line. There was no training about limiting the language of this tactic to ensure that women did not feel that they were being pressured to offer sexual acts. There was no training about situations in which this tactic would be inappropriate, such as when a deputy was one-on-one with a person of the opposite sex. There was no training to officers or supervisors that the tactic would be monitored by supervisors to ensure that it did not lead to abuses.

Similarly, County Defendants did not train their officers about the risk of abusing their powers for sexual purposes. Nor did County Defendants train

---

[5] The evidence to establish the facts in this section are based primarily on testimony from Plaintiff's retained expert, Defendant Dunning, Deputy Cooper, and/or DCSO OPS Investigator Matt Martin.

10

their officers or supervisors about conduct that could lead to abuse of power and to have strategies to ensure that the abuse of power did not occur for sexual purposes. County Defendants ignored the subject altogether in training save for training deputies, as described above, that serious sexual abuse of power would lead only to resignation, not prosecution.

### E.   DCSO Failed to Supervise its Officers in the Field and/or Failed to Supervise them by Holding them Accountable for Abusing their Power for Sexual Purposes[6]

In addition to the deficiencies in training and/or training that exacerbated the risk of DCSO officers abusing their power for their own sexual gratification, County Defendants utterly refused to supervise those same officers. Defendant Dunning succinctly summed up County Defendants' supervision strategy as trying to hire good people and then give them the discretion to work. He even admitted helplessness in rooting out misconduct.

That abdication of the responsibility to supervise manifested itself in a department that only gave wide discretion with no oversight. This lack of supervision meant that officers' work was not audited with available data, rules violations were not addressed, deputies were allowed to go silent for hours, reports were not reviewed for content, and officers were not randomly monitored in the field.

---

[6] The evidence to establish the facts in this section are based primarily on testimony from Plaintiff and Defendants' retained experts, Defendant Dunning, Deputy Cooper, DCSO Lieutenant Robert Jones, and/or DCSO OPS Investigator Matt Martin.

On top of the lack of day-to-day supervision, DCSO's Office of Professional Responsibility was not given the resources it needed to do its job. Amazingly, it had only one employee to investigate serious allegations of misconduct. This lack of resources led to inadequate data collection/analysis and superficial investigations.

### F. DCSO Failed to Implement a Policy to Address Officers Abusing Police Power for Sexual Purposes[7]

As identified above, County Defendants improperly trained and supervised DCSO officers. Those failures stem in part from the failure to implement any meaningful policy to equip supervisors to identify behaviors associated with abuse of police power for sexual purposes. Supervisors were not trained about what to look for in order to identify suspected misbehavior. Nor were they trained about how to effectively investigate police activities once suspect behavior was found in order to determine whether the actions were legitimate police actions or were abuses.

Similarly, the lack of a policy notified officers that their actions were not being scrutinized for potential evidence of abuse of authority for sexual purposes. This failure emboldened them to engage in conduct that abused police authority for their own gratification.

## III.  SUMMARY OF THE LAW

### A. Deputy Cooper Violated Ms. McGuire's Rights Under the Equal Protection Clause

In order to prevail in her claims under the Equal Protection Clause, Ms. McGuire must establish that Deputy Cooper intentionally discriminated against her

---

[7] The evidence to establish the facts in this section are based primarily on testimony from Plaintiff and Defendants' retained experts.

because of her gender. *Nolan v. Thompson*, 521 F.3d 983, 989 (8th Cir. 2008). Selective police investigation or harassment of a person may violate her right to equal protection if it flows from an impermissible motive, such as gender. *Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2010) (citing *St. German of Alaska E. Orthodox Catholic Church v. United States*, 840 F.2d 1087, 1095 (2d Cir. 1988)). *See also*, *Wayte v. United States*, 470 U.S. 598, 608, (1985); *Moring v. Ark. Dep't of Corr.*, 243 F.3d 452, 455 (8th Cir. 2001) ("[i]ntentional sexual harassment by persons acting under color of state law violates [the equal protection clause of] the Fourteenth Amendment and is actionable under § 1983."). The facts as identified above related to Deputy Cooper's abuse of his police power meets these elements.

## B. Deputy Cooper Violated Ms. McGuire's Substantive Due Process Rights

In order to prevail on her substantive due process claim, Plaintiff may establish that Deputy Cooper's sexual misconduct rose to the level of a sexual assault. A law enforcement officer's sexual assault violates the victim's substantive due process rights. *Rogers v. City of Little Rock, Ark.*, 152 F.3d 790, 796 (8th Cir. 1998); *Haberthur v. City of Raymore, Missouri*, 119 F.3d 720, 723 (8th Cir. 1997). To prove a sexual assault, Plaintiff may establish that Deputy Cooper caused Plaintiff to engage in unwanted sexual acts. *Id*. The facts as identified above related to Deputy Cooper's abuse of his police power meets these elements.

## C. Deputy Cooper Violated Plaintiff's Right to Be Free from Unreasonable Search and Seizure

To prove that Deputy Cooper seized Plaintiff without cause, immediately

after arriving and/or after he allowed Mr. Worland to dispose of all of the evidence,
Plaintiff must establish that Deputy Cooper had no basis to keep Plaintiff locked in
the back seat of the police car at either point in time. The Fourth Amendment
protects persons from unreasonable searches and seizures. A seizure occurs if a
person does not feel free to leave. *Florida v. Bostick*, 501 U.S. 429, 435, (1991);
*California v. Hodari D.*, 499 U.S. 621, 625 (1991); *Johnson v. Phillips*, 664 F.3d 232
(8th Cir. 2011). An officer may not seize a person without probable cause to believe
that he or she has committed or is committing a crime. *Brinegar v. United States*,
338 U.S. 160, 175 (2003). Being locked in Cooper's DCSO police car constitutes a
seizure for purposes of the Fourth Amendment analysis.

In addition, Deputy Cooper can be found liable if he prolonged his detention
of Plaintiff. To establish an unreasonably prolonged detention, a plaintiff must show
that the officer detained her beyond the amount of time otherwise justified by the
purpose of the stop and did so without proper cause. *United States v. Donelly*, 475
F.3d 946, 951-52 (8th Cir. 2007); *United States v. Martin*, 411 F.3d 998, 1002 (8th
Cir. 2005).

The facts as identified above related to Deputy Cooper's abuse of his police
power meets the above elements.

### D.   Defendant Dunning is Liable Based on a Theory of Supervisory Liability

In order to prevail in her claims alleging supervisory liability against
Defendant Dunning, Plaintiff must establish that: (1) Deputy Cooper violated
Plaintiff's constitutional rights; (2) Defendant Dunning had notice or knew about

the risks of his employees engaging in activities that would result in constitutional deprivations like the ones Plaintiff suffered; and (3) Defendant Dunning implicitly authorized those offending acts or was deliberately indifferent towards these deprivations because despite having knowledge of the risks of abuse of police powers for sexual purposes, he either assisted or approved, or disregarded or ignored the risk; and (4) Defendant Dunning's failure to provide adequate training or supervision caused the violation of the plaintiff's constitutional rights. *Wever v. Lincoln County, Nebraska*, 388 F.3d 601, 606-07 (8th Cir. 2004) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078); *Wagner v. Jones*, 664 F.3d 259, 275 (8th Cir. 2011) (quoting *Ottman v. City of Independence, Mo*., 341 F.3d 751, 761 (8th Cir.2003)); *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014) (to establish liability, plaintiff "must prove [the official] personally knew of the constitutional risk posed by [his] inadequate training or supervision").

The facts as identified above related to Defendant Dunning's notice of the risk of his officers' abuse of authority for sexual purposes, affirmative training that led to that abuse of authority, his deficient training to address the heightened risk of that abuse of authority, and his abdication of his responsibility to supervise his officers to deter and punish the above described abuse of police power satisfies these elements.

**E.     Defendant Douglas County is Liable because its Policies Caused Deputy Cooper to Violate Plaintiff's Rights**

In order to prevail against Defendant Douglas County based on a theory of

Douglas County's policy causing the violation of her rights, Plaintiff must prove that: (1) Deputy Cooper caused Plaintiff to engage in unwanted sexual acts (substantive due process claim) or Deputy Cooper acted against Plaintiff because of her gender (equal protection claim) or Deputy Cooper deprived Plaintiff of her liberty without probable cause (Fourth Amendment claim); (2)  When Deputy Cooper committed at least one of the above acts, it was Douglas County's policy to ignore reports of police sexual misconduct within Douglas County and throughout the country; and (3) The policy caused the violation of the plaintiff's constitutional rights. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978); *Connick v. Thompson*, 563 U.S. 51 (2011); *Bd. of Cnty. Comm'rs of Bryon Cnty., Okl. v. Brown*, 520 U.S. 397 (1997); *Farmer v. Brennan*, 511 U.S 825 (1994); *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986); *Brossart v. Janke*, 859 F.3d 616, 627-28 (8th Cir. 2017) (*petition for cert. filed*, 859 F.3d 616 (Jan. 02, 2018)); *Corwin v. City of Independence, Mo.*, 829 F.3d 695 (8th Cir. 2016); *Hollingsworth v. City of St. Ann*, 800 F.3d 985 (8th Cir. 2015); *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014); *B.A.B., Jr. v. Bd. of Educ. of City of St. Louis*, 698 F.3d 1037, 1040 (8th Cir. 2012); *Szabla v. City of Brooklyn Park*, 486 F.3d 385 389-90 (8th Cir. 2007) (*en banc*); *Mettler v. Whitledge*, 165 F.3d 1197, 1205 (8th Cir. 1999); *Ware v. Jackson County, Mo.*, 150 F.3d 873 (8th Cir. 1998); *Andrews v. Fowler*, 98 F.3d 1069 (8th Cir. 1996); *Tilson v. Forrest City Police Dept.*, 28 F.3d 802 (8th Cir. 1994); *Parrish v. Luckie*, 963 F.2d 201 (8th Cir. 1992); *Tsao v. Desert

*Palace, Inc.*, 698 F.3d 1128 (9th Cir. 2012*); Armstrong v. Squadrito*, 152 F.3d 564 (7th Cir. 1998); *Jones v. City of Chicago*, 787 F.2d 200 (7th Cir. 1986); *Avery v. Burke Cnty.*, 660 F.2d 111 (4th Cir. 1981).

In order to establish proof of Douglas County's policy, Plaintiff must show that Douglas County had an express policy or a widespread practice that is so permanent and widespread that it constituted Douglas County's standard operating procedure or custom. *Id.* A widespread practice may be a custom even if Douglas County has not formally approved it, so long as the plaintiff proves that Douglas County knew of the practice and allowed it to continue. *Id.*

This element includes a situation where Douglas County must have known about a subordinate's actions or failure to act or a decision or policy statement, including a decision not to adopt a needed policy, made by Defendant Sheriff Dunning, who is or was a policymaking officer of Douglas County. *Id.*

Such a decision or policy statement includes his approval of a decision or policy made by someone else or a practice of failing to train, supervise, or discipline employees of the Douglas County Sheriff's Office. *Id.*

The facts as identified above related to Defendant Dunning's notice of the risk of his officers' abuse of authority for sexual purposes, affirmative training that led to that abuse of authority, his deficient training to address the heightened risk of that abuse of authority, and his abdication of his responsibility to supervise his officers to deter and punish the above described abuse of police power satisfies these elements.

**F.      Defendant Douglas County is Liable because its Failure to Train, Supervise, or Discipline its Officers Caused Deputy Cooper to Violate Plaintiff's**

In order to prevail on her claim against Douglas County for a policy of failure to train, supervise, or discipline its employees, Plaintiff must prove each of the following by a greater weight of the evidence: (1) Douglas County's training program was not adequate to address concerns of police sexual misconduct or Douglas County failed to adequately supervise or discipline its employees for acts of police sexual misconduct; (2) Defendant Douglas County Sheriff Dunning knew that it was highly predictable that one or more of Douglas County deputies would engage in unconstitutional acts of sexual misconduct without additional training, adequate supervision, or discipline because there was a pattern of similar constitutional violations or because it was highly predictable; and (3) Defendant Douglas County's failure to provide adequate training or supervision or discipline caused the violation of the Plaintiff's constitutional rights. *Connick v. Thompson*, 563 U.S. 51, 131 S. Ct. 1350, 1365 (2011); *Okl. v. Brown*, 520 U.S. 397 (1997); *City of Canton v. Harris*, 489 U.S. 378, 388-391 (1989) ; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); *Corwin v. City of Independence, Mo.*, 829 F.3d 695, 699-700 (8th Cir. 2016); *Hollingsworth v. City of St. Ann*, 800 F.3d 985 (8th Cir. 2015); *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014); *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013).

The facts as identified above related to Defendant Dunning's notice of the risk of his officers' abuse of authority for sexual purposes, affirmative training that

led to that abuse of authority, his deficient training to address the heightened risk of that abuse of authority, and Douglas County's abdication of its responsibility to supervise DCSO officers to deter the abuse of police power and/or Douglas County's failure to investigate and punish officers for abuse of power for sexual purposes satisfies these elements.

RESPECTFULLY SUBMITTED,

/s/ Mark Loevy-Reyes

*Attorneys for Plaintiff Megan McGuire*

Arthur Loevy
Jon Loevy
Cindy Tsai
Josh Loevy
Mark Loevy-Reyes
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, <u>Cindy Tsai</u>, an attorney, hereby certify that on August 20, 2018, I electronically submitted the foregoing Plaintiff's Trial Brief with the Court and parties via electronic mail to the following:

Senior Judge Joseph Bataillon
bataillon@ned.uscourts.gov

Magistrate Judge Susan M. Bazis
bazis@ned.uscourts.gov

Timothy Dolan
tim.dolan@douglascounty-ne.gov

Meghan Bothe
meghan.bothe@douglascounty-ne.gov

Mr. Cory Cooper
c.cooper.417@gmail.com

<u>/s/ Cindy Tsai</u>
*One of Plaintiff's Attorneys*